**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GAIL CAMPERSON, LLOYD ZIMMERMAN JR., JOHN CAMPERSON, JESSICA ZIMMERMAN, ELIZABETH ZIMMERMAN, RYAN KULES, NANCY KULES, BECKY WETTERSTROM, CHASITY KOKESH, THOMAS KOKESH, JESSIE PERALEZ, CYNTHIA PARLIN as representative for the ESTATE OF SAMUEL PARLIN JR., KRISTEN CHASE, SYDNEY DAVILA, PATRICK FARR, CHAD FARR, SILVER FARR, DONALD BANDHOLD, AMY BOUTHOT SANBORN, JOSEPH BOUTHOT, MARY BETH EHNEY, WILLIAM EHNEY JR., MARCELLA GORSLINE, TAMMY LUFKIN, TAYLOR LUFKIN, LAVENIA REINKE, ELVA ESPINOZA, LUZ MARIA ESTRADA-PULIDO, DONNA ENGEMAN individually and as representative for the ESTATE OF JOHN ENGEMAN, SHELBY WEST, LASHAVIEA FLINT, MATLENE HOWARD, DYAMOND CAPEL, SHURREA DONLEY, RACHEL HOLLAND-HADJIS, GARRETT HOLLAND, DAVID HOLLAND, JOHN HOLLAND, CLAIRE NIESWIADOMY, PATRICIA NIXON, CATHERINE OCHOA, MARY RALYA, RONALD CRABTREE, JONATHAN BEYER, LISA ROSE, HEIDI CROSS, GARY JONES, ALEXANDRIA WORKMAN, MELISSA ALEX, AUSTIN ALEX, AUTUMN ALEX, ZACKERY ALEX, JUDY GORDON, TERESA GORDON, TIFFANY GORDON, MARCALEA SPROUSE, MARIA GRANADOS, DENISSE GRANADOS, LUIS GRANADOS, ROBERTA DAVIS, KEVIN KAVANAGH, ALANNA KAVANAGH, CATHERINE NEEDHAM, ROBI PETERSON, DENISE CULBERTSON, RUSSELL CULBERTSON, BERNADINE DUMAS, CLAUDE DUMAS, ERIC DUMAS, SHAUN DUMAS, DAVID HAINES, DAWN HAINES, COLIN HAINES, MACKENZIE HAINES, CONSTANCE FOYTECK, JULIA FINKEN, GABRIELLA SALCIDO, MAYBELLE

Case No.: 1:26-cv-3345

JURY TRIAL DEMANDED

LUEVANO, PETER E. SALCIDO, ANGELIC BRUBAKER, CRYSANIA SALCIDO, ERIK SALCIDO, PETER SALCIDO, KATHLEEN SALCIDO, SANGSOON KIM, SEOP KIM, MICHELLE KIM, MARK MUNNS as representative for the ESTATE OF JOSHUA MUNNS, ABBIE ROSE SHILLING, KIMBERLEY DONAHUE, SAMANTHA CUBITT, MELISSA SHILLING, CONSTANCE PRIESTAP MURRAY, BRODY PRIESTAP, FRANCHESCA ROCKWELL, CHARLES O'NEAL, JORDAN FISCUS, MALIA BOND, CAROLYN STEINBACHER, PAUL STEINBACHER, CHANTELLE RUSSELL, DOUGLAS DYKMAN, JANICE JOHNSON, MARTHA VOLKER, FERRIS BUTLER, FLOYD GIVEN, DANIEL MCCORMICK, MANUELA LEIJA, DOMINGO LEIJA, DOMINGO LEIJA JR., RAMIRO LEIJA, ROBERT LEIJA, JAN COLLINS, GARY MATHENY, KAREN MATHENY, PAUL MATHENY, ASHLEY DUNKIN, SHALAN WEBB, CHRISTINE WORTMAN, JENNIFER DENGEL, RACHEL MILLER, MADISEN PRATER, CHERYL HURLEY, SHANE PRATER, KATANA RICHARDSON, IYANA RICHARDSON, STEPHEN RICHARDSON JR., SHENANDOAH ARNETTE, COLIN KENNEDY, MICHELLE LINDSEY, LESLIE GENEVIE, AVA TOMSON, RICHARD TOMSON, KAREN FUNCHEON, ROBERT FUNCHEON, TONYA GUYTON, JAIDYN GUYTON, KENYON GUYTON, ANDREA MCDONALD, LARRY GUYTON SR., TIFFANY LITTLE, KYLEE LITTLE, DAKOTA SMITH-LIZOTTE, JENNIFER GABLE, NOEL FONTANILLA, FRANCES QUICHOCHO, LEE CASTRO, CHRISTINE CONCEPCION, KARISSA ROSELYN QUICHOCHO, RAMON QUICHOCHO JR., SAMANTHA HANCOCK, JENNIFER MATZEN, ELLEN WEIGLEIN, SARAH SIMMONS, FARY MALDONADO, DANIELLE SWEET individually and as representative for the ESTATE OF RYAN BALMER, ANTHONY BALMER, GABRIELLE BALMER, MARK BALMER, EMILY ADAMS,

SCOTT HOOD, STEPHANIE HOOD ATHERTON, FLORA HOOD, PATRICIA GRASS, FRANKLIN GRASS, ORA CLIFTON, JOHN LAMIE, BRETT COKE, MARGARET JOHNSON, URSULA JOSHUA, RONALD ETHERIDGE JR., RICHARD GILMORE JR., MEGAN CLEMENT, JENAE MADDIES, VANESSA GUTIERREZ, ANGELINA BOYD, ANIKA SAMUELS, JUBRIEL LAWAL, KENNETH WALKER, CYNTHIA HOCHSTETLER, MARTIN HOCHSTETLER, JONATHAN HOCHSTETLER, MARK HOCHSTETLER, NOAH HOCHSTETLER, GONZALO PAREDES, JAMES REEVES as representative for the ESTATE OF MICHAEL REEVES, MICHELLE AYRES, AYINDE WILLIAMS, SHEENA BANKS-WEST, DEREK BANKS-WEST JR., JANICE VANEK, ANNE ST. MARTIN, ALI SAFI, ELENA SHAW as representative for the ESTATE OF MICAH SHAW, CATHERINE OLMSTED, ANDREW STRAUGHTER, SILVIA BITTON, ELIZABETH BITTON, JACQUELINE BITTON, DEBRA LEVI, EMILY LEVI, KIMBERLEY VESEY, DEMPSEY BENNETT as representative for the ESTATE OF DURRELL BENNETT, KIMBERLY MILLER as representative for the ESTATE OF PATRICK MILLER, ESTHER WOLFER, LEONARD WOLFER, JACQUELINE SMITH, THOMAS SMITH, RACHELLE IDOL as representative for the ESTATE OF RICHARD VAUGHN, ADRIAN MCCANN, DEBORAH WILSON, JESSICA NICHOLS, STEVEN ELLIS, CAMERON ELLIS, JOHN ARAGON SR. as representative for the ESTATE OF JOHN ARAGON, MICHAEL KELLEY, ROSEMARIE FITZMORRIS-CURRIER, EMILY STEVENSON, MARY TOLLEFSON, JAMIE TOLLEFSON, JEFFREY TOLLEFSON, ANGELICA ANDRADE, PRISCILA MONCADA, OBDULIA MONCADA, ALEXANDRA AGUILAR, MIRIAM LOPEZ, DANIELA MONCADA, MATTHEW MONCADA, ROBERT CANINE, JANET JONES, KAREN JAMES, CHERYL LARSON, BRANDY LOSS, WANONIA POLK, MARY POLK, WALTER POLK, ALVIN JONES

III, DEANDRA JONES, XAVIER JONES, STEPHEN EVANS, ATYINIA WILLIAMS, C.W. by and through his next friend Atyinia Williams, THORNELL RHETT, JASON RHETT, HANNAH EVERHART, HAYDEN EVERHART, LINDSAY EVERHART, ABDUL MUGHAL, SITORAI KHASANZOD, ANGELA MUGHAL, HAMID MUGHAL, KHALID MUGHAL, M.M. by and through his next friend Abdul Mughal, NABILA MUGHAL, WILLIAM CHINN, SEAN NIQUETTE, LAUREN NIQUETTE, MARY NIQUETTE, THOMAS NIQUETTE, BRIAN ALLDRIDGE, DIANNA ALLDRIDGE, RONALD ALLDRIDGE, TODD ALLDRIDGE, ANDREW MAJOR, MARCUS SULLEN,

Plaintiffs,

v.

ASTRAZENECA UK LIMITED, ASTRAZENECA PHARMACEUTICALS LP, GE HEALTHCARE USA HOLDING LLC, GE MEDICAL SYSTEMS INFORMATION TECHNOLOGIES, INC., GE MEDICAL SYSTEMS INFORMATION TECHNOLOGIES GMBH, JOHNSON & JOHNSON, CILAG GMBH INTERNATIONAL, ETHICON ENDO-SURGERY, LLC, ETHICON, INC., JANSSEN ORTHO LLC, JANSSEN PHARMACEUTICA N.V., JOHNSON & JOHNSON (MIDDLE EAST) INC., ORTHO BIOLOGICS LLC, PFIZER INC., PFIZER ENTERPRISES SARL, PFIZER PHARMACEUTICALS LLC, PHARMACIA & UPJOHN COMPANY LLC, WYETH PHARMACEUTICALS INC., F. HOFFMANN-LA ROCHE LTD., GENENTECH, INC., HOFFMANN-LA ROCHE INC.,

Defendants.

**COMPLAINT FOR VIOLATION OF THE**
**ANTI-TERRORISM ACT AND STATE LAW**

## TABLE OF CONTENTS

Page

INTRODUCTION .......... 1

THE DEFENDANTS .......... 10

A. The AstraZeneca Defendants .......... 10

B. The GE Defendants .......... 10

C. The J&J Defendants .......... 11

D. The Pfizer Defendants .......... 12

E. The Roche Defendants .......... 12

JURISDICTION AND VENUE .......... 13

SOURCING .......... 14

FACTUAL ALLEGATIONS .......... 15

I. UNDER SADDAM HUSSEIN, THE IRAQI MINISTRY OF HEALTH BECAME A CORRUPT TOOL OF TERRORIST FINANCE .......... 15

II. DEFENDANTS TRANSACTED BUSINESS WITH A POST-SADDAM HEALTH MINISTRY THAT WAS CONTROLLED BY SHIITE TERRORISTS LOYAL TO MUQTADA AL-SADR .......... 19

A. Muqtada al-Sadr, Hezbollah, And The Formation Of Jaysh al-Mahdi .......... 19

B. Jaysh al-Mahdi's Control Of The Health Ministry .......... 23

1. Dr. Adel Muhsin Abdullah al-Khazali (Inspector General of MOH) .......... 28

2. Hakim al-Zamili (Deputy Minister of Health) .......... 30

3. Dr. Ali Bustan al-Fartusi, Dr. Jaleel Hadi al-Shemary, Dr. Hani Mousa Badr al-Uqabi, and Dr. Chasib Latif Ali al-Musawi al-Hajjami (Directors General at MOH) .......... 35

4. Other Senior and Mid-Level Commanders .......... 36

III. DEFENDANTS ENGAGED IN CORRUPT TRANSACTIONS THAT PROVIDED FINANCING TO JAYSH AL-MAHDI .......... 40

A. Jaysh al-Mahdi Raised Money Through Corrupt MOH Contracting Practices .......... 40

B. Defendants Made Corrupt Payments To Jaysh al-Mahdi .................................... 44

1. "Free Goods" Payments .................................................................................. 44

2. "Commission" Payments ................................................................................. 58

IV. DEFENDANTS KNEW OR RECKLESSLY DISREGARDED THAT THEIR TRANSACTIONS HELPED FUND JAYSH AL-MAHDI ATTACKS ON AMERICANS ................................................................................................ 68

A. Defendants' Corrupt Transactions Directly Funded Jaysh al-Mahdi Terrorist Attacks On Americans ........................................................................ 68

B. Defendants Knew Or Recklessly Disregarded That Their Transactions With MOH Financed Terrorism............................................................................. 75

V. EACH DEFENDANT ENGAGED IN COMMERCIAL TRANSACTIONS THAT IT KNEW OR RECKLESSLY DISREGARDED WERE STRUCTURED TO FINANCE JAYSH AL-MAHDI .............................................. 82

A. The AstraZeneca Defendants ............................................................................ 82

1. AstraZeneca Made Corrupt Payments to Jaysh al-Mahdi Members ............. 82

2. AstraZeneca's Corrupt Commercial Transactions Comport with Its Historical Sales Practices in International Markets ....................................... 87

3. AstraZeneca's Corrupt Transactions Had a Substantial Nexus to the United States ............................................................................................ 89

B. The GE Defendants ............................................................................................ 92

1. GE Made Corrupt Payments to Jaysh al-Mahdi Members ............................ 92

2. GE's Corrupt Payments to Jaysh al-Mahdi Members Comport with Its Historical Sales Practices in International Markets ....................................... 96

3. GE's Corrupt Transactions Had a Substantial Nexus to the United States ........................................................................................................... 100

C. The J&J Defendants ......................................................................................... 105

1. J&J Made Corrupt Payments to Jaysh al-Mahdi Members in Connection with the Sale of Medical Devices in Iraq ................................. 105

2. J&J Made Corrupt Payments to Jaysh al-Mahdi Members in Connection with the Sale of Pharmaceuticals in Iraq ................................. 108

3. J&J's Corrupt Payments to Jaysh al-Mahdi Comport with Its Historical Sales Practices in International Markets ..... 112

4. J&J's Corrupt Transactions Had a Substantial Nexus to the United States ..... 116

D. The Pfizer Defendants ..... 119

1. Pfizer Made Corrupt Payments to Jaysh al-Mahdi Members ..... 119

2. Pfizer's Corrupt Transactions with MOH Comport with Its Historical Sales Practices in International Markets ..... 124

3. Pfizer's Corrupt Transactions Had a Substantial Nexus with the United States ..... 126

E. The Roche Defendants ..... 132

1. Roche Made Corrupt Payments to Jaysh al-Mahdi Members ..... 132

2. Roche's Corrupt Transactions with Jaysh al-Mahdi Members Comport with Its Historical Sales Practices in International Markets ..... 136

3. Roche's Corrupt Transactions with MOH Had a Substantial Nexus to the United States ..... 137

VI. JAYSH AL-MAHDI, WITH SUBSTANTIAL SUPPORT FROM HEZBOLLAH, USED DEFENDANTS' RESOURCES TO COMMIT TERRORIST ATTACKS THAT KILLED AND INJURED AMERICANS ..... 141

A. Beginning In 2003, Jaysh al-Mahdi Conducted A Campaign Of Terror Against Americans In Iraq ..... 141

B. Jaysh al-Mahdi Was A Terrorist Enterprise ..... 146

C. Hezbollah Created, Armed, And Trained Jaysh al-Mahdi To Carry Out Terrorist Attacks Against Americans ..... 152

1. Hezbollah Has Orchestrated Campaigns of Terror Against Americans Across the Globe ..... 152

2. Hezbollah Co-Founded Jaysh al-Mahdi with Sadr To Carry Out a Campaign of Terror Against Americans in Iraq ..... 155

3. Hezbollah Authorized Jaysh al-Mahdi's Attacks Against Americans in Iraq ..... 161

4. Hezbollah Planned Jaysh al-Mahdi's Terrorist Attacks Against Americans in Iraq ..... 167

5. Hezbollah Provided Jaysh al-Mahdi with Weapons To Carry Out Terrorist Attacks Against Americans in Iraq ..... 176

VII. JAYSH AL-MAHDI KILLED AND INJURED PLAINTIFFS AND THEIR FAMILY MEMBERS THROUGH ACTS OF INTERNATIONAL TERRORISM THAT WERE PLANNED AND AUTHORIZED BY HEZBOLLAH ..... 177

CLAIMS FOR RELIEF ..... 290

JURY DEMAND ..... 303

PRAYER FOR RELIEF ..... 303

**INTRODUCTION**

1. This lawsuit seeks damages under the federal Anti-Terrorism Act on behalf of American service members and civilians, and their families, who were killed or wounded while serving their country in Iraq between 2005 and 2011. While these men and women worked to rebuild post-war Iraq, they were attacked by a terrorist group funded in part by Defendants' corrupt sales practices. The terrorist-finance mechanism was straightforward: the terrorists openly controlled the Iraqi ministry in charge of importing medical goods, and Defendants – all of which are large Western medical-supply companies – obtained lucrative contracts from that ministry by making corrupt payments to the terrorists who ran it. Those payments aided and abetted terrorism in Iraq by directly financing an Iran-backed, Hezbollah-trained militia that killed or injured thousands of Americans. Through their corrupt arrangements with the terrorists, Defendants also participated in a conspiracy to maintain their collective hegemony over the Iraqi healthcare system. The allegations below are based on more than 12 Confidential Witnesses with direct and indirect knowledge of the alleged facts; public and non-public reports, contracts, and emails; U.S. diplomatic and military cables (as published by *WikiLeaks*); Iraqi market data and regulations; public statements by U.S. and Iraqi government officials; English- and Arabic-language press reports; and Plaintiffs' own recollections.

2. Defendants' transactions were part of a pattern and practice of corrupt business dealings in Iraq dating back to Saddam Hussein. During Saddam's rule and ever since, Iraq has maintained a government-run healthcare system that in theory offers free medical care to all Iraqis. That system of socialized medicine has long given the Iraqi Ministry of Health ("MOH" or "Ministry") and Kimadia (MOH's state-owned import subsidiary) significant leverage over medical-goods suppliers seeking to do business in Iraq. It also has been a recipe for pervasive corruption in the medical-goods procurement process. Under Saddam from 2000-2003, Kimadia

officials used their leverage over foreign suppliers to extract sizable kickbacks on medical-goods contracts awarded under the U.N. Oil-for-Food Program. Most Defendants (or their predecessors or affiliates) made such corrupt payments to Saddam's regime. In doing so, they supplied Saddam's regime with illicit funding in direct contravention of Oil-for-Food Program restrictions designed to prevent Saddam from raising money to finance terrorism abroad.

3. By late 2004, after the collapse of Saddam's government, MOH fell under the control of a Shiite terrorist group known as Jaysh al-Mahdi (Arabic for "The Mahdi Army")[1] whose members swore fealty to anti-American cleric Muqtada al-Sadr. The Jaysh al-Mahdi-controlled MOH functioned more as a terrorist apparatus than a health organization. Public hospitals were converted into terrorist bases where Sunnis were abducted, tortured, and murdered. MOH ambulances transported Jaysh al-Mahdi death squads around Baghdad. Armed terrorists openly patrolled the halls of MOH headquarters in downtown Baghdad, which became too dangerous for Americans to enter and which one percipient witness described as a "Mahdi Army camp." And the Deputy Minister of Health – who conducted Ministry business while surrounded by Jaysh al-Mahdi fighters and weapons – tortured and killed Sadr's enemies with the help of the Ministry's Facilities Protection Service (itself a notorious Jaysh al-Mahdi division). At the same time, Jaysh al-Mahdi nearly destroyed the Iraqi healthcare system by systematically purging secular doctors, commandeering MOH facilities, and looting MOH's inventory for profit. After late 2004, companies selling medical goods to MOH were dealing with a counterparty that was not a genuine medical institution; it was a de facto terrorist group.

4. Despite Jaysh al-Mahdi's open control of MOH, Defendants continued their Saddam-era practice of making corrupt payments to officials inside the Ministry. In or about late

[1] The "Mahdi" is a messianic-like figure in Islam. Depending on the method of translation, English sources sometimes spell Jaysh al-Mahdi as "the Mehdi Army."

2004, Jaysh al-Mahdi implemented a requirement that medical-goods suppliers seeking access to Iraq's lucrative healthcare market pay Jaysh al-Mahdi agents a *Khums*, which is an Islamic concept translating roughly to a 20% religious tax. Companies seeking to win sales contracts from MOH after late 2004 had to pay that tax by providing Jaysh al-Mahdi agents with so-called "commissions" (an Iraqi euphemism for bribes) worth at least one-fifth the contract's value. During this time period, as explained in a contemporaneous memorandum by U.S. government investigators documenting an interview of an MOH source, "official corruption [was] tolerated at the MOH because it ha[d] become the ministry occupied by the Mahdi Army."

5. One common way that Defendants made corrupt payments to Jaysh al-Mahdi agents involved the transfer of "free goods." Under the "free goods" scheme, which was carried over from Oil-for-Food, medical-goods suppliers structured their transactions to provide MOH officials with additional batches of in-kind drugs and equipment, free of charge, on top of the quantities for which MOH had actually paid. Suppliers included those extra goods in the same shipments as the purchased goods and packaged them in a manner conducive to street resale, which ensured that MOH officials could efficiently take the extra goods and monetize them on the black market. Because of the way the contracts were structured, MOH officials did not have to account for such free goods in the national inventory. Jaysh al-Mahdi agents working at MOH were thus able to divert the extra goods and re-sell them for cash at sizeable mark-ups.

6. Another common way that Defendants made corrupt payments to Jaysh al-Mahdi agents was through commercially unreasonable clauses drafted into MOH contracts. Under this scheme, also carried over from Oil-for-Food, suppliers bribed MOH officials by funneling cash payments through their corrupt local agents. In theory, companies promised to provide MOH with after-sales support and other services ostensibly related to the product they sold, and they

funded those ostensible services by giving money to their local agents. In reality, such services were illusory and functioned merely to create a slush fund the local agents could use to pass on "commissions" to corrupt MOH officials.

7. Defendants used both techniques to finance Jaysh al-Mahdi throughout the period between 2004 and 2013, much as they had previously used them to finance Saddam's regime under Oil-for-Food. Plaintiffs have obtained specific evidence of many of Defendants' corrupt payments in connection with their MOH contracts, including documents memorializing such payments; contract numbers corresponding to Defendants' corrupt transactions; and particular percentages of "free goods" that Defendants delivered to MOH officials.

8. Defendants' corrupt transactions aided and abetted Jaysh al-Mahdi's terrorist operations against Americans in Iraq. Control of MOH, and the illicit revenue that came with it, was essential to Jaysh al-Mahdi's terrorist machine: in the words of one MOH insider, Kimadia was Sadr's "gold mine" that Jaysh al-Mahdi used to "finance their empire" in Iraq. Cash bribes provided to Jaysh al-Mahdi agents within MOH flowed directly into Jaysh al-Mahdi's coffers and helped the militia buy weapons, training, and logistical support for its terrorist attacks. Similarly, Defendants' provision of "free goods" to MOH officials gave Jaysh al-Mahdi agents valuable cash equivalents they used to fund attacks. Regional and local black markets provided ample opportunities to re-sell such drugs and devices; as the U.S. Embassy in Baghdad explained in a sensitive-but-unclassified 2006 report, Jaysh al-Mahdi relied on those black markets to "finance[] operations from diverted medicines." Indeed, concerns about Jaysh al-Mahdi's use of MOH to finance terrorist attacks prompted Coalition forces to raid MOH headquarters in February 2007 and arrest the Deputy Minister of Health for "orchestrat[ing] several kickback schemes" to "funnel[] millions of U.S. dollars to militia elements."

9. Defendants' corrupt transactions with MOH also aided and abetted terrorism by supplying Jaysh al-Mahdi with the means to pay its rank-and-file terrorist fighters. Some U.S. government personnel in Iraq called Jaysh al-Mahdi "The Pill Army," because Sadr and his Jaysh al-Mahdi commanders were notorious for paying their terrorist fighters in diverted pharmaceuticals, rather than cash. Those fighters – most of whom were poor, uneducated, young Shi'a men – accepted such payment because they could re-sell the free drugs on the street or could consume the pills themselves as a form of intoxication. This payment-in-pills scheme, which helped Jaysh al-Mahdi retain its legion of impoverished terrorist fighters, depended on the large volumes of divertible drugs that Defendants delivered to the terrorist-run MOH.

10. Defendants knew or recklessly disregarded that their corrupt transactions helped finance Jaysh al-Mahdi's terrorist attacks on Americans. Defendants' agents negotiated and memorialized those transactions at in-person meetings inside the Ministry's headquarters building in Baghdad, where their physical surroundings made clear that they were dealing with terrorists. Beginning in late 2004, the MOH headquarters building was decorated with hundreds of pictures of known terrorist Muqtada al-Sadr (often joined by his famous, martyred Grand Ayatollah father) alongside Shi'a terrorist slogans declaring "Death to America." The entrance to the building also contained a large mural paying homage to the Sadr family next to the unmistakable, all-black terrorist flag of Jaysh al-Mahdi. As *USA Today* reported in 2008, such Sadrist terrorist propaganda throughout the Ministry "remove[d] any doubts about who runs the place." Companies whose agents memorialized their corrupt transactions in the shadow of jihadist propaganda paying homage to Jaysh al-Mahdi's world-famous terrorist leader assuredly knew (or at least consciously overlooked) whom their transactions were benefiting.

11. Jaysh al-Mahdi's control of MOH also received extensive press coverage that Defendants knew about or recklessly disregarded. Beginning in 2005, public reports repeatedly documented the link between Sadr's terrorist militia and the MOH procurement process: major newspapers reported that MOH had fallen "under the control of the Shia cleric Moqtada al-Sadr"; that Sadrist MOH officials oversaw "the diversion of millions of dollars to a Shiite Muslim militia"; and that medical supplies were routinely "siphoned off and sold elsewhere for profit because of corruption in the Iraqi Ministry of Health," which was "in the 'grip' of the Mahdi Army." Those reported facts led to the highly publicized arrest and trial of the Deputy Minister of Health (himself a famously corrupt and violent Jaysh al-Mahdi commander), who was acquitted only after Jaysh al-Mahdi intimidated the witnesses into recanting. All of this was major, international news that Defendants could not have overlooked in good faith.

12. Defendants did not merely tolerate Jaysh al-Mahdi's control of MOH; they preferred it. Many of Defendants' drugs and medical devices had less expensive generic alternatives, which MOH could have purchased from Defendants' competitors at lower cost for the benefit of the Iraqi people. But for as long as Jaysh al-Mahdi remained in control of MOH, it favored Defendants' higher-priced drugs and devices because higher prices meant larger bribes and more free goods for the terrorists. Defendants thus conspired with Jaysh al-Mahdi to increase the cost of medical care in Iraq—with Defendants and the terrorists sharing the spoils. These powerful motivations converged on a shared objective: to keep Jaysh al-Mahdi in control and maintain the parties' collective hegemony over Iraq's lucrative healthcare system. Defendants accordingly entered into a conspiracy with Jaysh al-Mahdi to maintain the terrorists' control over the Iraqi healthcare system, and Jaysh al-Mahdi's terrorism furthered their conspiracy by making

it more difficult for the Americans to oust Jaysh al-Mahdi and reform the corrupt system from which Defendants and the terrorists were both benefitting.

13. Defendants' contacts with the United States were essential to their financing of Jaysh al-Mahdi. Each Defendant is part of a globally integrated company with a significant presence in the United States, and all but AstraZeneca and Roche maintain their worldwide headquarters in the United States. In some cases, Defendants contracted with MOH through American companies, with those American companies negotiating with Kimadia and executing the corrupt transactions. Because Kimadia insisted on doing business in U.S. dollars, Defendants also generally used the New York banking system to pay for letters of credit guaranteeing their corrupt transactions. And, in all cases, Defendants' corrupt transactions relied at least in part on goods sourced from U.S. facilities that they touted as a key component of their global supply networks. Indeed, many of Defendants' most valuable goods – and thus the goods most attractive to Jaysh al-Mahdi agents looking to profit on the black market – were manufactured by American affiliates in the United States. Because the terrorists placed a premium on obtaining (and re-selling) such American-made goods, they demanded that Defendants memorialize their goods' country of origin in the contracting documents. Defendants thus often had to certify their connection to the United States as a condition of obtaining the corrupt sales contracts at issue.

14. The Jaysh al-Mahdi attacks that Defendants' corrupt payments aided and abetted were acts of "international terrorism." 18 U.S.C. § 2333(a). Sadr, working with Hezbollah, founded Jaysh al-Mahdi in 2003 as an Islamic militia whose primary goal was to expel Americans from Iraq. In furtherance of that goal, Jaysh al-Mahdi waged a violent campaign that involved an array of asymmetrical terrorist tactics: Jaysh al-Mahdi fighters attacked civilians and service members indiscriminately; engaged in mass sectarian cleansing; targeted medics in

attacks; conducted kidnappings, torture, and executions; and hid from U.S. troops in mosques, schools, ambulances, and hospitals. In reaction to such tactics, the Pentagon's press service referred to Sadr's militia as "the Jaysh al-Mahdi terrorist organization."

15. In total, Jaysh al-Mahdi's terrorist attacks throughout Iraq likely killed more than 500 Americans and wounded thousands more – likely making it responsible for more American casualties in Iraq than any other terrorist group. That prompted the U.S. military leadership to observe in 2007 that Jaysh al-Mahdi was "more of a hindrance to long-term security in Iraq than [Al-Qaeda in Iraq]," the Sunni terrorist group that became ISIS.

16. Jaysh al-Mahdi's terrorist attacks against Americans in Iraq were "planned" and "authorized" by Hezbollah, 18 U.S.C. § 2333(d), the militant Lebanese terrorist group that the U.S. State Department has designated as a Foreign Terrorist Organization since 1997. In April 2003, Hezbollah dispatched to Iraq its chief terrorist mastermind, Imad Mugniyeh, to help Sadr found Jaysh al-Mahdi. Mugniyeh and other Hezbollah operatives subsequently recruited, trained, and equipped Jaysh al-Mahdi terrorists to carry out attacks against Americans in Iraq. At the same time, both Hezbollah's Secretary-General and its Grand Ayatollah spiritual leader publicly called on Iraqi Shi'a to join Jaysh al-Mahdi in its attacks against Americans in Iraq. Hezbollah's training, weapons, and personnel – along with the moral and religious authority provided by Hezbollah's incitement of Shiite religious violence in Iraq – were essential to Jaysh al-Mahdi's terrorist campaign. As thousands of Jaysh al-Mahdi terrorists declared during a 2006 rally in Sadr City, while marching under the Hezbollah flag: "We are Hezbollah."

17. Plaintiffs are U.S. citizens, and their family members, who served their country in Iraq between 2005 and 2011 and who were killed or wounded in terrorist attacks for which Jaysh al-Mahdi was responsible. As alleged below, Plaintiffs are entitled to recover for their injuries

under the federal Anti-Terrorism Act ("ATA") and state law. Defendants violated the ATA by structuring their transactions with MOH to make payments to Jaysh al-Mahdi members who they knew or recklessly disregarded would use such payments to help fund terrorist attacks on Americans in Iraq. Specifically, Defendants are liable under the ATA, 18 U.S.C. § 2333(d), for aiding and abetting Jaysh al-Mahdi's campaign to commit terrorist attacks in Iraq that were planned and authorized by Hezbollah, a designated Foreign Terrorist Organization. Additionally, Defendants are liable under the ATA, 18 U.S.C. § 2333(a), as courts have construed it, for supporting Jaysh al-Mahdi in violation of U.S. criminal law.

## THE DEFENDANTS

### A. The AstraZeneca Defendants

18. Defendant AstraZeneca UK Limited is a wholly owned subsidiary of AstraZeneca plc (collectively with its subsidiaries and affiliates, "AstraZeneca"), which is headquartered in the United Kingdom and whose American Depository Receipts trade on the New York Stock Exchange ("NYSE") under the ticker symbol AZN. AstraZeneca UK Limited is incorporated in the United Kingdom, and its principal place of business is in London, England.

19. Defendant AstraZeneca Pharmaceuticals LP is a wholly owned subsidiary of AstraZeneca plc. It is incorporated in Delaware, and its principal place of business is in Wilmington, Delaware.

### B. The GE Defendants

20. Defendant GE Healthcare USA Holding LLC is a wholly owned subsidiary of General Electric Company (collectively with its subsidiaries and affiliates, "GE"), which is publicly traded on the NYSE under the ticker symbol GE. GE Healthcare USA Holding LLC is incorporated in Delaware, and its principal place of business is in Arlington Heights, Illinois.

21. Defendant GE Medical Systems Information Technologies, Inc. is a wholly owned subsidiary of General Electric Company. GE Medical Systems Information Technologies, Inc. is incorporated in Wisconsin, and its principal place of business is in Milwaukee, Wisconsin.

22. Defendant GE Medical Systems Information Technologies GmbH is a wholly owned, indirect subsidiary of General Electric Company. GE Medical Systems Information Technologies GmbH is incorporated in Germany, and its principal place of business is in Freiburg, Germany.

**C. The J&J Defendants**

23. Defendant Johnson & Johnson (collectively with its subsidiaries, "J&J") is publicly traded on the NYSE under the ticker symbol JNJ. Johnson & Johnson is incorporated in Delaware, and its principal place of business is in New Brunswick, New Jersey.

24. Defendant Cilag GmbH International ("Cilag") is a wholly owned subsidiary of Johnson & Johnson. It is incorporated in Switzerland, and its principal place of business is in Zug, Switzerland.

25. Defendant Ethicon Endo-Surgery, LLC is a wholly owned subsidiary of Johnson & Johnson. It is incorporated in Delaware, and its principal place of business is in Guaynabo, Puerto Rico.

26. Defendant Ethicon, Inc. is a wholly owned subsidiary of Johnson & Johnson. It is incorporated in New Jersey, and its principal place of business is in Somerville, New Jersey.

27. Defendant Janssen Ortho LLC is a wholly owned subsidiary of Johnson & Johnson. It is incorporated in Delaware, and its principal place of business is in Gurabo, Puerto Rico.

28. Defendant Janssen Pharmaceutica N.V. is a wholly owned subsidiary of Johnson & Johnson. It is incorporated in Belgium, and its principal place of business is in Beerse, Belgium.

29. Defendant Johnson & Johnson (Middle East) Inc. ("J&J Middle East") is a wholly owned subsidiary of Johnson & Johnson. It is incorporated in New Jersey, and its principal place of business is in Dubai, United Arab Emirates.

30. Defendant Ortho Biologics LLC is a wholly owned subsidiary of Johnson & Johnson. It is incorporated in Delaware, and its principal place of business is in Manatí, Puerto Rico.

**D. The Pfizer Defendants**

31. Defendant Pfizer Inc. (collectively with its subsidiaries, "Pfizer") is publicly traded on the NYSE under the ticker symbol PFE. Pfizer Inc. is incorporated in Delaware, and its principal place of business is in New York, New York.

32. Defendant Pfizer Enterprises SARL is a wholly owned subsidiary of Pfizer Inc. It is incorporated in Belgium, and its principal place of business is in Luxembourg.

33. Defendant Pfizer Pharmaceuticals LLC is a wholly owned subsidiary of Pfizer Inc. It is incorporated in Delaware, and its principal place of business is in Barceloneta, Puerto Rico.

34. Defendant Pharmacia & Upjohn Company LLC is a wholly owned subsidiary of Pfizer Inc. It is incorporated in Delaware, and its principal place of business is in Kalamazoo, Michigan.

35. Defendant Wyeth Pharmaceuticals Inc. is a wholly owned subsidiary of Pfizer Inc. It is incorporated in Delaware, and its principal place of business is in Collegeville, Pennsylvania. Pfizer acquired Wyeth Pharmaceuticals Inc. as part of a January 2009 merger in which Pfizer Inc. purchased Wyeth and its subsidiaries (collectively, "Wyeth").

**E. The Roche Defendants**

36. Defendant F. Hoffmann-La Roche Ltd. is a wholly owned subsidiary of Roche Holding Ltd. (collectively with its subsidiaries and affiliates, "Roche"), which is headquartered in Switzerland and whose American Depository Receipts trade on OTCQX International Premier under the ticker symbol RHHBY. F. Hoffmann-La Roche Ltd. is incorporated in Switzerland, and its principal place of business is in Basel, Switzerland.

37. Defendant Genentech, Inc. ("Genentech") is a wholly owned subsidiary of Roche Holding Ltd. Genentech is incorporated in Delaware, and its principal place of business is in

South San Francisco, California. Roche has owned a majority stake in Genentech since 1990, and it acquired Genentech in its entirety pursuant to a March 2009 merger agreement.

38. Defendant Hoffmann-La Roche Inc. is a wholly owned subsidiary of Roche Holding Ltd. Hoffmann-La Roche Inc. is incorporated in New Jersey, and its principal place of business is in Nutley, New Jersey.

## JURISDICTION AND VENUE

39. This Court has subject-matter jurisdiction over Plaintiffs' federal-law claims under 18 U.S.C. § 2338 and 28 U.S.C. § 1331. It has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367.

40. This Court has personal jurisdiction over each of the Defendants under Federal Rule of Civil Procedure 4(k)(1)(C) and/or 4(k)(2), and 18 U.S.C. § 2334(a).

41. Venue is proper in this District under 18 U.S.C. § 2334(a) because Plaintiffs Hayden Everhart and Lindsay Everhart reside in the District.

**SOURCING**

42. The factual allegations that follow are based on an extensive investigation drawing on a broad array of public and non-public information, including evidence obtained from more than 12 Confidential Witnesses with direct and indirect knowledge of the alleged facts; public and non-public reports, contracts, and emails; U.S. diplomatic and military cables (as published by *WikiLeaks*); Iraqi market data and regulations; public statements by U.S. and Iraqi government officials; English- and Arabic-language press reports; and Plaintiffs' own recollections. For allegations that quote or paraphrase directly from a publicly available document, this Complaint typically cites the source in a footnote. For other allegations, such as those based on Confidential Witness interviews or non-public documents, the Complaint does not expressly identify the basis of the allegation, in an effort to protect Plaintiffs' sources.

43. Many of Plaintiffs' Confidential Witnesses harbor a well-founded fear for their physical safety, based on their current or former ties to Iraq or other Shi'a-majority countries. The last time witnesses came forward to testify against one of the Jaysh al-Mahdi terrorists who effectively ran MOH, they received death threats against themselves and their families. Many of Plaintiffs' Confidential Witnesses have expressed serious concern that any public allegations traceable to them could invite a similar result here. For that reason, Plaintiffs have withheld details tying specific allegations to particular Confidential Witnesses – as well as details tying allegations to particular sensitive documents – so as not to provide terrorists with the means to piece together their identities.

44. Plaintiffs' Confidential Witnesses have offered an array of first-hand perspectives on various aspects of the terrorist-financing scheme alleged below. Those witnesses include MOH employees with experience inside the Ministry across various time periods since 2003; other Iraqi officials who personally interacted with corrupt MOH employees doubling as Jaysh

al-Mahdi terrorists; former U.S. officials stationed in Iraq with responsibility for various facets of U.S. policy involving MOH and corruption, both during reconstruction and afterwards; and a civilian security contractor deployed to protect U.S. government personnel, who gained extensive tactical experience around MOH and in Jaysh al-Mahdi-controlled neighborhoods. The following allegations are based in part on those witnesses' observations and recollections, corroborated by public and non-public documents and press reports.

## FACTUAL ALLEGATIONS

### I. UNDER SADDAM HUSSEIN, THE IRAQI MINISTRY OF HEALTH BECAME A CORRUPT TOOL OF TERRORIST FINANCE

45. Defendants' transactions with MOH relied on a corrupt procurement process originally created under Saddam Hussein's regime. That corrupt system laid the groundwork for how Defendants funded terrorist attacks through MOH after Saddam's overthrow. The following nine paragraphs of this Complaint describe that background.

46. Saddam, the head of the secularist Sunni Ba'ath Party, ascended to power in Iraq in 1979. On August 2, 1990, Saddam's military invaded Kuwait, which sparked the first Gulf War and led the U.N. Security Council to impose trade sanctions on Iraq. The U.N. later adopted Resolution 986, which relaxed those sanctions and authorized Iraq to sell oil on the condition that the proceeds be deposited in a U.N.-monitored bank account and be used only to purchase designated humanitarian goods. This program was known as the "Oil-for-Food Program."

47. By mid-2000, Saddam's regime had implemented a scheme to subvert the Oil-for-Food Program by extracting corrupt payments from so-called "humanitarian-goods suppliers" like Defendants. The resulting scandal prompted congressional hearings in both the House and the Senate, resulted in a 623-page report by a U.N.-commissioned Independent Inquiry

Committee led by Paul Volcker ("*Volcker Report*"),[2] and was called by one Congressman "the biggest scandal in the history of the U.N. and one of the greatest financial scandals of modern times."[3] All told, Saddam's regime obtained more than $1.5 billion in illicit income from so-called "humanitarian-goods suppliers" under the Oil-for-Food Program.[4]

48. The Oil-for-Food scandal included transactions involving MOH, which – through Kimadia, its subsidiary import company that had a monopoly over all public medical-goods imports in Iraq – was responsible for importing drugs and devices using revenues that Iraq derived from its U.N.-approved oil sales under the Oil-for-Food Program.

49. MOH generally, and Kimadia specifically, was widely understood to be one of the most corrupt agencies of Saddam's regime. As one account summarized the 2004 observations of a U.S. military advisor with post-invasion responsibility for Kimadia operations, Kimadia "operated as a top-down 'controlled system of allocation' under Saddam Hussein, and was, by all counts, totally and utterly corrupt."[5] An analysis of Kimadia prepared in mid-2003 for USAID likewise reported a widespread sentiment among Kimadia mid-level employees that "the system is very corrupt both above an[d] below their authority."[6] For that reason, the U.S. government in 2003 and 2004 attempted to abolish Kimadia and replace it with a transparent, free-market procurement system, but encountered Iraqi opposition and was unable to cure Kimadia's entrenched corruption before handing sovereignty back to the Iraqis.

---

[2] Paul A. Volcker *et al.*, *Manipulation of the Oil-for-Food Programme by the Iraqi Regime* (Oct. 27, 2005) ("*Volcker Report*").

[3] 151 Cong. Rec. H4704 (daily ed. June 17, 2005) (statement of Rep. John Sullivan).

[4] *Volcker Report* at 4.

[5] Brandon Sprague & Adam Shemper, *Baghdad's Shame*, Salon (Aug. 28, 2003).

[6] Abt Associates, Inc., *Situational Analysis Report for Kimadia* 8, USAID Contract No. RAN-C-00-03-00010-00 (July 11, 2003).

50. Kimadia employed a number of different measures to obtain corrupt payments from medical-goods suppliers under Oil-for-Food. Most common was the use of post-sale, maintenance, and warranty fees, which later became known as "After Sales Service Fees" ("ASSFs") – a practice that spawned an international scandal and numerous Foreign Corrupt Practices Act ("FCPA") enforcement actions.[7] Saddam's regime imposed a 10% After Sales Service Fee as "a mandatory kickback to be paid by all suppliers" from 2000 through 2003.[8] Saddam's regime collected these payments from suppliers ostensibly to pay for post-sale services, but in reality they simply gave his regime illicit cash flow free of U.N. oversight. According to the Volcker Commission, Saddam sometimes collected ASSFs without memorializing them in the actual sales contracts: the "ten percent fee" was often paid "without labeling it an 'after-sales-service' fee or without inserting an after-sales-service provision in the applicable contract."[9] Suppliers typically concealed such fees on their books by routing them through third-party "consultants" or distributors who acted as their sales agents in Iraq.

51. Saddam's Kimadia also devised a second, equally potent scheme to extract corrupt payments from foreign suppliers. This second scheme worked much like the first, except that the bribes were paid in the form of goods rather than cash. Under this "free goods" scheme, suppliers provided free, in-kind drugs and equipment to Kimadia officials in quantities equal to

---

[7] *See* Compl. ¶ 1, *SEC v. Textron Inc.*, No. 07-cv-01505 (D.D.C. filed Aug. 23, 2007), ECF No. 1; Compl. ¶ 1, *SEC v. Novo Nordisk A/S*, No. 09-cv-00862 (D.D.C. filed May 11, 2009), ECF No. 1 ("*Novo Nordisk FCPA* Compl."); Compl. ¶¶ 2-3, *SEC v. Innospec, Inc.*, No. 10-cv-00448 (D.D.C. filed Mar. 17, 2010), ECF No. 1; Compl. ¶¶ 1-3, *SEC v. Gen. Elec. Co.*, No. 10-cv-01258 (D.D.C. July 27, 2010), ECF No. 1 ("*GE FCPA* Compl."); Compl. ¶¶ 33-41, *SEC v. ABB Ltd.*, No. 10-cv-01648 (D.D.C. filed Sept. 29, 2010), ECF No. 1; Compl. ¶¶ 51-60, *SEC v. Johnson & Johnson*, No. 11-cv-00686 (D.D.C. filed Apr. 8, 2011), ECF No. 1 ("*J&J FCPA* Compl."); Deferred Prosecution Agreement, *United States v. DePuy, Inc.*, Case No. 11-cr-00099-RBW (D.D.C. filed Apr. 8, 2011), ECF No. 1-1 ("*J&J DPA*"); Deferred Prosecution Agreement, *United States v. Weatherford Int'l Ltd.*, No. 13-cr-733 (S.D. Tex. filed Nov. 26, 2013), ECF No. 4.

[8] *Volcker Report* at 276.

[9] *Id.* at 249.

10% of the underlying contract. For example, if Kimadia contracted with a medical-supply company to buy one million units of Product A, the company would provide, free of charge, an extra 100,000 units of Product A on top of the 1 million units that had been purchased. The company would include those "free goods" in the same shipments as the underlying contracted-for goods and package them in a manner conducive to street resale – which ensured that Kimadia officials could divert the extra goods to the black market. Once diverted, the goods were resold at a markup, with corrupt Kimadia employees and their Ba'athist patrons reaping the profits.

52. The "free goods" scheme under Oil-for-Food was confirmed in a published journal article written by a former U.S. Army officer and medical logistician assigned to MOH under the Coalition Provisional Authority ("CPA").[10] The article appeared in *Contract Management*, a prominent procurement-logistics journal that is "the world's leading professional resource for those in the field of contract management."[11] The article explained that "10 percent free goods was another way the corrupt regime exploited the [Oil-for-Food Program]": the extra "free goods," by design, did not "make it into the Iraqi inventory," but instead often "traveled back across Iraqi borders to neighboring countries" for sale on black markets "at 100-1000 percent above the sale prices within the Iraqi health system."[12]

53. The U.S. government alleged the use of free goods to bribe Iraqi officials under Oil-for-Food. For example, according to the Securities and Exchange Commission ("SEC"), a GE subsidiary made substantial "in-kind kickback payments" on cardiology equipment to

---

[10] *See Pre-liberation Iraqi Procurement Processes*, 45 Contract Mgmt. 44 (July 2005) ("*Contract Management*").

[11] Nat'l Contract Mgmt. Ass'n, *Publications*, http://www.ncmahq.org/stay-informed/publications; Nat'l Contract Mgmt. Ass'n, *What Is NCMA?*, http://www.ncmahq.org/discover-our-profession/what-is-ncma.

[12] *Contract Management* at 48.

Saddam's Kimadia.[13] The GE subsidiary actually refused to pay the standard ASSFs in the form of "cash payments to the Iraqi ministry," but it "acquiesced" to making effectively the same payment using "in-kind" goods – which it included in the contract free of charge.[14] As with the cash payments, the free goods were funneled to MOH officials through a corrupt local sales agent and mischaracterized on the seller's books and records as a legitimate agent commission.[15]

54. Defendants made these corrupt payments to Saddam's regime even though the public purpose of the international sanctions program (which Defendants' corrupt transactions circumvented) was to choke off Saddam's ability to finance terrorist activities.[16] In fact, it was widely reported that Saddam used the illicit revenue obtained from corrupt foreign suppliers through the Oil-for-Food Program to finance international terrorist attacks.[17]

## II. DEFENDANTS TRANSACTED BUSINESS WITH A POST-SADDAM HEALTH MINISTRY THAT WAS CONTROLLED BY SHIITE TERRORISTS LOYAL TO MUQTADA AL-SADR

### A. Muqtada al-Sadr, Hezbollah, And The Formation Of Jaysh al-Mahdi

55. On March 19, 2003, the United States invaded Iraq. U.S. troops seized control of Baghdad less than three weeks later, and on April 9, 2003, Saddam's government fell. Shortly

---

[13] *GE FCPA* Compl. ¶ 23.

[14] *Id.* ¶ 24.

[15] *See id.* ¶¶ 25-28.

[16] *See* Iran Sanctions Act of 1990, Pub L. No. 101-513, § 586F(c)(1), 104 Stat. 1979, 2051 (Iraq sanctions imposed on "a country which has repeatedly provided support for acts of international terrorism"); Determination Iraq, 55 Fed. Reg. 37,793 (Sept. 13, 1990) (determining that "Iraq is a country which has repeatedly provided support for acts of international terrorism").

[17] *See*, *e.g.*, Cynthia R. Fagen, *Iraq's Oil for Terror; $72 Million to Palestinians*, N.Y. Post (Oct. 17, 2004) ("Saddam Hussein secretly bankrolled a notorious Palestinian terrorist group with $72 million worth of vouchers from the U.N.'s corrupt oil-for-food program"), http://nypost.com/2004/10/17/iraqs-oil-for-terror-72m-to-palestinians/; Statement of Chairman Henry Hyde, *The Oil-for-Food Program – Tracking the Funds: Hearing Before the H. Comm. on Int'l Relations*, 108th Cong. 9 (Nov. 17, 2004) (Saddam funded Palestinian terror through "kickback money Saddam demanded from suppliers"), http://commdocs.house.gov/committees/intlrel/hfa96930.000/hfa96930_0.HTM.

thereafter, the CPA began overseeing the reconstruction of a democratic Iraqi government and formulating a plan to transfer sovereignty to the Iraqi people.

56. Formal armed hostilities between the United States and the Iraqi government ended on May 1, 2003. After that date, American troops deployed to Iraq performed a peacekeeping and nation-building function, rather than a warfighting function. American troops' primary purpose was to create the political and security conditions conducive to Iraqi democracy.

57. The U.S. invasion of Iraq was watched closely by Iran and its terrorist proxy, Hezbollah. Even before the invasion began, as early as September 2002, Iran and Hezbollah plotted to undermine the anticipated U.S. presence in Iraq. Immediately after Saddam's government fell in April 2003, Hezbollah dispatched its chief terrorist mastermind, Imad Mugniyeh, to Iraq. Mugniyeh's assignment was to make contact with Muqtada al-Sadr, an influential Shiite cleric, and to work with Sadr to build a terrorist organization modeled after Hezbollah and capable of carrying out sophisticated attacks on Americans in Iraq. Mugniyeh made contact with Sadr shortly thereafter, and the two immediately began work creating the terrorist organization that would become known as Jaysh al-Mahdi. An Israeli intelligence report confirmed that, by October 2003, Hezbollah was already planning to "set up a resistance movement that would cause mass casualties" among American forces in Iraq.[18]

58. Sadr's power in Iraq is based in large part on his family lineage. His cousin and father-in-law, Baqir al-Sadr, was a powerful cleric and founder of the Da'wa Party, which today remains a dominant political force in Iraq. Baqir al-Sadr was executed by Saddam in 1980 and is

---

[18] Edward T. Pound, *Special Report: The Iran Connection,* U.S. News & World Report (Nov. 22, 2004), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iran-connection&catid=33&Itemid=115. Mr. Pound's article also cites a July 2003 U.S. intelligence report that concluded that Hezbollah agents were then "attempting to establish contact with Sadr and his Mahdi Army." On information and belief, based on information that has become available since July 2003, Hezbollah (through Mugniyeh) established contact with Sadr no later than April 2003.

known among Iraqi Shi'a as the "First Martyr." Muqtada's father, Grand Ayatollah Sadiq al-Sadr, was an even more powerful cleric whom Saddam assassinated in 1999. Sadiq al-Sadr is revered by many Iraqi Shi'a as the "Second Martyr." In addition, Muqtada's cousin, Musa al-Sadr, founded Amal – the predecessor to Hezbollah in Lebanon.

59. Drawing on this influence, Muqtada al-Sadr became the leader of masses of impoverished Iraqi Shi'a after Saddam's fall in April 2003. Sadr's followers took over Saddam City – the two-million-person slum in eastern Baghdad, which is the most densely populated area in Iraq – and renamed it "Sadr City" after Muqtada's father, Sadiq al-Sadr. During this time period, Sadr's public sermons in the Shiite holy city of Najaf decried the U.S. invasion of Iraq, labeled U.S. troops as an illegal occupying force, and urged Iraqis to expel Americans from the country. Sadr's rallies commonly ended with public "Death to America" chants.

60. By the summer of 2003, Sadr had channeled his popularity into a nascent organization called the "Sadrist Trend" (members of the Sadrist Trend and related groups are known as "Sadrists"). The Sadrist Trend was modeled expressly on Hezbollah. Like Hezbollah, the Sadrist Trend had both a political wing, called the Office of Martyr Sadr, and a terrorist wing, called "Jaysh al-Mahdi" (Arabic for "the Mahdi Army") or "JAM." And, like Hezbollah, the Sadrists seized control of important neighborhoods (such as Sadr City) and used Jaysh al-Mahdi to attack foreign enemies – in the case of the Sadrists, U.S.-led Coalition forces. The Office of Martyr Sadr and Jaysh al-Mahdi were closely interconnected, worked in tandem, shared common sources of financing, and were run by the same people. There was never any meaningful firewall between those two intertwined components of the Sadrist Trend.

61. By early 2004, Sadr's growing influence, along with the escalating violence employed by his terrorist militia, threatened the U.S. strategy in Iraq. That led the CPA, on

March 28, 2004, to order a 60-day closure of *al-Hawza*, the Sadrist newspaper that Sadr used to proselytize anti-American and anti-Israeli violence. Sadr reacted by intensifying his denunciations of the U.S. government and urging his followers to "'terrorize' their enemy."[19] According to *The Endgame: The Inside Story of the Struggle For Iraq, From George W. Bush to Barack Obama* ("*Endgame*"), Michael Gordon and General Bernard Trainor's celebrated account of the Iraq war,[20] Sadr's Friday sermon on April 2, 2004, was a "bitter invective against the United States, denouncing the Americans and even praising the September 11 attacks."[21]

62. From that point forward, Sadr and Jaysh al-Mahdi increased their attacks on Americans in Iraq, resulting in mass casualties among U.S. citizens (both military and civilian) working to stabilize and rebuild the country. By late 2004, Sadr had effectively seized control of large swaths of Iraq, including but not limited to Basra, Amarah, Najaf, Wasit, Kufa, Nasiriyah, and the entire eastern half of Baghdad. By early 2005, Sadr controlled 20 Jaysh al-Mahdi brigades – all of which were trained by Hezbollah – operating out of his command-and-control safe haven in Sadr City, from which Jaysh al-Mahdi coordinated and launched Hezbollah-supported attacks against Coalition forces throughout Iraq.

63. In service of its terrorist agenda, and relying on Hezbollah training, weapons, and personnel, Jaysh al-Mahdi mastered several types of attacks that proved especially deadly for U.S. troops and civilians, including the attacks that killed and injured Plaintiffs. As one commentator explained, Jaysh al-Mahdi was "[a]nalogous to the Sunni terrorist organization, al

---

[19] Nimrod Raphaeli, *Understanding Muqtada al-Sadr*, Middle East Quarterly (Fall 2004), http://www.meforum.org/655/understanding-muqtada-al-sadr.

[20] Mr. Gordon was the chief military correspondent for the *New York Times*, and General Trainor was a former foreign correspondent and retired Marine Corps Lieutenant General. The *New York Times* called *Endgame* full of "extraordinary research and sobriety" and "one well-documented fact after another." Gideon Rose, *Exiting the Iraq War: A Blow-by-Blow Chronicle*, N.Y. Times (Oct. 1, 2012).

[21] Michael R. Gordon & Gen. Bernard E. Trainor, *The Endgame: The Inside Story of the Struggle for Iraq, from George W. Bush to Barack Obama* 67 (Vintage Books 1st ed. 2012) ("*Endgame*").

Qaeda," "committed thousands of bombings," "detonated roadside explosives," and "fired mortar shells toward the Green Zone."[22] In total, Jaysh al-Mahdi's terrorist attacks throughout Iraq likely killed more than 500 Americans and wounded thousands more. The death toll inflicted by Jaysh al-Mahdi became so severe that, by July 2007, General David Petraeus concluded that "JAM is more of a hindrance to long-term security in Iraq than is [Al-Qaeda in Iraq]," the Sunni terrorist group that became ISIS.[23]

**B. Jaysh al-Mahdi's Control Of The Health Ministry**

64. In 2004, the Sadrists executed a plan to take control of MOH, which was the first Ministry that the CPA returned to Iraqi control. As described in more detail below, from 2004-2013, Jaysh al-Mahdi used its control over MOH to finance terrorist activities.

65. The Sadrists' plan to take control of MOH was modeled on Hezbollah's experience in Lebanon. Control of the Lebanese healthcare sector was (and remains) essential to Hezbollah's power. As it had done for Hezbollah in Lebanon, control over the Iraqi healthcare system offered the Sadrists several advantages, including the ability to raise funds for terrorism through the medical-goods contracting process.

66. The Sadrist takeover of MOH was part of the broader political trend in reconstruction-era Iraq. As different factions vied for power in the wake of Saddam's collapse, competing political parties (and their associated anti-American militias) focused on seizing control of the instruments of government. In a 2009 report, the U.S. Special Inspector General for Iraqi Reconstruction described this "undisguised power grab" that occurred throughout the Iraqi administrative state:

---

[22] Birgit Svensson, *The Mahdi Army: Turbans, Kalashnikovs and Plans to 'Slaughter'*, Deutsche Welle (June 22, 2014), http://www.dw.com/en/the-mahdi-army-turbans-kalashnikovs-and-plans-to-slaughter/a-17728487.

[23] *See Endgame* at 422.

> Almost overnight, a majority of the ministries of Iraq's central government – once controlled by the Ba'ath Party, but largely staffed by technocrats – became aligned with, and then dominated by, competing political parties. Sadrists seized the Health and Education ministries. Employing the model of service delivery embraced by Hezbollah – the radical Islamic Shi'a group based in Lebanon – they openly deployed ministry resources to build support among the Shi'a underclass.[24]

67. In early 2004, Sadrists began assuming important positions throughout the MOH bureaucracy. Sunnis and secular technocrats alike were purged in what one percipient witness describes as a widespread "occupational cleansing." Doctors who exhibited insufficient loyalty to the Sadrists were killed or forced to flee. One MOH insider estimates that, at the height of Sadrist control, the Ministry employed roughly 70,000 members of Jaysh al-Mahdi. As a result of this "occupational cleansing," the Sadrists achieved virtually total control over MOH.

68. By late 2004, Jaysh al-Mahdi personnel were invoking their status as MOH employees when arrested by Coalition forces. For example, an October 2, 2004 military arrest report (as published by *WikiLeaks*) documented the detention of two Iraqis in eastern Baghdad – one of whom "had a Mahdi Militia ID card" – who were "trying to hide Al Sadr posters" and who "both claimed to be Ministry of Health [Facilities Protection Service] workers."[25]

69. The 2005 parliamentary elections ratified Sadr's power over MOH. The Sadrists won 23 parliamentary seats in January and increased their total to 32 seats in December. In early 2005, the ministries within Prime Minister Ibrahim al-Jaafari's cabinet were divvied up by political party so that each party leader effectively controlled the ministries assigned to his party. As part of that process, the Sadrists officially assumed control of several ministries, including MOH. In early 2006, Sadr switched his support to Nouri al-Maliki, who replaced Jaafari as

---

[24] U.S. Special Inspector Gen. for Iraq Reconstruction, *Hard Lessons: The Iraq Reconstruction Experience* 250 (2009).

[25] *WikiLeaks* (Oct. 2, 2004), https://wikileaks.org/irq/report/2004/10/IRQ20041002n766.html.

Prime Minister. In exchange, the Sadrists retained control of MOH, while obtaining control of several other ministries as well. The Sadrists considered MOH to be their most important Ministry – it was the first one they demanded in cabinet negotiations – because of the enormous fundraising opportunity that came with control of Kimadia's corrupt procurement process.

70. In early 2005, Sadr selected Abdul Mutalib Ali Muhammad Salih al-Rabi'i as his first official Minister of Health. Dr. Mutalib was a member of Jaysh al-Mahdi who referred to himself as a "Mahdi soldier."

71. In mid-2006, Dr. Ali al-Shemari, another Sadrist, replaced Dr. Mutalib as the Minister of Health. During his tenure, a 2006 U.S. State Department cable (as published by *WikiLeaks*) noted "[t]he almost complete infiltration of the Health Ministry by Sadrists."[26] During this time period, Jaysh al-Mahdi controlled nearly every facet of MOH. As one percipient Iraqi witness explained, "the entire Iraqi Ministry of Health w[as] under the control of [the] Mahdi Army," which "made the Iraqi Ministry of Health, along with all Iraqi hospitals and health clinics, bases for their operations."[27]

72. The Sadrists' control over MOH extended to Kimadia. In the process of taking control of the Ministry, Jaysh al-Mahdi installed Sadrists in senior- and mid-level positions throughout Kimadia, including in the Director General position. As *USA Today* reported in 2008, "Al-Sadr's control over Kimadia, the state-run company that is responsible for importing and distributing drugs and supplies to Iraq's hospitals, also poses problems."[28] Quoting the Iraq director for the International Medical Corps, the article reported that Kimadia's "monopoly" over

[26] U.S. State Dep't Cable, *Ambassador's Meeting with Minister of Oil Shahristani* (Nov. 26, 2006), https://wikileaks.org/plusd/cables/06BAGHDAD4351_a.html.

[27] Omer Salih Mahdi, *Diary of an Iraqi ER Doctor Turned Journalist: Where Western Media Could Not Travel*, Huffington Post (updated May 25, 2011), https://www.huffingtonpost.com/omer-salih-mahdi/diary-of-an-iraqi-er-doct_b_83259.html.

[28] Charles Levinson, *Sadrists' Grip on Health Care Takes Toll*, USA Today (Mar. 27, 2008).

medical imports gave it a "stranglehold on the whole medical sector, and that is a source of power through which Sadr can control the health sector and threaten the country."[29]

73. MOH was a sprawling bureaucracy that employed thousands of Iraqis and had facilities all over the country. Kimadia was one division within the MOH bureaucracy – it was technically a state-owned import company and monopoly – and was based out of the MOH headquarters building in Sadrist-controlled eastern Baghdad, near the Medical City complex. In addition to Kimadia, the headquarters housed MOH's leadership and administrative departments. Other MOH facilities throughout Iraq housed the Ministry's regional and local administrative buildings, hospitals, and clinics. Because of Iraq's system of socialized medicine, every public-sector doctor, pharmacist, nurse, and medical technician in Iraq was employed by MOH.

74. The Sadrists openly advertised their control of MOH facilities, including the Ministry's Baghdad headquarters from which the contracting process was run. By late 2004, hundreds of Sadrist posters displaying large pictures of Muqtada and Grand Ayatollah Sadiq al-Sadr (Muqtada's father, the Second Martyr) adorned the halls of MOH's headquarters in Baghdad. These interior posters contained pictures of the Sadr family surrounded by Shi'a terrorist slogans conveying two basic messages in Arabic, translating roughly to "Death to America and Israel" and "we must destroy the occupiers." The Ministry's front gates conveyed a similar message. Beginning in 2005, the exterior wall just outside the MOH entrance contained a 20-foot mural of the Sadr family – so large it was visible from the air – alongside the unmistakable, all-black flag of Jaysh al-Mahdi. Similar black flags also appeared throughout the inside of the headquarters building, as well as other MOH installations around Iraq. In addition, the gates just outside the building (and adjacent to the mural) contained anti-American and anti-

[29] *Id.*

Israeli propaganda. As *USA Today* reported, these posters and slogans throughout the MOH headquarters building "remove[d] any doubts about who runs the place."[30]

75. From at least 2005-2007, the Ministry headquarters building also contained written messages soliciting donations for Sadr and Jaysh al-Mahdi. As *CBS News* journalists observed in October 2006, the MOH headquarters building was full of "[y]ellow boxes covered in Arabic scrawl, calling on people to contribute to Moqtada al Sadr, the founder and leader of the Mahdi Army milit[i]a."[31]

76. Jaysh al-Mahdi terrorists also set up a physical office inside the main Ministry building. When Dr. Mutalib became the first Sadrist Minister of Health in 2005, one office within the Minister's suite in the headquarters building became known as the "Jaysh al-Mahdi office." It was strewn with AK-47s and other weaponry, making clear to anyone who passed by that the Minster was personally associated with Jaysh al-Mahdi. The office was permanently staffed by senior clerics from Sadr's inner circle who exercised substantial control over MOH decisions, including contracting decisions.

77. The U.S. government did not support the Jaysh al-Mahdi-controlled Ministry of Health, nor did it encourage companies to transact with MOH between 2005 and 2008 in a way that would benefit the terrorists running it. The Jaysh al-Mahdi-run Ministry largely refused to cooperate with the U.S. government; levied death threats against U.S. health officials who tried to reform it; froze out U.S. anti-corruption personnel; and became so dangerous that U.S. government teams could no longer enter its Baghdad headquarters. As the Iraq Study Group

---

[30] *Id.*

[31] Lara Logan, *Iraq, Up Close: Bodies and Terror*, CBS News (Oct. 5, 2006).

Report concluded in 2006, "Sadr objects to the U.S. presence in Iraq, and therefore the ministries he controls – Health, Agriculture, and Transportation – will not work with Americans."[32]

78. Although the Sadrists filled MOH from top to bottom, the following officials played especially prominent roles in transforming the Ministry into a tool of Jaysh al-Mahdi.

**1. Dr. Adel Muhsin Abdullah al-Khazali (Inspector General of MOH)**

79. Dr. Adel Muhsin Abdullah al-Khazali arrived at MOH in August 2003 and assumed the title of Inspector General of MOH. He served as Inspector General of MOH until 2013. During that tenure, he married the Director of Contract Audit for Kimadia, a Sadrist who was in charge of the medical-goods contracting process. Within months of his arrival, Dr. Adel began exerting control over the Kimadia contracting process. Dr. Adel used his position to facilitate Jaysh al-Mahdi's corrupt activities inside MOH.

80. As detailed in a sensitive-but-unclassified report by the U.S. Embassy Baghdad, which was finalized on December 24, 2006, Dr. Adel traveled with a "Mehdi Army body guard detachment" and helped demonstrate that MOH was "openly under the control of the Mehdi Army of Muktad al-Sadr."[33] That bodyguard detachment consisted of roughly 130 Jaysh al-Mahdi fighters and functioned as an Adel-commanded Jaysh al-Mahdi unit. As one U.S. official working on anti-corruption matters in Iraq noted in a contemporaneous email, "Adel controls Health. Adel is also Mahdi Army and has been implicated in an[t]i-Sunni death squad activity."

81. In 2006 and 2007, Judge Radhi Hamza al-Radhi, head of Iraq's Commission on Public Integrity ("CPI"), attempted to investigate Dr. Adel for corruption. Judge Radhi's

---

[32] James A. Baker, III *et al*, *The Iraq Study Group Report* 26 (2006), http://history-world.org/061206_iraq_study_group_report.pdf.

[33] Off. of Accountability & Transparency, U.S. Embassy Baghdad, *The Sixth Month Review of Iraq's Performance & Capacity in Enforcing Its Anticorruption Laws* 24 (Dec. 24, 2006) ("*U.S. Embassy Baghdad Report*"). A near-final version of this report is available online at https://fas.org/irp/eprint/anticorruption.pdf.

investigation uncovered evidence (as later recounted in *Condé Nast Portfolio*) that "the Mahdi Army . . . had fully commandeered the ministries of health, trade and transportation" and that MOH ambulances and hospitals were "integral to the militia's sectarian killing machine."[34] In retaliation, Jaysh al-Mahdi began murdering Judge Radhi's investigators, who became too afraid to venture into Ministry buildings by late 2006. All told, more than 28 members of CPI were assassinated in 2006 and 2007. In mid-2007, fearful for his life, Judge Radhi fled Iraq.

82. According to a contemporaneous memorandum prepared by U.S. anti-corruption officials documenting a July 27, 2006 interview with an MOH confidential source, "Adel is a close contact of Muqtada al[-]Sadr" and "has political power because of his allegiance to Muqtada al[-]Sadr." The same memorandum documented Dr. Adel's regular attendance with his Jaysh al-Mahdi bodyguards at Friday prayers in Najaf, "where Muqtada delivers his radical messages." The MOH source further "advised that official corruption is tolerated at the MOH because it has become the ministry occupied by the Mahdi Army, in effect." And an August 12, 2007 memorandum documenting another CPI interview similarly described Dr. Adel as "one of the major supporters and organizers of the Mahdi Militia."

83. Dr. Adel also publicly embraced Jaysh al-Mahdi in an event that garnered international media coverage. After an August 12, 2006 raid by Coalition forces to detain Jaysh al-Mahdi bodyguards assigned to the Minister of Health, Dr. Adel stood next to other Jaysh al-Mahdi members, including Hakim al-Zamili and Dr. Chasib al-Hajjami, *see infra* Part II.B.2-3, in front of television cameras to oppose Coalition forces. This took place in a rally outside the MOH headquarters building, while Dr. Adel was protected by armed Jaysh al-Mahdi fighters.

---

[34] Christopher S. Stewart, *The Betrayal of Judge Radhi*, Condé Nast Portfolio (Mar. 17, 2008) ("*Betrayal*").

84. From 2004 until he was forced from his position in 2013, Dr. Adel used his position as Inspector General to raise funds for Jaysh al-Mahdi, including its closely related and allied "Special Group" offshoot, Asa'ib Ahl al-Haq or "AAH."

**2. Hakim al-Zamili (Deputy Minister of Health)**

85. Hakim al-Zamili was another senior MOH official who served as a high-ranking Jaysh al-Mahdi terrorist commander. Zamili joined MOH in 2003 as the Deputy Director General and in 2005 became the Deputy Minister of Health, serving until he was arrested in 2007. Zamili was a prominent Jaysh al-Mahdi commander who used his MOH position – in conjunction with Dr. Adel, with whom he worked closely – to conduct Jaysh al-Mahdi terrorist activities. As Dr. David Ghanim, an Iraqi native and Senior Research Fellow at the University of Gothenburg, observed in his book on Iraq's democratic institutions, Zamili "played a leading role in transforming the ministry into a bastion of sectarian violence."[35]

86. Zamili amassed power within MOH by seizing control of the Facilities Protection Service, a group of roughly 15,000 fighters nominally tasked with safeguarding the physical security of MOH assets. Zamili staffed the Facilities Protection Service with elite Jaysh al-Mahdi fighters loyal to Sadr and used it as his personally commanded Jaysh al-Mahdi division.

87. Under Zamili's direction, Jaysh al-Mahdi used MOH ambulances to ferry death squads around Baghdad, transport weapons, launch indirect fire attacks, and conduct vehicle-based attacks. Sadrist terror cells often set up operations at hospitals and used the facilities to hold weapons and hostages. They also used MOH facilities throughout the country as bases from which to directly launch attacks. As one senior Iraqi politician observed, according to a

[35] David Ghanim, *Iraq's Dysfunctional Democracy* 216 (Praeger 2011) ("*Dysfunctional Democracy*").

U.S. State Department cable (as published by *WikiLeaks*), the "Ministry of Health, infiltrated by Sadrists," was more aptly described as the "Ministry of Weapons Transportation."[36]

88. According to *CBS News*, a 2006 U.S. intelligence report corroborates those allegations. As reported, U.S. intelligence concluded "Sadr's Mahdi Army . . . turned morgues and hospitals into places where death squads operate freely" and detailed how:

- "Hospitals have become command and control centers for the Mahdi Army militia.
- Sunni patients are being murdered; some are dragged from their beds.
- The militia is keeping hostages inside some hospitals, where they are tortured and executed.
- They're using ambulances to transport hostages and illegal weapons, and even to help their fighters escape from U.S. forces."[37]

89. This Jaysh al-Mahdi appropriation of MOH resources extended throughout Iraq. As recounted in *Endgame*, "[e]ven hospitals were used as killing grounds. So many Sunni patients and relatives were abducted and killed at Baghdad's three major hospitals . . . that Sunnis were afraid to use the facilities, and would often drive their sick or injured relatives all the way to Fallujah or Ramadi."[38] By the fall of 2006, Jaysh al-Mahdi's control over MOH facilities had grown so complete that wounded Iraqi troops and police occupied more than 80% of the hospital beds in U.S. military facilities. As a U.S. Corps Commander explained, "[w]e cannot take them to civilian hospitals. They'll be shot."[39] An account in the *Washington Post* reflected the same sentiment, quoting one Sunni security guard whose cousin was allegedly

[36] U.S. State Dep't Cable, *Iraqi Moderate Front Organizers Concerned About Media Attention, Lack of Progress* (Dec. 12, 2006), https://wikileaks.org/plusd/cables/06BAGHDAD4527_a.html.

[37] Melissa McNamara, *CBS: Death Squads in Iraqi Hospitals*, CBS News (Oct. 4, 2006).

[38] *Endgame* at 222.

[39] *Id.* at 223.

murdered by Jaysh al-Mahdi in a hospital: "We would prefer now to die instead of going to the hospitals . . . . I will never go back to one. Never. The hospitals have become killing fields."[40]

90. From 2005-2007, Zamili regularly led contingents of Jaysh al-Mahdi fighters up to the roof of the MOH headquarters building to launch attacks, using mortars, sniper rifles, and heavy machine guns. On at least one occasion in 2006, Zamili himself was seen firing a DShK (a heavy-caliber machine gun popularly called a "Dushka") at nearby Sunni neighborhoods from the roof of the Ministry building. On another occasion in 2006, a U.S. official was traveling to meet with Dr. Adel at MOH when the American convoy was attacked just outside MOH's front gates by an IED planted by Jaysh al-Mahdi fighters doubling as Facilities Protection Service members. In light of these and other similar attacks, and Jaysh al-Mahdi's near-total control of the surrounding neighborhood, the area around MOH was considered one of the most dangerous parts of Baghdad for U.S. soldiers and civilians from 2005-2008.

91. From 2005-2007, Zamili's office and suite at MOH displayed Sadrist propaganda that paid homage to Muqtada and Sadiq al-Sadr. He conducted Ministry business while being guarded by armed Jaysh al-Mahdi fighters. His personal office was full of heavy weaponry, including rocket-propelled grenades and Kalashnikov machine guns. Based on those weapons, and the contingent of armed terrorists in the building, one witness who spent significant time in MOH headquarters understood it as more of a "Mahdi Army camp" than a medical building.

92. Numerous reports indicated that Zamili was responsible for the 2006 murder of Dr. Ali al-Mahdawi, the Sunni Director General of MOH for the Diyala province, after Mahdawi objected to Zamili's corrupt practices.[41] Dr. Ali al-Shemari, the Minister of Health who later

---

[40] Amit R. Paley, *Iraqi Hospitals Are War's New 'Killing Fields,'* Wash. Post (Aug. 30, 2006).

[41] *See*, *e.g.*, Kim Gamel, *Iraqi Official Tied to Militia Jailed*, Assoc. Press (Feb. 8, 2007).

testified against Zamili, admitted to Mahdawi's family that he was "surrounded by killers" and that he wanted to fire Zamili, but that the "criminal armed militia do not want that."[42]

93. Reports also indicated that Zamili was responsible for the 2007 murder of Ammar Saffar, his predecessor as Deputy Minister. Saffar, as recounted by his son, was "on the verge of exposing explosive evidence that funds earmarked to improve Iraq's health sector were being diverted to sectarian militias" when Zamili kidnapped and killed him.[43] Former Prime Minister Jaafari reportedly confirmed Zamili's culpability, telling Saffar's son that "prominent Sadrists" had admitted that "Zamili was in fact behind the kidnapping."[44]

94. On February 8, 2007, Coalition special forces arrested Zamili inside MOH headquarters, along with his Jaysh al-Mahdi deputy in charge of the Facilities Protection Service. They arrested Zamili based on accusations not only that he was a murderer, but also that he had participated in Jaysh al-Mahdi's terrorist fundraising via the diversion of medical goods and the use of inflated contracts for MOH equipment and services.

95. Zamili's arrest signaled the beginning of the U.S. military's troop surge on the ground in Iraq. The day of the arrest, a U.S. advisor to the Iraqi military explained to the *Los Angeles Times* that "[t]his is the first visible big fish."[45] A few months later, General David Petraeus heralded Zamili's arrest as one of the surge's early successes, explaining that Zamili had "effectively hijacked the Ministry of Health."[46] One U.S. Department of Justice ("DOJ")

---

[42] *Endgame* at 507.

[43] Ali Al-Saffar, *Iraq's Elected Criminals*, Foreign Policy (Mar. 4, 2010).

[44] *Id.*

[45] Louise Roug, *Iraqi Health Official Is Arrested in Sweep*, L.A. Times (Feb. 9, 2007).

[46] William Branigin, *Petraeus: Iraq Situation Is 'Exceedingly Challenging*,' Wash. Post (Apr. 26, 2007).

official opined to the *New York Times* during this period that Zamili's "case is as important, if not more important, than the Saddam Hussein case."[47]

96. In the months before the trial, however, the witness list was leaked to the Sadrists. Jaysh al-Mahdi then engaged in multiple acts of witness intimidation. On February 19, 2008, the trial was postponed because, as confirmed by a spokesman for the U.S. Judge Advocates' Corps, "[a]t least seven of the nine prosecution witnesses have received death threats."[48]

97. Shortly thereafter, several key witnesses backed out of testifying, and others recanted on the stand. On March 3, 2008, Zamili was acquitted for lack of evidence. The presiding judge in Iraq, as paraphrased by *NPR*, concluded that "there was little doubt that Zamili, who has close ties to Shiite cleric Moqtada al-Sadr, played some role in the recent sectarian violence. The court simply didn't have enough evidence to convict him."[49] Roughly a week later, Zamili was released. Stuart Bowen, the U.S. Special Inspector General for Iraqi Reconstruction, explained to Congress what had happened:

> Mr. BOWEN. Yes. The most notable case came to court 1 week ago in Baghdad, involving the deputy minister of health. There was significant evidence related to the sale of prescription drugs on the black market that had been ongoing within that ministry. The case was dismissed, because witnesses had been intimidated and did not show.[50]

98. In 2010, Zamili was elected to the Iraqi Parliament. In his campaign headquarters in Sadr City during the 2010 election season, Zamili maintained a pretense of denying the charges against him but did not conceal his support for terrorism. The *New York Times*, after an

[47] Michael R. Gordon, *Iraqi Premier Wants Trial of 2 Shiites in Killings*, N.Y. Times (Nov. 16, 2007).

[48] Byran Pearson, *Witnesses in Iraq Death Squad Trial Threatened*, Agence France Presse (Feb. 19, 2008).

[49] Dina Temple-Raston, *U.S. Urges New Trial for Iraqi Colonel*, National Public Radio Morning Edition (Mar. 13, 2008).

[50] Statement of Stuart W. Bowen, Jr., *Examining the Effectiveness of U.S. Efforts to Combat Waste, Fraud, Abuse, and Corruption in Iraq: Hearings Before the S. Comm. on Appropriations*, 110th Cong. 52 (2008), https://www.gpo.gov/fdsys/pkg/CHRG-110shrg43280/pdf/CHRG-110shrg43280.pdf.

interview, described Zamili as "unapologetic about the attacks that Shiite militias like Moqtada al-Sadr's Mahdi Army carried out in past years against the Americans."[51] In Zamili's words, "resistance was our right because we were occupied. We had a duty to protect the people from the U.S. forces and the attacks of terrorists [*i.e.*, Coalition forces and Sunnis]."[52]

### 3. Dr. Ali Bustan al-Fartusi, Dr. Jaleel Hadi al-Shemary, Dr. Hani Mousa Badr al-Uqabi, and Dr. Chasib Latif Ali al-Musawi al-Hajjami (Directors General at MOH)

99. In 2005, Jaysh al-Mahdi appointed several Directors General at MOH for the purpose of operationalizing its control over Ministry assets. Dr. Ali Bustan al-Fartusi, Dr. Jaleel Hadi al-Shemary, and Dr. Hani Mousa Badr al-Uqabi were the Directors General for Rusafa (the eastern part of Baghdad whose MOH Directorate included Sadr City), Karkh (the Jaysh al-Mahdi-controlled neighborhood just to the west of the Tigris River), and Medical City (near MOH headquarters), respectively. Each was a Jaysh al-Mahdi agent and participant in its terrorist operations. As regional directors with oversight of MOH resources in their areas of operation, Drs. Ali Bustan, Jaleel, and Hani facilitated the use of MOH ambulances, trucks, hospitals, pharmacies, clinics, and supplies to support Jaysh al-Mahdi's terrorist activities.

100. Dr. Ali Bustan's brother was the senior Jaysh al-Mahdi cleric and battalion commander for Sadr City who was, on information and belief, the leader of the notorious Fartusi Cell – a Jaysh al-Mahdi cell responsible for a substantial number of attacks against Coalition forces in Baghdad. Dr. Jaleel, for his part, was caught in 2004 by U.S. troops inside a mosque with explosives of the type often used by Jaysh al-Mahdi against Coalition forces – but was then released on a technicality. In a television interview years later, Dr. Jaleel boasted that he and his

---

[51] Marc Santora & Michael R. Gordon, *Murky Candidacy Stokes Iraq's Sectarian Fears*, N.Y. Times (Mar.3, 2010).

[52] *Id.*

Sadrist allies once "fired their weapons against American soldiers," which he described as an act of "patriotism" that "had a great impact on his life."[53]

101. Dr. Chasib Latif Ali al-Musawi al-Hajjami, the Director General for Operations at MOH, was another Sadrist and Jaysh al-Mahdi fighter who, in late 2005, attained his title after Dr. Adel forced out his predecessor. From at least 2005-2008, Dr. Chasib regularly bragged about being a Jaysh al-Mahdi soldier; he stated on at least one occasion in 2006 that he had wielded a Kalashnikov machine gun for Jaysh al-Mahdi against U.S. forces. In his years at MOH, Dr. Chasib also posted online photographs of himself armed and wearing Jaysh al-Mahdi garb, including several images of himself standing next to Muqtada al-Sadr.

102. As the person overseeing MOH's day-to-day operations, Dr. Chasib had official responsibility for the use of Ministry facilities and equipment, such as ambulances. He told MOH colleagues that his ambulances transported the corpses of Jaysh al-Mahdi's enemies. On one occasion in or about 2007, he said that the MOH ambulances he oversaw were "still wet from the blood of the corpses" from a Jaysh al-Mahdi attack the night before.

#### 4. Other Senior and Mid-Level Commanders

103. Many other mid-level MOH employees also played key leadership roles in Jaysh al-Mahdi as Company-, Battalion-, and Brigade-level commanders throughout the group's terrorist operations. Those MOH employees included pharmacists, administrators, nurses, security personnel, and vehicle managers within the Ministry; such mid-level employees were responsible for coordinating various types of attacks on Coalition forces, including the use of

[53] TV Interview on Afaq Channel with Jaleel al-Shammari (Feb. 17, 2017) (translated from Arabic), https://www.youtube.com/watch?time_continue=329&v=beat6M8Ey-c (last accessed Sept. 12, 2017).

improved explosive devices ("IEDs") and explosively formed penetrators ("EFPs"). Examples, drawn from contemporaneous military arrest reports (as published by *WikiLeaks*), include:

- **Imad Abu Sajjad, Brigade Commander for South Karkh (Baghdad).** On May 18, 2008, the Iraqi Army arrested "Imad Juwi Rahima aka Imad Abu Sajjad," who "work[ed] for the Ministry of Health" and was a "high level target" because of his status as "the South Karkh JAM Brigade Commander" who had "ordered IDF, EFP/IED, and SAF attacks" against Coalition forces.[54] In a 2006 Arabic-language article published by *Al-Jazeera*, Abu Sajjad was described as a "prominent leader in [the] Mahdi Army" who "was among the first to join when [Jaysh al-Mahdi] was formed," "command[ed] more than 1,500 fighters," and allegedly "provid[ed] protection for hospitals."[55] In a 2007 interview with the *New York Times*, Abu Sajjad stated that he and his fighters "had sworn loyalty to Moktada al-Sadr and promised to kill Americans or Sunnis when called upon to do so" and boasted that "Americans in Iraq . . . are really just prisoners" of Jaysh al-Mahdi.[56] An Arabic-language article published by *Al-Arabiya* further reported that Abu Sajjad was a deputy of Abu Dura, the Hezbollah-trained Jaysh al-Mahdi terrorist who played a key leadership role in its intelligence unit and who was nicknamed the "Shiite Zarqawi" for his brutal tactics.[57] On information and belief, as a senior Jaysh al-Mahdi terrorist in Iraq, Imad Abu Sajjad received specialized training from a Hezbollah agent deployed inside Iraq.
- **Sa'ad Abadi, Battalion Commander in Kadamiyah (Baghdad).** Sa'ad Abadi commanded a Jaysh al-Mahdi Battalion in Kadamiyah that included MOH employees and was linked to the Kadamiyah Teaching Hospital, which "JAM/SG cells" had "historically . . . used . . . as a cache site."[58] On information and belief, Sa'ad Abadi and his cell received specialized training from Hezbollah in a terrorist training camp in Iran, Iraq, or Lebanon.
- **Ali Hindi, Hajji Thair Cell in Kadamiyah (Baghdad).** On July 5, 2008, Coalition forces searched the home of Ali Hindi, who was a member of a Jaysh al-Mahdi cell known as the Hajji Thair cell in the Shuala section of the Kadamiyah District in Baghdad; Coalition forces discovered two MOH badges along with weapons, film, and a passport indicating travel through Syria,[59] which on information and belief is a significant indicator of terrorist training in Lebanon. On information and belief, Ali Hindi and his Special Group received specialized training from Hezbollah in a terrorist training camp in Iran, Iraq, or Lebanon.
- **Abu Hajir, EFP Cell in Sadr City (Baghdad).** Abu Hajir was a member of a Jaysh al-Mahdi cell in Sadr City that included MOH employees. During a December 4, 2008

---

[54] *WikiLeaks* (May 18, 2008), https://wikileaks.org/irq/report/2008/05/IRQ20080518n10702.html.

[55] Al-Jazeera (Nov. 20, 2006), https://goo.gl/PWSRx5 (link shortened; translated from Arabic).

[56] Damien Cave & Stephen Farrell, *At Street Level, Unmet Goals of Troop Buildup*, N.Y. Times (Sept. 9, 2007).

[57] *See* Al-Arabiya (Dec. 25, 2006), https://www.alarabiya.net/articles/2006/12/25/30226.html (translated from Arabic).

[58] *WikiLeaks* (June 11, 2009), https://wikileaks.org/irq/report/2009/06/IRQ20090611n12476.html.

[59] *WikiLeaks* (July 5, 2008), https://wikileaks.org/irq/report/2008/07/IRQ20080705n11375.html.

Coalition search "to capture Abu Hajir [in order] to disrupt [Jaysh al-Mahdi] operations in Sadr City," Coalition forces arrested seven suspected Jaysh al-Mahdi terrorists and recovered, among other things, an EFP, "Ministry of Health SCTY Force Badge," and U.S. currency.[60] On information and belief, Abu Hajir received specialized training from Hezbollah in a terrorist training camp in Iran, Iraq, or Lebanon.

- **Husayn Saleem Zair, IED Cell near Sadr City (Baghdad).** During a September 15, 2008 search near Sadr City, Coalition forces arrested Husayn Saleem Zair, who was "suspected to be a [Jaysh al-Mahdi] Special Groups IED cell member."[61] When he was detained, Zair possessed an MOH Facilities Protection Service ID card and badge, "religious documents," a "sheet of paper from [the] Ministry of Health about workers," and "pills."[62] On information and belief, Husayn Saleem Zair and his Special Group received specialized training from Hezbollah in a terrorist training camp in Iran, Iraq, or Lebanon.

104. These and other mid-level MOH employees translated Jaysh al-Mahdi's control of MOH into on-the-ground terrorist acts. Working at the direction of and in concert with senior terrorists (including the ones identified above), they used MOH assets to launch attacks, smuggle weapons, and gather intelligence. Contemporaneous U.S. military reports (as published by *WikiLeaks*) provide examples of Jaysh al-Mahdi using MOH resources to commit terrorist acts:

- **MOH Hospitals as Staging Areas.** On October 11, 2006, Coalition forces received reports that "Mahdi Army" personnel were in "Al Jwader Hospital" and "Al Sadr Hospital," among other places, and were "planning on attacking MNF if they enter Al Sadr City."[63]
- **MOH Vehicles as Attack Instruments.** On December 2, 2006, Coalition forces reported that 17 "JAM militants" were "planning to launch an attack on [Forward Operating Base] Rustamiyah . . . using Katyusha rockets and 120[mm] mortars," during which "militants [would] use five vehicles belonging to the Ministry of Health."[64] On December 12, 2006, Coalition forces reported that five ambulances had been "moved from Baghdad City to Al Sadr City and Al Shaab City," and that, "[f]rom the vehicles," Jaysh al-Mahdi would "fire mortars and then use the ambulances as [Vehicle-Borne IEDs]."[65]

---

[60] *WikiLeaks* (Dec. 4, 2008), https://wikileaks.org/irq/report/2008/12/IRQ20081204n11938.html.

[61] *WikiLeaks* (Sept. 15, 2008), https://wikileaks.org/irq/report/2008/09/IRQ20080915n11726.html.

[62] *WikiLeaks* (Sept. 15, 2008), https://wikileaks.org/irq/report/2008/09/IRQ20080915n11726.html.

[63] *WikiLeaks* (Oct. 11, 2006), https://wikileaks.org/irq/report/2006/10/IRQ20061011n5285.html.

[64] *WikiLeaks* (Dec. 2, 2006), https://wikileaks.org/irq/report/2006/12/IRQ20061202n5876.html.

[65] *WikiLeaks* (Dec. 12, 2006), https://wikileaks.org/irq/report/2006/12/IRQ20061212n6135.html.

- **MOH Headquarters as Attack Base.** On November 29, 2006, Coalition forces reported that Jaysh al-Mahdi fighters were "launching mortar rounds from [the] top of MOH."[66] On December 21, 2006, Coalition forces reported that "terrorists [were] on the roof of the Health Ministry [building] firing in the Al-Fadel area."[67]
- **MOH Facilities as Kidnapping Tool.** On August 13, 2006, Coalition forces arrested five suspected Jaysh al-Mahdi terrorists while acting on a tip that 15 "JAM [fighters] armed with PKC and AK-47 and wearing [Iraqi Army] uniforms kidnapped" six local nationals, "and took the kidnapped victims to MOH."[68]
- **MOH Vehicles as Smuggling Tool.** On December 15, 2006, Coalition forces reported that "[w]eapons have been transported" from Wasit Province (on the Iranian border) to Sadr City through the use of four "yellow trucks supported by ambulances."[69] Coalition forces determined that the weapons being transported "will be used to target" Americans in Baghdad.[70] On August 19, 2007, Coalition forces arrested three MOH employees "for questioning in association with the rocket cache found inside an ambulance," including an MOH Facilities Protection Service Night Shift Officer-in-Charge, MOH Deputy Security Manager for the Night Shift, and an MOH Vehicle Manager.[71]

105. Sadrist control of MOH and Kimadia was at its apex from late 2004 through 2008. During that period, Jaysh al-Mahdi's cooptation of the Ministry was so complete that there was no meaningful distinction between the MOH bureaucracy and the Jaysh al-Mahdi terrorist apparatus. In 2008, after a different party won the right to appoint the Minister of Health, the violence within the Ministry began to lessen to some degree. But until 2013 (and even afterward), Jaysh al-Mahdi's de facto control over the MOH contracting process – exercised via mid- and upper-level managers entrenched throughout the MOH bureaucracy – persisted and continued to fund terrorist attacks. That was made possible by several of the key Jaysh al-Mahdi agents described above. For example, Dr. Adel continued in his position as

---

66 *WikiLeaks* (Nov. 29, 2006), https://wikileaks.org/irq/report/2006/11/IRQ20061129n5782.html.

67 *WikiLeaks* (Dec. 21, 2006), https://wikileaks.org/irq/report/2006/12/IRQ20061221n6232.html.

68 *WikiLeaks* (Aug. 13, 2006), https://wikileaks.org/irq/report/2006/08/IRQ20060813n4950.html.

69 *WikiLeaks* (Dec. 15, 2006), https://wikileaks.org/irq/report/2006/12/IRQ20061215n6306.html.

70 *WikiLeaks* (Dec. 15, 2006), https://wikileaks.org/irq/report/2006/12/IRQ20061215n6306.html.

71 *WikiLeaks* (Aug. 19, 2007), https://wikileaks.org/irq/report/2007/08/IRQ20070819n9397.html.

Inspector General until 2013, while Dr. Ali Bustan and Dr. Jaleel continued in their positions until approximately 2015. Dr. Chasib remains in a high-level position inside MOH to this day.

## III. DEFENDANTS ENGAGED IN CORRUPT TRANSACTIONS THAT PROVIDED FINANCING TO JAYSH AL-MAHDI

### A. Jaysh al-Mahdi Raised Money Through Corrupt MOH Contracting Practices

106. Jaysh al-Mahdi financed its activities by extracting corrupt payments from foreign suppliers like Defendants. In a December 2004 official report, Health Minister Dr. Ala'din Alwan – a secular bureaucrat whom the Sadrists forced out in early 2005, just after he had publicly excoriated MOH's corrupt procurement practices and called for "drastic changes" – acknowledged that "corruption is widespread" within MOH.[72] According to Minister Alwan, "[p]rocurement processes, bidding procedures, and project management are areas where corruption is commonly encountered."[73] Similarly, as Health Minister Dr. Ali al-Shemari noted in the summer of 2006 (as described in a U.S. State Department cable as published by *WikiLeaks*), he was aware that "Kimadia is corrupt."[74]

107. Dr. Adel used his position as corruption watchdog at MOH to facilitate Jaysh al-Mahdi's fundraising activities from foreign suppliers like Defendants. As Inspector General, Dr. Adel blocked investigations into corrupt activities of Jaysh al-Mahdi officials at MOH. He also controlled the MOH procurement process through his marriage to the Director of Contract Audit for Kimadia. When others within the Iraqi government – either inside or outside MOH – would attempt to initiate legal investigations of MOH corruption, Dr. Adel scuttled the investigations.

---

[72] Ala'din Alwan, *Health in Iraq: The Current Situation, Our Vision for the Future and Areas of Work* 50, 75 (2d ed. Dec. 2004).

[73] *Id.* at 50.

[74] U.S. State Dep't Cable, *New Minister of Health: Let's Cooperate to Improve Healthcare & the Ministry* (June 12, 2006), https://wikileaks.org/plusd/cables/06BAGHDAD1978_a.html.

108. Jaysh al-Mahdi's fundraising schemes took advantage of MOH's lack of any modern logistics system. Drugs and devices were counted in an ad-hoc manual way, logged on paper, and stored in warehouses in a haphazard manner. There was no centralized system tracking the movement of goods and devices. A 2004 investigation by 60 Iraqi pharmacists, as described in a report by the U.N.'s Office for the Coordination of Humanitarian Affairs, found that "medicine was stolen from warehouses, it was stolen from hospitals, it was even stolen on its way to patients."[75] The Director General of Kimadia likewise admitted in 2004 that "huge volumes of paperwork make it easy to hide orders for stolen drugs and medical equipment."[76]

109. In June 2007, retired New Hampshire Superior Court Judge Arthur Brennan, who then headed the Office of Accountability and Transparency ("OAT") at the U.S. Embassy in Baghdad, oversaw an investigation into Jaysh al-Mahdi's corruption. As recounted by the New Hampshire Bar Association, OAT had "evidence of crimes committed by Dr. Adel Muhsin" – specifically, that "[m]illions of dollars in pharmaceuticals had been stolen or misappropriated."[77] But Judge Brennan determined that OAT could not effectively investigate Dr. Adel further, as he "believed that Muhsin was a danger to his OAT advisors."[78] Judge Brennan testified before the Senate in 2008 about Dr. Adel (without identifying him by name): "OAT had evidence that the man was corrupt and dangerous" and was involved in the "theft and or misappropriation of up to one billion dollars in medical supplies" – meaning that Dr. Adel and Jaysh al-Mahdi were exploiting their control over procurement at MOH and Kimadia by monetizing medical goods

[75] U.N. Off. for the Coordination of Humanitarian Aff., *Iraq: Health Ministry Fights Corruption*, IRIN News (June 16, 2004), http://reliefweb.int/report/iraq/iraq-health-ministry-fights-corruption.

[76] *Id.*

[77] Beverly Rorick, *NH Judge's Anti-Corruption Mission in Iraq Ends in Disenchantment*, New Hampshire Bar Ass'n Bar News (Oct. 15, 2010), https://www.nhbar.org/publications/display-news-issue.asp?id=5761.

[78] *Id.*

nominally intended for public facilities. Rather than being distributed for legitimate medicinal purposes, "[t]he medical supplies were showing up on the black market in Iraq and Syria."[79]

110. Jaysh al-Mahdi's re-selling of medical goods extended to neighboring countries such as Iran and Syria. As a U.S. anti-corruption official stated in a contemporaneous email, Dr. Adel, as agent of Jaysh al-Mahdi, awarded contracts to those who paid "the highest kickback. Once the bid is awarded – after collecting his kickback – he then obtains the actual drugs" and "resells them to Syria and Jordan for a profit." And, according to a memorandum documenting an August 12, 2007 meeting with CPI officials, there were "numerous reports of Adel interfering with contracts," steering "contracts to favored companies, and receiving kick backs."

111. Dr. Adel himself scarcely bothered to hide Kimadia's corruption. A U.S. State Department cable (as published by *WikiLeaks*) recounted on July 10, 2009 that Dr. Adel publicly "acknowledged corrupt practices by the Health Ministry's office, KIMADIA, responsible for procurement of medicines and other medical items."[80] Dr. Adel further admitted that, on his watch, "a 'large proportion' of the purchase contracts issued by KIMADIA were tainted with corruption."[81] Another U.S. State Department cable (as published by *WikiLeaks*) the following year observed that Dr. Adel had long "been the subject of credible corruption allegations," including "in connection with the Health Ministry's procurement of pharmaceuticals."[82]

112. A 2013 report by the Iraqi Parliament was equally scathing. After an extensive parliamentary investigation into Dr. Adel's practices, the Investigation Committee of the

---

[79] Statement of Arthur Brennan, *Waste Fraud & Corruption in Iraq*, S. Democratic Policy Comm. (May 12, 2008), 2008 WL 2010885 ("*Brennan Testimony*").

[80] U.S. State Dep't Cable, *Anti-Corruption Developments in Iraq* (July 10, 2009), https://wikileaks.org/plusd/cables/09BAGHDAD1870_a.html.

[81] *Id.*

[82] U.S. State Dep't Cable, *Ministry of Interior Bomb Detector Stirs Controversy & Charges of Corruption* (Feb. 11, 2010), https://wikileaks.org/plusd/cables/10BAGHDAD366_a.html.

Parliament confirmed the "involvement of the General Inspector [Dr. Adel] within the Ministry of Health and his wife, with financial and administrative corruption."[83] According to Hassan al-Jubouri, the chairman of the Investigation Committee, Dr. Adel and his wife had engaged in rampant "financial corruption through tak[ing] bribes from companies."[84]

113. MOH's procurement corruption and its terrorist ties went hand-in-hand. As documented in a contemporaneous memorandum memorializing a December 6, 2006 interview with a CPI investigator, Iraqi anti-corruption institutions failed to combat corruption at MOH because – even though there were "direct indications of equipment/medicine thefts" – outside investigators were "too scared of the militias within MOH to create waves."

114. The U.S. government's aid programs interfacing with MOH – including those run by the State Department, USAID, and the Army Corps of Engineers – generally circumvented MOH's corrupt procurement apparatus by focusing on infrastructure projects, capacity-building efforts such as hospital and clinic construction, and direct procurement of supplies not subject to Kimadia's corrupt import process. Most of these programs were created either during reconstruction (when the CPA ran MOH) or shortly thereafter, before the Sadrists took over the Ministry. U.S. government programs also implemented safeguards designed to prevent the diversion or misappropriation of U.S.-funded health projects, and were subject to audits and other anti-corruption safeguards – safeguards that Defendants' corrupt transactions lacked. Through these mechanisms, the U.S. government attempted to support the cause of rebuilding the Iraqi healthcare system without strengthening Jaysh al-Mahdi through the corrupt MOH

---

[83] Ahmed Hussein, *Investigations Prove Mohsin's Involvement in Corruption*, Iraqi News (May 13, 2013), http://www.iraqinews.com/baghdad-politics/investigations-prove-mohsin-s-involvement-in-corruption/.

[84] *Id.*

contracting process. At no point did the U.S. government encourage companies to accede to MOH's demands for corrupt payments in the Kimadia-run medical-supply procurement process.

**B. Defendants Made Corrupt Payments To Jaysh al-Mahdi**

115. Beginning in 2004, after the Sadrists infiltrated MOH, Defendants made corrupt payments to Jaysh al-Mahdi through MOH to exploit a post-Saddam Iraqi healthcare market that was generally perceived to be on the verge of rapid growth. For example, one study found that, from 2006-2011, the Iraqi pharmaceutical market experienced a 17% compound annual growth rate – making it the fastest-growing market in Eastern Europe, the Middle East, and Africa.[85]

116. In an effort to grow their market share in Iraq, Defendants engaged in transactions structured to provide financial support to Jaysh al-Mahdi. Defendants' corrupt payments to Jaysh al-Mahdi officials fell into two broad categories: (1) "free goods;" and (2) "commissions."

**1. "Free Goods" Payments**

117. In 2004, shortly after the CPA ceded control of MOH to the Iraqis, Defendants revived the "free goods" scheme they had used under Oil-for-Food. The scheme operated much the same way it had before, with two important differences. First, the Ministry's procurement budget skyrocketed from $16 million per year under Saddam to an average of well more than $1 billion after 2004, when the Sadrists controlled MOH. As a result, the market for Defendants' products in Iraq increased substantially, providing an additional motive for Defendants to engage in corrupt transactions with MOH. Second, whereas Kimadia under Saddam had demanded "free goods" in quantities equal to 10% of the underlying contract, Defendants varied the percentages they paid the Sadrists – mostly upwards. For example, AstraZeneca's general

[85] *See* Management Partners, *Iraq Pharmaceuticals Market Opportunities*, Market Insights (May 2013).

practice was to provide "free goods" to the Jaysh al-Mahdi-controlled Ministry in quantities ranging from 25% to 100% on sales of its blockbuster drugs.

118. Defendants knew that prescription drugs and medical devices, while inexpensive to manufacture and deliver, functioned as cash equivalents in Iraq: they possessed high street value throughout the Middle East, given the chronic shortages at state-run clinics across the region; they were easy to conceal and smuggle across borders; and they could be effectively monetized on regional black markets or by Jaysh al-Mahdi doctors and pharmacists through their private clinics. In Iraq between 2004 and at least 2008, medical goods supplied through the Kimadia procurement process functioned more as commodities – they were tradeable, carried a "street" value, and were easily convertible into cash – than they did as medicine to be provided to the public. That was particularly true with respect to the rare, expensive drugs of the sort sold by Defendants. When Defendants delivered "free goods" through their Kimadia contracts, therefore, they knowingly provided Jaysh al-Mahdi with a valuable, transportable commodity that could be converted into cash or other goods (such as weapons).

119. Delivering "free goods" to MOH offered Defendants other advantages. Unlike cash payments made to corrupt officials, which are difficult to justify if discovered, Defendants could argue that providing free drugs or medical devices to Iraqi health officials reflected charitable goals. The availability of this pretextual humanitarian justification has made the delivery of in-kind "free goods" a popular form of bribery in the Middle East.

120. The structure of the Iraqi procurement process ensured that the provision of "free goods" functioned not to benefit the Iraqi people, but as corrupt payments to the terrorists who ran MOH. From 2004-2013, the MOH procurement process generally began in December of each year, when Regional Directors General (such as Dr. Jaleel or Dr. Ali Bustan) supervised a

process through which doctors, pharmacists, and local hospital administrators assessed their inventories and calculated the region's needs for the upcoming year. They then submitted written requests to the MOH Needs Assessment Committee ordering the quantity of medical goods – specified to the number of individual units – required for the upcoming year. The Needs Assessment Committee collected those various orders, tabulated the total, and used the total to fix a national quota for each drug and device. Kimadia, in turn, used MOH's quota to set the quantities specified in the requests for proposal it issued the following year – so that the quantities purchased of each drug or device would match the corresponding quota set by MOH. After Kimadia purchased drugs and devices in those quantities, it was responsible for importing and distributing the goods to satisfy the orders placed by individual healthcare providers.

121. Kimadia procured its quota of each specific drug (or device) by issuing requests for proposal soliciting bids from suppliers for a specified quantity. Companies responded with bids proposing a price for the quantity of requested goods, which matched the annual quota set by MOH. On top of that fixed quantity, Kimadia's standard bid instructions regularly instructed companies to specify the quantity of extra goods that they would provide for free. This demand for "free goods" still appears on the face of Kimadia's standard instructions: in a checklist specifying "general contract conditions," Kimadia states that each contract "is subjected to free goods to be shipped with the contract goods." Given the Iraqi procurement process – in which the base quantity of "contract goods" specified in the bid already reflected all the orders submitted by Iraqi healthcare providers – the "free goods," by definition, did not correspond to any needs-based request by an authorized provider. Because no provider actually requested the "free goods," Kimadia had no legitimate destination to which to send those goods once received

in Iraqi warehouses. Accordingly, the "free goods" were not accounted for in Iraqi inventory and operated instead as a slush fund for the Jaysh al-Mahdi agents running the Ministry.

122. After a company won a tendering round, it was required to execute a formal sales contract with Kimadia. Each contract was required to be executed, by hand, by an executive with signing authority for the supplying company. The supplier had to physically bring a paper copy of the final, executed contract in person to MOH officials inside the Ministry headquarters building in Baghdad; MOH did not accept contracts that were delivered by mail or electronic means. Iraqi health officials were suspicious of forged signatures, and they demanded paper copies – delivered in person – in part to visually inspect the executive's signature on the contract. The signed sales contracts often memorialized both the underlying quantity of "contract goods" for which Kimadia would make payment and the quantity of extra "free goods" on top.

123. Although the precise layout of each Kimadia sales contract varied over time and by supplier, they generally followed the same core template. The first few pages of the template included (among other things) the following information:

- Contracting Party / Seller: The company that executed the contract with Kimadia and supplied the purchased goods (often called the "supplier").
- Manufacturer: The company that manufactured the goods that the supplier was selling. For drug contracts, this could refer either to the manufacturer of the active pharmaceutical ingredient or to the company that formulated and packaged the final drug. In the latter case, the sales contract itself might not identify the company that manufactured the active pharmaceutical ingredient.
- Origin of the Goods: The country from which the supplier agreed to source the purchased drugs or devices. Generally speaking, this term tracked the domicile of whatever entity was identified in the contract as the "manufacturer." Thus, in some instances the "origin" term described the place where the active pharmaceutical ingredient (the most important component of any drug) was made. In other instances, it described the place where the drug was formulated and packaged. The source of the drugs was material to Kimadia: MOH officials were suspicious of counterfeit drugs, and they insisted on contractual protections guaranteeing that drugs would be made in the proper country of origin. MOH officials also prioritized obtaining U.S.-manufactured drugs, which tended to be most valuable on the black market.

- National Code: The alphanumerical code assigned to the drug being sold (not applicable to devices). Before any drug could be sold in Iraq, MOH had to place it on the national formulary and assign it a National Code.
- Corresponding Bank: The supplier's correspondent bank account – including account number and SWIFT code – to which MOH wired payment. As a general rule, transactions with Kimadia occurred in U.S. dollars, so most suppliers had to identify a correspondent account capable of receiving payment in U.S. dollars.

124. Since 2004, the final section of the standard sales contract typically contained a series of additional contractual terms, often including the obligation to provide "free goods." Kimadia typically instructed suppliers not to label or distinguish these "free goods" from the rest of the goods destined for Iraqi inventory. This section also often contained other commercially unreasonable contractual provisions, such as a requirement that the supplier re-supply "free of charge" any drugs that expired before Kimadia was able to sell them.

125. In the sales contract, the supplier typically agreed it would make the sale pursuant to an irrevocable letter of credit. After execution of the sales contract, the letter of credit was typically sent from Kimadia's bank – The Trade Bank of Iraq ("TBI") – to the supplier's bank. Notice of the letter of credit was sent by SWIFT message, which included reference to the basic terms of the contract and often included – in Field 45A (denoting the Description of Goods and/or Services) – a specific reference to the "free goods" that would be delivered. For example, one J&J letter of credit stated that "THIS L/C CONTAIN FREE GOODS 20PCT" – meaning that the J&J supplier company had agreed to make a 20% "free goods" payment.

126. Letters of credit also confirmed the payment terms specified in the contract. In Field 47A, letters of credit typically provided that some percentage of the contract amount was payable upon presentation of the appropriate shipping documents at the Iraqi border, with the remainder payable after acceptance of the goods at the Kimadia warehouse. They also typically required the supplier to cover the banking charges associated with the transaction. To effectuate

that contractual term, letters of credit instructed the supplier's bank to credit TBI's New York-based correspondent banking account in U.S. dollars – so that the supplier, in essence, covered Kimadia's banking fees under the contract.

127. On information and belief, the supplier Defendants covered Kimadia's transaction and banking fees on each corrupt MOH sales contract by transferring funds into a TBI correspondent account at J.P. Morgan Chase Bank ("JPM NY") in New York. This allegation is based on the following:

(a) Plaintiffs have obtained two letters of credit governing two separate transactions in which Defendant Cilag defrayed Kimadia's transaction costs by wiring dollars into a JPM NY correspondent account based in New York.

(b) TBI is an Iraqi-owned entity that the CPA incorporated on July 17, 2003, to facilitate the import and export of goods to and from Iraq. Since its inception, according to TBI's chairman in a 2017 interview, TBI's focus has been on building an international "correspondent banks network" to "offer trade finance solutions to the public and private sectors."[86]

(c) JPM NY led a consortium of banks that established and managed TBI at its founding in 2003, and in that capacity JPM NY directly ran TBI's operating platform and trained TBI's employees. One of TBI's founding purposes was to issue letters of credit to finance Iraqi imports with the assistance of that JPM NY-led operating consortium. For example, the U.S. Export-Import Bank approved export insurance in December 2003 for up to $250 million in TBI-issued letters of credit, which it stated would be "used to support trade financing from JPMorgan Chase Bank, as lead of the TBI's Operating Consortium."[87]

(d) Correspondent accounts in New York were essential to TBI's mission of financing transactions for MOH and other ministries. Rebuilding the creditworthiness of Iraq's institutions was a crucial component of the U.S.-led reconstruction. Correspondent accounts in New York – which was (and remains) the hub of the global credit system, especially for U.S. dollar-denominated transactions like Kimadia's – were key to TBI's viability, which led TBI and the Iraqi ministries that relied on TBI to use New York-based accounts.

---

[86] Faisal al-Haimus, *Making Strides in Iraq & Beyond*, Banker Middle East (Feb. 22, 2017), 2017 WLNR 5615939.

[87] Press Release, Export-Import Bank of the United States, *$250 Million Ex-Im Bank Insurance Will Facilitate U.S. Exports to Iraq* (Dec. 28, 2003), http://www.exim.gov/news/250-million-ex-im-bank-insurance-will-facilitate-us-exports-iraq.

128. The availability of letters of credit, which relied on TBI's correspondent banking network in New York, was material to Defendants' corrupt transactions with MOH. In cross-border transactions, letters of credit serve a vital function: they help alleviate the seller's credit risk by having a creditworthy financial institution guarantee payment upon the presentation of documents establishing delivery. For that reason, the U.S. Department of Commerce has advised American businesses "dealing with Iraq" to "insist on confirmed, irrevocable [letters of credit] when initiating relationships with new importers and distributors."[88] Although "Iraqi companies often resist the use of confirmed [letters of credit], because of the additional collateral required by Iraqi and international banks for confirmation," the Department of Commerce has advised U.S. exporters to "require these necessary financial protections" before contracting with Iraqi purchasers.[89] When it came to transactions with Kimadia, the supplier Defendants secured those protections by making payments into TBI's New York correspondent accounts.

129. After TBI issued a letter of credit, suppliers shipped the goods into Iraq. The shipments typically arrived on trucks that contained both the "contract goods" and the "free goods," without distinguishing between the two. The goods arrived at a Kimadia warehouse loading area and had to be signed for by a Kimadia warehouse manager – whom the supplier (through its distributor) typically had to bribe, along with the relevant Deputy Director General of Kimadia. At that point – when Kimadia transferred the goods from the company's trucks to MOH warehouses – the "free goods" were often diverted. Whereas MOH employees (who, after 2004, were typically agents of Jaysh al-Mahdi) generally loaded the legitimate "contract goods"

[88] U.S. Dep't of Com., *Iraq – Doing Business in Iraq*, Ch. 7: How Do I Get Paid (Methods of Payment), https://www.export.gov/article?id=Iraq-Methods-of-Payment (last accessed June 1, 2017).

[89] *Id.*

onto forklifts and logged them into warehouse storage, they separated the illicit "free goods" and transferred them to trucks destined for the black market.

130. The well-publicized 2007 account written by Ali A. Allawi, a former Iraqi Minister, confirmed MOH officials' diversion of imported drugs and devices. As Dr. Allawi explained in *The Occupation of Iraq, Winning the War, Losing the Peace*:

> A deteriorating physical infrastructure, inadequate supplies and medicines, continuous power outages, all added to the sense of a health system under siege. This was further compounded by the ***rampant corruption in the medicines' importing company, Kimadiya,*** a state-owned monopoly from the Saddam era. ***Pharmaceuticals were routinely hoarded by company officials and then diverted to the black market or illegally exported***.
>
> ***The Health Ministry itself became a bastion of Islamist political parties***. In spite of heroic efforts by individual doctors, administrators and ministerial officials, the deterioration in the health system continued unchecked. The Health Ministry budget had exploded from a paltry $16 million in the last year of Saddam's rule to nearly a billion dollars in 2004, but ***this had to accommodate the*** massive losses to the health system's infrastructure and the ***theft or destruction of medicines and medical equipment.***[90]

131. An April 2007 report on the Iraqi pharmaceutical sector for USAID reached a similar conclusion. According to the report, the Iraqi "system of control of the pharmaceutical distribution chain has collapsed" and allowed "a significant trade in illicit imports" on the black market.[91] Although MOH expressed a purported desire to "tackle this practice," it "acknowledges corruption within its own ranks, with [black market] drugs being supplied directly from the Ministry."[92] The report found that black-market "drugs are freely available in the marketplace, either having been sold there illegally by Kimadia/MOH, sourced from illicit imports, or from goods looted from the Kimadia warehouses, as well as the hospital and clinic

[90] Dr. Ali A. Allawi, *The Occupation of Iraq: Winning the War, Losing the Peace* 378-79 (Yale Univ. Press 2007).

[91] USAID, *Pharmaceutical & Medical Products in Iraq* § 6.5.1.1, Contract No. 267-C-00-04-00435-00 (Apr. 17, 2007) ("*2007 USAID Report*").

[92] *Id.*

outlets."[93] As Dr. Ghanim likewise observed, Jaysh al-Mahdi's "control over the health ministry provided them with an ample opportunity for profiteering and corruption. Medical supplies intended for the Ministry of Health were looted and sold by the Mahdi Army."[94]

132. Dr. Adel helped facilitate this medical-diversion scheme on Jaysh al-Mahdi's behalf. As recounted in a 2008 email, a U.S. anti-corruption official who had worked in Iraq explained that "Dr. Adel made millions on the black market by diverting pharmaceutical supplies to Syria" while also "provid[ing] militia death squads with access to hospitals and ambulances for al Sadr's thugs to use in kidnapping, torturing and killing."

133. Although corruption and diversion characterized the entire Kimadia supply chain, including the legitimately purchased "contract goods," the "free goods" delivered by Defendants were particularly easy for the Sadrists to monetize. As observed by the former U.S. Army medical logistician writing in *Contract Management*, since the Saddam era the "free goods" delivered by corrupt foreign suppliers – which do not correspond to any legitimate order within the Iraqi healthcare system – have not gone "into the Iraqi inventory" but instead have been resold on the black market "at 100-1000 percent above" standard prices.[95] Thus, when Jaysh al-Mahdi was looking to divert medical goods for a profit, the "free goods" offered them an especially easy source. That is why, according to several witnesses, Jaysh al-Mahdi agents placed a premium on demanding "free goods" percentages on contracts for valuable drugs and devices. In the words of one witness with substantial experience inside the Sadrist-controlled MOH, such "donated" goods were "very easy to disappear."

---

[93] *Id.* § 2.0.

[94] *Dysfunctional Democracy* at 217.

[95] *Contract Management* at 48.

134. Companies further supported Jaysh al-Mahdi by selling MOH nearly-expired pharmaceuticals. Corrupt MOH officials paid suppliers full price for nearly-expired or otherwise poor-quality drugs that, under ordinary commercial circumstances, were virtually worthless. Kimadia imported the drugs, waited for them to expire or otherwise fail MOH testing, and then – based on Iraqi regulations barring the sale of such drugs in public clinics – pulled them from inventory and disposed of them on the black market.[96] This scheme gave Jaysh al-Mahdi agents at MOH another source of drugs that, like the "free goods," were especially easy to divert. Foreign suppliers, conversely, gained the benefit of selling virtually worthless drugs at full price – knowing that they were likely to be diverted and resold on the black market. On information and belief, Defendants participated in this poor-quality-drugs scheme throughout the period when the Sadrists controlled the Ministry. Indeed, that scheme resembled another mechanism foreign suppliers had used to deliver corrupt payments to Saddam's regime under Oil-for-Food.[97]

135. Defendants delivered "free goods" to Jaysh al-Mahdi agents through three basic mechanisms. First, and most commonly, Defendants used **FOC Clauses**, under which they agreed to a "free of charge" or "FOC" clause in the sales contract itself – which resembled the 10% "free goods" scheme practiced under Oil-for-Food. Each Defendant employed FOC Clauses at least in part; indeed, Kimadia's standard practice was to demand "free goods" as an

---

[96] Reports (as published by *WikiLeaks*) corroborate the pervasiveness of this scheme. For example, on November 11, 2008, Iraqi police, following an order "to arrest unlicensed pharmacies and street medicine dealers," arrested 29 "unlicensed pharmacies" in Nasiriyah "and confiscated a large amount of expired medicine." *WikiLeaks* (Nov. 11, 2008), https://wikileaks.org/irq/report/2008/11/IRQ20081111n11855.html.

[97] *See* Iraq Survey Group, *Comprehensive Report of the Special Advisor to the DCI on Iraq's WMD*, Vol. I (Regime Finance and Procurement) 37 (Sept. 30, 2004) ("Another method of generating kickbacks from UN OFF import contracts . . . was based on deceiving the UN over the quality of the items being imported to Iraq. For this illicit revenue scheme, Iraq arranged for a co-operative supplier to obtain a legitimate UN OFF contract specifying 'first quality' humanitarian goods. Iraq would then be authorized under UN OFF to pay top quality prices for the items via the UN OFF-controlled accounts. In reality, however, the co-operative supplier substituted cheap, poor-quality goods for the contract. This generated very high profits for the co-operative supplier. Saddam then arranged for the excess profits to be returned to Iraq via diplomatic channels, after the co-operative supplier took its 'fee.' ").

explicit term of the contract. Sometimes these clauses appeared as standalone clauses; other times they were framed as providing free goods for the nominal purpose of "analysis" by Kimadia. But Defendants' "free goods" payments were not always memorialized on the face of those contracts – depending on the individual contract and the course of negotiations, companies sometimes routed those payments through alternative means.

136. The **Administrative Fee Clause** was the second strategy Defendants used to deliver "free goods" to Jaysh al-Mahdi agents inside MOH. Under this strategy, Defendants and Kimadia agreed to commercially unreasonable contract provisions requiring the supplier to provide free product upon the satisfaction of some condition within Kimadia's control. For example, Defendants occasionally agreed to a clause promising to replace every drug or device that Kimadia failed to sell within a specified time period (or drugs and devices that Kimadia claimed were deficient), and then, on top of that, pay an "administrative fee" to compensate Kimadia for the lack of sales. Such provisions essentially gave MOH officials a blank check to demand additional "free goods" and cash from the supplier. This was particularly true because Defendants' sales contracts generally contained Iraqi choice-of-forum clauses requiring disputes to be litigated in notoriously corrupt and unreliable Iraqi courts – another commercially unreasonable term that facilitated the corrupt payments (such as Administrative Fee Clause payments) otherwise occurring under the contracts. Defendants and their corrupt counterparts sometimes used an Administrative Fee Clause as a substitute for an FOC Clause, or even in addition to such a clause. Pfizer, for example, accomplished the delivery of BeneFix "free goods" through both FOC Clauses and Administrative Fee Clauses.

137. The **Off-the-Books Payoff** is the third strategy Defendants used to pay "free goods" bribes. Under this strategy, Defendants used medical goods as cash equivalents to buy

off MOH officials to resolve disputes – often triggered by the commercially unreasonable contract provisions that Kimadia insisted appear in every contract. For example, Dr. Adel often accused companies of delivering spoiled or insufficient product and demanded an additional "donation" of "free goods" as compensation, which companies routinely agreed to provide. Instead of defending themselves against Dr. Adel's accusations, companies agreed to off-the-books settlements in which "free goods" were the currency of the settlement. In these circumstances, companies made a separate shipment of the "free goods" to MOH that was not tied to any particular tender or contract. As Defendants knew or recklessly disregarded, such shipments of extra goods were especially easy for Jaysh al-Mahdi to divert to the black market.

138. Defendants did not intend for the "free goods" provided to Kimadia to serve any legitimate charitable or medicinal purpose. It was widely understood in Iraq that MOH operated more like a terrorist organization than a legitimate health entity, and no rational company would have viewed MOH as a suitable object for charity. Nor did MOH actually operate as a charity: it followed a detailed, widely known distribution process that depended on local needs as calculated by the Needs Assessment Committee. Given the way that system was structured, which Defendants and their local agents knew or recklessly disregarded, the "free goods" payments were structurally designed to disappear from inventory.

139. The flourishing black market for medical goods in Iraq supports the same inference. Despite an inflated procurement budget – which ballooned to nearly $1 billion in 2004 and only grew from there – Kimadia was notoriously unwilling and unable to actually deliver imported drugs and devices to the people who needed them. As was widely reported, MOH's corruption and lack of inventory control meant that medical goods nominally intended

for the Iraqi people were routinely diverted.[98] For example, when Dr. Alwan became Minister of Health in May 2004, only six of the 32 chronic-disease drugs nominally purchased for public clinics were actually available to Iraqi patients. The provision of "free goods" to MOH made that problem worse. MOH staff attributed such rampant medical-goods shortages to two main causes: "excessive utilization of free pharmaceuticals, and structural obstacles to effective distribution, especially the corrupt vestiges of Kimadia."[99] When Defendants provided "free goods" to MOH officials, therefore, they knew (or recklessly disregarded) that those goods were not serving any legitimate public-health objective; they were destined for the black market.

140. Nor did the "free goods" payments operate as a legitimate discount. Kimadia had an obvious reason for demanding "free goods," rather than a price discount: discounted drugs and devices, while saving money in the MOH procurement budget, would have been harder for corrupt officials to monetize. For example, if Kimadia issued a request for proposal to buy X units of a drug at $Y per unit, a true "discount" might result in an offer to sell X units at $0.5Y per unit – that is, a 50% price discount on the requested quantity. While that would have been better for the Iraqi people and saved the government money, such a discount would have been harder for Jaysh al-Mahdi to monetize because the quantity purchased would have corresponded to actual purchase orders from Iraqi healthcare providers. Under the "free goods" scheme, Defendants would instead sell X units at the full $Y per unit – and then include another Z units for free. That allowed the Sadrists to keep and monetize the extra goods. By structuring the

[98] *See, e.g.*, Corinne Reilly, *Iraq's Once-Envied Health Care System Lost to War, Corruption*, McClatchy (May 17, 2009) ("Health ministry workers routinely siphon drugs from hospital orders to make extra cash on the black market. Bribery is rampant. Millions of dollars meant for clinics and equipment have gone missing. Millions more have been wasted on government contracts to buy expired medicines. The health ministry's inspector general openly admits the problems. Even so, the culprits are rarely punished.").

[99] James Dobbins *et al.*, *Occupying Iraq: A History of the Coalitional Provisional Authority* 130 (RAND Corp. 2009).

transaction to provide "free goods" rather than a price discount, Defendants ensured that the transaction would redound to the benefit of the Jaysh al-Mahdi agents with whom they were negotiating. At the same time, it allowed Defendants to prop up their relatively high official Iraq and Middle East-regional reference prices for drugs and medical devices.

141. Under Oil-for-Food, Kimadia openly rejected discounts in favor of kickback payments. As alleged by the SEC, one drug supplier "acquiesced to Kimadia's demands and authorized the payment of illegal ASSFs through a third-party agent."[100] But before doing so, a company executive had "rejected the request to pay Kimadia a ten percent kickback" and instead "suggested to the Kimadia import manager that [the company] reduce the price of its medicines by ten percent."[101] Kimadia, however, "angrily refused the offer" of a discount and insisted instead on the 10% kickback on top – to which the company ultimately agreed.[102] The same logic guided Kimadia's contracting strategy in later years. A true discount would not have benefited corrupt MOH officials; Kimadia thus rejected discounts in favor of extra "free goods."

142. Pfizer has settled an FCPA case that further illustrates how providing "free goods" to foreign officials functions as a bribe rather than as a legitimate discount. On August 7, 2012, Pfizer H.C.P. Corporation ("Pfizer HCP") – a Pfizer Inc. subsidiary that operated in several Central Asian markets – entered into a Deferred Prosecution Agreement with the DOJ that resolved expansive FCPA allegations.[103] In that agreement, Pfizer HCP admitted that it had paid a variety of bribes and kickbacks in Russia and elsewhere. Pfizer employees admittedly had "provid[ed] incentives" to healthcare providers "that were calculated as 5% of the value of

---

[100] *Novo Nordisk FCPA* Compl. ¶¶ 18-23.

[101] *Id.*

[102] *Id.*

[103] Deferred Prosecution Agreement, *United States v. Pfizer H.C.P. Corp.*, No. 12-cr-00169 (D.D.C. filed Aug. 7, 2012), ECF No. 4 ("*Pfizer DPA*").

certain Pfizer products."[104] "On its face," that arrangement "appeared to be a mechanism" for Pfizer employees "to provide the equivalent of indirect price discounts" to government hospitals. "In practice, however, Pfizer Russia used [those payments] to make cash payments to individual government healthcare professionals to corruptly reward past purchases . . . and to corruptly induce future purchases and prescriptions."[105] Defendants used a similar scheme here: their provision of "free goods" in connection with their Iraqi sales contracts functioned as corrupt payments to MOH officials who were members of Jaysh al-Mahdi.

**2. "Commission" Payments**

143. Defendants also made other corrupt payments to MOH officials at various stages of their sales transactions in Iraq. Jaysh al-Mahdi extracted a so-called *Khums* on Kimadia contracts – an Islamic concept translating roughly to a 20% religious tax. That policy required, as a general matter, companies doing business with Kimadia to pay bribes of at least 20% on every contract. This was sometimes paid in the form of in-kind bribes (like the "free goods" described above) but was often paid in cash as well. Such cash payments were typically called "commissions" – the Iraqi euphemism for bribes. From 2004-2013, it was standard practice for companies dealing with MOH to pay "commissions" on every major sales contract.

144. The 20% *Khums* accorded with Sadr's broader philosophy described in a 2009 U.S. State Department cable (as published by *WikiLeaks*): that Iraqi Shi'a "are required to pay one-fifth the value of certain items they acquire as wealth" to the Sadrists as a tax.[106] Muqtada

---

[104] *Pfizer DPA* Statement of Facts ¶¶ 36-37.

[105] *Id.*

[106] U.S. State Dep't Cable, *Karbala Shrines Pursuing Independent Agenda* (Apr. 24, 2009) ("Several contacts reported that Imams Karbala'i and Safi – concerned that the Iraqi faithful might curtail their payment of khums (in Shi'a Islam, believers are required to pay one-fifth the value of certain items they acquire as wealth as an 'Islamic tax') if there was a perception that all of their money was going to be sent to Iran."), https://wikileaks.org/plusd/cables/09BAGHDAD1100_a.html.

and the Sadrists thus demanded that every Shi'a pay the *Khums* as a 20% "flat-rate income tax/tithe" derived from a "customary" Islamic "obligation to share the profits."[107] Along those lines, in 2003 Sadr issued a *fatwa* authorizing looting of other people's property and allowing looters to "retain their stolen property as long as they made a contribution of 20 per cent of the value of the looted goods (*Khums*) to their local Sadrist office."[108]

145. These tactics permitted Jaysh al-Mahdi to reap the benefits of a mafia-style web of corruption that plagued MOH (including Kimadia) from top to bottom. Even when smaller "commissions" were paid in cash to individual Sadrist officials, they went to benefit the Jaysh al-Mahdi machine: such officials themselves had to kick back a percentage of their earnings to Sadr and Jaysh al-Mahdi as the price of keeping their lucrative positions in government. To that end, Jaysh al-Mahdi terrorists were embedded in leadership positions throughout every significant MOH and Kimadia department and committee, which ensured that Jaysh al-Mahdi and Sadr could institutionally profit from the "corruption economy" at MOH.

146. The Sadrists extracted their "commissions" from foreign medical-goods companies by using their leverage over multiple points of the transaction lifecycle. On information and belief, each Defendant paid significant "commissions" to MOH officials who were members of Jaysh al-Mahdi at some or all of those transaction stages. On information and belief, companies occasionally paid these "commissions" at early transaction stages even for contracts that they did not end up successfully obtaining. The transaction stages, and the corruption that characterized them, are explained in the following 19 paragraphs.

---

[107] Sam Hardy, *Khums: An un-Islamic Tax for an Islamic Antiquities Market?*, Conflict Antiquities (Blog) (Aug. 17, 2014), https://conflictantiquities.wordpress.com/2014/08/17/syria-iraq-islamic-antiquities-trafficking-tax/.

[108] *Id.*

147. The first opportunity for corrupt payments came at the **formulary stage** of the transaction lifecycle. Before a drug could be sold in Iraq, MOH had to approve the drug and place it on the national formulary (this requirement did not apply to devices). Only after a drug appeared on the formulary could MOH assign it a National Code and make it eligible for future Kimadia contracts. And, even after a drug made it onto the formulary, every new "indication" for the drug also had to be separately approved and then placed on the formulary. This power over the formulary provided MOH officials with a significant point of leverage: if MOH declined to approve a drug for sale (or a new indication for an approved drug) – or if it substantially delayed the approval process – it could exclude companies from future tendering rounds and materially threaten their revenues. MOH officials' regular practice was to exploit their leverage over the formulary to extract corrupt payments from foreign suppliers.

148. The **company registration stage** was another occasion for Jaysh al-Mahdi to extract corrupt payments from foreign suppliers. There were two key companies involved in any major transaction with Kimadia: the supplier (the company that executed the contract and assumed responsibility for ensuring delivery of the goods) and the manufacturer (the company that manufactured the goods being sold). Before Kimadia would award a contract to a foreign supplier, both the supplier and the manufacturer had to register with the MOH Technical Department to do business in Iraq. MOH also reserved the right to reject bids that did not describe the legal relationship between the two companies in a "clear and candid way," including disclosure of any subsidiary or affiliate relationship.

149. This company registration process typically took place shortly before or after the completion of the bid process – but in all events no later than six months after the execution of a sales contract. The registration process required an application to MOH and the retention of a

local Scientific Bureau to represent the company's interests in Iraq. Scientific Bureaus, by their nature and status under Iraqi law, must represent foreign suppliers' interests and act at those suppliers' direction and control. Specifically, under MOH regulations, foreign medical-goods suppliers had to register a Scientific Bureau to represent them and act as their agent in dealings with MOH. Scientific Bureaus could not enter agreements with or make payments to MOH unless so authorized by the suppliers they represented. As part of their registrations, suppliers and manufacturers had to submit letters to MOH certifying that their chosen Scientific Bureau was authorized to transact business with MOH on their behalf.

150. Scientific Bureaus also provided a conduit for corrupt payments to Jaysh al-Mahdi. Although Scientific Bureaus have continuously served as a vehicle for corruption in Iraq since 2004, beginning in 2006 or 2007 Jaysh al-Mahdi-affiliated MOH officials – including (but not limited to) Directors General Dr. Ali Bustan and Dr. Hani – further enhanced their ability to raise money for Jaysh al-Mahdi through "commissions" by setting up Scientific Bureaus under their control and steering companies to retain those Bureaus to represent the companies in transactions with Kimadia. The Bureaus – acting as agents for the foreign suppliers – would charge an elevated agent fee that would itself, in effect, be a payment to Jaysh al-Mahdi. On information and belief, Defendants hired certain Jaysh al-Mahdi-affiliated Scientific Bureaus to facilitate some of their corrupt transactions with MOH.

151. According to Kimadia's registration regulations, multinational companies were "required to register any of their subsidiaries" to the extent they "decide to supply any of their products from the said subsidiary." That required Defendants to submit paperwork to MOH describing their subsidiaries and affiliates involved in commercial transactions with MOH. As with the formulary stage described above, MOH officials could hold up company registration

paperwork – which MOH had to process as a condition of suppliers being permitted to sell in Iraq – as a way of encouraging suppliers to pay them additional "commissions." MOH officials' regular practice was to extract such payments in connection with the registration process.

152. The **drug or device registration stage** presented another opportunity for Jaysh al-Mahdi to extract corrupt payments from foreign suppliers. Even after a drug was placed on the formulary, a supplier could not sell its version of that drug until it separately registered with MOH. For example, acetaminophen might appear on the MOH formulary, but Johnson & Johnson would not be able to sell Tylenol (its branded version of acetaminophen) unless it separately registered Tylenol with MOH. A registration was effective for five years, after which the company was required to re-register the product. MOH officials' regular practice was to extract corrupt payments as a condition for registering a company's drugs or devices.

153. The product registration process required applicants to submit a wide array of information to MOH. For example, suppliers seeking to register U.S.-manufactured goods had to provide a certificate confirming that the U.S. Food and Drug Administration ("FDA") had approved the drug or device for sale in the United States, and such suppliers had to certify that they were sourcing the drug or device from the United States. Suppliers also had to write the country of origin – in the case of U.S.-manufactured goods, "USA" – on the inner and outer packages of the drugs or devices shipped to Kimadia.

154. In addition, even for drugs manufactured outside of the United States, Kimadia required suppliers to provide FDA approvals where applicable. FDA approval was important to MOH because of the reputational legitimacy the FDA conferred: FDA approval signified that the product was safe for use (thus satisfying Iraqi safety regulations), and FDA-approved drugs carried a high street value, which made FDA-approved goods especially attractive for black-

market diversion. Indeed, the Sadrists placed a premium on importing medical goods manufactured in the United States and Europe – as goods sourced from other countries were considered less valuable; worth less on the black market; and more likely to be counterfeit. Moreover, FDA approval was the gold standard for imported drugs and medical devices, and Kimadia prioritized obtaining documentation of FDA approval over and above approvals from regulatory bodies in other countries (including in Europe).

155. The **needs assessment stage** was another opportunity for Jaysh al-Mahdi to elicit corrupt payments from foreign suppliers. Jaysh al-Mahdi agents within regional MOH directorates (such as Dr. Ali Bustan, Dr. Jaleel, or Dr. Hani, *see supra* Part II.B.3) regularly extracted corrupt payments as part of their Needs Assessment Committee calculations. Regional MOH directorates had significant influence over the inventory-assessment calculations that informed how many units of each good Kimadia purchased each year; companies with a large market share in a certain class of good or drug thus regularly bribed MOH regional Directors General and their subordinates to influence Kimadia to make large purchases of their products.

156. The **tendering stage** presented another occasion for Jaysh al-Mahdi to collect corrupt payments from foreign suppliers. After a company had secured the necessary approvals to participate in a tendering round, the company had to then secure a sales contract from Kimadia before it could actually sell its drugs or devices. The tendering process itself was laced with corruption. As noted above, one important way that Kimadia extracted corrupt payments during the tendering process was by demanding that companies commit to provide "free goods" memorialized in the contracts themselves. But that was not the only way. Companies regularly made "commission" payments to Kimadia employees as well, as well as to MOH officials who sat on the committee overseeing the procurement process, to acquire inside information on the

evaluation process. Several witnesses recall that companies bidding on contracts regularly paid monthly "salaries" to Kimadia employees – essentially putting those employees on retainer – to provide the companies with confidential information about the tendering process.

157. The tendering process also required bidders to convey several important pieces of information to MOH. Beyond the quantity of "free goods," bids contained (among other things) the following information:

- The names of the supplier and the manufacturer;
- Authorization letters verifying that both the supplier and the manufacturer had registered to do business in Iraq;
- A certification confirming that the goods were wholly produced or manufactured in the country of origin, which had to be stamped by an appropriate agency within that country. Thus, if the goods being offered were manufactured in the United States, the supplier had to include a certificate – stamped by the U.S. Department of Commerce – that the goods being offered were indeed of U.S. origin; and
- An authorization letter from the manufacturer confirming that the supplier had authority to sell the manufacturer's products in Iraq and spelling out the legal relationship between the supplier and the manufacturer. MOH required both the supplier and the manufacturer to verify the supplier's authority to sell the manufacturer's products in Iraq; if the supplier did not include an authorization letter from the manufacturer in the bid, MOH would contact the manufacturer directly to obtain such a letter.

158. Suppliers who sold medical goods to MOH did so as agents for the foreign manufacturers whose products they sold.[109] Iraqi regulations – as well as the paperwork submitted during the tender process – made that relationship clear. As part of the tender process, a supplier was required to demonstrate "sole and exclusive rights to represent th[e] manufacturer in the territory of Iraq for all of its products," and each supplier had to procure a "letter from the manufacturing company authori[z]ing [the supplier] to represent them."[110] Manufacturers thus

[109] This was true for the manufacturers that were affiliated with the suppliers and that were actually making the active pharmaceutical ingredient ("API"); it did not appear to apply in circumstances in which Defendants entered into a relationship with a contract manufacturing partner that was technically listed as the "manufacturer" on certain contracts.

[110] *2007 USAID Report* § 6.3.2.1.2.

had the right to control the suppliers' conduct vis-à-vis MOH: manufacturers could refuse to authorize specific suppliers to sell in Iraq; could decline to produce documentation confirming that the suppliers acted on their behalf in negotiating with MOH; or could refuse to fulfill contracts that contained corrupt payments. Any one of those steps, which were in the manufacturer Defendants' power to control, would have precluded the corrupt payments at issue. None of those things happened, however, because the manufacturer Defendants were (like the supplier Defendants) eager to profit from sales in Iraq, and thus were willing to delegate to their supplier affiliate-agents the responsibility for Iraqi sales of their products.

159. Like Saddam had done under Oil-for-Food, the Sadrists also extracted corrupt payments funded through sham or inflated payments by the suppliers relating to such items as post-sales "services," "performance bonds," "warranties," "equipment donations," "contractual facilities," "maintenance," and "training." Corrupt payments through sham services agreements were the signature bribe of the Oil-for-Food scandal; while the nomenclature later changed, the practice continued once the Sadrists assumed control of MOH.

160. During the tender process, or as a condition of the tender, companies also paid for MOH officials (including Kimadia officials) to take free trips abroad – usually under the pretense of inspecting company facilities or attending conferences, seminars, or training sessions. These "free vacations" were often memorialized on the face of Kimadia's contracting instructions: suppliers were "responsible to submit training course[s] for the medical, technical and Kimadia staff, inside and outside Iraq, F.O.C. [free of charge]." In reality, both sides understood these free trips – which often involved luxurious resorts and generous "per diems" – as bribes intended to curry favor with MOH officials. For example, to win a $1,451,259.40 medical-device contract, Defendant J&J Middle East agreed to provide a 10% "free goods" bribe through the

FOC strategy and, on top of that, to host "(4) doctors (4) nurses & (2) [K]imadia staff for (10) days in country of origin F.O.C." and, further, to "train the medical, technical, engineering and Kimadia staff, inside and outside Iraq, F.O.C." On information and belief, Defendants regularly provided such vacations to Sadrist MOH officials.

161. Defendants' vacation bribes supported Jaysh al-Mahdi's terrorist activities in a number of ways. The sham "training" and "travel" expenses, which were paid as part of the free trips provided, functioned as a slush fund for cash payments to the Jaysh al-Mahdi agents who worked at MOH. In addition, the luxury vacations themselves benefited the terrorist enterprise by providing "rest and recuperation," popularly known as "R&R," for Jaysh al-Mahdi's terrorist leaders and financiers. The U.S. government recognizes "R&R in neighboring countries" as an important activity relevant to the functioning of a terrorist group.[111] On information and belief, Beirut was one destination for such free trips, and trips to Beirut (where Hezbollah's leadership resides) enabled Jaysh al-Mahdi agents to communicate securely with their Hezbollah sponsors.

162. Performance-bond clauses provided another mechanism for the delivery of corrupt payments during the tender process. A "performance bond" required the supplier to deliver up-front to Kimadia a guarantee, issued by a bank and backed by collateral, valued at a percentage of the value of the contract. These clauses were nominally to protect Kimadia from default by the supplier, but in reality they functioned as a conduit for additional corrupt payments. Not only did the performance bonds serve no legitimate business function given the presence of letters of credit (which already provided Kimadia with protection against default), but the sales contracts allowed Kimadia officials to seize the bond amount on demand, with

[111] *See*, *e.g.*, U.S. State Dep't, *Country Reports on Terrorism 2006, Ch. 6 – Terrorist Organizations* (listing "R&R in neighboring countries" as one of the "activities" pursued by a notorious terrorist group (FARC), along with "extortion, kidnapping, weapons sourcing, [and] logistics"), https://www.state.gov/j/ct/rls/crt/2006/82738.htm (last accessed Sep. 22, 2017).

virtually no accountability. For those reasons, foreign suppliers used "performance bonds" as a technique to funnel corrupt payments to Ba'athist officials under the Oil-for-Food Program.[112] The same remained true when Jaysh al-Mahdi controlled the Ministry.

163. Defendants regularly agreed to provide "performance bonds" in their sales contracts with the Jaysh al-Mahdi-run MOH, which functioned as another means through which Jaysh al-Mahdi could collect their required *Khums* in cash. These performance-bond clauses duplicated the letters of credit (for which the suppliers were separately paying); often involved the use of corrupt Iraqi banks; and were typically subject to few (if any) enforceable restrictions on when Kimadia officials could seize the bonds. Examples of performance-bond clauses executed by Defendants appeared in Order Nos. 40/2008/66, 40/2008/3, 40/2006/704, 40/2010/143, 40/2010/543, and 40/2006/185 (AstraZeneca, 5% bond); Order No. 40/2005/303 (Cilag, 10% bond); Order No. 40/2007/505 (Cilag, 5% bond); Order No. 40/2011/446 (Pfizer, 5% bond); and Order No. 40/2006/359 (Roche, 5% bond).

164. The **distribution stage** presented yet another occasion for Jaysh al-Mahdi to extract corrupt payments from foreign suppliers. The standard Kimadia sales contract imposed harsh penalties for late deliveries and conditioned payment on successful delivery. Meeting these conditions required the sign-off of multiple MOH officials, including a Kimadia Deputy Director General, individual warehouse managers, and members of the Facilities Protection Service nominally providing "security" for the shipments. As detailed in the *Contract*

[112] *See, e.g.*, Volcker Report at 277 ("Often this upward revision was accomplished by increasing the unit price, but in many instances an explicit after-sales-service fee equal to the levied amount was inserted in the contract. In other instances, the fee was disguised as a performance bond or a maintenance or training expense."); Compl. ¶ 25, *SEC v. York Int'l Corp.*, No. 07-cv-01750 (D.D.C. filed Oct. 1, 2007), ECF No. 1 ("In a November 7, 2000 memorandum to the Regional Sales Manager, who was based in YACR's Dubai branch, the Agent asserted that the Agent could facilitate the 'requested 10%' by characterizing the payment as a 'performance bond.'").

*Management* article, MOH employees historically have leveraged these positions to force companies to make additional corrupt payments throughout the distribution process.[113]

165. The **inventory stage** similarly allowed Jaysh al-Mahdi to collect corrupt payments from medical-goods suppliers. Kimadia's standard sales contract imposed steep penalties on companies whose goods did "not comply with specifications" (*e.g.*, failed MOH testing) or went "missing." That gave the Facilities Protection Service, whose members guarded MOH warehouses, significant leverage over medical-goods suppliers: if they failed to provide security, pilfered medicines from warehouse storage, or failed to properly maintain the goods (*e.g.*, by shutting off the power to a warehouse storing refrigerated goods), Kimadia could accuse the company of default and levy the penalties specified in the contract. That leverage allowed Jaysh al-Mahdi agents to extract additional payments from foreign suppliers.

## IV. DEFENDANTS KNEW OR RECKLESSLY DISREGARDED THAT THEIR TRANSACTIONS HELPED FUND JAYSH AL-MAHDI ATTACKS ON AMERICANS

### A. Defendants' Corrupt Transactions Directly Funded Jaysh al-Mahdi Terrorist Attacks On Americans

166. From at least 2004-2013, Defendants knowingly structured their transactions to facilitate Jaysh al-Mahdi's diversion of funds, drugs, and medical devices from MOH – which Jaysh al-Mahdi used to support terrorist operations against Americans in Iraq. Senior MOH officials involved in the procurement process (such as the officials identified above, *see supra* Part II.B) were avowed, well-known Jaysh al-Mahdi agents. As the August 12, 2007 memorandum put it, Dr. Adel extracted corrupt payments from suppliers in his capacity as "one of the major supporters and organizers of the Mahdi Militia." According to the same document, the "person who is in charge of all the medicine at MOH is also a [Mahdi] militia supporter."

[113] *See Contract Management* at 46-48.

Defendants' corrupt transactions overseen by such Jaysh al-Mahdi agents, with a counterparty that the Sadrists had totally commandeered, delivered resources directly to Jaysh al-Mahdi.

167. The Sadrist control over MOH was so complete that, by 2005, there was no longer any meaningful distinction between the Ministry and Jaysh al-Mahdi. By the fall of 2005, American intelligence officials had expressed escalating concerns (as described in *Endgame*) that Jaysh al-Mahdi members had "ensconced themselves in the ministries and were using them to advance their military ends."[114] The *Endgame* authors concluded that it was "bad enough that the Mahdi Army was the dominant security force in Sadr City and other Shiite neighborhoods in Baghdad. Now it had captured the very instruments of the state."[115] That was especially true of MOH, which functioned as a Jaysh al-Mahdi apparatus that did much more to facilitate terrorism than it did to provide medicine to the Iraqi people. Because Jaysh al-Mahdi had effectively captured MOH, corrupt payments via the latter directly benefited the former.

168. Defendants' corrupt transactions with MOH supplied Jaysh al-Mahdi with resources critical to its terrorist operations. The Sadrists' control over Kimadia's procurement budget – and the corrupt payments from foreign suppliers that came with it – was a key source of Jaysh al-Mahdi's power. According to one witness who occupied a high-level position inside MOH, Jaysh al-Mahdi's control over Kimadia was "how they financed their empire." Indeed, MOH was the Sadrists' top request during 2005-2008 cabinet negotiations precisely because Kimadia offered the Sadrists the means to fund the Jaysh al-Mahdi organization. Jaysh al-Mahdi's appropriation of MOH facilities as direct tools of terrorism (*see supra* Part II.B) further strengthened the potency of Defendants' corrupt transactions as a means of financing attacks. As

[114] *Endgame* at 220.

[115] *Id.*

Dr. Ghanim (the University of Gothenburg Senior Research Fellow) observed, "control over Kimadia, the state-run company responsible for importing and distributing drugs and supplies to Iraqi hospitals, provided the Mahdi Army with a position of monopoly and a source of power."[116]

169. Local government officials in Sadr City confirmed Jaysh al-Mahdi's use of government ministries, including MOH, to raise money. As recounted in a June 2007 U.S. State Department cable (as published by *WikiLeaks*), "Sadr City council members" detailed the ways in which Jaysh al-Mahdi raised revenue through local "control of services" provided by the government.[117] Jaysh al-Mahdi accomplished this, the council members explained, by ensuring that "a Sadrist" could "wield 'official' power" at key public institutions, which in turn permitted Jaysh al-Mahdi members to infiltrate the institution and "work around the fringes of that institution's jurisdiction with impunity."[118] The cable further explained that MOH "offices provide an opportunity for JAM to channel medicine onto the black market."[119]

170. The 2006 analysis prepared by the U.S. Embassy in Baghdad specifically documented the link between the MOH procurement process and Jaysh al-Mahdi attacks. After noting that MOH was "openly under the control of the Mehdi Army of Muktad al-Sadr," the report discussed Jaysh al-Mahdi's fundraising through corrupt pharmaceutical transactions:

> ***MOH has an atrocious reputation*** in the public and the Iraqi press regularly complains bitterly ***about the lack of pharmaceuticals which is blamed on corruption***. There are repeated stories of patients having to purchase black market drugs that were originally destined for MOH. Complaints of preventable deaths due to lack of medicines are

[116] *Dysfunctional Democracy* at 217.

[117] Amb. Ryan Crocker, U.S. State Dep't Cable, *Control of Services Means Opportunity for Criminality* (June 20, 2007), https://wikileaks.org/plusd/cables/07BAGHDAD2040_a.html.

[118] *Id.*

[119] *Id.*

> commonplace. ***Military sources have reported that the Medhi Army finances operations from diverted medicines***.[120]

171. A former official in the Office of the Treasury Attaché in Baghdad further documented that causal link in a 2010 article in *Military Review*, which is the "Professional Journal of the U.S. Army." In the context of explaining a broader thesis about the relationship between corruption and organized crime, the article reported that corrupt officials "may attempt to obtain control over other resources either to convert them into money or distribute them to maintain influence. The Mahdi Army, for example, used the Iraqi Ministry of Health to divert pharmaceuticals that were intended for the general public."[121]

172. Evidence gathered in connection with the February 2007 Zamili arrest further corroborates the direct link between the Sadrists' corrupt fundraising scheme at MOH and Jaysh al-Mahdi's terrorist activities. The day after the arrest, the Pentagon's press service issued a statement that Zamili had "reportedly orchestrated several kickback schemes by using inflated contracts for ministry equipment and services. These kickbacks, which officials believe have funneled millions of U.S. dollars to militia elements, support sectarian attacks and violence."[122] The same day, a Pentagon spokesman confirmed to *The Toronto Star* that Zamili's "corruption is believed to have funneled millions of U.S. dollars into rogue JAM."[123] Reporting on the raid two months later, the *Associated Press* similarly noted evidence that Zamili "orchestrated kickback

---

[120] *U.S. Embassy Baghdad Report* at 24-26 (emphasis added).

[121] Brock Dahl, *The Quiet Enemy: Defeating Corruption & Organized Crime*, Military Rev. 81-82 (Mar.-Apr. 2010).

[122] U.S. Dep't of Def., *Senior Official at Iraq Ministry of Health Detained; 13 Terrorists Killed*, Am. Forces Press Serv. (Feb. 8, 2007), http://archive.defense.gov/news/newsarticle.aspx?id=2976.

[123] *Iraq's Deputy Health Minister Arrested*, Toronto Star (Feb. 8, 2007).

schemes related to inflated contracts for equipment and services, with millions of dollars allegedly funneled to Mr. Sadr's Mahdi Army militia."[124]

173. The anti-corruption investigations spearheaded by the U.S. Office of Accountability and Transparency ("OAT") and the Iraqi CPI uncovered similar evidence that corrupt payments to MOH employees fueled Jaysh al-Mahdi terrorist attacks. Those investigations, according to Judge Brennan, involved evidence that Dr. Adel and Zamili had engaged in "theft or misappropriation of up to one billion dollars in medical supplies" that were "showing up on the black market in Iraq and Syria." Based on those investigations, Judge Brennan opined to Congress that "[i]t is likely that some of that money is financing outlaws and insurgents such as the Mehdi Army."[125] James Mattil, the Chief of Staff of OAT, testified similarly that corruption at Iraqi ministries, including at MOH, helped fund attacks against Americans in Iraq. As he explained, "[c]orruption and its consequences are the fuel that sustains the insurgency, providing the money, the people and the motivation to fight Americans in Iraq. Stuart Bowen of SIGIR correctly calls it 'the second insurgency.'"[126]

174. Judge Radhi, the head of the Iraqi CPI, similarly testified to Congress that, based on data he gathered as of late 2007, corruption at MOH alone had reached an estimated $2 billion.[127] As later reported, Judge Radhi considered his task in Iraq to be "put[ting] an end to the corruption that was . . . a principal source of funding for the terrorist groups that the U.S. military was trying to crush." In the course of his investigation, Judge Radhi concluded that

[124] Bassem Mroue & Qassim Abdul-Zahra, *Waste, Corruption Cost Iraq $8 Billion in Past 3 Years, Watchdog Says*, Assoc. Press (Apr. 5, 2007).

[125] *Brennan Testimony*, 2008 WL 2010885.

[126] Statement of James F. Mattil, *Waste, Fraud and Corruption in Iraq: Hearing Before the S. Comm. on Democratic Policy* (May 12, 2008), 2008 WL 2010884.

[127] *See* Statement of Judge Radhi Hamza al-Radhi, *Waste, Fraud and Corruption in Iraq: Hearing Before the S. Comm. on Appropriations* (Mar. 11, 2008), 2008 WL 652952.

Jaysh al-Mahdi had "fully commandeered the ministries of health, trade, and transportation. Its soldiers, with the tacit approval of ministry employees, stole food and medical supplies, among other things, and resold them to fund the insurgency against the Americans."[128]

175. On April 11, 2008, *60 Minutes* ran an interview with Judge Radhi for a story entitled "Iraq: State of Corruption."[129] He stated that a "big problem" with Iraqi corruption was that "American and the Iraqi funds are now going to the militias. And both Iraqis and the Americans are being killed with that." MOH – and the bribes that Defendants paid the terrorists running it – exemplified that fact. As summed up by the *60 Minutes* piece, the "bribery and outright theft" that plagued MOH (and other ministries) generated "ill-gotten gains" for terrorists that were "being used to kill American troops."[130]

176. Dr. Phil Williams, while he was a Visiting Professor at the U.S. Army War College, further documented that causal connection between MOH's procurement process and Jaysh al-Mahdi's terrorist operations. In 2009, Dr. Williams explained that Jaysh al-Mahdi's "infiltration" of MOH "not only led to sectarian killings of Sunni patients . . . but also made possible the diversion and sale of large amounts of pharmaceuticals. Along with many other rackets, this was an important funding source for [Jaysh al-Mahdi]."[131]

177. Some U.S. government personnel called Jaysh al-Mahdi the "The Pill Army," because Sadr and his lieutenants were notorious for paying Jaysh al-Mahdi's low-level terrorist fighters in pharmaceuticals, rather than cash. Those fighters – most of whom were young, poor, uneducated Shiite males – accepted such payment because they could either re-sell the pills on

[128] Christopher S. Stewart, *The Betrayal of Judge Radhi*, Condé Nast Portfolio (Mar. 17, 2008).

[129] *See* Steve Kroft, *Iraq: State of Corruption*, 60 Minutes (Apr. 11, 2008), http://www.cbsnews.com/news/iraq-state-of-corruption-11-04-2008/.

[130] *Id.*

[131] Phil Williams, *Criminals, Militias and Insurgents: Organized Crime in Iraq* 208-09 (June 2009).

the street or take the pills themselves (as an intoxicant, not as medicine). This technique of payment-by-pharmaceuticals, in turn, depended on the large volumes of divertible pills that Defendants provided the terrorist officials who ran MOH.

178. Information from U.S. military raids on Jaysh al-Mahdi safe houses between 2005-2008 (as published by *WikiLeaks*) similarly indicated that Jaysh al-Mahdi diverted MOH pharmaceuticals as a key part of its operations:

- On February 21, 2005, Coalition forces raided what was, on information and belief, a Jaysh al-Mahdi safe house near the Iranian border and seized a "large quantity of unknown pharmaceuticals" along with "7.62 ammo, several passports, ID's and documents."[132]
- On January 27, 2007, Coalition forces raided what was, on information and belief, a Jaysh al-Mahdi site southwest of Basra in which they recovered a large cache of rockets, mortars, explosives, and "syringes and suppositories."[133]
- On June 19, 2008, Coalition forces uncovered multiple weapons caches during raids on Jaysh al-Mahdi sites in eastern Baghdad near Sadr City; the caches included more than 100 AK-47s, an RPG launcher, and 20 boxes of prescription drugs, all of which appeared "to be serviceable, and were probably attained via local sources."[134]

179. Jaysh al-Mahdi monetized more than just drugs and small medical devices. Contemporaneous press accounts, beginning in 2004, revealed that large medical devices such as X-ray machines and magnetic resonance imaging ("MRI") machines were also diverted from MOH stockpiles and resold on local or regional black markets.[135]

180. Although Defendants' corrupt payments to Jaysh al-Mahdi agents inside MOH provided especially valuable assistance for Jaysh al-Mahdi terrorist attacks, the causal nexus was

---

[132] *WikiLeaks* (Feb. 21, 2005), https://wikileaks.org/irq/report/2005/02/IRQ20050221n1542.html.

[133] *WikiLeaks* (Jan. 27, 2007), https://wikileaks.org/irq/report/2007/01/IRQ20070127n6694.html.

[134] *WikiLeaks* (June 19, 2008), https://wikileaks.org/irq/report/2008/06/IRQ20080619n11314.html.

[135] *See*, *e.g.*, Beth Potter, *Iraqi Health Ministry Fights Corruption*, UPI (June 15, 2004) ("[Iraqi] Health officials would pay to get the stolen medical equipment back, Talibi said. He believes X-ray machines, ultrasound machines, maybe even a few MRI imaging machines donated to Iraq were probably sold for cents on the dollar to neighboring countries like Syria, Jordan, Turkey and Iran and are still relatively new."); Ala'din Alwan, *Health in Iraq* 56 (2d ed. 2004) (noting that MOH's "[e]xpensive multi-million dollar equipment was either stolen or damaged").

not limited to such corrupt payments or other FCPA violations. Whether or not Defendants technically violated the FCPA, their transactions with a counterparty that was openly controlled by terrorists – and which openly diverted Ministry resources to terrorist ends – supplied Jaysh al-Mahdi with medical goods and cash that it used to fund terrorism against Americans.

### B. Defendants Knew Or Recklessly Disregarded That Their Transactions With MOH Financed Terrorism

181. Defendants knew or recklessly disregarded that their corrupt transactions with MOH financed Jaysh al-Mahdi terrorist attacks. At all relevant times since 2004, MOH insisted that each supplier execute contracts by hand and deliver them in person to MOH headquarters in Baghdad. That required company agents (usually Scientific Bureaus) to enter a building whose physical premises explicitly paid homage to Sadr and his terrorist agenda. Beginning in late 2004, Defendants' agents, on their way to deliver their contracts, necessarily walked past multiple posters adorned with Sadrist pictures and jihadist propaganda. As *USA Today* reported, those posters "remove[d] any doubts about who runs the place."[136] Other features of the Ministry building – including the Jaysh al-Mahdi fighters in the hallways, the yellow collection boxes calling for Sadrist donations, and the array of heavy weaponry (including rocket-propelled grenades) displayed in the offices of key officials – conveyed the same message. In fact, MOH was unusual in that it was one of the few buildings in Iraq that, by late 2006, was considered too dangerous for Americans or other outside investigators to enter. As the *Los Angeles Times* reported in early 2007, "U.S. officials no longer visit the run-down [health] ministry. Even for Americans, who typically travel in cocoons of security, the threat level is too high."[137]

---

[136] Charles Levinson, *Sadrists' Grip on Iraqis' Healthcare Takes Toll*, USA Today (Mar. 27, 2008).

[137] Louise Roug, *Iraqi Health Official Is Arrested in Sweep*, L.A. Times (Feb. 9, 2007).

182. Beginning in early 2005, Minister Mutalib advertised that the office adjacent to his (staffed by clerics in Sadr's inner circle) was devoted to Jaysh al-Mahdi. The presence of heavy weaponry inside his office, along with Dr. Mutalib's open identification as a "Mahdi soldier," further indicated his Jaysh al-Mahdi ties to those who interacted personally with him, including Defendants' local agents. Those facts, combined with the ubiquitous anti-American propaganda inside MOH and the widespread reports of Jaysh al-Mahdi's violence against Americans, made clear to Defendants that the beneficiaries of their corrupt transactions were the anti-U.S. terrorists who ran the Ministry. And the heavy weaponry and violent messaging inside the building further indicated to Defendants what was already widely understood in Iraq: that Jaysh al-Mahdi terrorists – not benign Sadrist bureaucrats – actually ran MOH.

183. By early 2005, according to several witnesses with on-the-ground experience with the Iraqi healthcare sector, it was widely understood in Iraq that Jaysh al-Mahdi had taken control of MOH's contracting process. As Jeffrey Stacey, a professor of international relations at Tulane University, likewise observed in *The National Interest* in 2007, MOH was "[w]idely suspected of being turned into a Mahdi Army fief" that was "channeling . . . millions of dollars to the militia."[138] Defendants were aware of that common understanding in part through their Scientific Bureaus. Defendants each relied in part on Scientific Bureaus or other local agents to keep them abreast of Iraqi market conditions; these agents (which were subject to Defendants' control and whose knowledge is imputed to Defendants) knew that the Sadrists controlled MOH and used that control to raise money for terrorism. As a general matter, those agents spoke fluent Arabic, had relationships with people throughout MOH and Kimadia, and were well-informed

[138] Jeffrey Stacey, *Re-Occupy Iraq?*, Nat'l Interest (July-Aug. 2007).

about Iraqi politics. They could not have remained ignorant of the common understanding on the Iraqi street that the MOH contracting process was controlled by Jaysh al-Mahdi.

184. From 2005-2008, accounts from prominent Western media sources also reported on the direct link between MOH and Jaysh al-Mahdi, including:[139]

- *New York Times*, April 2005: "One political figure who may stand to gain from the new cabinet lineup is ***Moktada al-Sadr, the rebellious Shiite cleric who led two armed uprisings against the American occupation*** and the interim Iraqi government last year. Three members of the cabinet – ***the health minister***, the transportation minister and the civil society minister – ***belong to Mr. Sadr's political movement*** . . . ."[140]
- *Council on Foreign Relations*, May 2005: "***Minister of health*** Abdul Mutalib Mohammed Ali . . . is ***linked to Muqtada al-Sadr***, the anti-U.S. Shiite cleric who heads the Imam Mehdi Army, ***an armed militia that has intermittently waged an insurgency against U.S. forces*** in Iraq."[141]
- *Christian Science Monitor*, September 2005: "***Sadr movement officials run the Health Ministry***, extending influence from the hospitals to the ambulance service. ***Posters, stickers, and other memorabilia of Sadr are plastered on Ministry of Health*** checkpoints, hospitals, and the walls of Baghdad's main ambulance center."[142]
- *Guardian*, May 2006: "The [Health] ministry is ***under the control of*** the Shia cleric Moqtada ***al-Sadr***, and a large mural of his dead ayatollah father decorates the entrance to the compound. ***Most of the security guards in the morgue and the ministry are affiliated to his militia, the Mahdi army***, one of the militias thought to be behind the sectarian killing going on in their neighbourhoods."[143]
- *Christian Science Monitor*, May 2006: "The [health] ministry is ***run by the militant Shiite movement led by cleric Moqtada al-Sadr*** . . . . Security at the ministry and at the attached morgue is ***controlled by the Mahdi Army,*** the militia loyal to Mr. Sadr who have been accused by Sunni Arabs of running sectarian death squads. . . . ***Those who control the Health Ministry don't try to hide where their ultimate loyalties lie***."[144]
- *Washington Post*, August 2006: "[T]he primary group kidnapping Sunnis from hospitals is the Mahdi Army, a militia controlled by anti-American Shiite cleric Moqtada al-Sadr

[139] All emphases in this paragraph are added.

[140] Robert F. Worth, *The Struggle for Iraq: Politics; Iraq's Assembly Accepts Cabinet Despite Tension*, N.Y. Times (Apr. 29, 2005). At all times relevant to this Complaint, there was no actual or perceived firewall between the Sadrist political movement and Jaysh al-Mahdi.

[141] Lionel Beehner, *IRAQ: Cabinet Ministers*, Council on Foreign Rel. Backgrounder (May 2, 2005).

[142] Jill Carroll, *Sadr Militia's New Muscle in South*, Christian Sci. Monitor (Sept. 21, 2005).

[143] Ghaith Abdul-Ahad, *Inside Iraq's Hidden War*, Guardian (May 19, 2006).

[144] Dan Murphy, *Sadr's Militia Tightens Grip on Healthcare*, Christian Sci. Monitor (May 25, 2006).

that has infiltrated the Iraqi security forces and several government ministries. The minister of health, Ali al-Shimari, is a member of Sadr's political movement."[145]

- *Associated Press*, August 2006: "Iraq's health minister, ***who is aligned to a powerful Shiite militia***, claimed Sunday that ***U.S. forces arrested seven of his personal guards*** in a surprise pre-dawn raid on his office. . . . 'It is a provocation,' said al-Shemari, a Shiite ***aligned to the anti-U.S. radical cleric, Muqtada al-Sadr, who heads Iraq's biggest Shiite militia, the Mahdi Army***."[146]
- *CBS News*, October 2006: "[T]he morgue itself is believed to be controlled by the same Shiite militia blamed for many of the killings: ***the Mahdi Army***, founded and led by anti-American cleric Moqtada al-Sadr. The ***takeover began after the last election in December when Sadr's political faction was given control of the Ministry of Health***. The U.S. military has documented how ***Sadr's Mahdi Army has turned morgues and hospitals into places where death squads operate*** freely."[147]
- *USA Today*, November 2006: "[Sadr's] political group, for example, controls the Health Ministry and has used it to harbor death squads, infiltrate hospitals and punish al-Sadr's enemies, says Ayad al-Samarrai, the deputy chairman of the Iraqi Islamic Party, a Sunni group. . . . Iraq's Health Ministry is a ***case study in how al-Sadr used his government role to consolidate his political and military support***. Ministry-run hospitals have been used as a weapon against rival Sunnis, according to critics, such as Sunni lawmaker Mithal al-Alusi. '***It's a jungle***,' al-Alusi says. '***What (al-Sadr) has done with that ministry is criminal***.' "[148]
- *Newsweek*, December 2006: "Two prime ministers since 2005 – Ibrahim Jaafari and the current Iraqi leader, Nuri al-Maliki – have depended on [Sadr's] swing votes for their majority. But Sadr himself stayed out of government, and kept his distance. That way he could pursue a dual strategy – ***rebuilding his militia even as he capitalized on his control of key ministries, like Health*** and Transportation, to provide services to the poor and jobs to his followers."[149]
- *Los Angeles Times*, February 2007: "Iraqi and U.S. forces on Thursday launched a crackdown on the ***web of patronage that sustains radical anti-American cleric Muqtada Sadr***, detaining a high-level Iraqi official in connection with the killings of ***Health Ministry officials and the diversion of millions of dollars to a Shiite Muslim militia***. . . . The Health Ministry is controlled by Sadr, Iraqi and U.S. authorities say. It's a house of horrors where health officials have disappeared on their way to meetings, never to be heard from again."[150]
- *New York Times*, February 2007: "Iraqi and American troops arrested the second highest official in the Iraqi Health Ministry on Thursday, charging that he ***funneled millions of dollars to rogue Shiite militants*** who kidnapped and killed Iraqi civilians. The United

---

[145] Amit R. Paley, *Iraqi Hospitals are War's New 'Killing Fields'*, Wash. Post (Aug. 30, 2006).

[146] Qais al-Bashir, *Iraq Minister Says 7 Bodyguards Arrested*, Wash. Post (Aug. 13, 2006).

[147] Melissa McNamara, *CBS: Death Squads in Iraqi Hospitals*, CBS News (Oct. 4, 2006).

[148] Rick Jervis, *Cleric al-Sadr May Hold Iraq's Future in His Hands*, USA Today (Nov. 13, 2006).

[149] Jeffrey Bartholet, *Moqtada al-Sadr and U.S.'s Fate in Iraq*, Newsweek (Dec. 3, 2006).

[150] Louise Roug, *Iraqi Health Official is Arrested in Sweep*, L.A. Times (Feb. 9, 2007).

States military . . . accused the official of ***flooding the Health Ministry's payroll with militants***, embezzling American money meant to pay for Iraq's overworked medical system and using Health Ministry 'facilities and services for sectarian kidnapping and murder.' "[151]

- <u>*American Forces Press Service*, February 2007</u>: "[S]pecial Iraqi army forces captured a senior official with alleged ties to the Jaysh al-Mahdi militia. . . . ***The suspect reportedly orchestrated several kickback schemes by using inflated contracts*** for ministry equipment and services. These kickbacks, which officials believe have ***funneled millions of U.S. dollars to militia elements***, support sectarian attacks and violence targeting Iraqi civilians, U.S. officials said. The suspect is believed to ***support the Jaysh al-Mahdi militia*** through large-scale employment of its members."[152]
- <u>*NBC News*, July 2007</u>: "Supplies and medicine in strife-torn Baghdad's overcrowded hospitals have been ***siphoned off and sold elsewhere for profit because of corruption in the Iraqi Ministry of Health*** . . . . The draft report obtained by NBC said the Iraqi Ministry of Health, which oversees the country's hospitals, is ***in the 'grip' of the Mahdi Army***, the anti-American militia run by the Shiite cleric Muqtada al-Sadr."[153]
- <u>*USA Today*, March 2008</u>: "***A 6-foot picture hanging at the front gate of Iraq's Health Ministry removes any doubts about who runs the place.*** The photo is of the father and uncle of radical Shiite cleric Muqtada al-Sadr, both of whom were religious leaders killed by Saddam Hussein's regime. Employees of the ministry, many of whom are loyalists to al-Sadr, pass their images every day as they go to work. ***Al-Sadr's ironclad control over Iraq's health system and other key ministries has come under renewed scrutiny*** following recent clashes between his Mahdi Army militia and the Iraqi army."[154]
- <u>*60 Minutes*, April 2008</u>: "One of the biggest problems is corruption, which is robust even by Middle Eastern standards. According to U.S. and Iraqi officials, ***bribery and outright theft are flourishing in virtually every Iraqi ministry***, and some of those ill-gotten gains are being used to kill American troops. . . . The situation got so bad, Radhi says his investigators could not even enter certain government buildings. ***Asked if his investigators were allowed [into the] Ministry of Health, Radhi said, 'They entered the ministry and they conducted their investigations. But they were threatened to be kidnapped***.' So they stopped."[155]
- <u>*Business Monitor News*, November 2008</u>: "According to the International Medical Corps (IMC), ***radical Shi'a cleric Muqtada al-Sadr controls much of the public health system***. Al-Sadr's power may be waning as peace returns to the country, as indicated by his announcement on August 8 that he will order most of his militia, save a number of elite fighting units, to disarm. Yet, ***the Shi'a cleric's influence over*** the State Company for

[151] Damien Cave, *Iraq's No. 2 Health Official Is Held and Accused of Financing Shiite Militants*, N.Y. Times (Feb. 9, 2007).

[152] U.S. Dep't of Def., *Senior Official at Iraq Ministry of Health Detained; 13 Terrorists Killed*, Am. Forces Press Serv. (Feb. 8, 2007), http://archive.defense.gov/news/newsarticle.aspx?id=2976.

[153] Aram Roston & Lisa Myers, *'Untouchable' Corruption in Iraqi Ministries*, NBC News (July 30, 2007).

[154] Charles Levinson, *Sadrists' Grip on Health Care Takes Toll*, USA Today (Mar. 26, 2008).

[155] Steve Kroft, *Iraq: State of Corruption*, 60 Minutes (Apr. 11, 2008).

> Importation and Distribution of Drugs and Medical Appliances ***(Kimadia), which has a virtual monopoly on pharmaceutical distribution***[,] ***provides significant risk*** to pharmaceutical output from Sunni- and Kurd- dominated Mosul if sectarian unrest were to reignite."[156]

185. The full text of a near-final draft of the 2006 *U.S. Embassy Baghdad Report* was made publicly available on the Internet no later than September 19, 2007, and it received recurring media coverage both before and after its release. The draft accused MOH of "operating a pharmaceutical diversion scheme"; of being "openly under the control of the Mehdi Army"; of enabling the "Mehdi Army [to] finance[ ] operations from diverted medicines"; and of "shak[ing] down" clinics and doctors for free goods.[157] Media outlets describing the report included the *Washington Post* on June 25, 2007; *NBC News* on July 30, 2007; *The Nation* on August 30, 2007; *NPR* on September 1, 2007; and *60 Minutes* on April 11, 2008.[158]

186. On information and belief, Defendants were aware of these reports documenting the link between MOH and Jaysh al-Mahdi. Each Defendant generally maintained a corporate security group responsible for supervising their global supply chains, doing counterparty diligence, and preventing the theft or diversion of the drugs they sold, including in the Middle East. Pfizer, for example, maintained a Global Security group whose mandate included "[c]onduct[ing] due diligence . . . using both open and closed intelligence sources to verify the Company engages with legitimate business partners at all times."[159] As part of such efforts,

---

[156] Bus. Monitor News Indus. Alerts, *New Plant Suggests Re-Emergence of Pharmaceutical Industry*, 2008 WLNR 27850935 (Nov. 1, 2008).

[157] *U.S. Embassy Baghdad Report* at 23-25.

[158] *See* Walter Pincus, *Shhh . . . There Is Corruption in Iraq*, Wash. Post (June 25, 2007); Aram Roston & Lisa Myers, *'Untouchable' Corruption in Iraqi Ministries*, NBC News (July 30, 2007); David Corn, *Secret Report: Corruption Is 'Norm' Within Iraqi Government*, Nation (Aug. 30, 2007); Debbie Elliott, *Report Reveals Corruption in Iraqi Government*, All Things Considered (Sept. 1, 2007); Steve Kroft, *Iraq: State of Corruption*, 60 Minutes (Apr. 11, 2008).

[159] Staff Reporter, *Ireland: Director Global Security – EMEA*, Eur. Union News, Plus Media Sols. Private Ltd. Pak. (Nov. 25, 2014) (publishing Pfizer job announcement).

Defendants' standard practice would have been to conduct basic open-source research on the Iraqi market and the mechanics of the MOH procurement process – even a modicum of which would have uncovered the press reports discussing MOH's terrorist ties set forth above.

187. Defendants subscribed to intelligence-reporting services that discussed the relationship between MOH and Jaysh al-Mahdi. For example, Strategic Forecasting Inc., more popularly known as Stratfor, is a global strategic intelligence firm that allows individuals and companies to receive intelligence updates on countries around the world. On information and belief, based on Stratfor's subscription lists (as published by *WikiLeaks*), senior U.S.-based executives of Pfizer Inc.; GE Healthcare; Johnson & Johnson; AstraZeneca Pharmaceuticals LP; and Genentech, Inc. likely had access to the service as of February 8-15, 2007, when Stratfor included the following messages in its updates:

> IRAQ: U.S. and Iraqi forces raided the Health Ministry in Baghdad on [sic] and arrested Deputy Health Minister Hakim Zamili, a senior member of the political bloc loyal to Shiite cleric Muqtada al-Sadr. The U.S. military did not comment immediately on the reason for the arrest.[160]
>
> [O]ver the past week, the U.S. military continued its offensive against Shiite militia leaders in Baghdad. Coalition forces arrested Shiite militia financier and Deputy Minister of Health Hakim al-Zamili at his office in the Ministry of Health in Rusafa on Feb. 8. ***Al-Zamili is suspected of employing militia fighters and selling health services and equipment in return for millions of dollars that he later funneled to Shiite militias***.[161]

188. After 2004, Defendants could not have conducted credible due diligence that would have "cleared" their transactions with the Jaysh al-Mahdi-controlled MOH. As the 2006 *U.S. Embassy Baghdad Report* noted, terrorist control of the Ministry precluded even "basic

[160] Posting of Strategic Forecasting, Inc., noreply@stratfor.com, to nils@bildt.org & archive@stratfor.com, *Stratfor Intelligence Summary Strategic Forecasting* (Feb. 8, 2007), https://wikileaks.org/gifiles/docs/51/512219_fw-stratfor-intelligence-summary-.html.

[161] Press Release, Stratfor, *Iraq Update: Feb. 14, 2007* (Feb. 15, 2007) (emphasis added), https://worldview.stratfor.com/article/iraq-update-feb-14-2007.

efforts to stem th[e] perception" of widespread corruption at MOH.[162] And, by 2006, U.S. and Iraqi corruption investigators could "no longer go into the ministry because it is controlled by militia."[163] The lack of access to the Ministry hamstrung outside investigators from conducting even basic diligence, given that investigators could not obtain exculpatory documents – and that Dr. Adel's Inspector General's office at MOH was unresponsive to requests for information.

## V. EACH DEFENDANT ENGAGED IN COMMERCIAL TRANSACTIONS THAT IT KNEW OR RECKLESSLY DISREGARDED WERE STRUCTURED TO FINANCE JAYSH AL-MAHDI

### A. The AstraZeneca Defendants

#### 1. AstraZeneca Made Corrupt Payments to Jaysh al-Mahdi Members

189. The AstraZeneca *supplier* Defendant – a company that negotiated with Kimadia and made corrupt payments to Jaysh al-Mahdi agents – is AstraZeneca UK Limited. The AstraZeneca *manufacturer* Defendant – a company that manufactured drugs used to bribe Jaysh al-Mahdi agents – is AstraZeneca Pharmaceuticals LP.

190. From 2004 through the present, Kimadia awarded AstraZeneca at least 47 contracts relating to various drugs. During this time, AstraZeneca sold U.S.-manufactured drugs to MOH including, but not limited to: Arimidex (API manufacturing[164] and drug formulation in Newark, Delaware); Meronem (API made in Newark, Delaware); and Seroquel (API made in Newark, Delaware). On information and belief, AstraZeneca secured some or all of these contracts by paying Jaysh al-Mahdi's standard "commissions" of at least 20%. *See supra* Part

---

[162] *U.S. Embassy Baghdad Report* at 25.

[163] *Id.*

[164] "API" refers to a drug's "active pharmaceutical ingredient." AstraZeneca, like the other drug Defendants, ordinarily employed a two-part manufacturing process to create the drugs it sold. First, it manufactured many of its most complicated and lucrative APIs at U.S. facilities. Second, it used those same facilities, or affiliate facilities in Europe, to combine the U.S.-manufactured API with other compounds and materials into a deliverable drug, producing the final drug product through a process called "drug formulation." API manufacturing is ordinarily the most commercially important part of the drug-creation process, as well as the most technically challenging.

III.B.2. Moreover, during the period when Jaysh al-Mahdi's control of MOH was at its apex from 2004-2008, Kimadia awarded at least 19 drug contracts to AstraZeneca.

191. From 2004-2013, AstraZeneca delivered "free goods" to Jaysh al-Mahdi agents in connection with the sale of some of its most lucrative drugs. Those deliveries were made in connection with contracts negotiated by AstraZeneca UK Limited and involved several AstraZeneca manufacturers, including Defendant AstraZeneca Pharmaceuticals LP. Plaintiffs set forth below examples of those corrupt payments. This list is far from exhaustive; Plaintiffs believe discovery will uncover numerous additional instances of "free goods" payments that AstraZeneca made at additional times with additional drugs. Much of the information about these transactions resides within AstraZeneca's exclusive control: whereas AstraZeneca should possess the sales contracts and other documents memorializing its "free goods" payments, Kimadia generally does not publicly disclose historical contracting information prior to 2010. In addition, according to witnesses and a U.S. State Department cable (as published by *WikiLeaks*), a fire at MOH in 2009 "destroyed numerous documents related to Kimadia contracts," which prompted allegations that the fire was "deliberately set to destroy evidence of corruption."[165]

192. Despite those constraints (which discovery should readily remedy), Plaintiffs have amassed evidence of several specific corrupt transactions executed by AstraZeneca. The chart below depicts those AstraZeneca transactions on a drug-by-drug basis:

[165] U.S. State Dep't Cable, *Anti-Corruption Developments in Iraq* (July 10, 2009), https://wikileaks.org/plusd/cables/09BAGHDAD1870_a.html.

| Drug (Nat'l Code) | Supplier | Manufacturer | Formulary Date | Confirmed Contract | FOC % |
|---|---|---|---|---|---|
| Arimidex (15-AG0-014) | AstraZeneca UK Limited | AstraZeneca Pharmaceuticals LP | 2006 or earlier[166] | 40/2006/185 | 100% |
| Meronem injection (05-AG0-059) | AstraZeneca UK Limited | AstraZeneca Pharmaceuticals LP | 11-29-2004 | 40/2008/66 | 70% |
| Meronem powder (05-AG0-015) | AstraZeneca UK Limited | AstraZeneca Pharmaceuticals LP | 11-29-2004 | 40/2007/238 | 25% |
| Seroquel 200mg Tab (04-B00-079) | AstraZeneca UK Limited | AstraZeneca Pharmaceuticals LP | 5-16-2005 | 40/2008/3 | 100% |
| Zoladex (06-G00-008) | AstraZeneca UK Limited | AstraZeneca UK Limited | 2006 or earlier | 40/2006/704 | 25% |

The column headers in the chart above have the following meanings:

- Drug (Nat'l Code): The name of AstraZeneca's branded drug sold to Kimadia, with the unique National Code that MOH assigned to the underlying chemical compound when it placed the drug on the Iraqi formulary.
- Supplier: The AstraZeneca company that executed the sales contract with Kimadia and that held itself out as the company with authority to sell the drug in Iraq.
- Manufacturer: The AstraZeneca company that manufactured the drug (either the API or the formulation) that Kimadia purchased from the supplier. This entity is often, but not always, the entity identified as the manufacturer in the sales contract.
- Formulary Date: The date that MOH approved the drug's chemical compound for sale within Iraq and placed it on the formulary.
- Confirmed Contract: The contract number of the earliest confirmed sale of the drug to Kimadia of which Plaintiffs are currently aware. The second four digits of each code refer to the year of the tendering round pursuant to which Kimadia awarded the contract. It is likely that there are prior (and later) sales that Plaintiffs have not yet uncovered.
- FOC %: The size of the "free goods" bribe – measured against the value of the underlying sales – that the supplier and manufacturer paid in connection with their sales of the drug. FOC, which often appears in MOH documents, stands for "free of charge."

[166] For Arimidex (and certain other drugs below), Plaintiffs have not been able to determine the formulary date based on public information. In such circumstances, Plaintiffs provide an estimate based on the first confirmed contract number. Here, because Arimidex was sold pursuant to a contract negotiated during the 2006 tendering round (Contract No. 40/2006/185), and because MOH does not allow contracts for drugs missing from the formulary, Arimidex likely appeared on the formulary by 2006 at the latest (and likely earlier).

193. On information and belief, AstraZeneca UK Limited made corrupt payments in connection with each drug on an annual basis – in percentages similar to the ones listed on the chart – beginning the year after the drug was placed on the formulary and continuing through at least 2013. That allegation is based on the facts that: (a) Plaintiffs have obtained documentary evidence memorializing at least one “free goods” bribe that AstraZeneca paid in the listed percentage for each drug; and (b) Kimadia maintained a general policy of extracting similar “free goods” percentages on a given drug from year to year. Based on that policy, if a company paid a “free goods” bribe of X% in one year, it likely also paid a similar percentage on that same drug in other years beginning when the supplier first started selling that drug in Iraq. AstraZeneca made those corrupt payments through FOC Clauses, Administrative Fee Clauses, Off-the-Books Payoffs, or some combination thereof. AstraZeneca UK Limited also paid cash “commissions” to Jaysh al-Mahdi in connection with these same contracts.

194. AstraZeneca UK Limited made corrupt payments as agent for (among other affiliates) AstraZeneca Pharmaceuticals LP. As a condition of selling drugs in Iraq that were manufactured by AstraZeneca Pharmaceuticals LP, AstraZeneca UK Limited had to certify to MOH that AstraZeneca Pharmaceuticals LP had authorized the former to sell drugs manufactured by the latter. AstraZeneca UK Limited also had to certify to MOH that it was selling drugs on behalf of AstraZeneca Pharmaceuticals LP and that the drugs being supplied had been manufactured by AstraZeneca Pharmaceuticals LP. Based on these facts, and the Iraqi regulations governing the tender process, AstraZeneca Pharmaceuticals LP exercised control over AstraZeneca UK Limited with respect to the corrupt transactions executed by the latter.

195. AstraZeneca Pharmaceuticals LP also actively participated in the corrupt payments to Jaysh al-Mahdi agents, including by: (a) manufacturing drugs that it knew or

recklessly disregarded were being used by its affiliate to make corrupt payments to Jaysh al-Mahdi agents; (b) registering to do business as a manufacturer with the Jaysh al-Mahdi-controlled Health Ministry; and (c) submitting paperwork to MOH confirming AstraZeneca UK Limited's authority to negotiate and execute corrupt contracts on its behalf.

196. AstraZeneca UK Limited also used U.S.-manufactured drugs to make several Off-the-Books Payoffs to Jaysh al-Mahdi agents, including payments of Seroquel and Meronem. These Off-the-Books Payoffs were not associated with any ordinary-course contract and were especially easy for Jaysh al-Mahdi to divert to the black market. With respect to the Seroquel payment, AstraZeneca UK Limited supplied free Seroquel unconnected to any attendant order number or tendering round. With respect to Meronem, a Kimadia document notes that AstraZeneca provided free Meronem to MOH in the quantity of "20% after compensating for the material of the order number 40/2002/20" – *i.e.*, a corrupt Oil-for-Food-era contract.

197. AstraZeneca also agreed to Administrative Fee Clauses as an additional means of providing "free goods" and cash payments to Jaysh al-Mahdi. For example, in Order No. 40/2010/143, in which AstraZeneca UK Limited contracted for the sale of Meronem 500mg, AstraZeneca did not include an FOC Clause but did include an Administrative Fee Clause. That clause required AstraZeneca to replace "100%" of any Meronem that Kimadia failed to sell before expiration and, when doing so, to pay a "15% administrative fee."[167]

198. Arimidex illustrates how AstraZeneca's corrupt transactions worked. Arimidex is a breast-cancer drug that gained FDA approval in 1996. Before it came off patent in 2010, it was a major blockbuster drug for AstraZeneca, generating more than $1 billion in worldwide sales each year between 2005 and 2009. AstraZeneca UK Limited registered Arimidex for sale with

[167] Translated from Arabic.

Kimadia on May 24, 2006 (it had likely been placed on the formulary at least several months prior). AstraZeneca's practice was to pay 100% "free goods" bribes on Arimidex to the Jaysh al-Mahdi-controlled Ministry. That meant that AstraZeneca UK Limited delivered free additional batches of Arimidex to Kimadia, which Jaysh al-Mahdi agents were able to divert, in quantities equal to the underlying quantity for which Kimadia had paid. AstraZeneca secured at least three contracts for the sale of Arimidex alone during the period from 2004 through 2008, when it was virtually impossible to obtain sales contracts without making corrupt payments. AstraZeneca executed one such contract on February 5, 2007.

199. AstraZeneca's corrupt payments to Jaysh al-Mahdi agents carried significant monetary value. AstraZeneca's "free goods" percentages tended to rise for its most valuable drugs, and those drugs (for expensive-to-treat, chronic conditions) were among the easiest for Jaysh al-Mahdi to monetize on the black market. The dollar value of those drugs was high. For example, a single 2006-2007 Off-the-Books Payoff of Meronem, in which AstraZeneca gave MOH roughly 6,950 free packs of Meronem, was worth about $870,000 by itself (using 2010 tender prices). Another 2006-2007 Off-the-Books Payoff of roughly 17,000 packs of Seroquel 100mg and 15,000 packs of Seroquel 200mg was worth about $1.6 million (using 2008 contract prices). On information and belief, given the size of AstraZeneca's business in Iraq, the frequency of its contracts, and the particular drugs that it sold, AstraZeneca's corrupt payments (including "commissions" and "free goods") delivered at least several million dollars per year in total value to Jaysh al-Mahdi.

### 2. AstraZeneca's Corrupt Commercial Transactions Comport with Its Historical Sales Practices in International Markets

200. AstraZeneca has a history of engaging in corrupt international transactions. In 2016, the SEC instituted cease-and-desist proceedings against AstraZeneca plc, which it settled

for more than $5.5 million.[168] In its institution order, the SEC alleged that AstraZeneca subsidiaries in China (from 2007-2010) and Russia (from 2005-2010) caused AstraZeneca to make "numerous improper payments in cash, gifts and other items," including "conference support" and "travel," to healthcare providers "as incentives to purchase or prescribe AZN pharmaceuticals."[169] AstraZeneca plc allowed such unlawful conduct to take place, the SEC alleged, by "failing to devise and maintain a sufficient system of internal accounting controls" and failing to "adequately enforce its corporate policy against making improper payments."[170]

201. AstraZeneca's history of making corrupt payments extends to Iraq specifically. The Volcker Commission determined that AstraZeneca AB (an AstraZeneca UK Limited affiliate) paid Kimadia at least $162,571 in kickbacks relating to three contracts collectively to sell roughly $1.7 million of drugs under Oil-for-Food from 2000-2003;[171] the Republic of Iraq later filed suit over those same allegations.[172]

202. For those corrupt Oil-for-Food transactions, on information and belief, AstraZeneca relied on Omnitrade Pharma, a regional distributor based in Jordan that has represented AstraZeneca continuously since 1999. On information and belief, despite Omnitrade's role in facilitating those corrupt transactions, AstraZeneca continued to use it as an agent in post-Saddam Iraq – including, on information and belief, to assist with the corrupt contracts that delivered funding to Jaysh al-Mahdi through Kimadia.

---

[168] *See* Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934 at 1-2, 6, *In re AstraZeneca PLC*, Securities Exchange Act Release No. 78730, File No. 3-17517 (Aug. 30, 2016) ("*AZN SEC Order*").

[169] *Id.* ¶¶ 5, 13, 163.

[170] *Id.* ¶ 20.

[171] *Volcker Report*, Table 7, at 25.

[172] *See* First Am. Compl. ¶¶ 46-52, *Republic of Iraq v. ABB AG*, No. 08-cv-05951-GEL (S.D.N.Y. filed July 31, 2009), ECF No. 112.

203. AstraZeneca's more recent conduct further demonstrates its pattern and practice of making corrupt payments in Iraq. Notwithstanding AstraZeneca's 2016 settlement with the SEC,[173] AstraZeneca UK Limited has continued to engage in corrupt transactions with Kimadia officials in connection with the sale of U.S.-manufactured drugs over the past five years. Among other corrupt transactions, AstraZeneca UK Limited paid a 100% "free goods" bribe on Arimidex in 2016 and a 25% "free goods" bribe on Zoladex in 2016.

### 3. AstraZeneca's Corrupt Transactions Had a Substantial Nexus to the United States

204. Although AstraZeneca is headquartered in the United Kingdom, it maintains a significant presence in the United States. AstraZeneca has operated "several key R&D, manufacturing and commercial locations across the United States," including major centers in Wilmington, Delaware (its U.S. headquarters); Newark, Delaware (a major manufacturing facility); Gaithersburg, Maryland (a major biologics research & development center); and Boston, Massachusetts (additional research & development facilities).[174] The head of AstraZeneca's U.S. operations is an Executive Vice President and a member of AstraZeneca's Senior Executive Team, where his responsibilities include "driving growth and maximising [sic] the contribution of the commercial operations in North America to AstraZeneca's global business."[175] AstraZeneca describes its "U.S. operations" as "integral to our global business."[176]

205. A U.S.-headquartered company (AstraZeneca Pharmaceuticals LP) was directly involved in the corrupt transactions for the sales of the drugs it manufactured. Indeed, during the

---

[173] *See AZN SEC Order* at 1, 6-7.

[174] AstraZeneca, *AstraZeneca in the United States*, https://www.astrazeneca-us.com/az-in-us.html#! (last accessed Sept. 19, 2017).

[175] AstraZeneca, *What Science Can Do, AstraZeneca Annual Report and Form 20-F Information 2016*, at 88-89 (Mar. 7, 2017), https://www.sec.gov/Archives/edgar/data/901832/000095010317002275/dp73779_ex1501.htm.

[176] AstraZeneca, *AstraZeneca in the United States*, https://www.astrazeneca-us.com/az-in-us.html#! (last accessed Sept. 19, 2017).

relevant time period, Arimidex (100% FOC bribes) was manufactured by AstraZeneca Pharmaceuticals LP at a manufacturing facility in Newark, Delaware. The Newark facility was where Arimidex was "formulated and distributed globally"; AstraZeneca's director of corporate communications has described that facility as a "key strategic site in the firm's global supply chain";[177] and Arimidex's packaging listed Newark, Delaware, as its place of manufacture. Consistent with Kimadia's general practice, AstraZeneca UK Limited certified to Kimadia that it was sourcing Arimidex from the United States. On one occasion, in connection with Order No. 40/2006/185, the draft of the sales contract originally listed "UK" as the country of origin for Arimidex, but "UK" was then specifically crossed out and "US" was written in its stead.

206. Seroquel (100% FOC bribes), which is AstraZeneca's branded anti-psychotic drug, was discovered and developed by AstraZeneca in the 1990s in its Fairfax, Delaware laboratory. Since then, AstraZeneca Pharmaceuticals LP has manufactured Seroquel in its Newark, Delaware facility, and it has publicly stated that it manufactures Seroquel in the United States. In a 2001 press release announcing an expansion of AstraZeneca's Newark facility, the company identified its expanded capacity to manufacture and distribute Seroquel as a key benefit of the Newark facility upgrades.[178] AstraZeneca thus identified AstraZeneca Pharmaceuticals LP as the Seroquel manufacturer in certain contract negotiations with Kimadia, and AstraZeneca UK Limited certified to Kimadia in one or more sales contracts that it was sourcing Seroquel from the United States (based on the API's manufacture in the United States), notwithstanding one

---

[177] Cori Anne Natoli, *AstraZeneca's Bear Site to Get $100 Million Facelift*, News J. (Dec. 12, 2013), http://www.delawareonline.com/story/money/industries/healthcare/2013/12/12/astrazeneca-site-to-get-100-million-facelift/4005247/.

[178] *See* Press Release, AstraZeneca, *AstraZeneca to Expand Newark Manufacturing Facility* (Aug. 29, 2001), http://www.evaluategroup.com/Universal/View.aspx?type=Story&id=21007.

other sales contract (Order No. 40/2008/3) in which AstraZeneca identified the United Kingdom as the origin of goods (based on the drug's formulation in the United Kingdom).

207. In 2000, AstraZeneca gained FDA approval for its Newark, Delaware facility to manufacture Meronem (70% and 25% FOC bribes) as well. AstraZeneca Pharmaceuticals LP thereafter manufactured Meronem's API at its Newark facility. Indeed, a former AstraZeneca employee described his job at the Newark site as "delivering [Meronem] finished product to global markets." That U.S.-based facility, by supplying the API for the Meronem sold in Iraq, played a key role in facilitating the corrupt Meronem sales to the Jaysh al-Mahdi-controlled MOH at issue in this case, notwithstanding that AstraZeneca on occasion identified manufacturing partners such as ACS Dobfar S.p.A. in its sales contracts with Kimadia.

208. At all relevant times, AstraZeneca also relied upon U.S. personnel to support efforts to place new indications for existing AstraZeneca drugs on the formularies of health authorities outside of the United States. For example, an AstraZeneca employee in the United States was a member of AstraZeneca's "Global Project Team" for Seroquel and, as such, helped AstraZeneca "[r]eceive[ ] approval of Mania and Depression indications and [sustained release] Formulation in [the] US and globally."

209. As a condition of fulfilling its corrupt contracts with Kimadia for the delivery of U.S.-manufactured drugs, AstraZeneca UK Limited agreed to procure letters from the U.S. Department of Commerce confirming that the drugs were manufactured in the United States. It further procured evidence of FDA approval for all of its drugs sold to Kimadia, including those purportedly sourced from outside the United States.

210. On information and belief, AstraZeneca UK Limited consummated the above transactions through the New York banking system, by covering Kimadia's collateral costs in the form of payments wired into New York correspondent accounts.

**B. The GE Defendants**

**1. GE Made Corrupt Payments to Jaysh al-Mahdi Members**

211. The GE business unit that oversaw transactions with MOH is known as GE Healthcare. The global headquarters of GE Healthcare is located in Chicago, Illinois. GE operates this worldwide business unit through GE subsidiaries, including Defendants GE Healthcare USA Holding LLC, GE Medical Systems Information Technologies, Inc. ("GE Medical"), and GE Medical Systems Information Technologies GmbH.

212. The GE *supplier* Defendant – a company that negotiated with Kimadia and made corrupt payments to Jaysh al-Mahdi agents – is GE Medical Systems Information Technologies GmbH. The GE *manufacturer* Defendants – companies that manufactured the medical devices used to bribe Jaysh al-Mahdi agents – are GE Healthcare USA Holding LLC and GE Medical.

213. After the fall of Saddam in 2003, GE, like the pharmaceutical Defendants, pursued growth in the Middle East market in general and Iraq in particular. As one prominent Emirati newspaper explained, GE's "standout country in the [Middle East] region is Iraq, where it has deployed a team to train personnel, design hospitals and sell its technology."[179]

214. As part of that business strategy, GE made corrupt payments to Jaysh al-Mahdi agents in connection with MOH contracts. On information and belief, the Jaysh al-Mahdi-controlled MOH awarded hundreds of millions of dollars in contracts to GE Healthcare. For example, one 2009 report indicated that GE Healthcare had received at least 12 medical-device

[179] Triska Hamid, *General Electric and Philips are Among Those Aiming for Growth with US and European Budgets Squeezed*, Nat'l (Jan. 28, 2014), https://www.thenational.ae/business/1.317836.

contracts from the Sadrist-controlled Ministry worth roughly $400 million[180] – a number that likely understates the overall value of the contracts that GE Healthcare obtained. Moreover, from 2005-2011, GE Healthcare maintained functionally a 100% market share for all nuclear-medicine products in Iraq. Several witnesses, based on personal experience with the corrupt Kimadia procurement process and with the local agents GE Healthcare used to negotiate with Kimadia, understood that GE could have secured that 100% market share only by bribing an array of Jaysh al-Mahdi officials throughout MOH during that timeframe.

215. Reports in 2008 and 2009 indicated that GE Healthcare had previously engaged in corrupt transactions relating to large-scale medical-device contracts with the Sadrist-controlled MOH. Examples include:

- On January 23, 2008, an Arabic-language media source reported that Zamili had stated during his prosecution that Dr. Adel "took a 6-million-dollar bribe from a foreign company in a restaurant"[181] on contracts that one Confidential Witness understood to concern GE Healthcare.
- On December 29, 2008, a U.S. State Department cable (as published by *WikiLeaks*) reported that the existing "allegations of corruption against the Health Ministry IG" included an investigation into Dr. Adel's "profits from a USD 10 million electrocardiogram machine contract," which on information and belief was supplied by GE Healthcare.[182] Although the investigation uncovered credible evidence of bribery in connection with that contract, the Kimadia file "was mysteriously 'lost' before [Dr. Adel] could be prosecuted."[183]

---

[180] *See* Sabah al-Baghdadi, *Hidden Facts and Secrets of the Iraqi MOH Inspector General's Gangs Killing Iraqis*, Dunya al-Watan (May 21, 2009), https://pulpit.alwatanvoice.com/content/print/165460.html (translated from Arabic).

[181] Furat Naji, *Remember Hakim al-Zamili? Learn What Is New About His Case*, Al Basrah Network (Jan. 23, 2008), http://articles.abolkhaseb.net/ar_articles_2008/0108/forat_230108.htm (translated from Arabic).

[182] U.S. State Dep't Cable, *Summing Up Iraq's Year of Anti-Corruption* (Dec. 29, 2008), https://wikileaks.org/plusd/cables/08BAGHDAD4058_a.html. The Volcker Commission determined that GE paid kickbacks to secure an ECG contract during Oil-for-Food. *See Volcker Report*, Table 7, at 106 (GE Healthcare subsidiary Marquette Hellige paid ECG-related bribes during Oil-for-Food).

[183] *Id.*

- On May 21, 2009, an Arabic-language media source similarly reported that, in connection with 12 contracts worth $400 million, Dr. Adel had received kickbacks from GE and so dubbed him the "Emperor of Corruption."[184]

216. In or about March 2008, Dr. Adel stated on Iraqi radio that GE Healthcare was "corrupt," based on the medical-device sales it had made to MOH. Dr. Adel's accusation demonstrates the depth and longevity of GE Healthcare's corruption in Iraq. GE had paid large bribes on high-dollar contracts to MOH, but Dr. Adel's demands kept growing. The public accusation of corruption came when Dr. Adel's demands finally grew higher than what GE Healthcare was willing to pay. Perversely, as relayed in a contemporaneous email by a U.S. anti-corruption official stationed in Iraq, Dr. Adel publicly denounced GE not because he actually cared that GE was corrupt but because "GE wouldn't pay him a big enough bribe."

217. GE also made documented "free goods" deliveries in connection with large medical-device contracts. In 2010, for example, Kimadia awarded Contract No. 87/2010/216, valued at approximately $1.2 million, to GE Medical Systems Information Technologies GmbH, for the purchase of 200 ECG Machine MAC 1600, at the unit price of $6,096.58, with "20 FOC" – *i.e.*, a 10% free-goods bribe (20/200 FOC) worth roughly $120,000.[185]

218. On information and belief, GE made 10% (or similar) free-goods payments in connection with an array of other medical-device contracts from 2004-2013. This allegation is based on: (a) documentary evidence memorializing the "free goods" payment in connection with Contract No. 87/2010/216; (b) GE's employment of local agents with demonstrated history of corrupt payments in Iraq, including "free goods" payments, *see infra* Part V.B.2; (c) GE's 100%

---

[184] Sabah al-Baghdadi, *Hidden Facts and Secrets of the Iraqi MOH Inspector General's Gangs Killing Iraqis*, Dunya al-Watan (May 21, 2009), https://pulpit.alwatanvoice.com/content/print/165460.html (translated from Arabic).

[185] On information and belief, the correct name for this device is the GE Mac 1600 Electrocardiograph.

market share in nuclear medicine in Iraq from 2005 through at least 2011; and (d) Kimadia's general practice of extracting free-goods deliveries in connection with medical-device contracts across multiple years, usually through similar "free goods" percentages on a given medical device from year to year. GE made those corrupt payments through the use of FOC Clauses, Administrative Fee Clauses, Off-the-Books Payoffs, or some combination thereof. GE Medical Systems Information Technologies GmbH also paid cash "commissions" to Jaysh al-Mahdi in connection with these same contracts.

219. On information and belief, GE secured many of its MOH contracts since 2004 by paying Jaysh al-Mahdi's standard "commissions" of at least 20%. *See supra* Part III.B.2.

220. GE Medical Systems Information Technologies GmbH made such payments to Jaysh al-Mahdi members as agent for GE Healthcare and GE Medical. As a condition of selling goods in Iraq manufactured by either GE manufacturer Defendant, GE Medical Systems Information Technologies GmbH had to certify to MOH that the manufacturers had authorized it to sell their goods in Iraq. GE Medical Systems Information Technologies GmbH also had to certify that it was selling devices on behalf of those manufacturers and that GE Healthcare USA Holding LLC and GE Medical had manufactured the devices being supplied. Based on these facts, and the Iraqi regulations governing the tender process, the GE manufacturer Defendants exercised control over GE Medical Systems Information Technologies GmbH with respect to the corrupt transactions executed by the latter.

221. GE Healthcare USA Holding LLC and GE Medical also actively participated in the corrupt payments to Jaysh al-Mahdi agents, including by: (a) manufacturing devices they knew or recklessly disregarded were being used by their affiliate to bribe Jaysh al-Mahdi agents; (b) registering to do business as manufacturers with the Jaysh al-Mahdi-controlled MOH; and

(c) submitting paperwork to MOH confirming GE Medical Systems Information Technologies GmbH's authority to negotiate and execute corrupt contracts on their behalf.

222. GE's corrupt payments delivered substantial monetary value to Jaysh al-Mahdi. GE's contracts were for expensive, valuable "big iron" equipment that multiple witnesses recall as one of the most corrupt market segments in Iraq. Jaysh al-Mahdi members monetized such equipment not only by moving it on the black market, but also by diverting it to their own private clinics where Jaysh al-Mahdi agents (many of whom were doctors and clinicians) could charge patients for their use outside of Iraq's state-run public healthcare system. On information and belief, given the size of GE's business in Iraq, the frequency of its contracts, and the particular devices that it sold, GE's total corrupt payments (including "commissions" and "free goods") delivered at least several million dollars per year in total value to Jaysh al-Mahdi.

### 2. GE's Corrupt Payments to Jaysh al-Mahdi Members Comport with Its Historical Sales Practices in International Markets

223. GE has a history of entering into corrupt "free goods" transactions in Iraq. In 2010, GE resolved FCPA charges brought by the SEC by paying roughly $23 million, which was one of the larger Oil-for-Food settlements.[186] The SEC alleged that two GE subsidiaries obtained at least four Oil-for-Food medical-goods contracts from Kimadia between 2000-2003 by agreeing to "pay illegal kickbacks in the form of computer equipment, medical supplies, and services."[187] One GE subsidiary "declined to make cash payments to the Iraqi ministry" when asked to make the standard ASSF cash payment, but "acquiesced" to unlawful payments in the form of in-kind bribes "equal to ten percent of the contracts' value."[188]

---

[186] *See* Press Release, GE, *GE Announces Settlement of Oil-for-Food Matter* (July 27, 2010), http://www.genewsroom.com/Press-Releases/GE-Announces-Settlement-of-Oil-for-Food-Matter-227527.

[187] *GE FCPA* Compl. ¶ 22; *see id.* ¶¶ 29-30.

[188] *Id.* ¶ 24.

224. The GE subsidiaries paid for their illegal 10% free-goods bribes under Oil-for-Food by inflating a local agent's fee by an offsetting 10%, which the "agent used . . . to cover the cost of the equipment and services he kicked back to the Iraqi ministry."[189] GE's corrupt local agents in Iraq during Oil-for-Food and afterwards included:

225. **Alnabeel Scientific Bureau.** During the Oil-for-Food Program and continuing through the Sadrist takeover of MOH, GE Healthcare engaged the Alnabeel Scientific Bureau and its General Manager ("GE Agent 1").[190] GE Agent 1 stated to MOH officials in or around Fall 2003 that s/he represented GE Healthcare in Iraq.

226. GE Agent 1 was personally involved in paying a series of bribes in Iraq during both the Saddam and the post-Saddam eras. For example, according to one percipient witness, GE Agent 1 offered bribes on behalf of GE Healthcare in 2003 to MOH decisionmakers to secure payment from MOH relating to a contract for the sale of heart monitors, including an offer to purchase a luxury European automobile for an MOH decisionmaker. GE Agent 1 made that offer on behalf of GE Healthcare in a meeting on or about December 2003 at the Four Seasons in Amman, Jordan.

227. On information and belief, from 2003 through at least on or about November 2006, Alnabeel acted as one of GE Healthcare's agents in Iraq and assisted with the sale of GE Healthcare-manufactured products including, but not limited to, CT scanners, MRIs, X-Rays, Ultrasounds, and other devices manufactured by GE Healthcare.

228. **Al-Mazd Group.** During the Oil-for-Food era, as well as after the Sadrist takeover of MOH, GE Healthcare also engaged the Al-Mazd Group Medical & Engineering

---

[189] *Id.* ¶ 25.

[190] Consistent with the DOJ's and the SEC's practice in comparable FCPA cases, Plaintiffs have anonymized the names of local agents and distributors and other company employees implicated in the corruption scheme.

Systems & Technologies ("Al-Mazd"), which is also known as "AGMEST." Al-Mazd represented GE Healthcare in transactions with MOH involving CTs, MRIs, and other large-dollar medical devices.

229. According to multiple witnesses, Al-Mazd had a reputation in Iraq during the Oil-for-Food era, as well as the post-Saddam years, for making corrupt payments to MOH. On September 30, 2004, the Iraq Survey Group's report for the U.S. intelligence community publicly identified "Al-Mazd" / "AGMEST" as a corrupt agent potentially involved in violations of sanctions applicable to Iraq under the Oil-for-Food Program.[191]

230. After the end of Oil-for-Food, GE Healthcare continued to use Al-Mazd as one of its agents in Iraq, including after the Iraq Survey Group publicly identified Al-Mazd as a suspect agent. On information and belief, Al-Mazd represented GE Healthcare in connection with its CT, MRI, Ultrasound, and other device contracts in Iraq during most of the period of time from 2003 through at least 2008. Among other things, GE Healthcare relied on Al-Mazd's CEO ("GE Agent 2") to personally facilitate its medical-device sales in Iraq. In doing so, GE Healthcare knew or recklessly disregarded that GE Agent 2 had a direct connection to Jaysh al-Mahdi, through a family member who was part of Sadr's personal inner circle in Najaf.

231. There is evidence of Al-Mazd's corrupt payments to Iraqi officials continuing during the post-Saddam era when Jaysh al-Mahdi controlled MOH. As found by a Canadian judge for the Ontario Superior Court, Al-Mazd charged at least one Canadian medical-device supplier a 34% agent fee for representing the supplier with Kimadia in connection with a

[191] *See* Iraq Survey Group, *Comprehensive Report of the Special Advisor to the DCI on Iraq's WMD*, Vol. I (Regime Finance and Procurement, Annex I. Suspected WMD-Related Dual-Use Goods and Procurement Transactions) 262-63 (Sept. 30, 2004) (twice reporting that "the Al-Mazd Group for Medical and Engineering Systems and Technology (AGMEST) in Baghdad" had facilitated "[p]ossible [b]reaches of UN Sanctions" in Iraq).

commercial negotiation that took place in or about December 2006.[192] A 34% agent fee, which Al-Mazd charged based on the full retail price of the supplier's goods, is commercially unreasonable and a red flag that Al-Mazd was engaged in corrupt activities with MOH throughout the contracting process.[193] During the Canadian proceeding, the supplier's witness could not explain what legitimate benefit Al-Mazd had provided that would justify the 34% commission.[194] On information and belief, Al-Mazd also represented GE Healthcare in Iraq during the same time period at issue in the Canadian proceeding.

232. On its homepage, Al-Mazd boasts about its offerings as a "local after sales services (ASS) provider" that "represent[s] Suppliers & Manufacturers of State-Of-The-Art Medical Equipment And Supplies From U.S.A., Europe, Japan . . . and others." Indeed, Al-Mazd maintains a webpage devoted in part to its "after sales services" offerings, even though such arrangements – and the very concept of After Sales Service Fees – were widely discredited in the aftermath of the Oil-for-Food scandal. Al-Mazd also publicly touts the benefits that healthcare companies can derive from "charitable donations" of medical goods in Iraq.

233. Al-Mazd's website also boasts of Al-Mazd's sponsorship of "Scientific & Medical activities" that were "officially requested" by MOH,[195] and that Al-Mazd provided "training courses for MOH staff, done extra to the contracted courses (FOC) [w]ithin [Al-Mazd's] specialty."[196] As its website explains, Al-Mazd has provided FOC training courses to hundreds,

---

[192] *See Ali v. O-Two Med. Techs. Inc.* (2015), 2015 ONSC 3932, ¶¶ 33-34, 37-38 (Can. Ont. Super. Ct.).

[193] *See* DOJ & SEC, *A Resource Guide to the U.S. Foreign Corrupt Practices Act* at 22 (Nov. 14, 2012) ("[c]ommon red flags associated with third parties include . . . excessive commissions to third-party agents or consultants"), https://www.sec.gov/spotlight/fcpa/fcpa-resource-guide.pdf.

[194] *Ali*, 2015 ONSC 3932, ¶¶ 33-34; *see also id.* ¶ 59 ("Mr. Sharma testified that this was a benefit to O-Two, but that he could not quantify the benefit.").

[195] AGMEST, Marketing, http://www.agmest.com/en/marketing.

[196] AGMEST, Sponsoring Some of the Scientific & Medical Activities and Conferences Officially Requested, http://www.agmest.com/en/marketing?q=node/114.

if not thousands, of MOH officials, including courses relating to essentially every GE Healthcare major device offering by category. While most of these training courses are not attributed to a specific company, Al-Mazd advertises at least one occasion when it provided a training course for GE Healthcare on a free-of-charge basis relating to GE's ultrasound sales to MOH.

### 3. GE's Corrupt Transactions Had a Substantial Nexus to the United States

234. GE's corrupt transactions with Kimadia required extensive involvement of U.S. personnel and facilities in the global GE Healthcare business unit. At all relevant times, GE Healthcare – the integrated business unit of which GE Medical Systems Information Technologies GmbH was a part – maintained a substantial presence in Wisconsin, with corporate offices located in the Milwaukee County Research Park in Wauwatosa, Wisconsin, and nearly 6,000 employees in the State.[197]

235. Wisconsin has, at all relevant times, served as the "home base and headquarters for key GE Healthcare product lines and imaging businesses, including computerized tomography, magnetic resonance, x-ray, and the unit's services and life care solutions businesses."[198] As stated by a GE spokesman, Wisconsin is a "hub for global manufacturing and leadership."[199] Wisconsin is GE Healthcare's global hub for nuclear medicine and what is known in healthcare circles as "big iron" – CT, MRI, and positron emission tomography ("PET") scanners.[200]

---

[197] *See* Steve Jagler, *Jagler: GE's Wold Sees the Future of Health Care Today*, Milwaukee J. Sentinel (Mar. 11, 2017). On information and belief, GE's Wisconsin workforce was as large, if not larger, from 2003-2013.

[198] Thomas Content, *GE Healthcare to Move Global Headquarters from United Kingdom to Chicago*, Milwaukee J. Sentinel (Jan. 11, 2016).

[199] *Id.*

[200] *See* Guy Boulton, *GE Healthcare's Waukesha Business Units at the Forefront of 'Big Iron'*, Milwaukee J. Sentinel (Sept. 20, 2014).

236. GE Healthcare's Waukesha location has served as the global hub for GE Healthcare's business lines for X-rays, CTs, and MRIs (until at least 2011 with respect to X-rays and at all relevant times with respect to CTs and MRIs). One 2014 press report indicated that at least half of the CT and PET scanners manufactured at GE Healthcare's Waukesha facility since 2005 were sold on the international market.[201] GE Healthcare (Waukesha) manufactured one of GE's flagship CT scanner offerings, the GE Lightspeed CT Scanner, as well as a component of GE Healthcare CT machines, known as the Performix tube. In a 2010 brochure issued by GE Healthcare (Waukesha), GE touted its Waukesha-manufactured and/or -assembled Performix tubes as an essential component of GE Healthcare's value proposition in the CT market.[202]

237. GE Healthcare's Madison, Wisconsin location also served as the global hub for GE Healthcare's respiratory offerings, including ventilation and breathing technologies.

238. GE Healthcare relied heavily on cross-functional teams managed out of its U.S. headquarters to facilitate global sales and distribution. For example, one GE Healthcare employee based in Wisconsin wrote that s/he acted to "[s]upport global cross-functional teams" for GE-manufactured products and that s/he worked with both GE suppliers and manufacturers to "resolve issues observed throughout the breadth of the supply chain."

239. GE Healthcare's communications with the FDA confirm that its U.S.-based facilities played a key role in GE's medical-device sales in Iraq. GE Healthcare periodically has

---

[201] *See id.* ("About six years ago, revenue for the business that sells CT and PET scanners was more or less evenly split between the U.S. and international markets. Now the business generates more than 75% of its revenue from international sales.").

[202] *See* GE Healthcare, *Performix*[TM] *Tubes: The Value of Performance* at 2 (2010) ("Nothing builds reliability like experience. We've manufactured more than 25,000 Performix tubes, and our reliability has been proven time and time again – in the design lab and in the exam room. Performix tube development has come from more than 13 years of collaboration between GE Healthcare service engineering, manufacturing, and design engineering teams. Our tube manufacturing processes leverage our knowledge of GE Healthcare systems to eliminate potential failure points and ensure quality and dependability."), http://www3.gehealthcare.com.sg/~/media/Downloads/asean/Services/Equipment%20Services/GEHealthcare-Brochure_Performix.pdf?Parent=%7B2E0FBFDD-B334-4829-8DE0-BC40C6477BAC%7D.

issued recall notices to the FDA, and, on several occasions, those notices have represented that GE Healthcare USA Holding LLC or GE Medical sold the affected products in Iraq (among other countries). Examples of those recall notices that include Iraq are:

| Date GE Initiated Recall | Recalling GE Entity | GE Device | Recall Number |
|---|---|---|---|
| March 6, 2006 | GE Healthcare, LLC[203]<br>3000 N Grandview Blvd, Waukesha, WI 53188 | Solid State X-Ray Imager | Z-0896-06 |
| March 6, 2006 | GE Healthcare, LLC<br>3000 N Grandview Blvd, Waukesha, WI 53188 | Solid State X-Ray Imager | Z-0898-06 |
| June 24, 2008 | GE Healthcare, LLC<br>3000 N Grandview Blvd, Waukesha, WI 53188 | Flouroscopic X-Ray System | Z-2356-2008 |
| February 27, 2009 | GE Medical Systems Information Technology<br>9900 Innovation Dr. Wauwatosa WI 53226 | Detector and alarm, arrhythmia | Z-1232-2009 |
| July 13, 2012 | GE Healthcare, LLC<br>3000 N Grandview Blvd, Waukesha, WI 53188 | GEHC Voluson E6, E8 Expert, E10 Diagnostic Ultrasound System | Z-1833-2013 |
| March 9, 2015 | GE Healthcare, LLC<br>3000 N Grandview Blvd, Waukesha, WI 53188 | Multiple GEHC MRI Systems | Z-1305-2015 |

[203] GE Healthcare, LLC, though listed in these FDA recall notices, does not appear to be the name of an actual corporate entity. On information and belief, GE Healthcare, LLC is GE's shorthand for Defendant GE Healthcare USA Holding LLC.

| Date GE Initiated Recall | Recalling GE Entity | GE Device | Recall Number |
|---|---|---|---|
| December 23, 2015 | GE Medical Systems, LLC 3000 N Grandview Blvd, Waukesha, WI 53188-1615 | GEMS Brivo XR285amx Mobile Digital Ready Radiographic System | Z-0769-2016 |
| November 3, 2016 | GE Healthcare, LLC 3000 N Grandview Blvd, Waukesha, WI 53188 | GEHC Avance, Avance CS2, Amingo (Gas Machines / Anesthesia) | Z-0755-2017 |

240. GE Healthcare has asserted that it derives substantial competitive advantages in the international marketplace from its operations throughout Wisconsin, including, but not limited to: (i) a high-morale work force in a high quality-of-life location (Milwaukee's suburbs) that promotes employee productivity and retention; (ii) a highly educated work force, including more than 2,800 engineering degrees held by its Wisconsin employees; (iii) proximity to, and strategic partnerships with, the University of Wisconsin (Madison), through which GE Healthcare has developed pioneering radiology technologies for the global healthcare marketplace; (iv) "[t]he strength of the manufacturing sector in Wisconsin," which GE markets as "impressive";[204] and (v) Wisconsin's proximity to key international shipping hubs.

241. GE Healthcare also followed an integrated global strategy in its imaging (CT, MRI, and PET) business. In 2008, the President of GE Healthcare's Middle Eastern and African Growth Markets stated that GE Healthcare "look[ed] beyond traditional country and region borders to leverage synergies among international markets."[205] That required U.S. facilities to be involved in the tender process, including the negotiation of pricing terms. As one GE Healthcare

[204] Press Release, GE Healthcare, *GE Healthcare – Growing the Economy in Madison, WI*, Fact Sheet No. 14-000161, at 2 (2012), http://www3.gehealthcare.com/~/media/documents/us-global/news%20center/gehc-press-release_ge-healthcare-growing-wisconsins-economy_2012.pdf?Parent=%7B37B9EC8D-1F42-44EB-83C9-454DD572C2BF%7D.

[205] *GE Healthcare Combines Eastern, African Market Regions; Appoints President*, HealthImaging.Com (Jan. 28, 2008).

sales manager located in Wisconsin wrote, from 2007-2010, s/he "[p]rovided gate keeper / deal approver for all discounts and contract terms that exceeded limits set for individual sales reps and regional managers." Similarly, multiple high-level GE Healthcare compliance and auditor personnel were located in Wisconsin, with responsibility for reviewing contract terms and assuring (among other things) FCPA compliance.

242. GE Healthcare has used its U.S. managers, personnel, and facilities to solicit prospective customers at MOH. On at least one occasion in 2004, GE Healthcare paid for a senior Iraqi MOH official to travel to Wisconsin, had senior U.S.-based GE Healthcare staff provide that official a personal sales pitch, and gave the official a tour of a GE Healthcare facility in Waukesha.

243. GE Healthcare's corrupt transactions with MOH (alleged above) involved sales of medical devices manufactured largely in the United States. On information and belief, consistent with Kimadia's standard practice, GE certified to MOH during the registration and contract-negotiation process that its devices were made in the United States and that it was sourcing the devices sold to MOH from the United States.

244. On information and belief, as a condition of fulfilling its corrupt contracts with Kimadia for the delivery of U.S.-manufactured devices, GE Medical Systems Information Technologies GmbH agreed to procure letters from the U.S. Department of Commerce confirming that the devices were manufactured in the United States. On information and belief, it further procured evidence of FDA approval for all of its devices sold to Kimadia, including those purportedly sourced from outside the United States.

245. On information and belief, GE Medical Systems Information Technologies GmbH consummated its transactions through the New York banking system, by covering Kimadia's collateral costs in the form of payments wired into New York correspondent accounts.

## C. The J&J Defendants

246. Defendant Johnson & Johnson is the publicly traded parent company that owns (directly or indirectly) the other J&J Defendants transacting business in Iraq after Jaysh al-Mahdi's takeover of MOH. Johnson & Johnson oversaw and supervised the scheme by which J&J subsidiaries made corrupt payments to Jaysh al-Mahdi in Iraq. The J&J *supplier* Defendants – companies that negotiated with Kimadia and made corrupt payments to Jaysh al-Mahdi agents – are J&J Middle East (for devices) and Cilag GmbH International and Janssen Pharmaceutica N.V. (for drugs) (together, "Janssen-Cilag"). The J&J *manufacturer* Defendants – companies that manufactured goods used to bribe Jaysh al-Mahdi agents – are Ethicon, Inc. and Ethicon Endo-Surgery, LLC (for devices) (together, "Ethicon"), and Janssen Ortho LLC and Ortho Biologics LLC (for drugs).

### 1. J&J Made Corrupt Payments to Jaysh al-Mahdi Members in Connection with the Sale of Medical Devices in Iraq

247. J&J Middle East entered into corrupt transactions with the Jaysh al-Mahdi-controlled MOH in connection with the sale of medical devices from 2004-2013. Those corrupt transactions involved contracts negotiated by J&J Middle East and included devices manufactured in the United States by Ethicon. Plaintiffs set forth below examples of those device transactions. These examples are not exhaustive and are based on the information that Plaintiffs have been able to uncover without access to Defendants' files; Plaintiffs believe that discovery will reveal additional examples of corrupt payments.

| Contract Year | Supplier | Manufacturer | Confirmed Contract | Total Sale Price | FOC % |
|---|---|---|---|---|---|
| 2010 | J&J Middle East | Ethicon Endo-Surgery, LLC / Cordis Europa NV | 87/2009/401/B | $8.28 million | 30% |
| 2010 | J&J Middle East | Ethicon, Inc. | 92/2010/477/2 | $647,000 | 1 box per suture type[206] |
| 2011 | J&J Middle East | Ethicon Endo-Surgery, LLC | 87/2011/83/O | $1.79 million | 6,200 units |
| 2011 | J&J Middle East | Ethicon Endo-Surgery, LLC / Cordis Europa NV | 87/2009/400 | $1.45 million | 10% |
| 2012 | J&J Middle East | Ethicon Endo-Surgery, LLC / Cordis Europa NV | 87/2011/83/N/1 | $649,000 | 30% |

The column headers in this chart have the following meaning:

- Contract Year: The year that J&J Middle East executed the contract with Kimadia.
- Supplier: The J&J company that executed the sales contract with Kimadia and that held itself out as the company with authority to sell the devices in Iraq.
- Manufacturer: The J&J company that manufactured at least some of the devices that MOH purchased from the supplier. Many of these device contracts governed the purchase of multiple types of medical devices (and therefore may involve multiple manufacturers): for example, Contract No. 87/2009/400 memorialized the purchase of 31 different medical devices, some of which were manufactured in the United States by Defendant Ethicon Endo-Surgery, LLC, and others of which were manufactured by Cordis Europa NV.
- Confirmed Contract: The unique contract-number identifier that Kimadia assigned to the sales contract at issue.
- Total Sale Price: The total amount that Kimadia paid for the devices being sold.
- FOC %: The size of the "free goods" bribe – measured against the underlying quantity of goods being sold – that the supplier and manufacturer paid on the devices at issue.

248. These corrupt payments covered a variety of devices, including catheters, sutures, and arterial sheaths. Unlike drug contracts – which tend to cover one drug per contract – device contracts often cover multiple types of devices. On each of these examples, the FOC percentage

[206] A Kimadia award announcement relating to a 2010 tender (92/2010/477/2) memorializes the "free goods" bribe as "1 box of Sutures FOC" per "each type of suture ordered."

listed in the chart applied generally to every device covered by the contract. As with drugs, there was a thriving black market in the region for such goods: Iraqis often had to purchase such goods at elevated prices from private pharmacies run by Jaysh al-Mahdi.

249. On information and belief, from 2004-2013, J&J regularly made similar corrupt payments on comparable device sales. That allegation is based on the facts that: (a) Plaintiffs have obtained documentary evidence memorializing the corrupt payments above; (b) Kimadia maintained a general policy of extracting similar "free goods" percentages on a given device from year to year; and (c) Ethicon-manufactured and -branded sutures and other medical devices were used heavily in Iraq in 2005 and earlier. Ethicon was a dominant player in the Iraqi medical-device space under Saddam and afterwards, and Ethicon-branded devices appeared frequently in MOH inventory when the Sadrists began taking control in late 2004. J&J Middle East also paid cash "commissions" to Jaysh al-Mahdi in connection with these same contracts.

250. J&J Middle East made those corrupt payments acting as agent for (among other affiliates) Ethicon Endo-Surgery, LLC and Ethicon, Inc. As a condition of selling devices in Iraq manufactured by either J&J manufacturer Defendant, J&J Middle East had to certify to MOH that the manufacturer had authorized J&J Middle East to sell its devices. J&J Middle East also had to certify it was selling goods on behalf of those manufacturers and that the devices supplied had been manufactured by those manufacturers. Based on these facts, and the Iraqi regulations governing the tender process, the J&J device manufacturer Defendants exercised control over J&J Middle East with respect to the corrupt transactions executed by the latter.

251. Ethicon Endo-Surgery, LLC and Ethicon, Inc. also actively participated in the corrupt payments to Jaysh al-Mahdi agents, including by: (a) manufacturing devices that they knew or recklessly disregarded were being used by their affiliate to bribe Jaysh al-Mahdi agents;

(b) registering to do business as manufacturers with the Jaysh al-Mahdi-controlled MOH; and (c) submitting paperwork to MOH confirming J&J Middle East's authority to negotiate and execute corrupt contracts on their behalf.

252. J&J's corrupt transactions (including "commissions" and "free goods") delivered significant monetary value to Jaysh al-Mahdi. Using just the four examples above (excluding contract 92/2010/477/2), the "free goods" delivered by J&J had a value of more than $3 million. Assuming that J&J's corrupt payments in other years carried a similar value, it likely delivered more than $10 million worth of corrupt payments to Jaysh al-Mahdi agents between 2004-2013.

### 2. J&J Made Corrupt Payments to Jaysh al-Mahdi Members in Connection with the Sale of Pharmaceuticals in Iraq

253. J&J also made corrupt payments in connection with pharmaceutical contracts with MOH. From 2005 through the present, Kimadia awarded Janssen-Cilag at least 38 contracts relating to more than a dozen different drugs. During this time, Janssen-Cilag sold U.S.-manufactured drugs to MOH including but not limited to: Eprex (API made in Manatí, Puerto Rico); Topamax (API made in Gurabo, Puerto Rico); Leustatin (API made in Manatí, Puerto Rico); and Remicade (API made in Malvern, Pennsylvania).[207] On information and belief, J&J secured some or all of these contracts by paying Jaysh al-Mahdi's standard "commissions" of at least 20%. *See supra* Part III.B.2. Moreover, during the period when Jaysh al-Mahdi's control of MOH was at its apex – from 2004-2008 – Kimadia awarded at least 13 drug contracts to J&J.

254. From 2004-2013, J&J paid a wide variety of "free goods" bribes on drug contracts to the Jaysh al-Mahdi-controlled MOH. Examples, which Plaintiffs have uncovered without discovery of Defendants' files and which are merely illustrative, include:

[207] Merck controlled the license for Remicade in Iraq prior to April 2011, when control transferred to J&J. On information and belief, J&J began attempting to sell Remicade to Kimadia shortly thereafter, winning its first Remicade contract in or about December 2011.

| Drug (Nat'l Code) | Supplier | Manufacturer | Formulary Date | Confirmed Contract | FOC % |
|---|---|---|---|---|---|
| Eprex 2000 (08-C00-003) | Janssen-Cilag[208] | Ortho Biologics LLC | 04-15-2007 | 40/2005/303 | 20% |
| Eprex 4000 (08-C00-004) | Janssen-Cilag | Ortho Biologics LLC | 04-15-2007 | 40/2007/505 | 5% |
| Remicade (10-AC0-009) | Janssen-Cilag | Janssen Biotech, Inc.[209] | 02-28-2005 | TBD | 15% |
| Topamax (04-J00-044) | Janssen-Cilag | Janssen Ortho LLC | On or before 2006 | 40/2006/482 | Off-the-Books Payoff |

The column headers in this chart have the same meaning as in the AstraZeneca chart (at ¶ 191).

255. On information and belief, Janssen-Cilag made corrupt payments for each drug on an annual basis – similar to the percentages listed on the chart – beginning the year after the drug was placed on the formulary and continuing through the present. That allegation is based on the facts that: (a) Plaintiffs have obtained documentary evidence memorializing at least one "free goods" payment that Janssen-Cilag made in the listed percentage for each drug; and (b) Kimadia maintained a general policy of extracting similar "free goods" percentages on a given drug from year to year. Based on that policy, if a company paid a "free goods" bribe of X% in one year, it likely also paid a similar percentage on sales of the same drug in other years beginning when the supplier first started selling that drug in Iraq. Janssen-Cilag made those corrupt payments through the use of FOC Clauses, Administrative Fee Clauses, Off-the-Books Payoffs, or some combination thereof. Janssen-Cilag also paid cash "commissions" to Jaysh al-Mahdi in connection with these same contracts.

[208] J&J appears to have transacted with MOH through both Cilag GmbH International and Janssen Pharmaceutica N.V., sometimes with respect to overlapping drugs. Plaintiffs therefore have noted the supplier entity as Janssen-Cilag, just as the SEC and the DOJ did in prior FCPA proceedings against J&J. *See, e.g.*, *J&J FCPA* Compl. ¶ 55 (pleading supplier entity as "Janssen-Cilag," which referred to Janssen and Cilag collectively). This notation means that, on information and belief, both Cilag GmbH International and Janssen Pharmaceutica N.V. executed corrupt sales contracts for the drugs at issue.

[209] For sales contracts executed before June 2011, the J&J supplier company was named Centocor Ortho Biotech Inc. In June 2011, Centocor Ortho Biotech Inc. was renamed Janssen Biotech, Inc.

256. Janssen-Cilag made those corrupt payments acting as agent for (among other affiliates) the J&J drug manufacturer Defendants. As a condition of selling drugs in Iraq manufactured by the J&J drug manufacturer Defendants, Janssen-Cilag had to certify to MOH that those manufacturers had authorized it to sell their drugs. Janssen-Cilag also had to certify that it was selling drugs on behalf of those manufacturers and that they had manufactured the drugs being supplied. Based on these facts, and the Iraqi regulations governing the tender process, the J&J drug manufacturer Defendants exercised control over Janssen-Cilag with respect to the corrupt transactions executed by the latter.

257. The J&J drug manufacturer Defendants also actively participated in the corrupt payments to Jaysh al-Mahdi agents, including by: (a) manufacturing drugs they knew or recklessly disregarded were being used by their affiliate to bribe Jaysh al-Mahdi agents; (b) registering as manufacturers with the Jaysh al-Mahdi-controlled MOH; and (c) submitting paperwork to MOH confirming Janssen-Cilag's authority to negotiate and execute corrupt contracts on their behalf.

258. Eprex illustrates how J&J's corrupt transactions worked. Eprex is an integrated medical system that uses both a medicine (J&J's international branded version of erythropoietin, a chemical compound that treats anemia) and a device (a syringe fitted with a sophisticated needle guard). Since at least 2002, J&J has owned a license to manufacture and sell Eprex outside of the United States. Eprex (together with its branded counterpart in the United States, Procrit) has generated billions of dollars in worldwide revenue for J&J, accounting for at least $1.9 billion in annual revenues each year from 2005-2010.

259. While the Sadrists controlled the Iraqi Health Ministry, Janssen-Cilag routinely made large (between 5% and 20%, depending on the dosage) "free goods" payments of Eprex to

win lucrative tenders from Kimadia. Thus, for every 100 units of Eprex sold by J&J in Iraq, it often provided an extra 20, for free, that Jaysh al-Mahdi could divert to the black market to fund its terrorist activities. In addition, Janssen-Cilag also used free Eprex as a cash equivalent to make Off-the-Books Payoffs on several occasions to resolve disputes concerning other drugs, which were memorialized in a Kimadia document as “compensation in the form of material.” In addition to its Off-the-Books Payoffs of Eprex in 2006-2007, Janssen-Cilag also secured at least two contracts for the sale of Eprex – which were collectively worth more than $5 million – during the period from 2004 through 2008, when high-dollar contracts were virtually impossible to obtain without corrupt payments to Jaysh al-Mahdi agents.

260. J&J’s Eprex-related bribes to Jaysh al-Mahdi necessarily involved the provision of free medical devices in addition to free drugs. J&J’s “pre-filled syringes [of Eprex] are fitted with the PROTECS™ needle guard device to help prevent needle stick injuries after use.”[210] On information and belief, J&J included such devices in its Eprex packs to make it easier for J&J to sell Eprex. J&J’s provision of free medical devices as part of its free Eprex packs thus enhanced Jaysh al-Mahdi’s ability to efficiently monetize Eprex on the black market.

261. As another example, J&J provided free units of its blockbuster anti-epilepsy and anti-migraine drug Topamax to facilitate at least one Off-the-Books Payoff to corrupt MOH officials. On at least one occasion, as a Kimadia document memorialized, the Sadrists approved “compensation in the form of supplies” from Janssen-Cilag in response to an earlier request for “monetary compensation.”[211] The free Topamax functioned as a cash equivalent to buy off

[210] EPREX® PREFILLED SYRINGES Consumer Medicine Information at 3 (Mar. 2017), http://www.janssen.com/newzealand/sites/www_janssen_com_newzealand/files/prod_files/live/eprex.pdf (last accessed Sept. 21, 2017).

[211] Translated from Arabic.

MOH officials in connection with an unrelated dispute, and the Topamax was provided outside of the normal contracting process (and thus did not involve the typical use of a FOC Clause).

262. J&J's corrupt transactions delivered substantial value to Jaysh al-Mahdi. Eprex and Topamax were two of J&J's most important drugs during the period in question and, on information and belief, were a marketing priority for J&J in emerging markets. Moreover, these drugs treat chronic conditions – anemia for Eprex and epilepsy for Topamax – and such drugs were among the easiest to monetize on the black market. The dollar value of those corrupt payments was high: for example, J&J provided more than one Off-the-Books Payoff in the form of free Eprex in 2006-2007, and, based on 2007 tender prices per pack, the value of those free goods was at least several million dollars. In total, given the size of J&J's business in Iraq, the frequency of its contracts, and the particular drugs that it sold, J&J's corrupt transactions (including "commissions" and "free goods") likely delivered at least several million dollars per year in total value to Jaysh al-Mahdi.

### 3. J&J's Corrupt Payments to Jaysh al-Mahdi Comport with Its Historical Sales Practices in International Markets

263. J&J has admitted to bribing Iraqi officials during the Oil-for-Food scandal. According to J&J, Kimadia demanded that humanitarian-goods suppliers "pay a kickback, usually valued at 10% of the contract price, to the Iraqi government in order to be awarded a contract by the government."[212] Janssen-Cilag admittedly paid at least $857,387 in such kickbacks to corrupt Ba'athist officials to obtain 18 contracts for the sale of pharmaceuticals to

[212] *J&J DPA* ¶ 5.

Kimadia between December 2000 and March 2003.[213] As J&J's corporate representative recently testified in another case: "we paid kickbacks to Iraqi foreign officials."[214]

264. J&J made those corrupt ASSF payments to Kimadia through J&J Agent 1, its Lebanon-based sales agent.[215] On or about October 24, 2000, J&J Agent 1 wrote J&J and explained that "Kimadia is asking companies to pay them a 16 to 18% commission on each invoice. This subject will be discussed during your visit to Baghdad."[216] In response, in November 2000, Janssen-Cilag's Area Director with responsibility for J&J sales in Iraq instructed J&J Agent 1 to "sign[ ] a document stating that he would not pay commissions to Kimadia."[217] As J&J later admitted, however, that response letter was a mirage.[218] In reality, J&J Agent 1 proceeded to pay Kimadia its standard 10% kickbacks on Janssen-Cilag's behalf, and Janssen-Cilag reimbursed J&J Agent 1 by raising his agent fee. Those corrupt payments were then misrepresented in J&J's books and records as sales "commissions."[219]

265. On information and belief, from at least June 1998 through approximately February 2006, Janssen-Cilag made sales in Iraq through J&J Agent 1. Although Janssen-Cilag's contract with J&J Agent 1 described him as a "consultant," J&J has admitted that he actually functioned as J&J's agent who acted on J&J's behalf in paying kickbacks to Kimadia under Oil-for-Food.[220] On information and belief, J&J Agent 1 served as Janssen-Cilag's Iraqi

---

[213] *Id.* ¶ 102.

[214] Test. of Christina Egan (Fed. R. Civ. P. 30(b)(6) designee for J&J), Trial Tr., Vol. 15 at 69:15-69:16, *In Re: Depuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*, No. 3:13-cv-01071-K (N.D. Tex. Jan. 29, 2016), ECF No. 314.

[215] *See id.* ¶ 104.

[216] *Id.* ¶ 105.

[217] *Id.* ¶ 106.

[218] *See id.* ¶¶ 105-106.

[219] *Id.* ¶ 118.

[220] *See id.* ¶¶ 27, 102-106.

sales agent until approximately February 2006, when the SEC uncovered J&J's kickbacks and prompted J&J to terminate his contract.[221]

266. Under Oil-for-Food, Cilag also paid sizeable kickbacks on Eprex contracts. According to the *Volcker Report*, Cilag paid a total of $509,092 in kickbacks on six Oil-for-Food contracts worth roughly $5.6 million, and, on information and belief, Eprex accounted for a significant portion of the goods covered by those contracts.[222] When asked by the Volcker Commission in 2005 for a response to the Commission's conclusion that Cilag had paid those kickbacks, Cilag denied the charges.[223] Six years later, in pleading guilty to an FCPA violation, Cilag reversed course and admitted that the allegations were true.[224]

267. J&J's admitted criminal bribery during Oil-for-Food did not prompt it to terminate its relationship with its key distributor. On information and belief, Mersaco, a Lebanon-based distributor that held itself out as Janssen-Cilag's agent in the Middle East & North Africa ("MENA") region, was responsible for overseeing J&J Agent 1's day-to-day activities in Iraq on behalf of Janssen-Cilag during Oil-for-Food and afterwards. On information and belief, Mersaco was involved in the preparation of the phony November 2000 letter discussed above that concealed J&J's bribes to Kimadia.

268. Further, the Mersaco employee who exercised day-to-day responsibility for representing Janssen-Cilag in Iraq ("J&J Agent 2") handed out a business card in 2003 depicting him/herself as the "Regional Sales & Marketing Manager" for "Janssen-Cilag" and providing a J&J email address. Moreover, according to one witness who met with J&J Agent 2 at an in-

---

[221] *See J&J FCPA* Compl. ¶ 58.

[222] *See Volcker Report*, Table 7, at 44.

[223] *See id*. at 190 (Cilag Company Response).

[224] *See J&J DPA* ¶¶ 102-112.

person meeting in Amman in 2003, J&J Agent 2 represented J&J in procuring tainted contracts under Oil-for-Food. On information and belief, J&J Agent 2 thereafter remained a key player responsible for Janssen-Cilag's sales in Iraq – nominally working for Mersaco, but in reality taking direction from J&J managers and acting on J&J's behalf – when Jaysh al-Mahdi controlled MOH and during which time J&J paid numerous "free goods" bribes.

269. Under Saddam, J&J sold medical devices in Iraq through J&J Agent 3. J&J Agent 3 technically worked for Al-Misk Co. for Commercial Agencies ("Al-Misk"), but in reality s/he represented J&J and followed J&J's directions: J&J Agent 3's business card had a description as a "Product Specialist" for "Johnson & Johnson Inc.," and J&J Agent 3 presented him/herself as J&J's agent for medical devices in several meetings at MOH in Baghdad. J&J Agent 3 was also involved in facilitating the payment of bribes on J&J's behalf under Oil-for-Food. On information and belief, J&J Agent 3 continued to represent J&J for medical-device sales made in Iraq after Oil-for-Food, when Jaysh al-Mahdi controlled MOH.

270. On information and belief, Al-Misk appears to be the same as (or substantially related to) an Al-Misk entity that was one of the worst offenders out of the thousands of companies that paid kickbacks under Oil-for-Food. The Volcker Commission determined that a Jordanian entity called "Misk For Int'l Marketing And Supply" paid $1,663,467 in ASSF bribes to MOH officials to secure 17 contracts from 2000-2003.[225] Al-Misk did so regarding many categories of products corresponding to J&J goods sold in Iraq.[226]

271. During Oil-for-Food and afterwards, Ethicon transacted business with MOH through a Jordanian distributor named Al-Wafi Group for Marketing & International Trade Co.

[225] *Volcker Report*, Table 7, at 111.

[226] *See id.*

("Al-Wafi"). Al-Wafi has served as Ethicon's agent in Iraq during all or nearly all of the time period spanning from Oil-for-Food to the present. Al-Wafi, like Al-Misk, was one of the most corrupt companies in the Oil-for-Food scandal. The Volcker Commission determined that Al-Wafi paid $1,780,051 in ASSF bribes during Oil-for-Food to secure 10 contracts from 2000-2003.[227] Also like Al-Misk, some of Al-Wafi's bribes were to secure contracts for "Surgical Supplies," a category that included Ethicon products.[228]

272. J&J's more recent conduct further demonstrates its longstanding pattern and practice of making corrupt payments in Iraq. In 2011, J&J settled Oil-for-Food FCPA allegations and represented it had put in place a global compliance program to prevent future corrupt payments in Iraq. Despite those representations, J&J paid (among other bribes) a 20% free-goods bribe on Remicade in 2015 and a 20% free-goods bribe on Eprex in 2014.

### 4. J&J's Corrupt Transactions Had a Substantial Nexus to the United States

273. J&J's operations in the Middle East were overseen in part by senior managers residing in the United States. Defendant Johnson & Johnson maintained global anti-bribery and anti-corruption policies applicable throughout the J&J corporate hierarchy, which were promulgated by its global headquarters in New Jersey. One policy document was entitled International Health Care Business Integrity Guide and was drafted by the U.S.-based "Worldwide Office" of J&J's Office of Health Care Compliance & Privacy and the J&J Law Department. The November 2009 version of the document distinguished discounts from bribery: in contrast to the policy's general prohibition of bribery, it provided that "discounts may be granted when permitted by local laws and regulations and [when] in compliance with applicable

[227] *See id.* at 15.

[228] *See id.*

antitrust laws." And, although the policy stated that J&J "generally may not provide free goods" to healthcare providers, it authorized the delivery of "free goods" in certain circumstances: "a 'free' product under a 'buy one, get one' arrangement is not considered to be free for purposes of the Guide, but instead is a form of discount."

274. On January 14, 2011, Johnson & Johnson entered into a Deferred Prosecution Agreement with the DOJ in which it paid $70 million to resolve admitted allegations that J&J paid unlawful kickbacks in several countries, including Iraq. Johnson & Johnson admitted it was "responsible for the acts of its officers, employees and agents, and wholly-owned subsidiaries and operating companies" in paying those kickbacks.[229] Johnson & Johnson also represented that it had "conducted an extensive, global review of all of its operations to determine if there were problems elsewhere and has reported on any areas of concerns to the Department and the SEC."[230] On information and belief, Johnson & Johnson's review of its Iraq-related subsidiaries' anti-corruption practices began around February 2006, when it received an SEC subpoena seeking information about its Oil-for-Food practices.[231]

275. J&J made corrupt payments to Jaysh al-Mahdi members through American companies. Its corrupt medical-device contracts were executed by J&J Middle East, a New Jersey company. Many also required the direct involvement of U.S.-based Ethicon manufacturers. From 2005 through the present, Ethicon manufactured most of its medical devices at plants located in Puerto Rico and Cornelia, Georgia. J&J considered both plants to be significant to its global supply chain. As of 2012, the Cornelia plant, which has operated since 1947, produced the majority of the world's supply of surgical sutures.

---

[229] *J&J DPA* § 2(b).

[230] *Id.* § 4(k)(ii).

[231] *See* Johnson & Johnson Form 10-Q at 24 (May 10, 2006).

276. For sales of Ethicon sutures and arterial sheaths – as well as other surgical devices, which were manufactured by Cordis Europa NV – J&J suppliers certified in the contracting documents that J&J manufactured the goods in the United States.

277. The U.S. nexus extended equally to J&J's pharmaceutical contracts. Like the other Defendants, J&J relied on a globally integrated manufacturing and distribution chain. For example, since 1988, J&J has manufactured the API for Eprex (20% FOC bribes) exclusively at Ortho Biologics LLC's facility in Manatí, Puerto Rico – even though the manufacturer entities appearing on some of J&J's Eprex contracts with Kimadia were Cilag AG (a J&J subsidiary headquartered in Switzerland) or Vetter Pharma-Fertigung GmbH & Co. KG (a German contract manufacturing partner used by J&J for the aseptic filling and packaging of compounds into medical devices). J&J filled and packed Eprex syringes – *i.e.*, it placed the medicine manufactured in Puerto Rico into syringes, and then packed those syringes for sale – at a Swiss facility run by Cilag. However, the more difficult and hard-to-replicate part of the process – the API manufacturing – occurred at the Ortho Biologics LLC plant in Puerto Rico.

278. Senior J&J managers at its key production facilities in Puerto Rico, on both the device side and the pharmaceuticals side, took part in cross-functional teams with colleagues overseas. For example, one J&J manager in Puerto Rico with decades of experience in both device and drug manufacturing touted that s/he led "cross-functional," "cross-company," and "international" "teams while at Johnson & Johnson" in support of J&J's manufacturing and sales efforts concerning Eprex, Remicade, Leustatin, and other drugs.

279. Topamax similarly illustrates J&J's use of its U.S. contacts to make corrupt payments to Jaysh al-Mahdi. J&J (through Janssen Ortho LLC) manufactures Topamax's API primarily at its facility in Gurabo, Puerto Rico. Janssen-Cilag used free batches of Topamax –

for which, on information and belief, it made the API in Puerto Rico – as a means of buying off corrupt Sadrist officials at MOH to resolve various disputes with MOH.

280. As a condition of fulfilling its corrupt contracts with Kimadia for the delivery of U.S.-manufactured goods, the J&J supplier Defendants agreed to procure letters from the U.S. Department of Commerce confirming the goods were manufactured in the United States. They further procured evidence of FDA approval for all of their goods sold to Kimadia, including those purportedly sourced from outside the United States.

281. On information and belief, the J&J supplier Defendants consummated their transactions through the New York banking system, by covering Kimadia's collateral costs in the form of payments wired into New York correspondent accounts.

## D. The Pfizer Defendants

### 1. Pfizer Made Corrupt Payments to Jaysh al-Mahdi Members

282. The Pfizer *supplier* Defendants – companies that negotiated with Kimadia and made corrupt payments to Jaysh al-Mahdi agents – are Defendants Pfizer Inc.; Wyeth Pharmaceuticals Inc. (a former Wyeth subsidiary responsible for certain legacy Wyeth drugs); and Pfizer Enterprises SARL. The Pfizer *manufacturer* Defendants – companies that manufactured drugs used to bribe Jaysh al-Mahdi agents – are Pfizer Pharmaceuticals LLC and Pharmacia & Upjohn Company, LLC.

283. Two of the Pfizer supplier Defendants registered to do business with MOH in mid-2006, after Jaysh al-Mahdi had cemented its control over the Ministry. Wyeth Pharmaceutical Inc. registered with MOH on March 2, 2006, and Pfizer Inc. registered with MOH on September 28, 2006. Defendant Pfizer Pharmaceuticals LLC registered (or

re-registered)[232] on August 20, 2009, and another Puerto Rico-based legacy-Wyeth manufacturer, Wyeth-Ayerst Lederle, Inc., registered (or re-registered) on October 30, 2008. On each occasion, the registering company submitted registration documents in person to the MOH Technical Department. On information and belief, obtaining these registrations involved corrupt payments to Jaysh al-Mahdi agents inside MOH, including those who controlled the Technical Department.

284. From 2005 through the present, Kimadia awarded Pfizer at least 71 contracts relating to various Pfizer drugs. During this time, Pfizer sold many U.S.-manufactured drugs to MOH including, but not limited to: BeneFix (API made in Andover, Massachusetts); Depo-Provera (API made in Kalamazoo, Michigan); Neurontin (API made in Vega Baja, Puerto Rico); Campto (API made in Kalamazoo, Michigan); Prostin (API made in Kalamazoo, Michigan); and Solu-Medrol (API made in Kalamazoo, Michigan). On information and belief, Pfizer secured some or all of these contracts by paying Jaysh al-Mahdi's standard "commissions" of at least 20%. *See supra* Part III.B.2. Moreover, during the period when Jaysh al-Mahdi's control of MOH was at its apex from 2004-2008, Kimadia awarded at least 17 drug contracts to Pfizer.

285. From 2004-2013, Pfizer made corrupt payments to Jaysh al-Mahdi agents. Plaintiffs set forth below examples of Pfizer's corrupt transactions (which discovery will supplement), on a drug-by-drug basis:

---

[232] MOH regulations provide that a registration is effective for five years, which requires companies to re-register with the Ministry every five years. On information and belief, the registrations above were *re-registrations*, and the manufacturers were actually registered as early as 2003 and 2004.

| Drug (Nat'l Code) | Supplier | Manufacturer | Formulary Date | Confirmed Contract | FOC % |
|---|---|---|---|---|---|
| BeneFix 250 (08-H00-004) | Wyeth Pharmaceuticals Inc.[233] | Wyeth Farma, S.A.[234] | 5-29-2005 | 40/2006/287 | 10% |
| BeneFix 500 (08-H00-005) | Wyeth Pharmaceuticals Inc. | Wyeth Farma, S.A. | 5-29-2005 | 40/2006/683 | 10% |
| Campto (15-E00-002) | Pfizer Inc.[235] | Pfizer (Perth) Pty Limited | 7-25-2005 | TBD | 60% |
| Depo-Provera (06-F00-017) | Pfizer Enterprises SARL | Pharmacia & Upjohn Company, LLC | 2007 or earlier | 40/2007/503 | 20% |
| Neurontin (04-J00-053) | Pfizer Inc. | Pfizer Pharmaceuticals LLC | 2006 or earlier | 40/2006/428 | 50% |
| Solu-Medrol (15-AF0-019) (15-AF0-020) | Pfizer Enterprises SARL | Pfizer Manufacturing Belgium N.V. | 2005 or earlier | 40/2005/402 | 10% |
| Xyntha (08-H00-008) | Wyeth Pharmaceuticals Inc. / Pfizer Enterprises SARL | Wyeth Farma, S.A. | 5-29-2005 | 40/2006/683 | 5% |

The column headers in this chart have the same meaning as in the AstraZeneca chart (at ¶ 191).

286. On information and belief, the applicable Pfizer Defendants made corrupt payments in connection with their contracts for each drug on an annual basis – similar to the percentages listed on the chart – beginning the year after the drug was placed on the formulary

[233] On information and belief, Wyeth Pharmaceuticals Inc. acted as the supplier for BeneFix until after Pfizer's acquisition of Wyeth in 2009. In 2010, Pfizer Gulf FZ-LLC, a Pfizer subsidiary based in Dubai, began acting as the supplier. Similarly, on information and belief, Wyeth Pharmaceuticals Inc. acted as the supplier for Xyntha until 2010, when Pfizer Enterprises SARL took over the role.

[234] Pfizer identified Wyeth Farma, S.A. (a Spanish entity) as the manufacturer on at least some BeneFix contracts, possibly because Pfizer filled BeneFix into syringes and packaged the drugs for sale in Spain. But Pfizer manufactured the API in the United States and certified to Kimadia that it was doing so. Here (and for the other Defendants as well), where Plaintiffs have obtained reliable information from Kimadia's records depicting the manufacturer as listed on the contracts, Plaintiffs list that manufacturer in the chart. But where Kimadia records do not reliably identify a manufacturing entity, Plaintiffs list the entity that appears to have manufactured the active pharmaceutical ingredient of the drug in question.

[235] For the drugs on this chart for which "Pfizer Inc." is listed as the supplier, the supplying company that appears in published MOH award tables is "Pfizer (USA)." On information and belief, those entries appear to refer to Pfizer Inc., which registered as a corporate entity doing business with Kimadia on September 28, 2006, and which is a U.S.-based legacy-Pfizer company that acted as a supplier vis-à-vis MOH.

and continuing through the present. That allegation is based on the facts that: (a) Plaintiffs have obtained documentary evidence memorializing at least one "free goods" payment that Pfizer made in the listed percentage for each drug; and (b) Kimadia maintained a general policy of extracting similar "free goods" percentages on a given drug from year to year. Based on that historical practice, if a company paid "free goods" of X% in one year, it likely also paid a similar percentage on that same drug in other years beginning when the supplier first started selling that drug in Iraq. Pfizer made those corrupt payments by using FOC Clauses, Administrative Fee Clauses, Off-the-Books Payoffs, or some combination thereof. The Pfizer supplier Defendants also paid cash "commissions" to Jaysh al-Mahdi in connection with these same contracts.

287. Pfizer also used U.S.-manufactured drugs to make Off-the-Books Payoffs to Jaysh al-Mahdi agents. For example, a Kimadia document memorialized Wyeth Pharmaceuticals Inc.'s provision in 2006 or 2007 of 10,000 units of BeneFix 500 IU to Kimadia without any associated Contract or Order Number. Because such Off-the-Books Payoffs were not associated with any ordinary-course contract, they were especially easy for Jaysh al-Mahdi to divert for sale on the black market to finance terrorist activities.

288. The Pfizer supplier Defendants made corrupt payments acting as agent for (among other affiliates) the Pfizer manufacturer Defendants. As a condition of selling Pfizer-manufactured goods in Iraq, the Pfizer supplier Defendants had to certify to MOH that the Pfizer manufacturers had authorized them to sell their goods in Iraq. The Pfizer suppliers also had to certify they were selling devices on behalf of those manufacturers and that those devices were manufactured by each identified Pfizer manufacturer. Based on these facts, and the Iraqi regulations governing the tender process, the Pfizer manufacturer Defendants exercised control

over the Pfizer supplier Defendants with respect to the corrupt transactions executed by the latter.

289. The Pfizer manufacturer Defendants actively participated in the corrupt transactions with Jaysh al-Mahdi, including by: (a) manufacturing drugs that they knew or recklessly disregarded were being used by their affiliates to bribe Jaysh al-Mahdi agents; (b) registering to do business as manufacturers with the Jaysh al-Mahdi-controlled MOH; and (c) submitting paperwork to MOH confirming the Pfizer supplier Defendants' authority to negotiate and execute corrupt contracts on their behalf.

290. BeneFix illustrates how Pfizer's corrupt transactions worked. BeneFix is an integrated system containing both medicine and devices designed to treat hemophilia, and it historically generated more than $600 million annually in worldwide revenues for Pfizer and Wyeth. BeneFix was placed on the Iraqi formulary on May 29, 2005, and Wyeth's corrupt BeneFix transactions began around that time. Wyeth's, and later Pfizer's, corrupt transactions relating to its BeneFix contracts delivered substantial monetary value to Jaysh al-Mahdi agents. Given BeneFix's sales price to MOH of more than $350 per pack, and that Pfizer generally sold more than 10,000 units of BeneFix per year to MOH, Pfizer's "free goods" bribes on BeneFix alone likely provided Jaysh al-Mahdi with millions of dollars in value. For example, Pfizer's 2006-2007 Off-the-Books Payoff of 10,000 BeneFix packs was (based on the 2010 tender price of $373 per pack) worth roughly $3.7 million. In addition to the 2006-2007 Off-the-Books Payoff of BeneFix, Pfizer also secured at least four contracts for the sale of BeneFix during the period from 2004 through 2008, when high-dollar contracts were virtually impossible to obtain without corrupt payments to Jaysh al-Mahdi agents.

291. Pfizer's BeneFix-related bribes to Jaysh al-Mahdi involved the provision of free medical devices in addition to free medicines. With respect to the medicines aspect, BeneFix consisted of recombinant coagulation Factor IX, a biotech drug. With respect to the devices aspect, the European Medicines Agency has determined that each BeneFix pack contained at least six different medical devices or supplies in addition to the medicine itself.[236] On information and belief, Pfizer included such devices in its BeneFix packs to make it easier to sell BeneFix. Pfizer's provision of free medical devices as part of the free BeneFix packs thus enhanced Jaysh al-Mahdi's ability to efficiently monetize BeneFix on the black market.

292. On information and belief, given the size of Pfizer's business in Iraq, the frequency of its contracts, and the particular drugs that it sold, Pfizer's corrupt payments (including "commissions" and "free goods") delivered several million dollars per year in total value to Jaysh al-Mahdi.

### 2. Pfizer's Corrupt Transactions with MOH Comport with Its Historical Sales Practices in International Markets

293. The Pfizer Defendants have a history of making corrupt payments – including through the delivery of "free goods" – to grow demand for their products. In the August 2012 Deferred Prosecution Agreement identified above, for example, Pfizer admitted that it had paid in-kind kickbacks and had tried to conceal them as mere "discounts." More generally, Pfizer admitted that, "for the purpose of improperly influencing foreign officials in connection with regulatory and formulary approvals, purchase decisions, prescription decisions, and customs clearance," Pfizer entities had "made and authorized the making of payments of cash and the

[236] European Medicines Agency, *BeneFix Annex I: Summary of Product Characteristics* at 32, http://www.ema.europa.eu/docs/en_GB/document_library/EPAR_-_Product_Information/human/000139/WC500020390.pdf.

provision of other things of value both directly and through third parties."[237] For example, Pfizer admitted to a "bonuses" scheme in Croatia "to corruptly influence the . . . inclusion of pharmaceutical products in tenders or on formulary lists."[238] This scheme involved Pfizer's provision of "equipment, free pharmaceutical products, as well as cash payments."[239]

294. Wyeth likewise has a history of corrupt international payments. According to the SEC, between 2005 and 2010, subsidiaries of Wyeth LLC paid improper bribes and kickbacks in several international markets – including Saudi Arabia, Pakistan, Indonesia, and China.[240] At least some of those bribes took the form of in-kind payments much like the "free goods" at issue here: in Wyeth's Indonesian operations, for example, employees paid kickbacks to doctors in the form of free "Wyeth nutritional products."[241] The SEC also alleged that Wyeth subsidiaries in the above markets paid a litany of other bribes to foreign health officials, including the provision of "cash payments, . . . BlackBerrys, cell phones," "travel [bribes and payments for] office equipment and renovations."[242] On information and belief, Pfizer Inc. became aware of those bribes close in time to its acquisition of Wyeth, LLC in October 2009.

295. A 2013 presentation by a former Wyeth executive who served as Wyeth's Managing Director for the Middle East & North Africa region from 2004-2009 further suggests that Wyeth understood how "free goods" provided to Middle Eastern government customers were a form of corrupt payment. In the presentation, the former Wyeth Managing Director acknowledged that "[m]ost [p]hysicians [in the Middle East] are somehow affiliated with the

---

[237] *Pfizer DPA* ¶ 16.
[238] *Id.* ¶ 26.
[239] *Id.* ¶ 27.
[240] Compl. ¶ 2, *SEC v. Wyeth LLC*, No. 12-cv-01304 (D.D.C. filed Aug. 7, 2012), ECF No. 1.
[241] *Id.* ¶ 16.
[242] *Id.* ¶¶ 16, 20.

government" and that the practice of providing such doctors with "[e]xcessive bonus goods" was one of the "Prevailing Compliance Challenges" for doing business in the Middle East.

296. Pfizer's more recent conduct further demonstrates its longstanding pattern and practice of making corrupt payments in Iraq. Pfizer continued to make corrupt payments to Kimadia officials in connection with U.S.-drug contracts in the five years since Pfizer settled its FCPA allegations in 2012, at which point it purported to have a global compliance program that would prevent such behavior in the future.[243] Among other such corrupt payments, Pfizer provided a "free goods" bribe on Xyntha in 2017 (27,666 units FOC); a 14% "free goods" bribe on BeneFix in 2016; a 60% "free goods" bribe on Campto in 2016; and a 10% "free goods" bribe on Solu-Medrol in 2014.

### 3. Pfizer's Corrupt Transactions Had a Substantial Nexus with the United States

297. Pfizer employs a centralized, top-down business model that consolidates significant control over global operations in its New York headquarters. That model dates to an orchestrated plan of consolidation that Pfizer executed in the late 1990s. As recounted in a Pfizer yearbook distributed to its employees on the company's 150th anniversary (with a cover letter from Pfizer's then-CEO), Pfizer decided in the 1990s that "unifying" domestic and international sales would serve "the best interests of the company."[244] Thus, at the end of 1996, Pfizer "initiated a major reorganization . . . calculated to abolish whatever remained of the wall between domestic and international operations."[245] Pfizer has since espoused the virtues of its

[243] *Pfizer DPA* ¶ 4.

[244] Jeffrey L. Rodgengen, *The Legend of Pfizer* at 137, Ft. Lauderdale, FL: Write Stuff Syndicate, Inc. (1999).

[245] *Id.*

top-down model by using phrases such as a "'One Pfizer' strategy,"[246] "obliterat[ing] vertical hierarchies,"[247] and "frequently crossing organizational and geographic boundaries"[248] to describe its global operations.

298. At all relevant times, Pfizer's anti-corruption policies were designed and implemented by the Legal and Compliance Groups in New York. Pfizer's senior executives also have inserted themselves into international corruption issues. A former Pfizer CEO, who served from 2001-2006, claimed to have personally intervened with foreign heads of state to address alleged product-diversion issues. He wrote, "I tell [heads of state] that if we start a program and that program is failing because of diversion of product by corrupt officials for their own profit, I will shut the program down and I will tell the world specifically why I shut it down."[249]

299. Global sales and portfolio management functions for Pfizer brands – including brands sold in the Middle East – were likewise directed by senior marketing personnel located in New York. For example, an Executive Director at Wyeth Pharmaceuticals and later Pfizer from 2007-2011 explained that s/he had a "Global Strategy" role and was "[r]esponsible for all global brand management strategic activities" for BeneFix (10% FOC bribes) and Xyntha (5% FOC bribes). Another Pfizer employee similarly wrote that, in Pfizer's Established Products Division, "Global Brand Directors" at Pfizer's New York headquarters were responsible for the "Anti-Fungal portfolio (Vfend, Ecalta/Eraxis and Diflucan) in the Global Established Products Division," and so directed "global strategies and tactics" as part of "cross functional teams

---

[246] Paul Thomas, *Pfizer Moving from Centralized to Holistic Supply Chain Security*, Pharm. Mfg. (Feb. 14, 2012).

[247] John Simons, *King of the Pill: Pfizer Is the Biggest Drug Company Ever. Can It Become the Best?*, Fortune (Apr. 14, 2003).

[248] Pfizer Inc., *The Blue Book: Summary of Pfizer Policies on Business Conduct* 23 (2003), http://www.pfizer.com/files/investors/corporate/blue_book_english_international_2017.pdf.

[249] Hank McKinnell, *A Call to Action: Taking Back Healthcare for Future Generations* 167-68 (McGraw-Hill 2005).

including manufacturing, supply, portfolio management, medical, regulatory and regional colleagues." Another Pfizer Inc. manager located in New York likewise wrote that, from New York, s/he "[a]ctively partnered with in-country Pfizer Marketing and Sales leaders realizing local business objectives" in an array of emerging markets, including the Middle East. On information and belief, Pfizer had such cross-functional teams for the other drugs identified in this Complaint, indicating that U.S.-based personnel were involved in formulating Pfizer's sales strategies for the corrupt transactions that funded Jaysh al-Mahdi in Iraq.

300. Pfizer Inc. also centralized control over its "corporate responsibility" divisions, which included programs for "donated products" in emerging markets. For example, one New York-based Pfizer manager wrote that, from 1998-2009, s/he "[l]ed operations, contracting, communications, monitoring and evaluation and related policy development of Pfizer's international health programs," which involved "large cross-divisional regulatory (global compliance, dossier registration, API testing, packaging test) and program development teams" focused on moving donated product to needy countries. The employee also worked out of New York "with manufacturing and supply chain divisions to ensure concurrent interactions testing, dossier development and regulatory submissions to emerging markets and developing countries."

301. Pfizer operated an interconnected, global manufacturing and supply network that facilitated the worldwide distribution of Pfizer drugs. The business unit responsible for distribution is known as Pfizer Global Supply (previously called Pfizer Global Manufacturing), whose nerve center was Pfizer's manufacturing facility in Kalamazoo, Michigan. In 2011, Pfizer claimed that facility was the largest drug-manufacturing plant in the world.[250] From 2003-2008, Pfizer invested roughly $600 million in the Kalamazoo facility to give it the ability to

[250] *See* Pfizer in Kalamazoo County 2011, YouTube.com, https://www.youtube.com/watch?v=vrZNRkw-BGI (at 2:05).

manufacture the API for drugs distributed all over the world.[251] According to Pfizer's VP for Established Products in 2008, the Kalamazoo plant was critical to Pfizer's global operations not only due to its unique technical infrastructure, but also because "there's a long tradition of manufacturing here in Kalamazoo and here on the Kalamazoo site, so manufacturing these hard-to-make products is something we've learned over the years and become very good at."[252]

302. As Pfizer's head of Global Tender & Contracting Lead for Established Products explained in 2015, Pfizer's approach to international tenders "requires liaison and close coordination with many different functions" throughout the Pfizer corporate hierarchy, including manufacturing (to confirm capacity and cost), finance, pricing, and marketing; "[t]o be able to manage this, [Pfizer] created [a] cross-functional process that involves people from a wide range of areas."[253] Given Pfizer's centralized structure, the coordination of those various functions likely required the involvement of senior management in New York. A Pfizer Inc. manager for Emerging Markets and Transition Sites wrote that, while based out of New York in 2007, s/he "[t]ravel[led] extensively in the Asia/Africa/Middle East and South America region with Senior Pfizer Leadership providing financial leadership and council [sic] and conducting operations reviews and operating plan strategy sessions."

303. Iraqi records indicate that "Pfizer Inc." – the New York-based Pfizer parent company – acted as the supplier on several corrupt drug contracts executed with Kimadia. Those records comport with how Pfizer structured its integrated supply network, with centralized oversight by the global headquarters in New York.

[251] *See* CBS Radio Interview at Pfizer, YouTube.com, https://www.youtube.com/watch?v=zhYtEAeafMk (at 0:28).

[252] *Id.* (at 4:03).

[253] Suzanne Elvidge, *Making Tenders Work Globally: The Pfizer Approach*, Eye for Pharma (Jan. 28, 2015).

304. Pfizer was represented in Iraq by a Jordanian sales agent and his/her entity, Mass Marketing & Distribution Co. ("Pfizer Agent 1"). Over email, Pfizer Agent 1 represented himself/herself to Kimadia decisionmakers as acting on behalf of the Pfizer U.S. entities. For example, in one late 2003 email relating to two pharmaceutical contracts, Pfizer Agent 1 represented that s/he was acting on behalf of "Pfizer – USA." On information and belief, Pfizer Agent 1 and/or other agents acting on behalf of Pfizer, including Pfizer's scientific bureaus, also represented to Kimadia representatives that they were acting on behalf of "Pfizer USA." This belief is based on, among other things, the above late 2003 email as well as the frequent references to "Pfizer USA" throughout Kimadia documents prepared by different Kimadia officials, at different times from the 2000s through the present, and in connection with different Pfizer contracts for numerous different Pfizer drugs.

305. Many of Pfizer's corrupt payments involved U.S.-based manufacturers or facilities. For example, Pfizer relied on its Kalamazoo site to facilitate sales of Depo-Provera (20% FOC bribes) in Iraq. Pfizer manufactured Depo-Provera at its Kalamazoo facility, and it used the Kalamazoo facility as part of its global distribution network to sell Depo-Provera in markets around the world. Kalamazoo-based personnel were involved not only in manufacturing Depo-Provera's API, but also in arranging sales of Depo-Provera (among other drugs) in international markets. MOH records thus identify the U.S.-based Pharmacia & Upjohn Company as Depo-Provera's manufacturer, and, consistent with Kimadia's standard practice, Pfizer certified to MOH that it was sourcing Depo-Provera from the United States.

306. Pfizer also relied on its U.S. presence in facilitating Iraq sales of Neurontin, its anticonvulsant drug on which it paid 50% FOC bribes. Pfizer developed Neurontin at its facility in Ann Arbor, Michigan, and a Pfizer press release touted Neurontin as the "continuing fruits of

Michigan's historic support of innovation."[254] As for the physical manufacture of Neurontin's API, Pfizer used its facility in Vega Baja, Puerto Rico. As with the other Defendants that relied heavily on Puerto Rico to manufacture drugs for global distribution, Pfizer sourced Neurontin from Puerto Rico facilities because of Puerto Rico's unique location, status as a U.S. territory, and valuable tax incentives.

307. Pfizer (and Wyeth before it) likewise used U.S.-based personnel to oversee global marketing and brand-management activities for BeneFix (10% FOC bribes). Wyeth developed BeneFix at its facility in Andover, Massachusetts, where it also manufactured BeneFix's API. From 2004 through at least 2008, Wyeth exclusively manufactured the API for BeneFix in Andover. Wyeth used its U.S. facilities, primarily Andover, to oversee BeneFix's global distribution, including by creating a 2004 corporate roadmap contemplating the "central planning of the entire supply chain."[255] When Pfizer acquired Wyeth in 2009, it continued Wyeth's practice of manufacturing BeneFix in Andover. Pfizer has called Andover "a crucial part of our global footprint for both clinical and commercial manufacturing."[256] Today, Pfizer describes the Andover facility as a "vital cog in both Pfizer's WRD and Pfizer's Global Supply network."[257]

308. Consistent with MOH's standard requirements, Pfizer guaranteed MOH that it manufactured BeneFix at its Andover facility. For example, in 2010, Pfizer executed a contract

---

[254] Press Release, Pfizer Inc., *Pfizer Inc. Opens $250 Million Technical Development Facility, Latest Investment in Development of New Medicines at Growing Ann Arbor Research Campus* (June 24, 2002), http://www.evaluategroup.com/Universal/View.aspx?type=Story&id=27494.

[255] Allen Jacques (Senior Director, Network Planning for Wyeth Biopharma), *Supply Chain Cycle Time Reduction*, Biopharm Int'l, Vol. 17 Issue 10 (Oct. 1, 2004), http://www.biopharminternational.com/supply-chain-cycle-time-reduction.

[256] Press Release, Pfizer Inc., *Pfizer Breaks Ground on New Biologics Clinical Manufacturing Facility in Andover, Massachusetts* (June 16, 2016), http://www.pfizer.com/news/press-release/press-release-detail/pfizer_breaks_ground_on_new_biologics_clinical_manufacturing_facility_in_andover_massachusetts.

[257] Pfizer Inc., *Andover, Massachusetts Site Statistics*, http://www.pfizer.com/science/research-development/centers/ma_andover (last accessed Sept. 22, 2017).

with Kimadia for the sale of 18,002 packs of BeneFix. The manufacturing entity was listed as Wyeth Farma S.A., a Pfizer Inc. subsidiary headquartered in Spain (which performed the drug formulation but not the API manufacturing). In Section 29 of that contract, the Pfizer supplier "guarantee[d] that raw materials used for manufacturing" – *i.e.*, BeneFix's API – "will be prepared in the country of origin (Andover, USA)."[258] Pfizer made similar guarantees with respect to the other U.S.-manufactured drugs it sold to MOH.

309. As a condition of fulfilling its corrupt contracts with Kimadia for the delivery of U.S.-manufactured drugs, the Pfizer supplier Defendants agreed to procure letters from the U.S. Department of Commerce confirming the drugs were manufactured in the United States. They further procured evidence of FDA approval for all of their drugs sold to Kimadia, including those purportedly sourced from outside the United States.

310. On information and belief, the Pfizer supplier Defendants consummated their transactions through the New York banking system, by covering Kimadia's collateral costs in the form of payments wired into New York correspondent accounts.

## E. The Roche Defendants

### 1. Roche Made Corrupt Payments to Jaysh al-Mahdi Members

311. The Roche *supplier* Defendant – a company that negotiated with Kimadia and made corrupt payments to Jaysh al-Mahdi agents – is F. Hoffmann-La Roche Ltd. The Roche *manufacturer* Defendants – companies that manufactured drugs used to bribe Jaysh al-Mahdi agents – are Genentech, Inc. and Hoffmann-La Roche Inc.

312. From 2005 through the present, Kimadia awarded Roche at least 44 contracts for the sale of Roche drugs and devices. During this time, Roche sold U.S.-manufactured drugs and

[258] Translated from Arabic.

devices to MOH including, but not limited to: Herceptin (API made in Vacaville, California); Pegasys (API made in Florence, South Carolina); Rituxan/MabThera (API made in Vacaville, California); Xeloda (API made in Nutley, New Jersey, and Florence, South Carolina); and Avastin (API made in Vacaville, California). On information and belief, Roche secured some or all of these contracts by paying Jaysh al-Mahdi's standard "commission" of at least 20%. *See supra* Part III.B.2. Moreover, during the period when Jaysh al-Mahdi's control of MOH was at its apex from 2004-2008, Kimadia awarded at least 18 drug and/or device contracts to Roche.

313. From 2004-2013, Roche delivered "free goods" to Jaysh al-Mahdi agents in connection with the sale of some of its most lucrative drugs and devices. Those corrupt payments concerned contracts negotiated by F. Hoffmann-La Roche Ltd. and involved drugs sourced from several U.S.-based Roche facilities. Examples, which Plaintiffs have uncovered without discovery of Defendants' files and are merely illustrative, include:

| Drug (Nat'l Code) | Supplier | Manufacturer | Formulary Date | Confirmed Contract | FOC % |
|---|---|---|---|---|---|
| Avastin 100mg (15-AF0-043) | F. Hoffmann-La Roche Ltd. | Genentech, Inc. / Roche Diagnostics GmbH[259] | 6-11-2006 | TBD | 20% |
| Avastin 400mg (15-AF0-044) | F. Hoffmann-La Roche Ltd. | Genentech, Inc. / Roche Diagnostics GmbH | 6-11-2006 | TBD | 20% |
| Herceptin 440mg (15-AF0-036) | F. Hoffmann-La Roche Ltd. | Genentech, Inc. | 2007 or earlier | 40/2007/137 | 15% |
| MabThera (15-B00-036) | F. Hoffmann-La Roche Ltd. | Genentech, Inc. | 2004 or earlier | 40/2004/899 | 10% |
| Pegasys (15-B00-055) | F. Hoffmann-La Roche Ltd. | Roche Carolina Inc. | 9-11-2005 | 40/2006/359 | 15% |
| Xeloda (15-AG0-038) | F. Hoffmann-La Roche Ltd. | Hoffmann-La Roche Inc. | 2006 or earlier | 40/2006/45 | 10% |

[259] On information and belief, Genentech, Inc. manufactured the API for Avastin, while Roche Diagnostics GmbH performed the drug formulation.

The column headers in this chart have the same meaning as in the AstraZeneca chart (at ¶ 191).

314. On information and belief, Roche made those corrupt payments on an annual basis – in percentages similar to the ones listed on the chart – beginning the year after the drug was placed on the formulary and continuing through the present. That allegation is based on the facts that: (a) Plaintiffs have obtained documentary evidence memorializing at least one "free goods" bribe that Roche paid in the listed percentage for each drug; and (b) Kimadia maintained a general policy of extracting similar "free goods" percentages on a given drug from year to year. Based on that policy, if a company paid "free goods" of X% in one year, it likely also paid a similar percentage on that same drug in other years beginning when the supplier started selling that drug in Iraq. Roche made those payments through the use of FOC Clauses, Administrative Fee Clauses, Off-the-Books Payoffs, or some combination thereof. F. Hoffmann-La Roche Ltd. also paid cash "commissions" to Jaysh al-Mahdi in connection with these same contracts.

315. F. Hoffmann-La Roche Ltd. made corrupt payments acting as agent for (among other affiliates) the Roche manufacturer Defendants. As a condition of selling drugs in Iraq manufactured by those companies, F. Hoffmann-La Roche Ltd. had to certify to MOH that it was authorized to sell those manufacturers' drugs. It also had to certify that it was selling drugs on behalf of those manufacturers and that they had actually manufactured the drugs being supplied. Based on these facts, and the Iraqi regulations governing the tender process, the Roche manufacturer Defendants exercised control over F. Hoffmann-La Roche Ltd. with respect to the corrupt transactions executed by the latter.

316. The Roche manufacturer Defendants actively participated in making corrupt payments to Jaysh al-Mahdi agents, including by: (a) manufacturing drugs that they knew or recklessly disregarded were being used by their affiliate to bribe Jaysh al-Mahdi agents;

(b) registering to do business as manufacturers with the Jaysh al-Mahdi-controlled MOH; and (c) submitting paperwork to MOH confirming F. Hoffmann-La Roche Ltd.'s authority to negotiate and execute corrupt contracts on their behalf.

317. Herceptin illustrates how Roche's corrupt transactions worked. Herceptin is a blockbuster breast-cancer drug that, between 2006 and 2010, generated at least $2.7 billion per year in worldwide revenue. Beginning in 2007 or earlier, Roche generally paid "free goods" percentages of 15% on Herceptin contracts obtained from Kimadia. Those payments delivered significant monetary value to MOH. Herceptin is extremely expensive: for a single patient in 2012, "Herceptin's price tag [was] $4,500 a month, or $54,000 a year."[260] Accordingly, even a comparatively small "free goods" percentage of Herceptin was likely worth at least $100,000.

318. Roche's corrupt payments relating to sales of its chronic-hepatitis drug Pegasys (15% FOC bribes) involved medical devices as well as drugs. Such devices, on information and belief, included needles and/or Genentech's Pegasys ProClick™ Autoinjector, which is a "medical device[ ], namely, [an] injector filled with a pharmaceutical."[261] On information and belief, Roche included such devices in its Pegasys packs to make it easier to sell. Roche's provision of free medical devices as part of the free Pegasys packs thus enhanced Jaysh al-Mahdi's ability to efficiently monetize Pegasys on the black market.

319. On information and belief, given the size of Roche's business in Iraq, the frequency of its contracts, and the particular drugs that it sold, Roche's total corrupt payments (including "commissions" and "free goods") delivered at least several million dollars per year in total value to Jaysh al-Mahdi.

---

[260] Tracy Staton, *FDA Approves Roche's Pricey New Herceptin Partner, Perjeta*, Fierce Pharma (June 11, 2012).

[261] U.S. Pat. & Trademark Off., *Trademark Electronic Search System (TESS)* (Genentech trademark for Pegasys ProClick™ Autoinjector), http://tmsearch.uspto.gov/bin/showfield?f=doc&state=4806:v4jgoj.2.1.

### 2. Roche's Corrupt Transactions with Jaysh al-Mahdi Members Comport with Its Historical Sales Practices in International Markets

320. Roche participated in Oil-for-Food via Roche Agent 1, an employee of Omnitrade. As the Volcker Commission found, F. Hoffmann-La Roche Ltd. paid at least $296,225 in kickbacks to procure 16 Oil-for-Food contracts from 2000-2003 worth more than $3.5 million.[262] The Volcker Commission's findings reveal that Roche won the second-largest number of Oil-for-Food contracts (16) among the large Western pharmaceutical companies – trailing only Janssen-Cilag (with 19).[263] On information and belief, despite that documented evidence of corruption, Roche continued to use Roche Agent 1 (and Omnitrade) to transact with the Sadrist-controlled MOH from late 2004 and onwards, including for the negotiation and execution of contracts for the sale of MabThera on or about December 2005 and Pegasys on or about March 2007.

321. Roche Diagnostics GmbH, which is listed as a manufacturer on some of Roche's Avastin contracts, has a similar history of making corrupt payments in Iraq. As the Volcker Commission found, Roche Diagnostics GmbH paid at least $184,618 in kickbacks to procure one Oil-for-Food contract worth roughly $2 million.[264] Roche Diagnostics Manager 1 was formerly the head of Roche Diagnostics for Iran and the Levant Territory (on information and belief including Iraq, Syria, Lebanon, and Jordan), and had a business card with an identification as a "Managing Director" at Roche's "Regional Office." In that capacity, Roche Diagnostics Manager 1 was responsible for Roche Diagnostics' kickbacks to corrupt MOH officials during Oil-for-Food. One witness who personally met Roche Diagnostics Manager 1 in Amman in

[262] *See Volcker Report*, Table 7, at 63.
[263] *See id.* at 44, 63, 89.
[264] *See id.* at 140.

2003 understood that Roche Diagnostics Manager 1 had paid bribes on behalf of Roche during Oil-for-Food. Nevertheless, Roche Diagnostics Manager 1 was promoted, rather than fired, after Oil-for-Food, and continued to represent Roche vis-à-vis MOH during the years when Jaysh al-Mahdi controlled MOH.

322. Roche's more recent conduct further demonstrates its longstanding pattern and practice of making corrupt payments in Iraq. Among other corrupt payments during the past five years, Roche paid a 12% free-goods bribe on Herceptin in 2017; a 15% free-goods bribe on Pegasys in 2014; a 10% free-goods bribe on Rituxan/MabThera in 2014; a 20% free-goods bribe on Avastin in 2014; and a 10% free-goods bribe on Tarceva in 2014.

### 3. Roche's Corrupt Transactions with MOH Had a Substantial Nexus to the United States

323. Roche, like the other Defendants, employed a globally integrated distribution model that relied heavily on its U.S. manufacturing capabilities to source and distribute product worldwide. Genentech, Inc. played a pivotal role in those global distribution capabilities. When Roche fully acquired Genentech, Inc. in 2009, it took steps to preserve the unique Genentech culture and brand, moving Roche's U.S. headquarters from Nutley, New Jersey, to Genentech's main offices in South San Francisco. Genentech also maintained its corporate documents – including regulatory, marketing, and sales materials for Genentech drugs – at its headquarters in South San Francisco.

324. The Nutley facility was shuttered in 2012. Until its closure, the Nutley facility played a key role in Roche's global distribution capabilities, including with respect to sales of Xeloda, a lucrative chemotherapy drug on which Roche paid 10% "free goods" bribes to the Jaysh al-Mahdi-controlled Ministry.

325. During the time that Roche's American headquarters were in New Jersey, Roche located key global compliance personnel there, with special responsibility for U.S.-manufactured drugs. For example, one Compliance Specialist at the New Jersey office wrote that, from 2003-2005, s/he was involved in compliance efforts with respect to "inspections from global regulatory agencies" and "trained [a] global audience on compliant management system" for Roche's products.

326. From 2005-2009, Roche's top-three selling drugs worldwide – cancer medicines Herceptin, Avastin, and Rituxan (branded in Iraq as MabThera) – were all developed in the United States and manufactured by Genentech in its Vacaville, California facility. From 2004 through at least 2008, the Vacaville plant served as the exclusive global manufacturer of the API for those blockbuster drugs, which Roche then sent to other facilities in Oregon or Switzerland for "packaging in vials or syringes."[265] As Genentech's VP for Manufacturing Operations stated, "We're always looking to develop solutions for unmet medical needs – the tough stuff that no one else is doing. That's why our pharmaceuticals are in such demand. Our Vacaville operations are a major part of this ongoing process."[266] Roche built the Vacaville facility specifically to meet the unique manufacturing challenges posed by Genentech's complex biologic drugs like Herceptin.

327. On information and belief, Roche was dependent upon Genentech's Vacaville facility for the manufacturing of the API for MabThera (10% free goods) sales to MOH. MabThera is a sophisticated biotech drug the API for which was manufactured exclusively in Genentech's bioreactors in Vacaville for distribution worldwide, and F. Hoffmann-La Roche

[265] *Genentech Details Big Vacaville Expansion*, North Bay Bus. J. (Nov. 4, 2013), http://www.northbaybusinessjournal.com/csp/mediapool/sites/NBBJ/IndustryNews/story.csp?cid=4184162&sid=778&fid=181.

[266] *Id.*

Ltd. could not have sold MabThera to Iraq without the API manufacturing activity that took place in the United States. Although one contract for MabThera listed F. Hoffmann-La Roche Ltd. as the manufacturer and identified Switzerland as the country of origin, that meant only that the drug was formulated in Switzerland – the API was still sourced from the United States.

328. Another biotech drug, Herceptin (15% FOC bribes), required a complex research and manufacturing process. Since 1998, Genentech, Inc. has manufactured Herceptin's API exclusively at its facility in Vacaville, California. In 2000, Genentech, Inc. called its Vacaville plant the "world's largest biotechnology manufacturing plant for the large-scale production of pharmaceutical proteins."[267] According to industry reports, the Vacaville facility played a "major part" of Roche's global distribution chain, "producing more than half of Roche's global output of biologic direct substance products."[268] After the Vacaville facility manufactured the active ingredient, the substances were frozen and then packaged into vials or syringes at Roche facilities in Hillsboro, Oregon, or near Basel, Switzerland.

329. In 1998, Roche and Genentech, Inc. (which was at all times majority-owned by Roche) agreed to a licensing arrangement under which Roche attained the exclusive marketing authority to sell Herceptin around the world. Roche then attained the ability to sell Herceptin directly upon completing its 2009 acquisition of Genentech, Inc. Roche negotiated and executed its Herceptin sales contracts in Iraq through F. Hoffmann-La Roche Ltd., which obtained those contracts by paying 15% "free goods" bribes in the form of drugs sourced from the United States. Consistent with Kimadia's standard practice, F. Hoffmann-La Roche Ltd. identified

---

[267] Press Release, Genentech, *Genentech's Vacaville Facility Granted FDA Licensure* (Apr. 25, 2000), https://www.gene.com/media/press-releases/4611/2000-04-25/genentechs-vacaville-facility-granted-fd.

[268] *Genentech Details Big Vacaville Expansion*, North Bay Bus. J. (Nov. 4, 2013), http://www.northbaybusinessjournal.com/csp/mediapool/sites/NBBJ/IndustryNews/story.csp?cid=4184162&sid=778&fid=181.

Genentech, Inc. as Herceptin's manufacturer in the contracting documents, and it assured Kimadia that it would source Herceptin from the United States.

330. Throughout the relevant period, Roche also relied on its manufacturing facilities in Florence, South Carolina, as a key cog in its global distribution network. Whereas the Vacaville facility focused on Roche's blockbuster biotech cancer drugs, the Florence facility (managed by Roche Carolina Inc.) focused on Roche's blockbuster chemical drugs and devices. According to the European Medicines Agency, the Florence facility was the primary manufacturing site for six key Roche drugs or devices, including Pegasys.[269]

331. Since 2002, Roche has manufactured Pegasys (15% FOC bribes) predominantly at its Florence facility. Roche built that facility using tax credits and technical training programs funded by the City of Florence and the State of South Carolina. Roche selected the Florence facility as a key site to manufacture Pegasys' API "because of a robust infrastructure already in place" at the facility.[270]

332. As a condition of fulfilling its corrupt contracts with Kimadia for the delivery of U.S.-manufactured drugs, F. Hoffmann-La Roche Ltd. agreed to procure letters from the U.S. Department of Commerce confirming that the drugs were manufactured in the United States. It further procured evidence of FDA approval for all of its drugs sold to Kimadia, including those allegedly sourced from outside the United States.

333. On information and belief, F. Hoffmann-La Roche Ltd. consummated its transactions with Kimadia through the New York banking system, by covering Kimadia's collateral costs in the form of payments wired into New York correspondent accounts.

---

[269] European Medicines Agency, Committee for Medicinal Products for Human Use, EMA/568026/2012, at 3 (Sept. 28, 2012).

[270] Kable Intelligence Ltd., *Roche Bulk Active Ingredient Manufacturing Facility, Florence, SC*, http://www.pharmaceutical-technology.com/projects/rochecarolina/ (last accessed July 18, 2017).

## VI. JAYSH AL-MAHDI, WITH SUBSTANTIAL SUPPORT FROM HEZBOLLAH, USED DEFENDANTS' RESOURCES TO COMMIT TERRORIST ATTACKS THAT KILLED AND INJURED AMERICANS

### A. Beginning In 2003, Jaysh al-Mahdi Conducted A Campaign Of Terror Against Americans In Iraq

334. Muqtada al-Sadr founded Jaysh al-Mahdi in April 2003 with the assistance of Imad Mugniyeh, the chief terrorist mind of Hezbollah. From the beginning, Jaysh al-Mahdi's publicly stated, primary goal was the expulsion of Americans from Iraq. In July 2003, Sadr publicly announced the founding of Jaysh al-Mahdi by calling for a "general mobilization to fight" the so-called "American and British occupiers."[271] In a later sermon delivered by an aide on August 6, 2004, Sadr called America "the greatest of Satans" and proclaimed: "America is our enemy and the enemy of the people, and we will not accept its partnership."[272] And during Sadr's Friday sermons on March 26, 2004, among other things:

- Sadr praised "[t]he date of September 11th," which he explained "is the date of the collapse of the Two Towers, and therefore is a miracle from God, who never disappoints his servants but allows infidels time before striking them."
- Sadr pledged his fealty to Hezbollah, which he couched in Shi'a Islamic terms such that he was communicating to his followers that support for Hezbollah is a religious duty, stating at one point, "our victorious party, Hezbollah."
- Sadr called for violent resistance to, and "jihad" against, the American "occupiers" and "invaders" of Iraq, invoking multiple passages from the Koran to provide a purported religious justification for attacking Americans in Iraq.

335. Like many terrorist organizations, Jaysh al-Mahdi was structured as an integrated network of cells, militias, and "Special Groups," each of which served the mission of the broader organization. As Dr. David E. Johnson, a former Army Colonel who has studied Jaysh al-

---

[271] Mahan Abedin, *Dossier: The Sadrist Movement*, Middle East Intell. Bull. (July 2003), https://www.meforum.org/meib/articles/0307_iraqd.htm.

[272] Abdul Hussein al-Obeidi, *Rebel Shiite Cleric Blames 'Occupier' for Church Attacks, Kidnappings in Iraq*, Assoc. Press (Aug. 6, 2004).

Mahdi's tactics, explained, "[Jaysh al-Mahdi] was mostly a franchise operation, nationally integrated in support of al-Sadr's political program, but locally owned and operated."[273] The most prominent Jaysh al-Mahdi "Special Group" was known as Asa'ib Ahl al-Haq or "AAH."

336. Despite its cellular structure, Jaysh al-Mahdi maintained a basic hierarchical command structure. As two counterterrorism scholars explained in June 2008, "although Sadr frequently gives [Jaysh al-Mahdi cells] autonomy over their local actions, he maintains the ability to control them when he chooses."[274] Formally separate Jaysh al-Mahdi cells also shared membership and leadership, relied on common sources of financing and institutional support from the broader Sadrist organization, and frequently operated together in coordinated attacks.[275]

337. Jaysh al-Mahdi cells were also unified ideologically by radical Shi'a ideology, devotion to Sadr, and violent opposition to American presence in Iraq. According to an unclassified (as redacted) summary of an interview with a detained Jaysh al-Mahdi operative from 2008, the operative "look[ed] to Muqtada al-Sadr (MAS) for guidance . . . [and] ha[d] no knowledge of who would replace MAS as the leader of [Jaysh al-Mahdi] should anything happen to MAS," because "[t]here is no one who can replace MAS."[276] A March 2008 U.S. State Department cable (as published by *WikiLeaks*) similarly reported that Jaysh al-Mahdi's various elements "are different faces of the same group controlled by a single hand, who assigns each a

[273] David E. Johnson *et al.*, *The 2008 Battle of Sadr City: Reimagining Urban Combat* 23 (RAND Corp. 2013) ("*2008 Battle of Sadr City*"), https://www.rand.org/content/dam/rand/pubs/research_reports/RR100/RR160/RAND_RR160.pdf.

[274] Daveed Gartenstein-Ross & Bill Roggio, *Sadr's Special Groups*, The Weekly Standard (June 9, 2008), http://www.weeklystandard.com/sadrs-special-groups/article/16297.

[275] *See*, *e.g.*, *2008 Battle of Sadr City* at 25-26.

[276] Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 010, at 1 (Spring 2007-Early 2008), https://ctc.usma.edu/v2/wp-content/uploads/2013/10/Redacted-Intelligence-Report-010-Summary.pdf.

role."[277] And a U.S. military-intelligence officer told the *Washington Post* in May 2008 that Jaysh al-Mahdi's various cells "all have direct communication with [Sadr]."[278]

338. Jaysh al-Mahdi's cellular structure prevented Coalition forces from engaging Jaysh al-Mahdi in a conventional military manner, especially in urban settings. For example, when Coalition forces took control of Sadr City in 2008, Jaysh al-Mahdi cells disappeared underground and hid among civilians while continuing to attack American forces. Jaysh al-Mahdi's cellular structure also provided each Jaysh al-Mahdi cell with the tactical agility to adapt to rapidly changing conditions. For example, individual Jaysh al-Mahdi cells were able to react to passing American convoys by setting up roadside bombs quickly without explicitly seeking permission to do so, safe in the knowledge that they had been given broad authorization to carry out such strikes against any Americans in Iraq.

339. From 2003-2007, Jaysh al-Mahdi expanded from a fledgling group concentrated in Shi'a areas to a terrorist organization with a significant presence throughout Iraq. What began as a small group of 300 fighters in April 2003 grew to a terrorist organization of between 6,000 and 10,000 fighters by June 2004 and boasted at least 60,000 fighters by January 2007. Jaysh al-Mahdi operated throughout Iraq, with regional command centers in Kirkuk, Diyala, Baghdad, Wasit, Hillah, Karbala, Amarah, Basra, Diwaniyah, and Nasiriyah. Jaysh al-Mahdi maintained an especially strong presence in the Al Rashid, Karkh, and Kadamiyah Districts of western Baghdad, all of eastern Baghdad (including the areas in and around Sadr City and Rustamiyah), Baqubah, Hillah, Najaf, Basra, and Wasit (though its power extended well beyond those areas).

---

[277] U.S. State Dep't Cable, *PM Chief of Staff Abdallah Tells Ambassador GOI Will Continue Basra Military Operations* (Mar. 31, 2008), https://wikileaks.org/plusd/cables/08BAGHDAD990_a.html.

[278] Amit R. Paley, *U.S. Deploys a Purpose-Driven Distinction*, Wash. Post (May 21, 2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/05/20/AR2008052001716.html.

340. Jaysh al-Mahdi fighters used a variety of tactics and weaponry against Americans in Iraq. Distinctive weapons and tactics used by Jaysh al-Mahdi included the following:

341. **IEDs.** Improvised explosive devices ("IEDs") are homemade bombs that are often used as booby traps by terrorist organizations. Frequently, IEDs are set up as roadside bombs that terrorists can detonate when a vehicle passes by. According to a 2013 *New York Times* report, at times IEDs have caused as many as 80% of Coalition casualties in Iraq.[279] IEDs were a signature weapon of Jaysh al-Mahdi. Baghdad, the location of Jaysh al-Mahdi's Sadr City headquarters, experienced more than 1,500 IED attacks between January 2007 and June 2008. In raids within Sadr City in 2008, Coalition forces discovered numerous weapons caches containing IEDs and bomb-making materials. One specific IED technique reportedly used by Jaysh al-Mahdi involved "daisy-chains" of multiple 122mm or 155mm artillery shells.

342. **EFPs.** Explosively formed penetrators ("EFPs") are an advanced type of IED with a specially shaped explosive charge designed to penetrate tank armor, which is impervious to more traditional weapons. According to a 2013 *New York Times* report, EFPs were the "single most lethal weapon American forces faced in Iraq."[280] According to one declassified CENTCOM study, there were at least 1,534 EFP detonations in Iraq between July 2005 and December 2011, resulting in at least 196 Americans killed in action and at least 861 Americans wounded in action.[281] Jaysh al-Mahdi typically used EFPs by placing them on public roadways.

343. The manufacture of EFPs required advanced machinery and copper not widely available in Iraq, as well as advanced engineering know-how. Hezbollah introduced EFPs to

---

[279] *See* John Ismay, *The Most Lethal Weapon Americans Faced in Iraq*, N.Y. Times (Oct. 18, 2013), https://atwar.blogs.nytimes.com/2013/10/18/the-most-lethal-weapon-americans-faced-in-iraq/?_r=1.

[280] *Id.*

[281] *See* U.S. Army Central Command, "OIF EFP Detonations by Month," https://admin.govexec.com/media/gbc/docs/pdfs_edit/enclosure_tab_a_document_for_review_%28150813_oif_efp_pull_no_summary%29_%281%29.pdf.

Iraq in 2004 and was the conduit through which Jaysh al-Mahdi acquired the technology to manufacture EFPs. In 2007 and 2008, Iraqi and Coalition forces discovered EFP factories inside Jaysh al-Mahdi strongholds, including Sadr City, demonstrating that Jaysh al-Mahdi had acquired from Hezbollah the technological capability to produce these deadly devices.

344. **Mortars.** A mortar is an artillery-like weapon that fires explosives at short ranges. Jaysh al-Mahdi frequently used mortars against Americans in Iraq. Between January 2007 and June 2008, there were more than 1,500 mortar attacks in Baghdad alone. In raids within the Jaysh al-Mahdi stronghold of Sadr City in October 2008, Iraqi forces discovered numerous weapons caches containing mortars.

345. **RPGs.** Jaysh al-Mahdi used rocket-propelled grenades ("RPGs") against Coalition forces on numerous occasions. In one such attack in May 2007, Jaysh al-Mahdi fighters killed 12 people and wounded another 75. Iraqi forces discovered numerous weapons caches containing RPGs in raids within Sadr City in October 2008.

346. **Rockets.** Jaysh al-Mahdi fired a variety of rockets at Coalition targets on numerous occasions. For example, Jaysh al-Mahdi operatives used Misagh-1 surface-to-air missiles to destroy at least one American helicopter. In March 2008, Jaysh al-Mahdi operatives within Sadr City launched coordinated rocket attacks on the International Zone (commonly known as the "Green Zone") in southeast Baghdad, several miles away. The rockets fired by Jaysh al-Mahdi included 107mm rockets, 122mm rockets, and man-portable air-defense systems.[282] The purpose of those attacks was to terrorize the civilian residents of the Green Zone – including American political and civilian personnel. The rocket attacks were a key part of the broader Jaysh al-Mahdi terror campaign, as Jaysh al-Mahdi agents boasted about America's

[282] *See 2008 Battle of Sadr City* at 38, 41, 57.

alleged inability to protect civilians in the Green Zone. These attacks prompted Coalition forces to enter Sadr City to deny Jaysh al-Mahdi the ability to fire freely on the civilian Green Zone. When Coalition forces entered Sadr City – as a direct response to Jaysh al-Mahdi's terrorist attacks on civilians in the Green Zone that were planned and authorized by Hezbollah – they encountered ambushes and traps that Jaysh al-Mahdi had set for them.[283] Officials estimated that the ensuing violence – all directly caused by Jaysh al-Mahdi's attacks on the Green Zone and often collectively called the "Battle of Sadr City" – killed 925 people and injured 2,605 others.[284]

347. **Complex Attacks.** Jaysh al-Mahdi militants frequently carried out so-called "complex attacks" against American peacekeeping forces. Complex attacks involve multiple teams of terrorists using different weapons and tactics in concert. In March 2008 for example, a Jaysh al-Mahdi operative explained to journalists that, to attack a vehicle, one group of Jaysh al-Mahdi militants would attack it with a barrage of small-arms fire to distract the soldiers while another group of Jaysh al-Mahdi militants planted an IED underneath the vehicle.[285] In another attack type, Jaysh al-Mahdi detonated EFPs and followed up by immediately attacking the disoriented victims with small-arms fire.

## B. Jaysh al-Mahdi Was A Terrorist Enterprise

348. Jaysh al-Mahdi was not a military force; rather, as the Pentagon's press service recognized, it acted as "the Jaysh al-Mahdi terrorist organization."[286] General George Casey,

---

[283] *See id.* at 19-24, 59-60; *see also* Sudarsan Raghavan, *19 Tense Hours in Sadr City Alongside the Mahdi Army*, Wash. Post (Mar. 29, 2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/03/28/AR2008032803810.html?sid=ST2008032804069.

[284] *See 2008 Battle of Sadr City* at 98.

[285] *See* Sudarsan Raghavan, *19 Tense Hours in Sadr City Alongside the Mahdi Army*, Wash. Post (Mar. 29, 2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/03/28/AR2008032803810.html?sid=ST2008032804069.

[286] U.S. Dep't of Def., *Forces Arrest Terrorism Suspects in Iraq*, Am. Forces Press Serv. (Nov. 13, 2009), http://archive.defense.gov/news/newsarticle.aspx?id=56680.

who served as Commanding General of the Multi-National Force in Iraq from 2004-2007, described Jaysh al-Mahdi in a 2006 U.S. State Department cable (as published by *WikiLeaks*) as "[t]errorists and killers murdering innocent people."[287] Members of both parties in Congress have also publicly recognized Jaysh al-Mahdi as a terrorist organization.[288] Although Jaysh al-Mahdi is sometimes also called a "militia" in the colloquial sense – a term Plaintiffs sometimes use in this Complaint – it was not a legal "militia" under Iraqi law. Indeed, as one Iraqi military officer put it: "Mahdi Army! They're not an army! . . . They're a bunch of looters."[289] A U.S. commander concurred that Jaysh al-Mahdi's unlawful violent tactics made it a "mob with a lot of weapons" rather than a legitimate military force.[290]

349. Jaysh al-Mahdi's campaign of terror against Americans differed from conventional military conflicts in important ways:

- Unlike a conventional military force, Jaysh al-Mahdi was supported and directed by an international terrorist organization, Hezbollah, whose aim was to inflict mass casualties on Americans in Iraq and around the world. *See infra* Part VI.C.
- Unlike conventional military conflicts, Jaysh al-Mahdi's campaign of terror did not take place during a declared war: Coalition forces ousted Saddam Hussein in April 2003 and remained in Iraq only to help the country rebuild its government.
- Unlike conventional military conflicts, Jaysh al-Mahdi's campaign of terror was not limited by geography or time. Although this lawsuit focuses on violence within Iraq, Jaysh al-Mahdi fighters have fought with Hezbollah in Lebanon as well.[291] Similarly, although this lawsuit focuses on violence from 2005-2009, Jaysh al-Mahdi's campaign of terror against Americans in Iraq has continued indefinitely. In July 2016, Sadr

[287] U.S. State Dep't Cable, *MCNS Discusses Militia Death Squads, Recent Military Operations* (Mar. 25, 2006), https://wikileaks.org/plusd/cables/06BAGHDAD981_a.html.

[288] *See* 152 Cong. Rec. H8581 (daily ed. Nov. 13, 2006) (statement of Rep. Ted Poe); 153 Cong. Rec. S1670 (daily ed. Feb. 7, 2007) (statement of Sen. Frank Lautenberg).

[289] Karl Vick & Sewell Chan, *Violence in Sadr City Embitters Both Sides*, Wash. Post (Apr. 6, 2004).

[290] *Id.*

[291] For example, according to intelligence sources cited in a July 2006 U.S. State Department cable (as published by *WikiLeaks*), "a JAM campaign to recruit fighters for service in Lebanon has kicked into high gear. Recruitment of females is said to be a high priority, although it is not known in what capacity they would be employed. Hazim Al-Araji, a JAM member with high-ranking relatives in Hezbollah, is reportedly in charge of the drive." U.S. State Dep't Cable, *Iraqi Reaction to Israel-Lebanon Situation* (July 20, 2006), https://wikileaks.org/plusd/cables/06BAGHDAD2591_a.html.

announced that his militias would once again target U.S. forces after the battle against ISIS is over. As Sadr described his goal in a May 2015 speech: "If America persists then it will cease to exist."[292]

- Unlike in conventional military conflicts, Jaysh al-Mahdi did not simply engage in combat against a single defined enemy or enemies, but rather engaged in calculated sectarian violence designed to sow instability and undermine the legitimacy of the democratic government (and thus undermine U.S. objectives in Iraq). As the Department of Defense observed in 2006, Jaysh al-Mahdi "replaced al-Qaeda in Iraq as the most dangerous accelerant of potentially self-sustaining sectarian violence in Iraq."[293]
- Unlike in the 2006 Israel-Lebanon conflict (even assuming that should be classified as a military conflict), Jaysh al-Mahdi engaged in violence against the very government whose ministries it controlled. Jaysh al-Mahdi never declared "war" on the Iraqi government, and the Sadrists never formally seceded from the Iraqi government; rather, they engaged in a terrorist campaign in part against the U.S.-supported Iraqi government in an effort to cement their own power and coerce policy changes.

350. Following the return of sovereignty to the Iraqi government in July 2004, Coalition forces – including the U.S. military units of which many Plaintiffs were a part – functioned primarily not as combat forces but as stabilization forces aiding the Iraqi government in rebuilding the country's civil institutions. As then-U.S. Secretary Colin Powell explained in connection with U.N. Resolution 1546, which authorized the creation of the Multi-National Force in Iraq ("MNF-I"), the "goal" of the military presence in Iraq was "to help the Iraqi people to complete the political transition" and "permit the United Nations and the international community to work to facilitate Iraq's reconstruction."[294] This mission required U.S. troops to "participate in the provision of humanitarian assistance, civil affairs support, and relief and reconstruction assistance."[295] Governance, economics, capacity building, and rule of law became major lines of effort for the U.S. military's stability operations, and U.S. troops

[292] Charlie Bayliss, *Top Muslim Cleric Tells His Followers to Attack Troops Who are at War with Islamic State*, Daily Express (July 19, 2016), http://www.express.co.uk/news/world/690810/muslim-cleric-attack-us-troops-war-isis.

[293] Dep't of Def., *Measuring Stability & Security in Iraq* 19 (Nov. 30, 2006).

[294] Letter from Colin L. Powell, U.S. Sec'y, to Lauro L. Baja, Jr., President of the U.N. Sec. Council (June 7, 2004), http://www.un.org/News/dh/iraq/draft-iraq-res-7jun04.pdf.

[295] *Id.*

cooperated with civilians and local officials in their day-to-day efforts to facilitate Iraqi reconstruction. The U.S. military also worked regularly in hybrid teams involving civilian members of the U.S. government, including from the State Department.

351. Jaysh al-Mahdi sought to undermine U.S. reconstruction efforts by terrorizing the population, killing Sunni civilians, and commandeering the instruments of local government. The U.S. military thus had to fight Jaysh al-Mahdi in an effort to prevent it from derailing the United States' broader project of civilian reconstruction in Iraq.

352. As a terrorist organization, Jaysh al-Mahdi routinely committed acts that would violate the law of war, sometimes referred to as international humanitarian law, if Jaysh al-Mahdi were subject to that law. For example, they attacked from mosques in their initial assault on American and Coalition forces in April 2004 in Najaf, and again in Baghdad in 2007 and 2008 after the "surge" of U.S. forces. In August 2004, Sadr was accused of violating the law of war by using a holy site, the Shrine of Imam Ali, as a headquarters from which to launch attacks. Jaysh al-Mahdi also used weapons in a manner that could kill indiscriminately and thus violate the law of war. For example, Jaysh al-Mahdi used EFPs that included passive infrared sensors that would be triggered by any nearby movement (including by civilians). On many occasions, those EFPs killed and injured civilians. Jaysh al-Mahdi also used children to attack Coalition forces and attempted to provoke Americans into killing Iraqi children. Jaysh al-Mahdi further put bounties on U.S. medics, and Jaysh al-Mahdi fighters specifically targeted medics during ambushes and other firefights. Jaysh al-Mahdi also massacred thousands of civilians in Iraq.

353. Jaysh al-Mahdi did not follow the required practices of a military force. Although its members commonly dressed in all-black garb for propaganda purposes (particularly during public demonstrations, and in and around MOH), they rarely wore uniforms while staging

attacks on Americans. Their civilian garb allowed them to camouflage their presence and blend in with civilians to avoid counter-attacks from U.S. forces. They also infiltrated the Iraqi Police and wore police uniforms to disguise their presence while committing attacks. Jaysh al-Mahdi members routinely attacked Americans in Iraq (both civilian and military) without wearing a fixed distinctive sign recognizable at a distance and without carrying their arms openly. Moreover, on direct orders from Muqtada al-Sadr, Jaysh al-Mahdi terrorists did not distinguish between uniformed American military personnel and American civilians – Jaysh al-Mahdi considered both illegitimate and so attacked both indiscriminately.

354. Jaysh al-Mahdi combined violations of the law of war with street crimes, engaging in ethnic-cleansing massacres of Sunnis at roadside checkpoints and in neighborhood sweeps; fighters also stole victims' property, including cars and homes. In May 2008, Iraqis in Baghdad accused Jaysh al-Mahdi members of robbery, kidnapping for ransom, rape, and murder.

355. At all times relevant to this Complaint, Defendants knew that Jaysh al-Mahdi was a violent, anti-American terrorist organization that was massacring both American soldiers and American and Iraqi civilians. They knew this not only because it was common knowledge on the Iraqi street – a common understanding of which Defendants' local Iraqi agents were aware – but also because it was widely reported both by the U.S. government and in the Western press.[296]

356. Notwithstanding Jaysh al-Mahdi's frequent attacks against Americans in Iraq, the Secretary of State did not officially designate Jaysh al-Mahdi as a Foreign Terrorist Organization

[296] *See, e.g.*, Dep't of Def., *Measuring Stability & Security in Iraq* 19 (Nov. 30, 2006) (Jaysh al-Mahdi "replaced al-Qaeda in Iraq as the most dangerous accelerant of potentially self-sustaining sectarian violence in Iraq"); *id.* at 20 ("Attacks on the Sunni population by JAM . . . contribute to Sunni concerns about persecution."); Melissa McNamara, *CBS: Death Squads in Iraqi Hospitals*, CBS News (Oct. 4, 2006) (noting that hospital "patients are being murdered" by Jaysh al-Mahdi, which was "keeping hostages inside some hospitals"); Karl Vick & Sewell Chan, *Violence in Sadr City Embitters Both Sides*, Wash. Post (Apr. 6, 2004) (describing confrontations between Jaysh al-Mahdi and U.S. forces; U.S. commander calling Jaysh al-Mahdi a "mob with a lot of weapons").

("FTO") under 8 U.S.C. § 1189. That decision reflected a concern among some U.S. policymakers about the best way to influence Sadr, who wielded significant political clout as an Iraqi kingmaker and enjoyed a cult-like following among millions of Iraqi Shi'a. Sadr's power over certain elements of the Iraqi government led some U.S. policymakers to caution against overly antagonizing his followers, which led the U.S. government to refrain from formally designating Jaysh al-Mahdi as an FTO. This was primarily a strategic diplomatic decision geared at preserving flexibility for members of the U.S. government to engage with the Sadrists if and when doing so would serve the national interest (something an FTO designation could have inhibited). It was not intended to signal the U.S. government's approval of the Sadrists' activities, nor was it intended to allow private companies to deliver support to Jaysh al-Mahdi. Indeed, the diplomatic decision to refrain from designating Jaysh al-Mahdi as an FTO (which allowed U.S. officials to engage with the Sadrists when necessary) is not inconsistent with the reality that Jaysh al-Mahdi acted and functioned as a terrorist group. Plaintiffs' claims hinge on the latter point; they expressly disclaim any challenge to the former.

357. The U.S. strategy of preserving the option of diplomatically engaging with the Sadrists depended on simultaneously degrading Jaysh al-Mahdi's infrastructure and undermining its ability to mount terrorist attacks. That strategy partially succeeded by mid-2008 after Coalition forces had dealt Jaysh al-Mahdi heavy losses in Basra and in the Battle of Sadr City, which pressured Muqtada al-Sadr into turning toward the political process. But Defendants' conduct – by supplying Jaysh al-Mahdi with corrupt resources it could use to attack Americans – undermined that strategy by bolstering Jaysh al-Mahdi's capacity to mount terrorist attacks and correspondingly reducing the Sadrists' incentives to engage in legitimate political activity.

### C. Hezbollah Created, Armed, And Trained Jaysh al-Mahdi To Carry Out Terrorist Attacks Against Americans

358. Jaysh al-Mahdi's campaign of terror against Americans and Sunni Iraqis could not have occurred without the planning and authorization provided by Hezbollah, a Lebanese-based Shi'a terrorist organization that orchestrates terror attacks against Americans around the world on behalf of Iran. Richard Armitage, the Deputy Secretary of State under President George W. Bush, has described Hezbollah as "the 'A-Team of Terrorists,' "[297] and former CIA director George Tenet has opined that Hezbollah "is [al-Qaeda's] equal if not far more capable organization."[298] Hezbollah's chief terrorist mastermind, Imad Mugniyeh, helped Sadr found Jaysh al-Mahdi to inflict "mass casualties" on Americans in Iraq and recruited many of its first members; Hezbollah has since orchestrated Jaysh al-Mahdi's campaign of terror against Americans in Iraq.[299]

#### 1. Hezbollah Has Orchestrated Campaigns of Terror Against Americans Across the Globe

359. Hezbollah's geographic power base is in Lebanon, where it operates a parallel shadow government and provides some social services: as of 2004, Hezbollah operated three hospitals, 12 health centers, 20 infirmaries, and 20 dental clinics within Lebanon.[300] Hezbollah has used its control of government healthcare services to create patronage relationships with

---

[297] Ed Bradley, *Hezbollah: "A-Team of Terrorists"*, CBS News (Apr. 18, 2003), http://www.cbsnews.com/news/hezbollah-a-team-of-terrorists/.

[298] Statement of Hon. George J. Tenet, *Current and Future Worldwide Threats to the National Security of the United States: Hearing Before the S. Comm. on Armed Services*, 108th Cong. 60 (Feb. 12, 2003), http://www.gpo.gov/fdsys/pkg/CHRG-108shrg91721/pdf/CHRG-108shrg91721.pdf.

[299] Edward T. Pound, *Special Report: The Iran Connection,* U.S. News & World Report (Nov. 22, 2004), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iran-connection&catid=33&Itemid=115.

[300] *See* Shawn Teresa Flanigan & Mounah Abdel-Samad, *Hezbollah's Social Jihad: Nonprofits as Resistance Organizations*, Middle East Policy Council (2009), http://www.mepc.org/hezbollahs-social-jihad-nonprofits-resistance-organizations.

Lebanon's citizens. As Hezbollah's 1985 manifesto explains, "our military apparatus is not separate from our overall social fabric. Each of us is a fighting soldier."[301] American Brigadier General Alexus Grynkewich has called this means of terrorist financing "welfare as warfare."[302]

360. Hezbollah's activities have stretched far beyond Lebanon's borders. Hezbollah's primary stated goal is the destruction of the United States and Israel, which it calls the "Great Satan" and the "Little Satan," respectively.[303] Hezbollah also frequently functions as a terrorist proxy for Iran, committing and orchestrating terrorist attacks abroad with Iran's support. Hezbollah's 1985 manifesto proclaims that the "first root of vice is America" and explains that "Imam [Ruhollah] Khomeini, our leader, has repeatedly stressed that America is the cause of all our catastrophes and the source of all malice."[304] In 2003, Hezbollah Secretary-General Hassan Nasrallah proclaimed: "Let the entire world hear me. Our hostility to the Great Satan [America] is absolute . . . . Regardless of how the world has changed after 11 September, Death to America will remain our reverberating and powerful slogan: Death to America."[305]

361. Hezbollah has coordinated terrorist attacks around the world primarily by acting through terrorist proxies. As Dr. Matthew Levitt has explained, "Hezbollah is extremely adept at

[301] Hezbollah Manifesto, *reprinted in Anti-American Terrorism and the Middle East: A Documentary Reader* 50 (Barry Rubin & Judith Colp Rubin eds., Oxford Univ. Press 2002).

[302] *See* Alexus Grynkewich, *Welfare as Warfare: How Violent Non-State Groups Use Social Services to Attack the State*, 31 Stud. in Conflict & Terrorism 350 (2008).

[303] *See* Times of Israel, *Nasrallah Proud that PM, Obama Discussed Hezbollah* (Nov. 11, 2015), http://www.timesofisrael.com/liveblog_entry/nasrallah-proud-that-pm-obama-discussed-hezbollah/; Ariel Ben Solomon, *Nasrallah 'Proud' that Netanyahu and Obama Discussed Hezbollah in White House Meeting*, Jerusalem Post (Nov. 11, 2015), http://www.jpost.com/Arab-Israeli-Conflict/Nasrallah-praises-wave-of-terror-against-Israelis-432734.

[304] Hezbollah Manifesto, *reprinted in Anti-American Terrorism and the Middle East: A Documentary Reader* 50 (Barry Rubin & Judith Colp Rubin eds., Oxford Univ. Press 2002).

[305] Sept. 27, 2002 Al-Manar broadcast, *quoted in* "Hassan Nasrallah: In His Own Words," Committee for Accuracy in Middle East Reporting in America (July 26, 2006), http://www.camera.org/index.asp?x_context=7&x_issue=11&x_article=1158.

recruiting members from local populations in areas where they have networks on the ground."[306] Hezbollah has trained and equipped these local terrorist proxies to carry out terrorist attacks on Hezbollah's behalf. Hezbollah has successfully employed this strategy to facilitate attacks by its proxies in (among other places) Paris, France (1985-86); Buenos Aires, Argentina (1992); and Khobar, Saudi Arabia (1996).

362. Hezbollah raises money for its terrorist activities by engaging in criminal activities around the world. It is especially adept at raising money on the black market by selling and smuggling pharmaceuticals. According to Boaz Ganor of the International Institute for Counterterrorism, "the most senior echelons of Hezbollah are involved in this criminal activity."[307]

363. Defendants themselves were aware of Hezbollah's pharmaceutical smuggling operations. In April 2009, representatives from Pfizer, J&J, and other pharmaceutical companies attended a conference in Nigeria on the risks posed by international pharmaceutical smuggling by terrorist groups. According to an April 2009 U.S. State Department cable (as published by *WikiLeaks*), attendees were cautioned about "Lebanese networks that ship drugs and counterfeit meds from Latin America and Asia into and through Nigeria" and warned that "Hezbollah and Hamas are involved in smuggling drugs, counterfeit medicines and weapons into and out of Nigeria."[308] Two years later, in November 2011, Pfizer's Chief Security Officer testified before Congress that "[p]harmaceutical counterfeiting is a low risk, high profit criminal activity that has

---

[306] Matthew Levitt, *Hezbollah: A Case Study of Global Reach*, Remarks to a Conference on "Post-Modern Terrorism: Trends, Scenarios, and Future Threats" at 4 (Sept. 8, 2003), https://www.aclu.org/files/fbimappingfoia/20111110/ACLURM001616.pdf.

[307] Boaz Ganor & Miri Halperin Wernli, *The Infiltration of Terrorist Organizations Into the Pharmaceutical Industry: Hezbollah as a Case Study*, 36 Stud. in Conflict & Terrorism 699, 703 (2013).

[308] U.S. State Dep't Cable, *Nigeria: Counterfeit Meds Enforcement Training in Lagos* (Apr. 30, 2009), https://wikileaks.org/plusd/cables/09ABUJA746_a.html.

attracted drug traffickers, fire arms smugglers, and terrorists" and noted the "indictment of 19 people who gave a portion of their profits from the sale of counterfeit Viagra to Hezbollah."[309]

364. In 1997, then-U.S. Secretary of State Madeleine Albright designated Hezbollah an FTO pursuant to 8 U.S.C. § 1189. That designation has remained in place ever since.

365.

**2. Hezbollah Co-Founded Jaysh al-Mahdi with Sadr To Carry Out a Campaign of Terror Against Americans in Iraq**

366. In April 2003, Hezbollah dispatched to Iraq its chief terrorist mastermind, Imad Mugniyeh, to help Muqtada al-Sadr found Jaysh al-Mahdi. Hezbollah's goal, according to an October 2003 Israeli intelligence report, was to set up a terrorist network in Iraq to inflict "mass casualties" on Americans.[310] A U.S. Special Operations task force report quoted by the *U.S. News & World Report* in 2004 explained that "the Lebanese Hizballah leadership believes that the struggle in Iraq is the new battleground in the fight against the U.S."[311] As one embedded war correspondent put it, Jaysh al-Mahdi was created to be "the Iraqi branch of Hezbollah."[312]

367. Sadr was a natural fit to lead Hezbollah's campaign of terror in Iraq. In addition to being the descendant of two revered Shi'a martyrs (Sadiq al-Sadr and Baqir al-Sadr) and sharing Hezbollah's affinity for violence, Sadr himself had a close relationship with Hezbollah and Iran. Hassan Nasrallah, Hezbollah's Secretary-General, had studied under Muqtada al-Sadr's uncle, Baqir al-Sadr. Muqtada's cousin, Musa al-Sadr, founded Hezbollah's predecessor

---

[309] Testimony of John P. Clark, *Stop Online Piracy Act: Hearing Before the H. Comm. on the Judiciary*, 112th Cong. 61 (Nov. 16, 2011), https://judiciary.house.gov/_files/hearings/printers/112th/112-154_71240.PDF.

[310] Edward T. Pound, *Special Report: The Iran Connection,* U.S. News & World Report (Nov. 22, 2004), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iran-connection&catid=33&Itemid=115.

[311] *Id.*

[312] Michael J. Totten, *Balance of Terror*, Michael J. Totten's Middle East J. (Aug. 14, 2007), http://www.michaeltotten.com/archives/001504.html.

in Lebanon. A 2004 U.S. military-intelligence report (as quoted in *U.S. News & World Report*) concluded that Sadr had a direct relationship with Hassan Nasrallah, the head of Hezbollah, and that a top adviser to Nasrallah had personally delivered funds to Sadr in Najaf.[313] Sadr himself visited Tehran and Beirut on numerous occasions. And, in 2016, Nasrallah personally brokered talks between Sadr and the Iraqi government.[314]

368. Hezbollah's role in Jaysh al-Mahdi's activities was similar to its role in other terror campaigns it sponsored: Hezbollah recruited, trained, armed, and directed Jaysh al-Mahdi terrorists, who carried out terrorist attacks against Americans on Hezbollah's behalf. Hezbollah Secretary-General Hassan Nasrallah was deeply involved in Jaysh al-Mahdi's campaign of terror, reportedly spending "several hours daily dealing with 'the situation in Iraq.' "[315]

369. Immediately after Jaysh al-Mahdi's founding in April 2003, Mugniyeh began to recruit and train soldiers for Jaysh al-Mahdi. Mugniyeh soon recruited 300 terrorists for Jaysh al-Mahdi from Shi'a communities in Kuwait and Saudi Arabia, then sent those terrorists to Lebanon for training in the use of assault rifles, booby traps, and kidnapping. These 300 fighters were some of Jaysh al-Mahdi's first members. That same month, according to the *Asia Times*, Hezbollah "opened two offices in the Iraqi cities of Basra and Safwan" in order to "build[] up [its] organizational and military apparatuses in Iraq."[316] By August 2003, Hezbollah had established permanent teams of 30 to 40 operatives in Najaf to recruit and train Jaysh al-Mahdi

---

[313] *See* Edward T. Pound, *Special Report: The Iran Connection,* U.S. News & World Report (Nov. 22, 2004), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iran-connection&catid=33&Itemid=115.

[314] *See* Naharnet Newsdesk, *Report: Nasrallah Meets al-Sadr to Reconcile Him with al-Maliki*, Naharnet (Apr. 15, 2016), http://www.naharnet.com/stories/en/207104.

[315] Hamza Hendawi & Qassim Abdul-Zahra, *Shiite Sources: Hezbollah Helping Iraqi Militia*, NBC News (July 1, 2008), http://www.nbcnews.com/id/25480176/ns/world_news-mideast_n_africa/t/shiite-sources-hezbollah-helping-iraqi-militia/#.WUwhPLaQyUk.

[316] Olivier Guitta, *Nasrallah's Other Fight*, Asia Times (July 29, 2006), http://www.atimes.com/atimes/Middle_East/HG29Ak02.html.

terrorists. At the same time, these Hezbollah operatives were acquiring rocket-propelled grenades, antitank missiles, and other weapons for Jaysh al-Mahdi.

370. Hezbollah's involvement in Jaysh al-Mahdi's campaign of terror only grew during the subsequent months and years. By January 2004, nearly 800 Hezbollah agents had been sent to Iraq, where they were deployed to direct Jaysh al-Mahdi's terrorist campaign from key Jaysh al-Mahdi strongholds in Iraq, including, but not limited to, Sadr City, Najaf, Safwan, and Basra. Eighteen of these Hezbollah operatives were detained on charges of terrorism in February 2005. An October 2006 U.S. intelligence summary (as published by *WikiLeaks*) noted that "300 Hezbollah terrorists from Lebanon have joined with [the] Mahdi Militia in Najaf" after travelling to Iraq on tourist visas.[317] Mugniyeh continued to personally supervise Jaysh al-Mahdi's campaign of terror until his death in February 2008, at which point he was replaced by other Hezbollah operatives. At the time Mugniyeh was killed in 2008, the U.S. government continued to view him as an ongoing threat to Americans in Iraq.

371. In addition to its terrorist mastermind Imad Mugniyeh, Hezbollah deployed a litany of its senior terrorist planners to direct Jaysh al-Mahdi's campaign of terror against Americans in Iraq, including, but not limited to, the following Hezbollah terrorists:

- **Ali Mussa Daqduq (Senior Hezbollah Field Commander).** Hezbollah directed its senior field commander, Ali Mussa Daqduq, to work with the Quds Force to instruct Jaysh al-Mahdi on the use of EFPs, mortars, rockets, and other terrorist tactics, including kidnapping operations.
- **Muhammad Kawtharani (Nasrallah's Personal Liaison to Sadr).** Hezbollah also deployed a senior cleric, Muhammad Kawtharani, to serve as a liaison to Jaysh al-Mahdi. In 2013, the U.S. Treasury Department identified Kawtharani as a member of "Hizballah's leadership" who "act[ed] for, or on behalf of Hizballah," and was "responsible for terrorist operations" in Iraq "[a]s the individual in charge of Hizballah's

[317] U.S. Dep't of Def., *US Iraq Intelligence Summary – Iran – Mahdi Militia – Hezbollah – Harbala* (Oct. 10, 2006), https://wikileaks.org/wiki/US_Iraq_Intelligence_Summary_-_Iran_-_Mahdi_Militia_-_Hezbollah_-_Harbala_(Oct_10,_2006).

Iraq activities."[318] Kawtharani, as personal adviser to Nasrallah, was directly involved in coordinating attacks against Americans in Baghdad.

- **Yusuf Hashem (Iraq Operations – Country-wide).** Hezbollah also tasked another senior Hezbollah terrorist commander, Yusuf Hashem, to coordinate Hezbollah's Jaysh al-Mahdi operations in Iraq.
- **Ali Falih Hadi (Iraq Operations – Basra and Amarah).** According to a Coalition threat report (as published by *WikiLeaks*), Ali Falih Hadi was a member of Hezbollah who was based in Amarah in Basra Province and was "responsible for supplying" weapons to members of a joint Jaysh al-Mahdi/Hezbollah cell operating in Basra.[319]
- **Hezbollah Bombmakers.** On information and belief, Hezbollah deployed one or more experienced bombmakers into Iraq to provide in-country direction to Jaysh al-Mahdi terrorists relating to the design, manufacture, storage, and maintenance of EFPs and IEDs for use against Americans in Iraq.

372. At Hezbollah's direction, Jaysh al-Mahdi escalated its attacks on Americans in Iraq beginning in the winter of 2005. This escalation was the result of Hezbollah's own "strategic decision" to ratchet up pressure on the United States by boosting Hezbollah's "support [for] Sadr" and fostering "managed instability" in Iraq.[320] According to the *New York Times*, a senior American intelligence official assessed that, as part of this "strategic decision" to escalate the terrorist campaign against Americans in Iraq, Iran served as "a link to Lebanese Hezbollah" and "helped facilitate Hezbollah training inside of Iraq, but more importantly Jaish al-Mahdi members going to Lebanon" for training.[321]

373. Jaysh al-Mahdi and Sadr publicly embraced their links to Hezbollah. During his Friday sermons on March 26, 2004 – in which he praised the attacks of September 11th and called for violence against Americans in Iraq – Sadr swore fealty to Hezbollah in Shi'a Islamic terms, pledging support to "our victorious party, Hezbollah." Weeks later, in a sermon in April

---

[318] Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Hizballah Leadership* (Aug. 22, 2013), https://www.treasury.gov/press-center/press-releases/Pages/jl2147.aspx.

[319] *WikiLeaks* (Jul. 16, 2008) (While the report identifies "Ali Falih Hadey," on information and belief "Hadey" has the same meaning as "Hadi."), https://wikileaks.org/irq/report/2008/07/IRQ20080716n11210.html.

[320] Michel R. Gordon & Dexter Filkins, *Hezbollah Said to Help Shiite Army in Iraq*, N.Y. Times (Nov. 28, 2006), http://www.nytimes.com/2006/11/28/world/middleeast/28military.html.

[321] *Id.*

2004, Sadr declared that he was Hezbollah's "striking arm in Iraq," proclaiming: "I will support the real Islamic unity that has been created by Hassan Nasrallah, the secretary-general of the victorious Hezbollah."[322] In an August 2007 interview, Sadr again reportedly acknowledged that Jaysh al-Mahdi "ha[s] formal links with Hizbollah" and "cop[ies] Hizbollah in the way they fight and their tactics."[323] Another Jaysh al-Mahdi member told an interviewer that "[w]e learned [from Hezbollah] how to take advantage of an armored vehicle's weakness" – referring to the use of EFPs – "and how to wait and kill the soldiers who try to escape."[324]

374. In the years after 2003, Jaysh al-Mahdi fighters regularly participated in anti-American marches in which they marched under Hezbollah flags and banners. Tens of thousands of members of Jaysh al-Mahdi publicly swore fealty to Hezbollah in various marches in Sadr City in 2006 alone, including on July 21, 2006 and August 4, 2006.

375. On August 4, 2006, more than 10,000 members of Jaysh al-Mahdi attended a joint Jaysh al-Mahdi/Hezbollah march in Sadr City, which further demonstrated Hezbollah's control over Jaysh al-Mahdi operations. As recounted in a field report in *Al-Jazeera*, demonstrators wore "white shrouds symboli[z]ing [their] willingness to die for Hezbollah, waved the Lebanese guerrillas' yellow banner and chanted slogans in support of their leader, Sheik Hassan Nasrallah."[325] The crowd of Jaysh al-Mahdi fighters further declared "Mahdi Army and Hezbollah are one," and chanted "Allah, Allah, give victory to Hassan Nasrallah."[326] The close,

---

[322] Wire, *Iraqi Cleric Calls for Alliance with Hezbollah, Hamas*, Buffalo News (Apr. 2, 2004), http://buffalonews.com/2004/04/02/iraqi-cleric-calls-for-alliance-with-hezbollah-hamas/.

[323] Nizar Latif & Phil Sands, *Mehdi Fighters 'Trained by Hizbollah in Lebanon'*, Independent (Aug. 20, 2007).

[324] *Id.*

[325] *Iraq's Shia March for Hezbollah*, Al-Jazeera (Aug. 4, 2006), www.aljazeera.com/archive/2006/08/200849131615702691.html.

[326] *Id.*

symbiotic connection between Jaysh al-Mahdi and Hezbollah was summed up by Jaysh al-Mahdi members' repeated declaration at the rally: "we are Hezbollah."

376. Defendants were aware of the close and extensive links between Hezbollah and Jaysh al-Mahdi as early as 2004, based on the widespread coverage those links received in the Western and international media, including but not limited to:

- In April 2004, the *Washington Times* reported that Sadr was "being aided directly by Iran's Revolutionary Guard, which plays a large role in running that country, and by Hezbollah, an Iranian-created terrorist group based in Lebanon."[327]
- In November 2004, *U.S. News & World Report* reported that, according to intelligence reports, "Iran used Hezbollah to train and provide funds to Sadr's Mahdi Army"; that "Hezbollah had established 'a team of 30 to 40 operatives' in Najaf 'in support of Moqtada Sadr's Shia paramilitary group'"; that "Hezbollah was recruiting and training members of Sadr's militia"; and that "Hezbollah was 'buying rocket-propelled grenades . . . antitank missiles' and other weapons for Sadr's militia."[328]
- In July 2006, the *Asia Times* reported that Hezbollah had "opened two offices in the Iraqi cities of Basra and Safwan" in order to "build[ ] up [its] organizational and military apparatuses in Iraq."[329]
- In November 2006, the *New York Times* reported that "Hezbollah had been training members of the Mahdi Army," that Hezbollah had trained more than a thousand terrorists in Hezbollah camps in Lebanon alone, and that a senior U.S. intelligence official assessed that "Lebanese Hezbollah" made a "strategic decision" in late winter 2005 or early spring 2006 "to provide more support to Sadr to increase pressure on the U.S."[330]
- In August 2007, the London-based *Independent* printed Sadr's August 2007 interview, in which he admitted Jaysh al-Mahdi's "formal links with Hizbollah."[331]

377. In 2009, the U.S. Treasury Department formally recognized the links between Hezbollah and Jaysh al-Mahdi when it designated Jaysh al-Mahdi commander Abu Mahdi al-

---

[327] *Iran, Hezbollah Support al-Sadr*, Wash. Times (Apr. 7, 2004), http://www.washingtontimes.com/news/2004/apr/7/20040407-124311-9361r/.

[328] Edward T. Pound, *Special Report: The Iran Connection,* U.S. News & World Report (Nov. 22, 2004) (citation omitted), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iran-connection&catid=33&Itemid=115.

[329] Olivier Guitta, *Nasrallah's Other Fight*, Asia Times (July 29, 2006), http://www.atimes.com/atimes/Middle_East/HG29Ak02.html.

[330] Michel R. Gordon & Dexter Filkins, *Hezbollah Said to Help Shiite Army in Iraq*, N.Y. Times (Nov. 28, 2006), http://www.nytimes.com/2006/11/28/world/middleeast/28military.html.

[331] Nizar Latif & Phil Sands, *Mehdi Fighters 'Trained by Hizbollah in Lebanon'*, Independent (Aug. 20, 2007).

Muhandis as a Specially Designated Global Terrorist. The press release noted that, "[a]s of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces."[332] According to the press release, these Jaysh al-Mahdi cells "received training in guerilla warfare, handling bombs and explosives, and employing weapons [such as] missiles, mortars, and sniper rifles" from Hezbollah instructors.[333]

378. The U.S. Treasury Department again recognized the links between Hezbollah and Jaysh al-Mahdi in 2012, finding that "Hizballah, along with its Iranian allies, trained and advised Iraqi militants to carry out numerous terrorist attacks."[334] According to Treasury's findings, in 2005, "Iran asked Hizballah to form a group to train Iraqis to fight Coalition Forces in Iraq. In response, Hassan Nasrallah established a covert Hizballah unit to train and advise Iraqi militants in Jaysh al-Mahdi (JAM) and JAM Special Groups."[335] As of 2006, that unit was working with the Iranian Quds Force "to provide training and equipment to JAM Special Groups to augment their ability to inflict damage against U.S. troops."[336]

### 3. Hezbollah Authorized Jaysh al-Mahdi's Attacks Against Americans in Iraq

379. After helping to create Jaysh al-Mahdi in April 2003, Hezbollah began a wide-ranging public propaganda campaign to authorize and incite Shi'a in Iraq to join Jaysh al-Mahdi's campaign of terrorism against Americans in Iraq. It did so primarily through two

---

[332] Press Release, U.S. Dep't of Treasury, *Treasury Designates Individual, Entity Posing Threat to Stability in Iraq* (July 2, 2009), https://www.treasury.gov/press-center/press-releases/Pages/tg195.aspx.

[333] *Id.*

[334] Press Release, U.S. Dep't of Treasury, *Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq* (Nov. 19, 2012), https://www.treasury.gov/press-center/press-releases/Pages/tg1775.aspx.

[335] *Id.*

[336] *Id.*

channels. First, Hezbollah took advantage of the reverence that Iraqi Shi'a felt towards Hezbollah's senior leadership – and in particular Secretary-General Hassan Nasrallah and Grand Ayatollah Fadlallah – by having those leaders issue repeated calls to Iraqi Shi'a to join Jaysh al-Mahdi and attack Americans in Iraq. Second, Hezbollah encouraged senior members of Jaysh al-Mahdi, including Sadr himself, to carry out such attacks. As a *Middle East Intelligence Bulletin* dispatch explained in March 2004, Hezbollah operatives in Iraq "have focused mainly on establishing lines of communication with Iraqi Shiite leaders and distributing anti-American propaganda, but the groundwork is clearly being laid for incitement of violence in the future."[337]

380. Hezbollah's message of authorization was effective because many Jaysh al-Mahdi members looked to Hezbollah as a moral and religious authority on par with Sadr himself. As early as 2004, propaganda posters picturing Sadr side-by-side with Secretary-General Nasrallah appeared throughout Baghdad. In August 2006, tens of thousands of Jaysh al-Mahdi operatives staged a massive, public, pro-Hezbollah rally in Sadr City. Rally-goers burned American flags, chanted "Death to America," and displayed the portraits of Sadr and Nasrallah side-by-side in the streets of Baghdad. Members of the rally wore white shrouds to symbolize their willingness to die for Hezbollah and asked for "victory to Hassan Nasrallah."[338] Jaysh al-Mahdi members also asked "al-Sadr to consider them an extension of Hizbullah" and "expressed a genuine desire to participate with Hizbullah against" the Coalition government in Iraq.[339] In a subsequent demonstration in July 2007, Jaysh al-Mahdi members again carried signs featuring the pictures of Sadr and Nasrallah side-by-side. And, after Hezbollah terrorist mastermind Imad Mugniyeh

---

[337] Gary C. Gambill, *Dossier: Hassan Nasrallah*, Middle East Intell. Bull. (Feb.-Mar. 2004), https://www.meforum.org/meib/articles/0402_ld.htm.

[338] *Shiites Hold pro-Hezbollah Rally in Baghdad*, NBC News (Aug. 4, 2006), http://www.nbcnews.com/id/14179529/ns/world_news-mideast_n_africa/t/shiites-hold-pro-hezbollah-rally-baghdad/.

[339] Middle East Media Research Inst., *Iraqi Shi'a View of the Lebanon Crisis*, Inquiry & Analysis Series No. 290 (Aug. 11, 2006), https://www.memri.org/reports/iraqi-shia-views-lebanon-crisis.

was killed in 2008, Jaysh al-Mahdi held a public funeral service for him where senior members of Jaysh al-Mahdi again declared their allegiance to Hezbollah.

381. Grand Ayatollah Muhammad Hussein Fadlallah, whom the U.S. Treasury Department has called "Hizballah's Spiritual Leader,"[340] occupied a similarly exalted position among Iraqi Shi'a. Fadlallah himself became a Specially Designated Terrorist in 1995[341] as a result of his role as a "Leading Ideological Figure of Hizballah."[342] Among other things, the U.S. government concluded that "Sheikh Muhammad Hussein Fadlallah, Hizballah's chief 'spiritual leader,' reportedly issued the *fatwa* (religious ruling) authorizing the Marine Corps barracks bombing" in Beirut in 1983,[343] which was the deadliest terrorist attack against America before September 11th. Although he was of Lebanese descent, Fadlallah was born in Najaf, grew up in Najaf, studied in Najaf, reportedly spoke with an Iraqi accent, was a respected Shi'a theologian, and was close with the Sadr family, including the First and Second Martyrs as well as Muqtada himself. When Fadlallah died in 2010, Muqtada al-Sadr called on his followers to observe three days of mourning in honor of Hezbollah's spiritual leader.

382. Hezbollah's religious and moral authority was especially powerful because Jaysh al-Mahdi, like many other terrorist organizations, looked to religious authorities for validation. As Professor Bruce Hoffman has explained, "'Shiites do not believe in the legitimate authority of

[340] Press Release, U.S. Dep't of Treasury, *Treasury Designates Islamic Extremist, Two Companies Supporting Hizballah in Tri-Border Area* (June 10, 2004), https://www.treasury.gov/press-center/press-releases/Pages/js1720.aspx.

[341] *Id.*

[342] U.S. Dep't of Treasury, *Publication of the Hizballah International Financing Prevention Act of 2015 Related Sanctions Regulations; Counter Terrorism Designations Updates; Syria Designations Updates* (Apr. 15, 2016), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20160415.aspx; *see also* Harvey W. Kushner, *Encyclopedia of Terrorism* 128 (Sage Publications 2003)

[343] Government's Written Proffer in Support of Its Request for Detention Pending Trial at 7, *United States v. D-2 Elfat El Aouar*, Crim. No. 06-20248 (E.D. Mich. filed May 22, 2006), ECF No. 8.

secular governments.' "[344] Instead, "religion serves as a legitimizing force – conveyed by sacred text or imparted via clerical authorities claiming to speak for the divine."[345] Thus, for religious terrorist organizations such as Jaysh al-Mahdi, "violence first and foremost is a sacramental act or divine duty executed in direct response to some theological demand or imperative."[346] As prominent voices in Shi'a Islam, Grand Ayatollah Fadlallah and Secretary-General Nasrallah were especially influential among members of Jaysh al-Mahdi.

383. Hezbollah's leaders leveraged their moral and religious authority over Jaysh al-Mahdi by publicly calling for "jihad" and issuing *fatwas* against Americans in Iraq.[347] An April 2003 dispatch from the *Middle East Intelligence Bulletin* reported that "Hezbollah has recently begun a campaign to incite opposition to American forces in Iraq" by broadcasting propaganda to millions of Arab viewers (including Shi'a in Iraq) on its television station al-Manar.[348] Such propaganda, which explicitly called for acts of "resistance" against Americans in Iraq, made up more than one-quarter of al-Manar's content.[349]

384. In furtherance of this campaign, Secretary-General Nasrallah made repeated and direct communications to Iraqi Jaysh al-Mahdi members to attack Americans:

- In a March 2003 speech, Nasrallah publicly declared Hezbollah's support for attacks against Americans, promising that "peoples of this part of the world will receive [America] . . . ***with guns, blood, weapons, and martyrdom operations***."[350]

---

[344] Bruce Hoffman, *"Holy Terror": The Implications of Terrorism Motivated by a Religious Imperative*, 18 Stud. in Conflict & Terrorism 271, 274 (1995) (quoting Marvin Zonis & Daniel Brumberg, *Behind Beirut Terrorism*, N.Y. Times (Oct. 8, 1984)).

[345] *Id.* at 272.

[346] *Id.*

[347] Niles Lathem, *House of Jihad*, N.Y. Post (Feb. 5, 2007), http://nypost.com/2007/02/05/house-of-jihad/.

[348] Avi Jorisch, *Al-Manar and the War in Iraq*, Middle East Intell. Bull. (Apr. 2003), http://www.washingtoninstitute.org/policy-analysis/view/al-manar-and-the-war-in-iraq.

[349] *Id.*

[350] Nicholas Noe, *Voice of Hezbollah: The Statements of Sayyed Hassan Nasrallah* 285 (2007).

- In an April 2003 speech, Nasrallah directly called on Iraqi Shi'a to attack Americans in Iraq, declaring that "***[t]he Iraqi people must resist this occupation***" and that "[w]e can bet that the Iraqi people will resist the American occupation and liberate themselves."[351]
- In an October 2006 interview that aired on Al-Jazeera, Nasrallah stated: "We consider the resistance in Iraq . . . to be legitimate resistance, which is justified and appropriate . . . and ***we support and endorse this resistance***."[352]
- In a January 2007 interview broadcast on al-Manar, Nasrallah declared: "We support the option of a comprehensive Iraqi resistance, with all its aspects, especially the military aspect. We believe that the solution in Iraq begins with adopting the option of armed resistance – ***jihad against the occupation forces***."[353]
- In a December 2009 speech broadcast on al-Manar, Nasrallah promised "***all-out war***" against "the Great Satan" of America over a chorus of "Death to America" chants.[354]

385. Nasrallah's call for "jihad" was particularly potent because of its religious significance. As one federal court has explained, a "jihad" is a "religiously sanctioned resistance against perceived enemies of Islam."[355] This religious sanctioning was thus highly significant to members of Jaysh al-Mahdi, a militantly Shi'a terrorist organization that frequently engaged in religious violence.

386. Grand Ayatollah Fadlallah echoed similar themes in an August 2004 *fatwa* in which he instructed the Shi'a in Iraq that it was their religious duty to attack American military and civilian personnel in Iraq as a means of resisting the occupation. "A Fatwa is an edict of a religious leader, authorizing a faithful Muslim to commit murder."[356] The Grand Ayatollah's

---

[351] Deborah Horan, *Hezbollah Chief to Iraqis: Resist U.S.*, Chi. Trib. (Apr. 23, 2003), http://articles.chicagotribune.com/2003-04-23/news/0304230260_1_hezbollah-iraqi-shiites-iraqi-people.

[352] Excerpts from Interview with Hassan Nasrallah, Middle East Media Research Inst. TV Monitor Project (Oct. 31, 2006), https://www.memri.org/tv/hizbullah-secretary-general-hassan-nasrallah-when-we-were-young-i-cannot-forget-sight-american/transcript (last accessed Sept. 21, 2017).

[353] Niles Lathem, *House of Jihad*, N.Y. Post (Feb. 5, 2007), http://nypost.com/2007/02/05/house-of-jihad/.

[354] Excerpts from December 25, 2009 Speech by Hassan Nasrallah, Middle East Media Research Inst. (Dec. 29, 2009), https://www.memri.org/reports/hizbullah-secretary-general-hassan-nasrallah-al-manar-tv-us-beast-one-bite-our-nation-and (last accessed Sept. 21, 2017).

[355] *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 7 (D.D.C. 2016).

[356] *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 103 n.8 (D.D.C. 2000).

*fatwa*, which received widespread coverage in the Iraqi and Western media, was a critical green light for Jaysh al-Mahdi terrorists in Iraq to attack Americans in Iraq.

387. Until Fadlallah's death in 2010, he consistently incited his Shi'a followers in Iraq and Lebanon to attack Americans. In at least six Friday sermons in the Imam Hassanayn Mosque in Beirut that took place between February and April 2003 – sermons that would have been widely shared in Iraq and would have undoubtedly been known to Sadr and other leaders of Jaysh al-Mahdi – Fadlallah blessed the calls made by others such as Nasrallah for Iraqi Shiites to violently resist the U.S. occupation.

388. Information gathered by Coalition forces during raids upon Jaysh al-Mahdi confirmed the power of Nasrallah's and Fadlallah's messages of authorization. For example, according to a U.S. military incident report (as published by *WikiLeaks*), an October 9, 2008 raid on a Jaysh al-Mahdi safe house in Basra yielded "religious Iranian video clips," "MAS [*i.e.*, Muqtada al-Sadr] literature," a "[n]otebook with JAM computer training dated 11 Jan 2007," and a "[p]icture of Mohammad Hussein Fadala [sic]" who was identified in the report as a "Deputy of Hassan Wasrala [sic] (Hezbollah)."[357]

389. Hezbollah also wielded significant influence over Sadr himself, who had deep personal ties to Hezbollah's leaders. *The Arab Weekly* reported that Sadr was "greatly inspired by Hassan Nasrallah" in part because "both men rose to lead their parties at a fairly young age."[358] According to a March 2007 report by the Jamestown Foundation, a counterterrorism think tank, Sadr "has looked up to Hezbollah of Lebanon as a model of Shiite military success[,]

---

[357] *WikiLeaks* (Oct. 9, 2008), https://wikileaks.org/irq/report/2008/10/IRQ20081009n11927.html.

[358] Sami Moubayed, *Iran Invests in Iraq's Mahdi Army*, Arab Weekly (May 22, 2016), http://www.thearabweekly.com/Iran/5187/Iran-invests-in-Iraq%E2%80%99s-Mahdi-Army.

[because] [h]e respects the leadership of the organization and admires [Hassan Nasrallah]."[359] Accordingly, Sadr publicly declared his loyalty to Hezbollah; co-founded Jaysh al-Mahdi with the help of Hezbollah's chief terrorist mastermind, Imad Mugniyeh; expressly modelled his organization on Hezbollah; and travelled to Beirut (where Hezbollah is headquartered) several times from 2005-2009. On information and belief, Hezbollah used its close relationship with Sadr to authorize and incite him to organize a terror campaign that would inflict "mass casualties" against Americans in Iraq.

390. Hezbollah's leaders have directly connected Hezbollah's authorization of terror attacks against Americans in Iraq to Hezbollah's terrorist objective of forcing the U.S. to abandon Iraq. For example, in a speech on October 25, 2011, Nasrallah stated that "resistance groups" Hezbollah had backed (that is, Jaysh al-Mahdi) pressured the U.S. to reduce its presence in Iraq. In the same speech, Nasrallah boasted that the Hezbollah-Jaysh al-Mahdi campaign of terror against Americans in Iraq should be considered a model for terrorist campaigns against the U.S. and its allies around the world.

#### 4. Hezbollah Planned Jaysh al-Mahdi's Terrorist Attacks Against Americans in Iraq

391.

392. Hezbollah trained Jaysh al-Mahdi in the use of weapons and tactics that were specifically designed to target Americans in Iraq – and that Jaysh al-Mahdi in fact used successfully to perpetrate terrorist attacks against Americans in Iraq. This training began at Jaysh al-Mahdi's inception in April 2003, when Imad Mugniyeh recruited and trained some of Jaysh al-Mahdi's first 300 fighters in Lebanon. It continued through at least 2008, when

[359] Babak Rahimi, *Moqtada al-Sadr's New Alliance with Tehran*, Jamestown Found. (Mar. 1, 2007), https://jamestown.org/program/moqtada-al-sadrs-new-alliance-with-tehran/.

Hezbollah held training camps for Jaysh al-Mahdi fighters in Iran (in conjunction with Iran's Quds Force), Lebanon, and Iraq. According to a captured Jaysh al-Mahdi operative, paraphrased in an unclassified (as redacted) U.S. military-intelligence report, "[w]ithout a doubt, all training received in Iran" – at Hezbollah-run camps – "is intended for use against [Coalition forces]."[360]

393. From 2003-2008, Jaysh al-Mahdi recruits travelled to Hezbollah training camps in Lebanon and Iran through meticulously planned routes. Because of the logistical challenges associated with bringing Jaysh al-Mahdi militants into Iran and Lebanon, Hezbollah occasionally trained members of Jaysh al-Mahdi to become "master trainers," who learned terrorist tactics from Hezbollah in Iran or Lebanon and then passed that knowledge on to other Jaysh al-Mahdi members in Iraq.[361] U.S. officials have referred to this practice as "training the trainer."[362] Hezbollah also trained members of Jaysh al-Mahdi inside of Iraq, including, but not limited to, in Sadr City, Najaf, Basra, and Safwan.

394. Although Hezbollah training in Iran often occurred in conjunction with the Iranian Quds Force, Hezbollah's role was crucial to Jaysh al-Mahdi for at least three reasons. First, Hezbollah operatives had considerably more experience with terrorist tactics and explosives than their Quds Force counterparts. Second, Hezbollah operatives typically spoke Arabic, the language spoken by most Jaysh al-Mahdi members, while members of the Quds Force did not. Third, Hezbollah and Jaysh al-Mahdi shared a cultural affinity; captured Iraqi fighters have expressed their strong preference for training with Hezbollah over the Quds Force.

---

[360] Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 002, at 2 (Spring 2007-Early 2008), https://ctc.usma.edu/v2/wp-content/uploads/2013/10/Redacted-Intelligence-Report-002-Summary.pdf.

[361] Michael R. Gordon, *Hezbollah Trains Iraqis in Iran, Officials Say*, N.Y. Times (May 5, 2008), http://www.nytimes.com/2008/05/05/world/middleeast/05iran.html.

[362] *Id.*

395. Hezbollah's training was rigorous. According to unclassified (as redacted) U.S. military-intelligence reports, Hezbollah's training camps lasted anywhere from three weeks to several months.[363] Trainees were awakened at 5:30 a.m. every day to pray and exercise. Classes started at 8:00 a.m. and continued until dusk. Each class lasted roughly 50 minutes, with 10-minute breaks in between classes. Some classes were held in actual classrooms with whiteboards and projectors; others were held at firing ranges and other outdoor locations. The training included programs in a myriad of skills, including "[w]eapons, bomb-making, intelligence, assassinations, the [gamut] of skill sets," according to a U.S. intelligence official quoted in the *New York Times* in November 2006.[364] The topics covered in these training programs included the following:

396. **Basic Weapons Training.** Many Jaysh al-Mahdi recruits had little to no combat experience or weapons training when they joined the organization, because the only qualification that prospective Jaysh al-Mahdi recruits were expected to have was the ability to read and write. Accordingly, Hezbollah provided basic training intended to give new Jaysh al-Mahdi recruits a broad overview of terrorist attack tactics and weapons use, as well as specific training in the use of pistols, AK-47s, machine guns, and sniper rifles.

397. **IEDs.** Hezbollah trained Jaysh al-Mahdi members in the creation and deployment of IEDs. For instance, Hezbollah provided an IED Specialty Training Course to members of Jaysh al-Mahdi at its training camps designed to teach Jaysh al-Mahdi fighters how to create and deploy improvised explosives such as roadside bombs.

[363] *See* Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 005, at 2-3 (Spring 2007-Early 2008), https://ctc.usma.edu/v2/wp-content/uploads/2013/10/Redacted-Intelligence-Report-005-Summary.pdf.

[364] Michel R. Gordon & Dexter Filkins, *Some Mahdi Army Fighters Trained with Hezbollah*, N.Y. Times (Nov. 28, 2006), http://www.nytimes.com/2006/11/28/world/africa/28iht-militia.3702222.html?pagewanted=2&_r=0.

398. **EFPs.** In 2004, Hezbollah "introduced [to Iraq] a new breed of roadside bomb more lethal than any seen before" – the EFP.[365] Hezbollah trained members of Jaysh al-Mahdi in the deployment of EFPs, which were expressly designed to penetrate the American armor. Hezbollah was essential to those EFP training efforts because Hezbollah fighters had direct experience using EFPs against Israeli armor in Lebanon. Indeed, at that point, Hezbollah was the world's foremost expert on EFPs. Hezbollah also imparted to Jaysh al-Mahdi the complex expertise required to manufacture and use EFPs, and drawing on its experience in Lebanon, Hezbollah instructed Jaysh al-Mahdi to use EFPs against American soldiers. The *New York Times* reported in 2013 that "Iran passed E.F.P. technology to the Lebanese militia Hezbollah, which in turn passed E.F.P. kits to proxy groups fighting in Iraq."[366] On information and belief, the EFP factory that Iraqi forces discovered in Jaysh al-Mahdi's Sadr City stronghold in October 2008, was built using the EFP technology that Hezbollah had provided to Jaysh al-Mahdi. As a declassified British intelligence report concluded, EFPs used in Iraq during this time period were "exclusively associated with Hizballah."[367]

399. Hezbollah planned the Jaysh al-Mahdi EFP terrorist attack campaign (as with the other Jaysh al-Mahdi attacks outlined in this Complaint) in Iraq through the extensive training and coordination set forth above. Hezbollah's planning of Jaysh al-Mahdi's EFP attacks against Americans included: (1) targeting specific geographies in Iraq, such as Baghdad and Basra, where Jaysh al-Mahdi was permitted to launch EFP attacks; (2) instructing Jaysh al-Mahdi to use EFPs against American armored vehicles in the first instance; (3) providing technical assistance

[365] Michael Ware, *Inside Iran's Secret War for Iraq*, Time (Aug. 22, 2005).

[366] John Ismay, *The Most Lethal Weapon Americans Faced in Iraq*, N.Y. Times (Oct. 18, 2013), https://atwar.blogs.nytimes.com/2013/10/18/the-most-lethal-weapon-americans-faced-in-iraq/.

[367] Minute, Deputy Chief of Assessments Staff to Sir Nigel Sheinwald, Iraq: Lebanese Training including manuscript comment Blair (May 3, 2007).

to Jaysh al-Mahdi with respect to EFP design schematics and concepts; (4) helping manufacture EFPs for use against Americans in Iraq; (5) training senior Jaysh al-Mahdi terrorist commanders in Lebanon, Baghdad, and Iran with respect to all aspects of the EFP network, from design, to manufacture, to transportation, to attack strategy; (6) training lower-level Jaysh al-Mahdi members in camps in Lebanon, Sadr City, and Iran with respect to EFP tactics; (7) preparing and distributing sophisticated, high production value Arabic-language CD-ROMs and instructional videos concerning EFPs; and (8) forward deploying senior Hezbollah terrorists, including but not limited to Daqduq, to coordinate EFP attacks against Americans.

400. **Rockets.** Hezbollah trained members of Jaysh al-Mahdi in the use of rocket launchers and anti-aircraft missiles. In particular, Hezbollah directed Jaysh al-Mahdi members to launch indirect-fire rocket attacks on the Green Zone from Sadr City, and it instructed them on how to do so. Hezbollah's direction to fire rockets on the Green Zone specifically included the indirect-fire attacks in early 2008 that precipitated the Battle of Sadr City. During these attacks in 2008, Jaysh al-Mahdi rocket teams showed an ability to hit specific targets several miles away, demonstrating the effectiveness of Hezbollah's instruction. By that point, Hezbollah had become renowned for its use of rockets during the 2006 Israel-Hezbollah war, when it fired rockets at civilian targets in northern Israel. Indeed, the *Long War Journal* reported that the rockets Jaysh al-Mahdi fired into Baghdad's Green Zone were "the same rockets Hezbollah fired into northern Israel from Lebanon during the Israel-Hezbollah war in the summer of 2006."[368]

401. **Mortars.** Hezbollah trained Jaysh al-Mahdi fighters in the use of mortars, including by providing a Mortar Specialty Training Course to members of Jaysh al-Mahdi at its training camps in Iran. The purpose of this training was to teach Jaysh al-Mahdi militants to hit

[368] Bill Roggio, *Mahdi Rocket Teams Destroyed in Sadr City*, Long War J. (June 3, 2007), http://www.longwarjournal.org/archives/2007/06/mahdi_rocket_teams_d.php.

distant targets with mortar strikes. American military personnel have noted that Jaysh al-Mahdi's mortar strikes were particularly accurate.

402. **RPGs and Anti-Tank Missiles.** Hezbollah trained Jaysh al-Mahdi operatives in the use of RPGs and advanced anti-tank missiles, including assembly, firing procedures, target acquisition, and the use of various kinds of munitions. Hezbollah's RPG and anti-tank missile training focused on attacks against armored vehicles and command structures such as the ones the United States used in Iraq. For example, a Hezbollah "planning guide" that U.S. forces recovered from Daqduq provided tactical instructions to Jaysh al-Mahdi terrorists for the use of RPGs against Americans, including commands concerning volume of fire and specific vehicles in the convoy to target in order to inflict maximum casualties.

403. **Complex Attacks.** Hezbollah training programs emphasized "complex attacks" and small-group tactics that combine different types of attacks by different members of a team. One unclassified (as redacted) U.S. military-intelligence report summarized these tactics:

> For example, an engineer team may be responsible for emplacing and detonating IEDs on a convoy while a Support Weapons team is simultaneously responsible for launching mortars or rockets at the same vehicles. A conventional weapons team would then be responsible for firing at the vehicles with small arms and assaulting the vehicles. The Support Weapons team would be responsible for launching mortars at the vehicles again once the conventional weapons team pulled back. Each team functions together but does not get involved in what the other team is doing. A plan would be worked out ahead of time for this, and one individual in each team would be responsible for coordinating with the other team leaders during the attack.[369]

[369] Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 001, at 3 (Spring 2007-Early 2008), https://ctc.usma.edu/v2/wp-content/uploads/2013/10/Redacted-Intelligence-Report-001-Summary.pdf.

Hezbollah also instructed Jaysh al-Mahdi operatives "on how to conduct precision, military style kidnappings," according to a 2006 U.S. government cable (as quoted in the *New York Times*).[370]

404. **Kidnappings**. Hezbollah is well-known for its kidnapping operations. In 2006, for example, Hezbollah agents conducted cross-border raids into Israel and abducted a number of Israeli soldiers. Hezbollah also trained Jaysh al-Mahdi operatives "on how to conduct precision, military style kidnappings," according to a 2006 U.S. government cable (as quoted in the *New York Times*).[371] Jaysh al-Mahdi put this training to use during the 2007 raid on the Provincial Joint Coordination Center in Karbala, where Jaysh al-Mahdi terrorists kidnapped four U.S. soldiers and killed another. And a 2011 letter from five U.S. Senators documented that Hezbollah operative Daqduq instructed "Iraqi extremists" who were part of Jaysh al-Mahdi on "how to conduct intelligence and kidnapping operations."

405. The extent of Hezbollah's involvement in Jaysh al-Mahdi's attacks was demonstrated by evidence gathered in connection with Daqduq's capture in 2007, which included a document described by five U.S. Senators as a 22-page "planning guide" memorializing Hezbollah's wide-ranging involvement in the terrorist attacks detailed above. This "planning guide" included specific instructions describing how to plant IEDs and carry out abductions of Americans. Hezbollah's instruction as reflected in this "planning guide" enabled Jaysh al-Mahdi to execute an array of sophisticated attacks against Americans that it otherwise would have been unable to carry out.

---

[370] *The War Logs: Secret Dispatches From the War in Iraq*, *Alleged Jaysh Al-Mahdi Plans to Kidnap U.S. Soldiers in Baghdad, Iraq*, N.Y. Times (Dec. 22, 2006), http://www.nytimes.com/interactive/world/iraq-war-logs.html#report/ABD1B1E9-D673-93B1-757861100C0728BC.

[371] *Id.*

406. Hezbollah trained, and coordinated with, Jaysh al-Mahdi terrorists who were responsible for Hezbollah-authorized terrorist attacks throughout Iraq. On information and belief, that training and coordination extended to the following areas (among others):

- **Baghdad – Al Rashid District.** Al Rashid includes a main approach to Baghdad International Airport ("BIAP") and Victory Base Complex, a consolidated facility containing a range of Coalition military and civilian personnel that surrounded Baghdad International Airport ("BIAP") and so was a focus of Jaysh al-Mahdi's attacks in western Baghdad. On information and belief, Jaysh al-Mahdi coordinated attacks against Coalition forces in the Al Rashid District with Hezbollah. According to a U.S. military incident report (as published by *WikiLeaks*), "JAM/Hizballah members operating" in Al Rashid coordinated through Haji Abu Ali and Mohammad Kawtharani, the latter of whom personally advised Nasrallah. Such coordination also reportedly involved Jabbar Abdalnabi Alzarjawi, a "JAM leader" in Al Rashid who "facilitated . . . the movement of Hizballah members from Iran" into western Baghdad.[372]
- **Baghdad – Kadamiyah District.** Kadamiyah was one of Jaysh al-Mahdi's strongholds in western Baghdad. On information and belief, Hezbollah training and coordination enabled Jaysh al-Mahdi's to target Americans in Kadamiyah. According to a U.S. military incident report (as published by *WikiLeaks*), Salah Aldeen Fayath, his brother, and his daughter, whom the U.S. government determined "was a member of Hezbollah," provided targeting support for Jaysh al-Mahdi operations against Coalition forces in Kadamiyah.[373]
- **Baghdad – Rusafa District.** Rusafa is a Jaysh al-Mahdi stronghold in eastern Baghdad that includes the MOH headquarters building. On information and belief, Hezbollah trained, locally supported, and coordinated with the Jaysh al-Mahdi IED/EFP cell operating in and near Rusafa. For example, Jaysh al-Mahdi cells trained by Hezbollah in Iran used Rusafa to launch rocket attacks on the Green Zone.
- **Baghdad – Sadr City (Thawra District).** Sadr City serves as Jaysh al-Mahdi's command-and-control center, safe haven, and principal power base in Iraq. On information and belief, Hezbollah trained, locally supported, and coordinated with Jaysh al-Mahdi IED/EFP cells operating in and near Sadr City, with respect to both the attacks themselves and the subsequent Hezbollah and Jaysh al-Mahdi propaganda concerning such attacks. For example, an August 12, 2008 U.S. military incident report (as published by *WikiLeaks*) confirmed that a "Hezbollah IED/EFP . . . cell" was active in and near Sadr City and was coordinating EFP attacks against Coalition forces with a "recon [Jaysh al-Mahdi] element working in the area."[374]
- **Baghdad – New Baghdad District, Karadah District, and FOB Rustamiyah.** New Baghdad, Karadah, and the area near Forward Operating Base ("FOB") Rustamiyah were focal points for Hezbollah-coordinated attacks by Jaysh al-Mahdi in eastern Baghdad.

[372] *WikiLeaks* (Nov. 22, 2008), https://wikileaks.org/irq/report/2008/11/IRQ20081122n11950.html.

[373] *WikiLeaks* (Oct. 19, 2006), https://wikileaks.org/irq/report/2006/10/IRQ20061019n5720.html.

[374] *WikiLeaks* (Aug. 12, 2008), https://wikileaks.org/irq/report/2008/08/IRQ20080812n11209.html.

For example, one U.S. military report (as published by *WikiLeaks*) concluded that, with respect to attacks near FOB Rustamiyah, it was "most likely" that "Hezbollah operatives [were] directing [Jaysh al-Mahdi] to conduct [indirect fire] attacks against [Coalition forces] in [the] Baghdad area."[375] Similarly, according to an arrest report (as published by *WikiLeaks*), Abu Aloze served as "JAM leadership" in the area, was responsible for coordinating attacks against Americans in the New Baghdad and Karadah Districts (including against FOBs in the area), and was specifically trained by Hezbollah in Lebanon.[376]

- **Babil, Wasit, and Salman Pak (Central Iraq).** On information and belief, Hezbollah trained, locally supported, and coordinated with Jaysh al-Mahdi cells operating in central Iraq, including Babil, Wasit, and Salman Pak. As published by *WikiLeaks*, Ahmad Sahib Ghali was a commander of Jaysh al-Mahdi's "assassination cell and IED cell" in Hillah.[377] Ghali and his co-commanders were Jaysh al-Mahdi terrorists who were trained by Hezbollah to conduct attacks against Coalition forces near Hillah.
- **Basra and Amarah (Southern Iraq).** Basra and Amarah are Jaysh al-Mahdi strongholds in southern Iraq. On information and belief, Hezbollah trained, locally supported, and coordinated with Jaysh al-Mahdi cells operating in and near Basra and Amarah. For example, in July and August 2008, U.S. government reports (as published by *WikiLeaks*) confirmed that five terrorist squads, comprised of "a combination of Hezbollah and JAM who finished their training in Iran" were "heading to Basrah to attack [Coalition forces]" and "carry out terrorist activities" after "coming back from Iran," where they had been "trained" on how to "use [indirect fire] techniques" and "manufactur[e] IEDs."[378]
- **Diyala (Northern Iraq).** Diyala is a province in northern Iraq and was (and remains) a central area of emphasis for Hezbollah and Jaysh al-Mahdi because of the critical role its capital, Baqubah, plays with respect to the Shiite terrorists' desire to have a secure land corridor linking Iran to Syria. On information and belief, Hezbollah trained, locally supported, and coordinated with Jaysh al-Mahdi cells operating in and near Diyala. As published by *WikiLeaks*, on June 23, 2008, Coalition forces detained a Jaysh al-Mahdi commander in Baqubah, Rezul Sami Mohammed, who was "in possession of JAM and Hezbollah propaganda material."[379] Similarly, on September 27, 2008, as published by *WikiLeaks*, Coalition forces conducted a raid to capture Hezbollah operative Mohammed Radam in order to "reduce Hezbollah influence" near Baqubah.[380]
- **Kirkuk (Northern Iraq).** Kirkuk is a province in northern Iraq that played (and continues to play) a key role in radical Shiite terrorists' transportation, logistics, and communications networks. Consequently, Hezbollah and Jaysh al-Mahdi have had a

---

[375] *WikiLeaks* (Mar. 16, 2008), https://wikileaks.org/irq/report/2008/03/IRQ20080316n10618.html.

[376] *WikiLeaks* (June 23, 2008), https://wikileaks.org/irq/report/2008/06/IRQ20080623n11207.html.

[377] *WikiLeaks* (June 15, 2008), https://wikileaks.org/irq/report/2008/06/IRQ20080615n11261.html.

[378] *WikiLeaks* (July 16, 2008), https://wikileaks.org/irq/report/2008/07/IRQ20080716n11210.html; *WikiLeaks (*July 20, 2008), https://wikileaks.org/irq/report/2008/07/IRQ20080720n11400.html.

[379] *WikiLeaks* (June 23, 2008), https://wikileaks.org/irq/report/2008/06/IRQ20080623n11209.html.

[380] *WikiLeaks* (Sept. 27, 2008), https://wikileaks.org/irq/report/2008/09/IRQ20080927n11997.html.

longstanding presence in Kirkuk. On information and belief, Hezbollah trained, supported, and coordinated with Jaysh al-Mahdi cells operating in and near Kirkuk. As published by *WikiLeaks*, a March 9, 2006 Department of State cable reported that a senior Kurdish official, when addressing the security challenges in Kirkuk province with U.S. counterparts, specifically identified the threat posed in Kirkuk province by Muqtada al-Sadr, whom the Kurdish official noted "was in league with Iran, Syria and Hezbollah."[381]

### 5. Hezbollah Provided Jaysh al-Mahdi with Weapons To Carry Out Terrorist Attacks Against Americans in Iraq

407. Hezbollah supplied many of the weapons that Jaysh al-Mahdi used to commit acts of terror against Americans in Iraq – though Jaysh al-Mahdi still required money and resources (derived in significant part from its control of MOH) to acquire those weapons and transport them to the appropriate cells in Iraq. A Jaysh al-Mahdi commander told journalists in June 2007 that "[a]ll of the Mahdi Army's weapons except for the AK-47 rifles come from Iran."[382]

408. Hezbollah facilitated the flow of these weapons from Iran into Iraq by working with Jaysh al-Mahdi to set up cross-border smuggling networks. The *Long War Journal* reported in June 2007 that rockets that Jaysh al-Mahdi fired into Baghdad's Green Zone were "the same rockets Hezbollah fired into northern Israel from Lebanon during the Israel-Hezbollah war in the summer of 2006."[383] Later that year, on August 12, 2008, Coalition forces arrested nine Hezbollah members who had been funneling weapons into Iraq. Hezbollah's involvement in these smuggling operations accorded with its longstanding role as Iran's weapons smuggler (including its attempt in 2003 to smuggle 50 tons of weapons from Iran to the Palestinian Authority, the largest Iranian-linked smuggling operation ever uncovered).

---

[381] U.S. State Dep't Cable, *Kurdistan Regional Government PUK Prime Minister Pushes for Kirkuk Against Spread of Political Islam and Iranian Influence* (Mar. 9, 2006), https://wikileaks.org/plusd/cables/06KIRKUK58_a.html.

[382] Leila Fadel, *Chilling Stories from the Mahdi Army*, McClatchy DC (June 22, 2007), http://www.mcclatchydc.com/news/nation-world/world/article24465475.html.

[383] Bill Roggio, *Mahdi Rocket Teams Destroyed in Sadr City*, Long War J. (June 3, 2007), http://www.longwarjournal.org/archives/2007/06/mahdi_rocket_teams_d.php.

409. Hezbollah has also purchased weapons for Jaysh al-Mahdi outright. For example, according to a U.S. military-intelligence document (as quoted in *U.S. News & World Report* in 2004), "Hezbollah was 'buying rocket-propelled grenades . . . antitank missiles' and other weapons for Sadr's militia."[384]

410. Weapons supplied to Jaysh al-Mahdi by Hezbollah include the same types of weapons on which Hezbollah trained Jaysh al-Mahdi: small arms, IEDs, EFPs, rockets, mortars, and RPGs. These weapons were first smuggled into the Jaysh al-Mahdi command-and-control safe haven of Sadr City and then distributed to Jaysh al-Mahdi cells in outlying provinces. For attacks carried out with those weapons, Hezbollah not only trained Jaysh al-Mahdi how to use them; it supplied the weapons themselves.

## VII. JAYSH AL-MAHDI KILLED AND INJURED PLAINTIFFS AND THEIR FAMILY MEMBERS THROUGH ACTS OF INTERNATIONAL TERRORISM THAT WERE PLANNED AND AUTHORIZED BY HEZBOLLAH

411. Jaysh al-Mahdi's terrorist campaign against Americans in Iraq, which was financed in part through Defendants' corrupt transactions with MOH, killed and injured Plaintiffs and their family members. Each of the acts of international terrorism described below was committed or proximately caused by Jaysh al-Mahdi and was planned, authorized, and/or carried out (in conjunction with Jaysh al-Mahdi) by Hezbollah.

### The November 29, 2005 IED Attack in Baghdad[385] (Kules Family)

412. On November 29, 2005, Jaysh al-Mahdi committed an IED attack near Camp Taji in Baghdad Governorate, Iraq (the "November 29, 2005 Attack"). The attack was planned and authorized by Hezbollah.

[384] Edward T. Pound, *Special Report: The Iran Connection,* U.S. News & World Report (Nov. 22, 2004), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iran-connection&catid=33&Itemid=115 (alteration in original).

[385] All references to locations in the attack subheadings refer to *governorates* (not cities) in Iraq.

413. The November 29, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

414. **Captain Ryan Kules** served in Iraq as a member of the U.S. Army at the time of the attack. The November 29, 2005 Attack severely wounded CPT Kules, who suffered from an amputation of the right arm and left leg.

415. Plaintiff CPT Kules was a U.S. national at the time of the attack and remains one today.

416. As a result of the November 29, 2005 Attack and his injuries, CPT Kules has experienced severe physical and emotional pain and suffering.

417. Plaintiff Nancy Kules is the wife of CPT Kules and a U.S. national.

418. As a result of the November 29, 2005 Attack and CPT Kules' injuries, Plaintiff members of the Kules family have experienced severe physical and emotional pain and suffering.

**The December 4, 2005 IED Attack in Baghdad (Kokesh Family)**

419. On December 4, 2005, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "December 4, 2005 Attack"). The attack was planned and authorized by Hezbollah.

420. The December 4, 2005 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

421. **Sergeant Allen Kokesh Jr.** served in Iraq as a member of the U.S. Army National Guard at the time of the attack. SGT Kokesh was injured in the December 4, 2005 Attack. SGT Kokesh died on February 7, 2006, as a result of injuries sustained during the attack.

422. SGT Kokesh was a U.S. national at the time of the attack and his death.

423. Plaintiff Becky Wetterstrom is the mother of SGT Kokesh and a U.S. national.

424. Plaintiff Chasity Kokesh is the sister of SGT Kokesh and a U.S. national.

425. Plaintiff Thomas Kokesh is the brother of SGT Kokesh and a U.S. national.

426. As a result of the December 4, 2005 Attack and SGT Kokesh's injuries and death, each member of the Kokesh family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Kokesh's society, companionship, and counsel.

427. As a result of the December 4, 2005 Attack, SGT Kokesh was injured in his person and/or property. The Plaintiff members of the Kokesh family are the survivors and/or heirs of SGT Kokesh and are entitled to recover for the damages SGT Kokesh sustained.

**The January 5, 2006 IED Attack in Najaf (Peralez Family)**

428. On January 5, 2006, Jaysh al-Mahdi committed an IED attack in Najaf Governorate, Iraq (the "January 5, 2006 Attack"). The attack was planned and authorized by Hezbollah.

429. The January 5, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

430. **Sergeant Johnny Peralez Jr.** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Peralez was injured in the January 5, 2006 Attack. SGT Peralez died on January 5, 2006, as a result of injuries sustained during the attack.

431. SGT Peralez was a U.S. national at the time of the attack and his death.

432. Plaintiff Jessie Peralez is the brother of SGT Peralez and a U.S. national.

433. As a result of the January 5, 2006 Attack and SGT Peralez's injuries and death, each member of the Peralez family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Peralez's society, companionship, and counsel.

434. As a result of the January 5, 2006 Attack, SGT Peralez was injured in his person and/or property. The Plaintiff members of the Peralez family are the survivors and/or heirs of SGT Peralez and are entitled to recover for the damages SGT Peralez sustained.

**The January 16, 2006 IED Attack in Baghdad (Parlin Family)**

435. On January 16, 2006, Jaysh al-Mahdi committed an IED attack on the road connecting Baghdad International Airport to the center of Baghdad (Airport Road) in the Al-Rashid District, Baghdad Governorate, Iraq (the "January 16, 2006 Attack"). The attack was planned and authorized by Hezbollah.

436. The January 16, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

437. **Samuel Parlin Jr.** served in Iraq as a civilian contractor employed by DynCorp International as a member of the Civilian Police Advisory Training Team ("CPATT"), which was responsible for the Coalition efforts to train and equip the Iraqi police at the time of the attack. Samuel Parlin Jr. was injured in the January 16, 2006 Attack. Samuel Parlin Jr. died on January 16, 2006, as a result of injuries sustained during the attack.

438. Samuel Parlin Jr. was a U.S. national at the time of the attack and his death.

439. Plaintiff Cynthia Parlin is the widow of Samuel Parlin Jr. and a U.S. national. She brings claims solely in her representative capacity on behalf of Samuel Parlin Jr.'s estate.

440. As a result of the January 16, 2006 Attack and Samuel Parlin Jr.'s injuries and death, each member of the Parlin family has experienced severe mental anguish, emotional pain and suffering, and the loss of Samuel Parlin Jr.'s society, companionship, and counsel.

441. As a result of the January 16, 2006 Attack, Samuel Parlin Jr. was injured in his person and/or property. The Plaintiff members of the Parlin family are the survivors and/or heirs of Samuel Parlin Jr. and are entitled to recover for the damages Samuel Parlin Jr. sustained.

**The January 23, 2006 IED Attack in Baghdad (Chase Family)**

442. On January 23, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "January 23, 2006 Attack"). The attack was planned and authorized by Hezbollah.

443. The January 23, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

444. **Staff Sergeant Lance Chase** served in Iraq as a member of the U.S. Army at the time of the attack. SSG Chase was injured in the January 23, 2006 Attack. SSG Chase died on January 23, 2006, as a result of injuries sustained during the attack.

445. SSG Chase was a U.S. national at the time of the attack and his death.

446. Plaintiff Kristen Chase is the widow of SSG Chase and a U.S. national.

447. As a result of the January 23, 2006 Attack and SSG Chase's injuries and death, each member of the Chase family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Chase's society, companionship, and counsel.

448. As a result of the January 23, 2006 Attack, SSG Chase was injured in his person and/or property. The Plaintiff members of the Chase family are the survivors and/or heirs of SSG Chase and are entitled to recover for the damages SSG Chase sustained.

**The February 20, 2006 EFP Attack in Baghdad (Davila Family)**

449. On February 20, 2006, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Sadr City, Baghdad Governorate, Iraq (the "February 20, 2006 Attack"). The attack was planned and authorized by Hezbollah.

450. The February 20, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

451. **Sergeant Jessie Davila** served in Iraq as a member of the U.S. Army National Guard at the time of the attack. SGT Davila was injured in the February 20, 2006 Attack. SGT Davila died on February 20, 2006, as a result of injuries sustained during the attack.

452. SGT Davila was a U.S. national at the time of the attack and his death.

453. Plaintiff Sydney Davila is the daughter of SGT Davila and a U.S. national.

454. As a result of the February 20, 2006 Attack and SGT Davila's injuries and death, each member of the Davila family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Davila's society, companionship, and counsel.

455. As a result of the February 20, 2006 Attack, SGT Davila was injured in his person and/or property. The Plaintiff members of the Davila family are the survivors and/or heirs of SGT Davila and are entitled to recover for the damages SGT Davila sustained.

**The February 26, 2006 Complex Attack in Baghdad (Farr Family)**

456. On February 26, 2006, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed a complex attack involving an EFP and small arms fire in the Mansour District in Baghdad Governorate, Iraq (the "February 26, 2006 Attack"). The attack was planned and authorized by Hezbollah.

457. The February 26, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

458. **Specialist Clay Farr** served in Iraq as a member of the U.S. Army at the time of the attack. SPC Farr was injured in the February 26, 2006 Attack. SPC Farr died on February 26, 2006, as a result of injuries sustained during the attack.

459. SPC Farr was a U.S. national at the time of the attack and his death.

460. Plaintiff Patrick Farr is the father of SPC Farr and a U.S. national.

461. Plaintiff Chad Farr is the brother of SPC Farr and a U.S. national.

462. Plaintiff Silver Farr is the stepmother of SPC Farr and a U.S. national. Ms. Farr lived in the same household as SPC Farr for a substantial period of time and considered SPC Farr the functional equivalent of a biological son.

463. As a result of the February 26, 2006 Attack and SPC Farr's injuries and death, each member of the Farr family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Farr's society, companionship, and counsel.

464. As a result of the February 26, 2006 Attack, SPC Farr was injured in his person and/or property. The Plaintiff members of the Farr family are the survivors and/or heirs of SPC Farr and are entitled to recover for the damages SPC Farr sustained.

**The April 12, 2006 EFP Attack in Karbala (Bandhold Family)**

465. On April 12, 2006, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack on a roadway in Karbala Governorate, Iraq (the "April 12, 2006 Attack"). The attack was planned and authorized by Hezbollah.

466. The April 12, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

467. **Corporal Scott Bandhold** served in Iraq as a member of the U.S. Army at the time of the attack. CPL Bandhold was injured in the April 12, 2006 Attack. CPL Bandhold died on April 12, 2006, as a result of injuries sustained during the attack.

468. CPL Bandhold was a U.S. national at the time of the attack and his death.

469. Plaintiff Donald Bandhold is the brother of CPL Bandhold and a U.S. national.

470. As a result of the April 12, 2006 Attack and CPL Bandhold's injuries and death, each member of the Bandhold family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Bandhold's society, companionship, and counsel.

471. As a result of the April 12, 2006 Attack, CPL Bandhold was injured in his person and/or property. The Plaintiff members of the Bandhold family are the survivors and/or heirs of CPL Bandhold and are entitled to recover for the damages CPL Bandhold sustained.

**The April 22, 2006 IED Attack in Baghdad (Bouthot Family)**

472. On April 22, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "April 22, 2006 Attack"). The attack was planned and authorized by Hezbollah.

473. The April 22, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

474. **Private Second Class Michael Bouthot** served in Iraq as a member of the U.S. Army at the time of the attack. PV2 Bouthot was injured in the April 22, 2006 Attack. PV2 Bouthot died on April 22, 2006, as a result of injuries sustained during the attack.

475. PV2 Bouthot was a U.S. national at the time of the attack and his death.

476. Plaintiff Amy Bouthot Sanborn is the sister of PV2 Bouthot and a U.S. national.

477. Plaintiff Joseph Bouthot is the brother of PV2 Bouthot and a U.S. national.

478. As a result of the April 22, 2006 Attack and PV2 Bouthot's injuries and death, each member of the Bouthot family has experienced severe mental anguish, emotional pain and suffering, and the loss of PV2 Bouthot's society, companionship, and counsel.

479. As a result of the April 22, 2006 Attack, PV2 Bouthot was injured in his person and/or property. The Plaintiff members of the Bouthot family are the survivors and/or heirs of PV2 Bouthot and are entitled to recover for the damages PV2 Bouthot sustained.

**The April 22, 2006 IED Attack in Baghdad (Zimmerman Family)**

480. On April 22, 2006, Jaysh al-Mahdi committed an IED attack near Durbin Bridge in Baghdad Governorate, Iraq (the "April 22, 2006 Durbin Bridge Attack"). The attack was planned and authorized by Hezbollah.

481. The April 22, 2006 Durbin Bridge Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

482. **Private First Class Travis Zimmerman** served in Iraq as a member of the U.S. Army at the time of the attack. PFC Zimmerman was injured in the April 22, 2006 Durbin Bridge Attack. PFC Zimmerman died on April 22, 2006, as a result of injuries sustained during the attack.

483. PFC Zimmerman was a U.S. national at the time of the attack and his death.

484. Plaintiff Gail Camperson is the mother of PFC Zimmerman and a U.S. national.

485. Plaintiff Lloyd Zimmerman Jr. is the father of PFC Zimmerman and a U.S. national.

486. Plaintiff John Camperson is the brother of PFC Zimmerman and a U.S. national.

487. Plaintiff Jessica Zimmerman is the sister of PFC Zimmerman and a U.S. national.

488. Plaintiff Elizabeth Zimmerman is the stepmother of PFC Zimmerman and a U.S. national. Ms. Zimmerman lived in the same household as PFC Zimmerman for a substantial period of time and considered PFC Zimmerman the functional equivalent of a biological son.

489. As a result of the April 22, 2006 Durbin Bridge Attack and PFC Zimmerman's injuries and death, each member of the Zimmerman family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Zimmerman's society, companionship, and counsel.

490. As a result of the April 22, 2006 Durbin Bridge Attack, PFC Zimmerman was injured in his person and/or property. The Plaintiff members of the Zimmerman family are the survivors and/or heirs of PFC Zimmerman and are entitled to recover for the damages PFC Zimmerman sustained.

**The April 23, 2006 IED Attack in Baghdad (Ehney Family)**

491. On April 23, 2006, Jaysh al-Mahdi committed an IED attack in Taji District, Baghdad Governorate, Iraq (the "April 23, 2006 Attack"). The attack was planned and authorized by Hezbollah.

492. The April 23, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

493. **Sergeant Robert Ehney** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Ehney was injured in the April 23, 2006 Attack. SGT Ehney died on April 23, 2006, as a result of injuries sustained during the attack.

494. SGT Ehney was a U.S. national at the time of the attack and his death.

495. Plaintiff Mary Beth Ehney is the mother of SGT Ehney and a U.S. national.

496. Plaintiff William Ehney Jr. is the father of SGT Ehney and a U.S. national.

497. As a result of the April 23, 2006 Attack and SGT Ehney's injuries and death, each member of the Ehney family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Ehney's society, companionship, and counsel.

498. As a result of the April 23, 2006 Attack, SGT Ehney was injured in his person and/or property. The Plaintiff members of the Ehney family are the survivors and/or heirs of SGT Ehney and are entitled to recover for the damages SGT Ehney sustained.

**The May 4, 2006 IED Attack in Baghdad (Lufkin and Reinke Families)**

499. On May 4, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "May 4, 2006 Attack"). The attack was planned and authorized by Hezbollah.

500. The May 4, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

501. **Private First Class Caleb Lufkin** served in Iraq as a member of the U.S. Army at the time of the attack. PFC Lufkin was injured in the May 4, 2006 Attack. PFC Lufkin died on May 25, 2006, as a result of injuries sustained during the attack.

502. PFC Lufkin was a U.S. national at the time of the attack and his death.

503. Plaintiff Marcella Gorsline is the mother of PFC Lufkin and a U.S. national.

504. Plaintiff Tammy Lufkin is the father of PFC Lufkin and a U.S. national.

505. Plaintiff Taylor Lufkin is the brother of PFC Lufkin and a U.S. national.

506. As a result of the May 4, 2006 Attack and PFC Lufkin's injuries and death, each member of the Lufkin family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Lufkin's society, companionship, and counsel.

507. As a result of the May 4, 2006 Attack, PFC Lufkin was injured in his person and/or property. The Plaintiff members of the Lufkin family are the survivors and/or heirs of PFC Lufkin and are entitled to recover for the damages PFC Lufkin sustained.

508. **Staff Sergeant Gavin Reinke** served in Iraq as a member of the U.S. Army at the time of the attack. SSG Reinke was injured in the May 4, 2006 Attack. SSG Reinke died on May 4, 2006, as a result of injuries sustained during the attack.

509. SSG Reinke was a U.S. national at the time of the attack and his death.

510. Plaintiff Lavenia Reinke is the widow of SSG Reinke and a U.S. national.

511. As a result of the May 4, 2006 Attack and SSG Reinke's injuries and death, each member of the Reinke family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Reinke's society, companionship, and counsel.

512. As a result of the May 4, 2006 Attack, SSG Reinke was injured in his person and/or property. The Plaintiff members of the Reinke family are the survivors and/or heirs of SSG Reinke and are entitled to recover for the damages SSG Reinke sustained.

**The May 5, 2006 EFP Attack in Babil (Saenz Family)**

513. On May 5, 2006, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack north of Hillah City in Babil Governorate, Iraq (the "May 5, 2006 Attack"). The attack was planned and authorized by Hezbollah.

514. The May 5, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

515. **First Sergeant Carlos Saenz** served in Iraq as a member of the U.S. Army at the time of the attack. 1SG Saenz was injured in the May 5, 2006 Attack. 1SG Saenz died on May 5, 2006, as a result of injuries sustained during the attack.

516. 1SG Saenz was a U.S. national at the time of the attack and his death.

517. Plaintiff Elva Espinoza is the sister of 1SG Saenz and a U.S. national.

518. Plaintiff Luz Maria Estrada-Pulido is the sister of 1SG Saenz and a U.S. national.

519. As a result of the May 5, 2006 Attack and 1SG Saenz's injuries and death, each member of the Saenz family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1SG Saenz's society, companionship, and counsel.

520. As a result of the May 5, 2006 Attack, 1SG Saenz was injured in his person and/or property. The Plaintiff members of the Saenz family are the survivors and/or heirs of 1SG Saenz and are entitled to recover for the damages 1SG Saenz sustained.

**The May 14, 2006 IED Attack in Baghdad (Engeman and West Families)**

521. On May 14, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "May 14, 2006 Attack"). The attack was planned and authorized by Hezbollah.

522. The May 14, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

523. **Chief Warrant Officer 4 John Engeman** served in Iraq as a member of the U.S. Army at the time of the attack. CW4 Engeman was injured in the May 14, 2006 Attack. CW4 Engeman died on May 14, 2006, as a result of injuries sustained during the attack.

524. CW4 Engeman was a U.S. national at the time of the attack and his death.

525. Plaintiff Donna Engeman is the widow of CW4 Engeman and a U.S. National. She brings claims in both her individual capacity and her representative capacity on behalf of John Engeman's estate.

526. As a result of the May 14, 2006 Attack and CW4 Engeman's injuries and death, each member of the Engeman family has experienced severe mental anguish, emotional pain and suffering, and the loss of CW4 Engeman's society, companionship, and counsel.

527. As a result of the May 14, 2006 Attack, CW4 Engeman was injured in his person and/or property. The Plaintiff members of the Engeman family are the survivors and/or heirs of CW4 Engeman and are entitled to recover for the damages CW4 Engeman sustained.

528. **Master Sergeant Robert West** served in Iraq as a member of the U.S. Army at the time of the attack. MSG West was injured in the May 14, 2006 Attack. MSG West died on May 14, 2006, as a result of injuries sustained during the attack.

529. MSG West was a U.S. national at the time of the attack and his death.

530. Plaintiff Shelby West is the daughter of MSG West and a U.S. national.

531. As a result of the May 14, 2006 Attack and MSG West's injuries and death, each member of the West family has experienced severe mental anguish, emotional pain and suffering, and the loss of MSG West's society, companionship, and counsel.

532. As a result of the May 14, 2006 Attack, MSG West was injured in his person and/or property. The Plaintiff members of the West family are the survivors and/or heirs of MSG West and are entitled to recover for the damages MSG West sustained.

**The May 15, 2006 IED Attack in Baghdad (Flint Family)**

533. On May 15, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "May 15, 2006 Attack"). The attack was planned and authorized by Hezbollah.

534. The May 15, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

535. **Staff Sergeant Marion Flint Jr.** served in Iraq as a member of the U.S. Army at the time of the attack. SSG Flint was injured in the May 15, 2006 Attack. SSG Flint died on May 15, 2006, as a result of injuries sustained during the attack.

536. SSG Flint was a U.S. national at the time of the attack and his death.

537. Plaintiff LaShaviea Flint is the widow of SSG Flint and a U.S. national.

538. Plaintiff Matlene Howard is the mother of SSG Flint and a U.S. national.

539. Plaintiff Dyamond Capel is the stepdaughter of SSG Flint and a U.S. national. Ms. Capel lived in the same household as SSG Flint for a substantial period of time and considered SSG Flint the functional equivalent of a biological father.

540. As a result of the May 15, 2006 Attack and SSG Flint's injuries and death, each member of the Flint family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Flint's society, companionship, and counsel.

541. As a result of the May 15, 2006 Attack, SSG Flint was injured in his person and/or property. The Plaintiff members of the Flint family are the survivors and/or heirs of SSG Flint and are entitled to recover for the damages SSG Flint sustained.

**The May 16, 2006 IED Attack in Baghdad (Halsel Family)**

542. On May 16, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "May 16, 2006 Attack"). The attack was planned and authorized by Hezbollah.

543. The May 16, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

544. **Staff Sergeant Santiago Halsel** served in Iraq as a member of the U.S. Army at the time of the attack. SSG Halsel was injured in the May 16, 2006 Attack. SSG Halsel died on May 16, 2006, as a result of injuries sustained during the attack.

545. SSG Halsel was a U.S. national at the time of the attack and his death.

546. Plaintiff Shurrea Donley is the sister of SSG Halsel and a U.S. national.

547. As a result of the May 16, 2006 Attack and SSG Halsel's injuries and death, each member of the Halsel family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Halsel's society, companionship, and counsel.

548. As a result of the May 16, 2006 Attack, SSG Halsel was injured in his person and/or property. The Plaintiff members of the Halsel family are the survivors and/or heirs of SSG Halsel and are entitled to recover for the damages SSG Halsel sustained.

**The May 18, 2006 IED Attack in Baghdad (Holland Family)**

549. On May 18, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "May 18, 2006 Attack"). The attack was planned and authorized by Hezbollah.

550. The May 18, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

551. **Lieutenant Colonel Daniel Holland** served in Iraq as a member of the U.S. Army at the time of the attack. LTC Holland was injured in the May 18, 2006 Attack. LTC Holland died on May 18, 2006, as a result of injuries sustained during the attack.

552. LTC Holland was a U.S. national at the time of the attack and his death.

553. Plaintiff Rachel Holland-Hadjis is the daughter of LTC Holland and a U.S. national.

554. Plaintiff Garrett Holland is the son of LTC Holland and a U.S. national.

555. Plaintiff David Holland is the brother of LTC Holland and a U.S. national.

556. Plaintiff John Holland is the brother of LTC Holland and a U.S. national.

557. Plaintiff Claire Nieswiadomy is the sister of LTC Holland and a U.S. national.

558. Plaintiff Patricia Nixon is the sister of LTC Holland and a U.S. national.

559. Plaintiff Catherine Ochoa is the sister of LTC Holland and a U.S. national.

560. Plaintiff Mary Ralya is the sister of LTC Holland and a U.S. national.

561. As a result of the May 18, 2006 Attack and LTC Holland's injuries and death, each member of the Holland family has experienced severe mental anguish, emotional pain and suffering, and the loss of LTC Holland's society, companionship, and counsel.

562. As a result of the May 18, 2006 Attack, LTC Holland was injured in his person and/or property. The Plaintiff members of the Holland family are the survivors and/or heirs of LTC Holland and are entitled to recover for the damages LTC Holland sustained.

**The June 8, 2006 EFP Attack in Wasit (Crabtree Family)**

563. On June 8, 2006, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack near Azizyah in Wasit Governorate, Iraq (the "June 8, 2006 Attack"). The attack was planned and authorized by Hezbollah.

564. The June 8, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

565. **Sergeant First Class Daniel Crabtree** served in Iraq as a member of the U.S. Army National Guard at the time of the attack. SFC Crabtree was injured in the June 8, 2006 Attack. SFC Crabtree died on June 8, 2006, as a result of injuries sustained during the attack.

566. SFC Crabtree was a U.S. national at the time of the attack and his death.

567. Plaintiff Ronald Crabtree is the father of SFC Crabtree and a U.S. national.

568. As a result of the June 8, 2006 Attack and SFC Crabtree's injuries and death, each member of the Crabtree family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Crabtree's society, companionship, and counsel.

569. As a result of the June 8, 2006 Attack, SFC Crabtree was injured in his person and/or property. The Plaintiff members of the Crabtree family are the survivors and/or heirs of SFC Crabtree and are entitled to recover for the damages SFC Crabtree sustained.

**The June 23, 2006 IED Attack in Baghdad (Beyer Family)**

570. On June 23, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "June 23, 2006 Attack"). The attack was planned and authorized by Hezbollah.

571. The June 23, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

572. **Specialist Paul Beyer** served in Iraq as a member of the U.S. Army at the time of the attack. SPC Beyer was injured in the June 23, 2006 Attack. SPC Beyer died on June 23, 2006, as a result of injuries sustained during the attack.

573. SPC Beyer was a U.S. national at the time of the attack and his death.

574. Plaintiff Jonathan Beyer is the brother of SPC Beyer and a U.S. national.

575. As a result of the June 23, 2006 Attack and SPC Beyer's injuries and death, each member of the Beyer family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Beyer's society, companionship, and counsel.

576. As a result of the June 23, 2006 Attack, SPC Beyer was injured in his person and/or property. The Plaintiff members of the Beyer family are the survivors and/or heirs of SPC Beyer and are entitled to recover for the damages SPC Beyer sustained.

**The June 29, 2006 IED Attack in Baghdad (Rose Family)**

577. On June 29, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "June 29, 2006 Attack"). The attack was planned and authorized by Hezbollah.

578. The June 29, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

579. **Corporal Christopher Rose** served in Iraq as a member of the U.S. Army at the time of the attack. CPL Rose was injured in the June 29, 2006 Attack. CPL Rose died on June 29, 2006, as a result of injuries sustained during the attack.

580. CPL Rose was a U.S. national at the time of the attack and his death.

581. Plaintiff Lisa Rose is the sister of CPL Rose and a U.S. national.

582. As a result of the June 29, 2006 Attack and CPL Rose's injuries and death, each member of the Rose family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Rose's society, companionship, and counsel.

583. As a result of the June 29, 2006 Attack, CPL Rose was injured in his person and/or property. The Plaintiff members of the Rose family are the survivors and/or heirs of CPL Rose and are entitled to recover for the damages CPL Rose sustained.

**The August 27, 2006 Complex Attack in Baghdad (Cross Family)**

584. On August 27, 2006, Jaysh al-Mahdi committed a complex attack involving IED and small arms fire in Baghdad Governorate, Iraq (the "August 27, 2006 Complex Attack"). The attack was planned and authorized by Hezbollah.

585. The August 27, 2006 Complex Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

586. **Corporal Kenneth Cross** served in Iraq as a member of the U.S. Army at the time of the attack. CPL Cross was injured in the August 27, 2006 Complex Attack. CPL Cross died on August 27, 2006, as a result of injuries sustained during the attack.

587. CPL Cross was a U.S. national at the time of the attack and his death.

588. Plaintiff Heidi Cross is the widow of CPL Cross and a U.S. national.

589. As a result of the August 27, 2006 Complex Attack and CPL Cross' injuries and death, each member of the Cross family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Cross' society, companionship, and counsel.

590. As a result of the August 27, 2006 Complex Attack, CPL Cross was injured in his person and/or property. The Plaintiff members of the Cross family are the survivors and/or heirs of CPL Cross and are entitled to recover for the damages CPL Cross sustained.

**The August 27, 2006 Small Arms Attack in Baghdad (Jones Family)**

591. On August 27, 2006, Jaysh al-Mahdi committed a small arms attack in Baghdad Governorate, Iraq (the "August 27, 2006 Small Arms Attack"). The attack was planned and authorized by Hezbollah.

592. The August 27, 2006 Small Arms Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

593. **Corporal Joshua Jones** served in Iraq as a member of the U.S. Army at the time of the attack. CPL Jones was injured in the August 27, 2006 Small Arms Attack. CPL Jones died on August 27, 2006, as a result of injuries sustained during the attack.

594. CPL Jones was a U.S. national at the time of the attack and his death.

595. Plaintiff Gary Jones is the father of CPL Jones and a U.S. national.

596. Plaintiff Alexandria Workman is the sister of CPL Jones and a U.S. national.

597. As a result of the August 27, 2006 Small Arms Attack and CPL Jones' injuries and death, each member of the Jones family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Jones' society, companionship, and counsel.

598. As a result of the August 27, 2006 Small Arms Attack, CPL Jones was injured in his person and/or property. The Plaintiff members of the Jones family are the survivors and/or heirs of CPL Jones and are entitled to recover for the damages CPL Jones sustained.

**The August 30, 2006 Complex Attack in Baghdad (Alex Family)**

599. On August 30, 2006, Jaysh al-Mahdi committed a complex attack involving small arms fire in Baghdad Governorate, Iraq (the "August 30, 2006 Attack"). The attack was planned and authorized by Hezbollah.

600. The August 30, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

601. **Staff Sergeant Eugene Alex** served in Iraq as a member of the U.S. Army at the time of the attack. SSG Alex was injured in the August 30, 2006 Attack. SSG Alex died on September 2, 2006, as a result of injuries sustained during the attack.

602. SSG Alex was a U.S. national at the time of the attack and his death.

603. Plaintiff Melissa Alex is the widow of SSG Alex and a U.S. national.

604. Plaintiff Austin Alex is the son of SSG Alex and a U.S. national.

605. Plaintiff Autumn Alex is the daughter of SSG Alex and a U.S. national.

606. Plaintiff Zackery Alex is the son of SSG Alex and a U.S. national.

607. As a result of the August 30, 2006 Attack and SSG Alex's injuries and death, each member of the Alex family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Alex's society, companionship, and counsel.

608. As a result of the August 30, 2006 Attack, SSG Alex was injured in his person and/or property. The Plaintiff members of the Alex family are the survivors and/or heirs of SSG Alex and are entitled to recover for the damages SSG Alex sustained.

**The September 8, 2006 IED Attack in Baghdad (Gordon Family)**

609. On September 8, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "September 8, 2006 Attack"). The attack was planned and authorized by Hezbollah.

610. The September 8, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

611. **Sergeant David Gordon** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Gordon was injured in the September 8, 2006 Attack. SGT Gordon died on September 8, 2006, as a result of injuries sustained during the attack.

612. SGT Gordon was a U.S. national at the time of the attack and his death.

613. Plaintiff Judy Gordon is the mother of SGT Gordon and a U.S. national.

614. Plaintiff Teresa Gordon is the sister of SGT Gordon and a U.S. national.

615. Plaintiff Tiffany Gordon is the sister of SGT Gordon and a U.S. national.

616. As a result of the September 8, 2006 Attack and SGT Gordon's injuries and death, each member of the Gordon family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Gordon's society, companionship, and counsel.

617. As a result of the September 8, 2006 Attack, SGT Gordon was injured in his person and/or property. The Plaintiff members of the Gordon family are the survivors and/or heirs of SGT Gordon and are entitled to recover for the damages SGT Gordon sustained.

**The September 14, 2006 IED Attack in Baghdad (Williams Family)**

618. On September 14, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "September 14, 2006 Attack"). The attack was planned and authorized by Hezbollah.

619. The September 14, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

620. **Sergeant Clinton Williams** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Williams was injured in the September 14, 2006 Attack. SGT Williams died on September 14, 2006, as a result of injuries sustained during the attack.

621. SGT Williams was a U.S. national at the time of the attack and his death.

622. Plaintiff Marcalea Sprouse is the mother of SGT Williams and a U.S. national.

623. As a result of the September 14, 2006 Attack and SGT Williams' injuries and death, each member of the Williams family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Williams' society, companionship, and counsel.

624. As a result of the September 14, 2006 Attack, SGT Williams was injured in his person and/or property. The Plaintiff members of the Williams family are the survivors and/or heirs of SGT Williams and are entitled to recover for the damages SGT Williams sustained.

**The September 15, 2006 IED Attack in Baghdad (Granados Family)**

625. On September 15, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "September 15, 2006 Attack"). The attack was planned and authorized by Hezbollah.

626. The September 15, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

627. **Corporal Cesar Granados** served in Iraq as a member of the U.S. Army at the time of the attack. CPL Granados was injured in the September 15, 2006 Attack. CPL Granados died on September 15, 2006, as a result of injuries sustained during the attack.

628. CPL Granados was a U.S. national at the time of the attack and his death.

629. Plaintiff Maria Granados is the mother of CPL Granados and a U.S. national.

630. Plaintiff Denisse Granados is the sister of CPL Granados and a U.S. national.

631. Plaintiff Luis Granados is the brother of CPL Granados and a U.S. national.

632. As a result of the September 15, 2006 Attack and CPL Granados' injuries and death, each member of the Granados family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Granados' society, companionship, and counsel.

633. As a result of the September 15, 2006 Attack, CPL Granados was injured in his person and/or property. The Plaintiff members of the Granados family are the survivors and/or heirs of CPL Granados and are entitled to recover for the damages CPL Granados sustained.

**The September 17, 2006 IED Attack in Baghdad (Davis Family)**

634. On September 17, 2006, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an IED attack in Sadr City, Baghdad Governorate, Iraq (the "September 17, 2006 Attack"). The attack was planned and authorized by Hezbollah.

635. The September 17, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

636. **Sergeant David Davis** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Davis was injured in the September 17, 2006 Attack. SGT Davis died on September 17, 2006, as a result of injuries sustained during the attack.

637. SGT Davis was a U.S. national at the time of the attack and his death.

638. Plaintiff Roberta Davis is the widow of SGT Davis and a U.S. national.

639. As a result of the September 17, 2006 Attack and SGT Davis' injuries and death, each member of the Davis family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Davis' society, companionship, and counsel.

640. As a result of the September 17, 2006 Attack, SGT Davis was injured in his person and/or property. The Plaintiff members of the Davis family are the survivors and/or heirs of SGT Davis and are entitled to recover for the damages SGT Davis sustained.

**The September 20, 2006 IED Attack in Baghdad (Kavanagh Family)**

641. On September 20, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "September 20, 2006 IED Attack"). The attack was planned and authorized by Hezbollah.

642. The September 20, 2006 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

643. **Private Second Class Eric Kavanagh** served in Iraq as a member of the U.S. Army at the time of the attack. PV2 Kavanagh was injured in the September 20, 2006 IED Attack. PV2 Kavanagh died on September 20, 2006, as a result of injuries sustained during the attack.

644. PV2 Kavanagh was a U.S. national at the time of the attack and his death.

645. Plaintiff Kevin Kavanagh is the father of PV2 Kavanagh and a U.S. national.

646. Plaintiff Alanna Kavanagh is the sister of PV2 Kavanagh and a U.S. national.

647. As a result of the September 20, 2006 IED Attack and PV2 Kavanagh's injuries and death, each member of the Kavanagh family has experienced severe mental anguish, emotional pain and suffering, and the loss of PV2 Kavanagh's society, companionship, and counsel.

648. As a result of the September 20, 2006 IED Attack, PV2 Kavanagh was injured in his person and/or property. The Plaintiff members of the Kavanagh family are the survivors

and/or heirs of PV2 Kavanagh and are entitled to recover for the damages PV2 Kavanagh sustained.

**The September 20, 2006 Small Arms Attack in Baghdad (Needham Family)**

649. On September 20, 2006, Jaysh al-Mahdi committed a small arms attack in Baghdad Governorate, Iraq (the "September 20, 2006 Small Arms Attack"). The attack was planned and authorized by Hezbollah.

650. The September 20, 2006 Small Arms Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

651. **Master Sergeant Robb Needham** served in Iraq as a member of the U.S. Army Reserve at the time of the attack. MSG Needham was injured in the September 20, 2006 Small Arms Attack. MSG Needham died on September 20, 2006, as a result of injuries sustained during the attack.

652. MSG Needham was a U.S. national at the time of the attack and his death.

653. Plaintiff Catherine Needham is the widow of MSG Needham and a U.S. national.

654. Plaintiff Robi Peterson is the daughter of MSG Needham and a U.S. national.

655. As a result of the September 20, 2006 Small Arms Attack and MSG Needham's injuries and death, each member of the Needham family has experienced severe mental anguish, emotional pain and suffering, and the loss of MSG Needham's society, companionship, and counsel.

656. As a result of the September 20, 2006 Small Arms Attack, MSG Needham was injured in his person and/or property. The Plaintiff members of the Needham family are the

survivors and/or heirs of MSG Needham and are entitled to recover for the damages MSG Needham sustained.

**The October 17, 2006 IED Attack in Baghdad (Culbertson and Dumas Families)**

657. On October 17, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "October 17, 2006 Attack"). The attack was planned and authorized by Hezbollah.

658. The October 17, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

659. **Corporal Russell Culbertson III** served in Iraq as a member of the U.S. Army at the time of the attack. CPL Culbertson was injured in the October 17, 2006 Attack. CPL Culbertson died on October 17, 2006, as a result of injuries sustained during the attack.

660. CPL Culbertson was a U.S. national at the time of the attack and his death.

661. Plaintiff Denise Culbertson is the mother of CPL Culbertson and a U.S. national.

662. Plaintiff Russell Culbertson is the father of CPL Culbertson and a U.S. national.

663. As a result of the October 17, 2006 Attack and CPL Culbertson's injuries and death, each member of the Culbertson family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Culbertson's society, companionship, and counsel.

664. As a result of the October 17, 2006 Attack, CPL Culbertson was injured in his person and/or property. The Plaintiff members of the Culbertson family are the survivors and/or heirs of CPL Culbertson and are entitled to recover for the damages CPL Culbertson sustained.

665. **Corporal Joseph Dumas Jr.** served in Iraq as a member of the U.S. Army at the time of the attack. CPL Dumas was injured in the October 17, 2006 Attack. CPL Dumas died on October 17, 2006, as a result of injuries sustained during the attack.

666. CPL Dumas was a U.S. national at the time of the attack and his death.

667. Plaintiff Bernadine Dumas is the mother of CPL Dumas and a U.S. national.

668. Plaintiff Claude Dumas is the father of CPL Dumas and a U.S. national.

669. Plaintiff Eric Dumas is the brother of CPL Dumas and a U.S. national.

670. Plaintiff Shaun Dumas is the brother of CPL Dumas and a U.S. national.

671. As a result of the October 17, 2006 Attack and CPL Dumas' injuries and death, each member of the Dumas family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Dumas' society, companionship, and counsel.

672. As a result of the October 17, 2006 Attack, CPL Dumas was injured in his person and/or property. The Plaintiff members of the Dumas family are the survivors and/or heirs of CPL Dumas and are entitled to recover for the damages CPL Dumas sustained.

**The October 22, 2006 EFP Attack in Baghdad (Haines Family)**

673. On October 22, 2006, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Baghdad Governorate, Iraq (the "October 22, 2006 Attack"). The attack was planned and authorized by Hezbollah.

674. The October 22, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

675. **Lieutenant Colonel David Haines** served in Iraq as a member of the U.S. Army at the time of the attack. The October 22, 2006 Attack severely wounded LTC Haines, who

suffered from PTSD, depression, a fracture to the right femur (requiring multiple surgeries), shrapnel injuries to his right hand, left arm, right leg, and buttocks, burns to his body (requiring multiple skin grafts), and nerve damage. He has limited mobility in both hands and his right leg is shorter than his left leg due to his injuries.

676. Plaintiff LTC Haines was a U.S. national at the time of the attack and remains one today.

677. As a result of the October 22, 2006 Attack and his injuries, LTC Haines has experienced severe physical and emotional pain and suffering.

678. Plaintiff Dawn Haines is the wife of LTC Haines and a U.S. national.

679. Plaintiff Colin Haines is the son of LTC Haines and a U.S. national.

680. Plaintiff Mackenzie Haines is the daughter of LTC Haines and a U.S. national.

681. As a result of the October 22, 2006 Attack and LTC Haines' injuries, Plaintiff members of the Haines family have experienced severe physical and emotional pain and suffering.

**The October 30, 2006 Small Arms Attack in Baghdad (Foyteck Family)**

682. On October 30, 2006, Jaysh al-Mahdi committed a small arms attack in Baghdad Governorate, Iraq (the "October 30, 2006 Attack"). The attack was planned and authorized by Hezbollah.

683. The October 30, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

684. **Sergeant Kraig Foyteck** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Foyteck was injured in the October 30, 2006 Attack. SGT Foyteck died on October 30, 2006, as a result of injuries sustained during the attack.

685. SGT Foyteck was a U.S. national at the time of the attack and his death.

686. Plaintiff Constance Foyteck is the mother of SGT Foyteck and a U.S. national.

687. As a result of the October 30, 2006 Attack and SGT Foyteck's injuries and death, each member of the Foyteck family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Foyteck's society, companionship, and counsel.

688. As a result of the October 30, 2006 Attack, SGT Foyteck was injured in his person and/or property. The Plaintiff members of the Foyteck family are the survivors and/or heirs of SGT Foyteck and are entitled to recover for the damages SGT Foyteck sustained.

**The November 2, 2006 EFP Attack in Baghdad (Finken Family)**

689. On November 2, 2006, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Baghdad Governorate, Iraq (the "November 2, 2006 Attack"). The attack was planned and authorized by Hezbollah.

690. The November 2, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

691. **Lieutenant Colonel Paul Finken** served in Iraq as a member of the U.S. Army at the time of the attack. LTC Finken was injured in the November 2, 2006 Attack. LTC Finken died on November 2, 2006, as a result of injuries sustained during the attack.

692. LTC Finken was a U.S. national at the time of the attack and his death.

693. Plaintiff Julia Finken is the daughter of LTC Finken and a U.S. national.

694. As a result of the November 2, 2006 Attack and LTC Finken's injuries and death, each member of the Finken family has experienced severe mental anguish, emotional pain and suffering, and the loss of LTC Finken's society, companionship, and counsel.

695. As a result of the November 2, 2006 Attack, LTC Finken was injured in his person and/or property. The Plaintiff members of the Finken family are the survivors and/or heirs of LTC Finken and are entitled to recover for the damages LTC Finken sustained.

**The November 9, 2006 IED Attack in Baghdad (Salcido Family)**

696. On November 9, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "November 9, 2006 Attack"). The attack was planned and authorized by Hezbollah.

697. The November 9, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

698. **Sergeant First Class Rudy Salcido** served in Iraq as a member of the U.S. Army National Guard at the time of the attack. SFC Salcido was injured in the November 9, 2006 Attack. SFC Salcido died on November 9, 2006, as a result of injuries sustained during the attack.

699. SFC Salcido was a U.S. national at the time of the attack and his death.

700. Plaintiff Gabriella Salcido is the daughter of SFC Salcido and a U.S. national.

701. Plaintiff Maybelle Luevano is the mother of SFC Salcido and a U.S. national.

702. Plaintiff Peter E. Salcido is the father of SFC Salcido and a U.S. national.

703. Plaintiff Angelic Brubaker is the sister of SFC Salcido and a U.S. national.

704. Plaintiff Crysania Salcido is the sister of SFC Salcido and a U.S. national.

705. Plaintiff Erik Salcido is the brother of SFC Salcido and a U.S. national.

706. Plaintiff Peter Salcido is the brother of SFC Salcido and a U.S. national.

707. Plaintiff Kathleen Salcido is the stepmother of SFC Salcido and a U.S. national. Ms. Salcido lived in the same household as SFC Salcido for a substantial period of time and considered SFC Salcido the functional equivalent of a biological son.

708. As a result of the November 9, 2006 Attack and SFC Salcido's injuries and death, each member of the Salcido family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Salcido's society, companionship, and counsel.

709. As a result of the November 9, 2006 Attack, SFC Salcido was injured in his person and/or property. The Plaintiff members of the Salcido family are the survivors and/or heirs of SFC Salcido and are entitled to recover for the damages SFC Salcido sustained.

**The November 13, 2006 EFP Attack in Baghdad (Kim Family)**

710. On November 13, 2006, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Baghdad Governorate, Iraq (the "November 13, 2006 Attack"). The attack was planned and authorized by Hezbollah.

711. The November 13, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

712. **Private First Class Jang Kim** served in Iraq as a member of the U.S. Army at the time of the attack. PFC Kim was injured in the November 13, 2006 Attack. PFC Kim died on November 13, 2006, as a result of injuries sustained during the attack.

713. PFC Kim was a U.S. national at the time of the attack and his death.

714. Plaintiff Sangsoon Kim is the mother of PFC Kim and a U.S. national.

715. Plaintiff Seop Kim is the father of PFC Kim and a U.S. national.

716. Plaintiff Michelle Kim is the sister of PFC Kim and a U.S. national.

717. As a result of the November 13, 2006 Attack and PFC Kim's injuries and death, each member of the Kim family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Kim's society, companionship, and counsel.

718. As a result of the November 13, 2006 Attack, PFC Kim was injured in his person and/or property. The Plaintiff members of the Kim family are the survivors and/or heirs of PFC Kim and are entitled to recover for the damages PFC Kim sustained.

**The November 16, 2006 Complex Attack in Basra (Munns Family)**

719. On November 16, 2006, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed a complex attack involving kidnapping/hostage-taking, torture, and execution in Basra Governorate, Iraq (the "November 16, 2006 Attack"). The attack was planned and authorized by Hezbollah.

720. The November 16, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

721. **Joshua Munns** served in southern Iraq as a civilian security contractor for Crescent Security at the time of the attack. Joshua Munns was injured in the November 16, 2006 Attack. He was kidnapped, maimed, tortured, beaten, and ultimately executed after approximately 17 months of being held hostage. Joshua Munns's remains, which showed indications of post-mortem mutilation, were identified on March 23, 2008.

722. Joshua Munns was a U.S. national at the time of the attack and his death.

723. Plaintiff Mark Munns is the father of Joshua Munns and a U.S. national. He brings claims in solely his representative capacity on behalf of Joshua Munns's estate.

724. As a result of the November 16, 2006 Attack and Joshua Munns' injuries and death, each member of the Munns family has experienced severe mental anguish, emotional pain and suffering, and the loss of Joshua Munns' society, companionship, and counsel.

725. As a result of the November 16, 2006 Attack, Joshua Munns was injured in his person and/or property. The Plaintiff members of the Munns family are the survivors and/or heirs of Joshua Munns and are entitled to recover for the damages Joshua Munns sustained.

**The November 18, 2006 IED Attack in Baghdad (Shilling Family)**

726. On November 18, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "November 18, 2006 Attack"). The attack was planned and authorized by Hezbollah.

727. The November 18, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

728. **Specialist Bradley Shilling** served in Iraq as a member of the U.S. Army at the time of the attack. SPC Shilling was injured in the November 18, 2006 Attack. SPC Shilling died on November 18, 2006, as a result of injuries sustained during the attack.

729. SPC Shilling was a U.S. national at the time of the attack and his death.

730. Plaintiff Abbie Rose Shilling is the daughter of SPC Shilling and a U.S. national.

731. Plaintiff Kimberley Donahue is the mother of SPC Shilling and a U.S. national.

732. Plaintiff Samantha Cubitt is the sister of SPC Shilling and a U.S. national.

733. Plaintiff Melissa Shilling is the sister of SPC Shilling and a U.S. national.

734. As a result of the November 18, 2006 Attack and SPC Shilling's injuries and death, each member of the Shilling family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Shilling's society, companionship, and counsel.

735. As a result of the November 18, 2006 Attack, SPC Shilling was injured in his person and/or property. The Plaintiff members of the Shilling family are the survivors and/or heirs of SPC Shilling and are entitled to recover for the damages SPC Shilling sustained.

**The November 23, 2006 Small Arms Attack in Baghdad (Priestap Family)**

736. On November 23, 2006, Jaysh al-Mahdi committed a small arms attack in Baghdad Governorate, Iraq (the "November 23, 2006 Attack"). The attack was planned and authorized by Hezbollah.

737. The November 23, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

738. **Sergeant First Class James Priestap** served in Iraq as a member of the U.S. Army at the time of the attack. SFC Priestap was injured in the November 23, 2006 Attack. SFC Priestap died on November 23, 2006, as a result of injuries sustained during the attack.

739. SFC Priestap was a U.S. national at the time of the attack and his death.

740. Plaintiff Constance Priestap Murray is the widow of SFC Priestap and a U.S. national.

741. Plaintiff Brody Priestap is the son of SFC Priestap and a U.S. national.

742. Plaintiff Franchesca Rockwell is the daughter of SFC Priestap and a U.S. national.

743. As a result of the November 23, 2006 Attack and SFC Priestap's injuries and death, each member of the Priestap family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Priestap's society, companionship, and counsel.

744. As a result of the November 23, 2006 Attack, SFC Priestap was injured in his person and/or property. The Plaintiff members of the Priestap family are the survivors and/or heirs of SFC Priestap and are entitled to recover for the damages SFC Priestap sustained.

**The November 26, 2006 IED Attack in Baghdad (Burrows Family)**

745. On November 26, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "November 26, 2006 Attack"). The attack was planned and authorized by Hezbollah.

746. The November 26, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

747. **Private Second Class Joshua Burrows** served in Iraq as a member of the U.S. Army at the time of the attack. PV2 Burrows was injured in the November 26, 2006 Attack. PV2 Burrows died on November 26, 2006, as a result of injuries sustained during the attack.

748. PV2 Burrows was a U.S. national at the time of the attack and his death.

749. Plaintiff Charles O'Neal is the stepfather of PV2 Burrows and a U.S. national. Mr. O'Neal lived in the same household as PV2 Burrows for a substantial period of time and considered PV2 Burrows the functional equivalent of a biological son.

750. As a result of the November 26, 2006 Attack and PV2 Burrows' injuries and death, each member of the Burrows family has experienced severe mental anguish, emotional pain and suffering, and the loss of PV2 Burrows' society, companionship, and counsel.

751. As a result of the November 26, 2006 Attack, PV2 Burrows was injured in his person and/or property. The Plaintiff members of the Burrows family are the survivors and/or heirs of PV2 Burrows and are entitled to recover for the damages PV2 Burrows sustained.

**The December 2, 2006 IED Attack in Baghdad (Fiscus Family)**

752. On December 2, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "December 2, 2006 Attack"). The attack was planned and authorized by Hezbollah.

753. The December 2, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

754. **Sergeant Keith Fiscus** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Fiscus was injured in the December 2, 2006 Attack. SGT Fiscus died on December 2, 2006, as a result of injuries sustained during the attack.

755. SGT Fiscus was a U.S. national at the time of the attack and his death.

756. Plaintiff Jordan Fiscus is the brother of SGT Fiscus and a U.S. national.

757. As a result of the December 2, 2006 Attack and SGT Fiscus' injuries and death, each member of the Fiscus family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Fiscus' society, companionship, and counsel.

758. As a result of the December 2, 2006 Attack, SGT Fiscus was injured in his person and/or property. The Plaintiff members of the Fiscus family are the survivors and/or heirs of SGT Fiscus and are entitled to recover for the damages SGT Fiscus sustained.

**The December 10, 2006 EFP Attack in Baghdad (Murphy Family)**

759. On December 10, 2006, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Baghdad Governorate, Iraq (the "December 10, 2006 EFP Attack"). The attack was planned and authorized by Hezbollah.

760. The December 10, 2006 EFP Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

761. **Specialist Shawn Murphy** served in Iraq as a member of the U.S. Army at the time of the attack. SPC Murphy was injured in the December 10, 2006 EFP Attack. SPC Murphy died on December 10, 2006, as a result of injuries sustained during the attack.

762. SPC Murphy was a U.S. national at the time of the attack and his death.

763. Plaintiff Malia Bond is the sister of SPC Murphy and a U.S. national.

764. As a result of the December 10, 2006 EFP Attack and SPC Murphy's injuries and death, each member of the Murphy family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Murphy's society, companionship, and counsel.

765. As a result of the December 10, 2006 EFP Attack, SPC Murphy was injured in his person and/or property. The Plaintiff members of the Murphy family are the survivors and/or heirs of SPC Murphy and are entitled to recover for the damages SPC Murphy sustained.

**The December 10, 2006 IED Attack in Baghdad (Steinbacher Family)**

766. On December 10, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "December 10, 2006 IED Attack"). The attack was planned and authorized by Hezbollah.

767. The December 10, 2006 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

768. **Specialist Nicholas Steinbacher** served in Iraq as a member of the U.S. Army at the time of the attack. SPC Steinbacher was injured in the December 10, 2006 IED Attack. SPC Steinbacher died on December 10, 2006, as a result of injuries sustained during the attack.

769. SPC Steinbacher was a U.S. national at the time of the attack and his death.

770. Plaintiff Carolyn Steinbacher is the mother of SPC Steinbacher and a U.S. national.

771. Plaintiff Paul Steinbacher is the father of SPC Steinbacher and a U.S. national.

772. As a result of the December 10, 2006 IED Attack and SPC Steinbacher's injuries and death, each member of the Steinbacher family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Steinbacher's society, companionship, and counsel.

773. As a result of the December 10, 2006 IED Attack, SPC Steinbacher was injured in his person and/or property. The Plaintiff members of the Steinbacher family are the survivors and/or heirs of SPC Steinbacher and are entitled to recover for the damages SPC Steinbacher sustained.

**The December 20, 2006 IED Attack in Baghdad (Dykman Family)**

774. On December 20, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "December 20, 2006 Attack"). The attack was planned and authorized by Hezbollah.

775. The December 20, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

776. **Sergeant Scott Dykman** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Dykman was injured in the December 20, 2006 Attack. SGT Dykman died on December 20, 2006, as a result of injuries sustained during the attack.

777. SGT Dykman was a U.S. national at the time of the attack and his death.

778. Plaintiff Chantelle Russell is the widow of SGT Dykman and a U.S. national.

779. Plaintiff Douglas Dykman is the father of SGT Dykman and a U.S. national.

780. Plaintiff Janice Johnson is the stepmother of SGT Dykman and a U.S. national. Ms. Johnson lived in the same household as SGT Dykman for a substantial period of time and considered SGT Dykman the functional equivalent of a biological son.

781. As a result of the December 20, 2006 Attack and SGT Dykman's injuries and death, each member of the Dykman family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Dykman's society, companionship, and counsel.

782. As a result of the December 20, 2006 Attack, SGT Dykman was injured in his person and/or property. The Plaintiff members of the Dykman family are the survivors and/or heirs of SGT Dykman and are entitled to recover for the damages SGT Dykman sustained.

**The December 20, 2006 IED Attack in Baghdad (Volker Family)**

783. On December 20, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "December 20, 2006 IED Attack"). The attack was planned and authorized by Hezbollah.

784. The December 20, 2006 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

785. **Specialist Robert Volker** served in Iraq as a member of the U.S. Army at the time of the attack. SPC Volker was injured in the December 20, 2006 IED Attack. SPC Volker died on December 20, 2006, as a result of injuries sustained during the attack.

786. SPC Volker was a U.S. national at the time of the attack and his death.

787. Plaintiff Martha Volker is the widow of SPC Volker and a U.S. national.

788. As a result of the December 20, 2006 IED Attack and SPC Volker's injuries and death, each member of the Volker family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Volker's society, companionship, and counsel.

789. As a result of the December 20, 2006 IED Attack, SPC Volker was injured in his person and/or property. The Plaintiff members of the Volker family are the survivors and/or heirs of SPC Volker and are entitled to recover for the damages SPC Volker sustained.

**The December 21, 2006 IED Attack in Baghdad (Ferris Butler)**

790. On December 21, 2006, Jaysh al-Mahdi committed an IED attack in Yusufiyah, Baghdad Governorate, Iraq (the "December 21, 2006 Attack"). The attack was planned and authorized by Hezbollah.

791. The December 21, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

792. **Captain Ferris Butler** served in Iraq as a member of the U.S. Army at the time of the attack. The December 21, 2006 Attack severely wounded CPT Butler, who suffered from severe lower extremity injuries, including bilateral tibia and fibula compound fractures, shattered ankles, multiple foot fractures, and severe lower leg nerve damage, which lead to at least 52 surgeries (over year and a half period) trying to save his feet, including removing and transplanting his left latissimus dorsi (back muscle) and several upper leg skin grafts. Ultimately, CPT Butler had bilateral below knee amputations of both feet. Due to blood clots CPT Butler had an IVC filter placed in his chest that wasn't able to be extracted during an attempted removal procedure, and will likely have to be removed later in life through an invasive open chest surgery. CPT Butler also sustained lower back injuries, minor facial shrapnel injuries, and a broken finger.

793. Plaintiff CPT Butler was a U.S. national at the time of the attack and remains one today.

794. As a result of the December 21, 2006 Attack and his injuries, CPT Butler has experienced severe physical and emotional pain and suffering.

**<u>The December 27, 2006 IED Attack in Baghdad (Given Family)</u>**

795. On December 27, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "December 27, 2006 Attack"). The attack was planned and authorized by Hezbollah.

796. The December 27, 2006 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

797. **Private First Class Nathaniel Given** served in Iraq as a member of the U.S. Army at the time of the attack. PFC Given was injured in the December 27, 2006 Attack. PFC Given died on December 27, 2006, as a result of injuries sustained during the attack.

798. PFC Given was a U.S. national at the time of the attack and his death.

799. Plaintiff Floyd Given is the father of PFC Given and a U.S. national.

800. As a result of the December 27, 2006 Attack and PFC Given's injuries and death, each member of the Given family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Given's society, companionship, and counsel.

801. As a result of the December 27, 2006 Attack, PFC Given was injured in his person and/or property. The Plaintiff members of the Given family are the survivors and/or heirs of PFC Given and are entitled to recover for the damages PFC Given sustained.

**The December 27, 2006 IED Attack in Baghdad (McCormick Family)**

802. On December 27, 2006, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "December 27, 2006 IED Attack"). The attack was planned and authorized by Hezbollah.

803. The December 27, 2006 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

804. **Private First Class Clinton McCormick** served in Iraq as a member of the U.S. Army at the time of the attack. PFC McCormick was injured in the December 27, 2006 IED Attack. PFC McCormick died on December 27, 2006, as a result of injuries sustained during the attack.

805. PFC McCormick was a U.S. national at the time of the attack and his death.

806. Plaintiff Daniel McCormick is the brother of PFC McCormick and a U.S. national.

807. As a result of the December 27, 2006 IED Attack and PFC McCormick's injuries and death, each member of the McCormick family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC McCormick's society, companionship, and counsel.

808. As a result of the December 27, 2006 IED Attack, PFC McCormick was injured in his person and/or property. The Plaintiff members of the McCormick family are the survivors and/or heirs of PFC McCormick and are entitled to recover for the damages PFC McCormick sustained.

**The January 24, 2007 Sniper Attack in Baghdad (Leija Family)**

809. On January 24, 2007, Jaysh al-Mahdi committed a sniper attack in Baghdad Governorate, Iraq (the "January 24, 2007 Attack"). The attack was planned and authorized by Hezbollah.

810. The January 24, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

811. **Staff Sergeant Hector Leija** served in Iraq as a member of the U.S. Army at the time of the attack. SSG Leija was injured in the January 24, 2007 Attack. SSG Leija died on January 24, 2007, as a result of injuries sustained during the attack.

812. SSG Leija was a U.S. national at the time of the attack and his death.

813. Plaintiff Manuela Leija is the mother of SSG Leija and a U.S. national.

814. Plaintiff Domingo Leija is the father of SSG Leija and a U.S. national.

815. Plaintiff Domingo Leija Jr. is the brother of SSG Leija and a U.S. national.

816. Plaintiff Ramiro Leija is the brother of SSG Leija and a U.S. national.

817. Plaintiff Robert Leija is the brother of SSG Leija and a U.S. national.

818. As a result of the January 24, 2007 Attack and SSG Leija's injuries and death, each member of the Leija family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Leija's society, companionship, and counsel.

819. As a result of the January 24, 2007 Attack, SSG Leija was injured in his person and/or property. The Plaintiff members of the Leija family are the survivors and/or heirs of SSG Leija and are entitled to recover for the damages SSG Leija sustained.

**The February 4, 2007 IED Attack in Baghdad (Matheny Family)**

820. On February 4, 2007, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "February 4, 2007 Attack"). The attack was planned and authorized by Hezbollah.

821. The February 4, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

822. **Sergeant Randy Matheny** served in Iraq as a member of the U.S. Army National Guard at the time of the attack. SGT Matheny was injured in the February 4, 2007 Attack. SGT Matheny died on February 4, 2007, as a result of injuries sustained during the attack.

823. SGT Matheny was a U.S. national at the time of the attack and his death.

824. Plaintiff Jan Collins is the mother of SGT Matheny and a U.S. national.

825. Plaintiff Gary Matheny is the father of SGT Matheny and a U.S. national.

826. Plaintiff Karen Matheny is the sister of SGT Matheny and a U.S. national.

827. Plaintiff Paul Matheny is the brother of SGT Matheny and a U.S. national.

828. As a result of the February 4, 2007 Attack and SGT Matheny's injuries and death, each member of the Matheny family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Matheny's society, companionship, and counsel.

829. As a result of the February 4, 2007 Attack, SGT Matheny was injured in his person and/or property. The Plaintiff members of the Matheny family are the survivors and/or heirs of SGT Matheny and are entitled to recover for the damages SGT Matheny sustained.

**The February 19, 2007 IED Attack in Baghdad (Dunkin Family)**

830. On February 19, 2007, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "February 19, 2007 Attack"). The attack was planned and authorized by Hezbollah.

831. The February 19, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

832. **Sergeant Shawn Dunkin** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Dunkin was injured in the February 19, 2007 Attack. SGT Dunkin died on February 19, 2007, as a result of injuries sustained during the attack.

833. SGT Dunkin was a U.S. national at the time of the attack and his death.

834. Plaintiff Ashley Dunkin is the widow of SGT Dunkin and a U.S. national.

835. As a result of the February 19, 2007 Attack and SGT Dunkin's injuries and death, each member of the Dunkin family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Dunkin's society, companionship, and counsel.

836. As a result of the February 19, 2007 Attack, SGT Dunkin was injured in his person and/or property. The Plaintiff members of the Dunkin family are the survivors and/or heirs of SGT Dunkin and are entitled to recover for the damages SGT Dunkin sustained.

**The March 7, 2007 IED Attack in Baghdad (Webb Family)**

837. On March 7, 2007, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "March 7, 2007 Attack"). The attack was planned and authorized by Hezbollah.

838. The March 7, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

839. **Staff Sergeant Christopher Webb** served in Iraq as a member of the U.S. Army at the time of the attack. SSG Webb was injured in the March 7, 2007 Attack. SSG Webb died on March 7, 2007, as a result of injuries sustained during the attack.

840. SSG Webb was a U.S. national at the time of the attack and his death.

841. Plaintiff Shalan Webb is the widow of SSG Webb and a U.S. national.

842. As a result of the March 7, 2007 Attack and SSG Webb's injuries and death, each member of the Webb family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Webb's society, companionship, and counsel.

843. As a result of the March 7, 2007 Attack, SSG Webb was injured in his person and/or property. The Plaintiff members of the Webb family are the survivors and/or heirs of SSG Webb and are entitled to recover for the damages SSG Webb sustained.

**The March 13, 2007 IED Attack in Baghdad (Carr Family)**

844. On March 13, 2007, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "March 13, 2007 Attack"). The attack was planned and authorized by Hezbollah.

845. The March 13, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

846. **Sergeant Robert Carr** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Carr was injured in the March 13, 2007 Attack. SGT Carr died on March 13, 2007, as a result of injuries sustained during the attack.

847. SGT Carr was a U.S. national at the time of the attack and his death.

848. Plaintiff Christine Wortman is the mother of SGT Carr and a U.S. national.

849. Plaintiff Jennifer Dengel is the sister of SGT Carr and a U.S. national.

850. Plaintiff Rachel Miller is the sister of SGT Carr and a U.S. national.

851. As a result of the March 13, 2007 Attack and SGT Carr's injuries and death, each member of the Carr family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Carr's society, companionship, and counsel.

852. As a result of the March 13, 2007 Attack, SGT Carr was injured in his person and/or property. The Plaintiff members of the Carr family are the survivors and/or heirs of SGT Carr and are entitled to recover for the damages SGT Carr sustained.

**The March 15, 2007 EFP Attack in Baghdad (Prater Family)**

853. On March 15, 2007, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Baghdad Governorate, Iraq (the "March 15, 2007 Attack"). The attack was planned and authorized by Hezbollah.

854. The March 15, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

855. **Staff Sergeant Terry Prater** served in Iraq as a member of the U.S. Army at the time of the attack. SSG Prater was injured in the March 15, 2007 Attack. SSG Prater died on March 15, 2007, as a result of injuries sustained during the attack.

856. SSG Prater was a U.S. national at the time of the attack and his death.

857. Plaintiff Madisen Prater is the daughter of SSG Prater and a U.S. national.

858. Plaintiff Cheryl Hurley is the mother of SSG Prater and a U.S. national.

859. Plaintiff Shane Prater is the brother of SSG Prater and a U.S. national.

860. As a result of the March 15, 2007 Attack and SSG Prater's injuries and death, each member of the Prater family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Prater's society, companionship, and counsel.

861. As a result of the March 15, 2007 Attack, SSG Prater was injured in his person and/or property. The Plaintiff members of the Prater family are the survivors and/or heirs of SSG Prater and are entitled to recover for the damages SSG Prater sustained.

**The March 20, 2007 IED Attack in Baghdad (Richardson Family)**

862. On March 20, 2007, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "March 20, 2007 Attack"). The attack was planned and authorized by Hezbollah.

863. The March 20, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

864. **Specialist Stephen Richardson** served in Iraq as a member of the U.S. Army at the time of the attack. SPC Richardson was injured in the March 20, 2007 Attack. SPC Richardson died on March 20, 2007, as a result of injuries sustained during the attack.

865. SPC Richardson was a U.S. national at the time of the attack and his death.

866. Plaintiff Katana Richardson is the widow of SPC Richardson and a U.S. national.

867. Plaintiff Iyana Richardson is the daughter of SPC Richardson and a U.S. national.

868. Plaintiff Stephen Richardson Jr. is the son of SPC Richardson and a U.S. national.

869. As a result of the March 20, 2007 Attack and SPC Richardson's injuries and death, each member of the Richardson family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Richardson's society, companionship, and counsel.

870. As a result of the March 20, 2007 Attack, SPC Richardson was injured in his person and/or property. The Plaintiff members of the Richardson family are the survivors and/or heirs of SPC Richardson and are entitled to recover for the damages SPC Richardson sustained.

**The March 31, 2007 IED Attack in Baghdad (Arnette Family)**

871. On March 31, 2007, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "March 31, 2007 Attack"). The attack was planned and authorized by Hezbollah.

872. The March 31, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

873. **Staff Sergeant Jason Arnette** served in Iraq as a member of the U.S. Army at the time of the attack. SSG Arnette was injured in the March 31, 2007 Attack. SSG Arnette died on April 1, 2007, as a result of injuries sustained during the attack.

874. SSG Arnette was a U.S. national at the time of the attack and his death.

875. Plaintiff Shenandoah Arnette is the widow of SSG Arnette and a U.S. national.

876. As a result of the March 31, 2007 Attack and SSG Arnette's injuries and death, each member of the Arnette family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Arnette's society, companionship, and counsel.

877. As a result of the March 31, 2007 Attack, SSG Arnette was injured in his person and/or property. The Plaintiff members of the Arnette family are the survivors and/or heirs of SSG Arnette and are entitled to recover for the damages SSG Arnette sustained.

**The April 8, 2007 Indirect Fire Attack in Al Qadisiyah (Kennedy Family)**

878. On April 8, 2007, Jaysh al-Mahdi committed an indirect fire attack in Al Diwaniyah, Al Qadisiyah Governorate, Iraq (the "April 8, 2007 Attack"). The attack was planned and authorized by Hezbollah.

879. The April 8, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

880. **Sergeant Adam Kennedy** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Kennedy was injured in the April 8, 2007 Attack. SGT Kennedy died on April 8, 2007, as a result of injuries sustained during the attack.

881. SGT Kennedy was a U.S. national at the time of the attack and his death.

882. Plaintiff Colin Kennedy is the brother of SGT Kennedy and a U.S. national.

883. As a result of the April 8, 2007 Attack and SGT Kennedy's injuries and death, each member of the Kennedy family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Kennedy's society, companionship, and counsel.

884. As a result of the April 8, 2007 Attack, SGT Kennedy was injured in his person and/or property. The Plaintiff members of the Kennedy family are the survivors and/or heirs of SGT Kennedy and are entitled to recover for the damages SGT Kennedy sustained.

**The April 12, 2007 IED Attack in Baghdad (Lindsey Family)**

885. On April 12, 2007, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "April 12, 2007 Attack"). The attack was planned and authorized by Hezbollah.

886. The April 12, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

887. **Corporal James Lindsey** served in Iraq as a member of the U.S. Army at the time of the attack. CPL Lindsey was injured in the April 12, 2007 Attack. CPL Lindsey died on April 12, 2007, as a result of injuries sustained during the attack.

888. CPL Lindsey was a U.S. national at the time of the attack and his death.

889. Plaintiff Michelle Lindsey is the widow of CPL Lindsey and a U.S. national.

890. As a result of the April 12, 2007 Attack and CPL Lindsey's injuries and death, each member of the Lindsey family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Lindsey's society, companionship, and counsel.

891. As a result of the April 12, 2007 Attack, CPL Lindsey was injured in his person and/or property. The Plaintiff members of the Lindsey family are the survivors and/or heirs of CPL Lindsey and are entitled to recover for the damages CPL Lindsey sustained.

**The April 16, 2007 IED Attack in Baghdad (Genevie Family)**

892. On April 16, 2007, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "April 16, 2007 IED Attack"). The attack was planned and authorized by Hezbollah.

893. The April 16, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

894. **Specialist Aaron Genevie** served in Iraq as a member of the U.S. Army at the time of the attack. SPC Genevie was injured in the April 16, 2007 IED Attack. SPC Genevie died on April 16, 2007, as a result of injuries sustained during the attack.

895. SPC Genevie was a U.S. national at the time of the attack and his death.

896. Plaintiff Leslie Genevie is the sister of SPC Genevie and a U.S. national.

897. As a result of the April 16, 2007 IED Attack and SPC Genevie's injuries and death, each member of the Genevie family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Genevie's society, companionship, and counsel.

898. As a result of the April 16, 2007 IED Attack, SPC Genevie was injured in his person and/or property. The Plaintiff members of the Genevie family are the survivors and/or heirs of SPC Genevie and are entitled to recover for the damages SPC Genevie sustained.

**The April 16, 2007 EFP Attack in Baghdad (Starcevich Family)**

899. On April 16, 2007, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in the Al Rashid District in Baghdad Governorate, Iraq (the "April 16, 2007 EFP Attack"). The attack was planned and authorized by Hezbollah.

900. The April 16, 2007 EFP Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

901. **Specialist Lucas Starcevich** served in Iraq as a member of the U.S. Army at the time of the attack. SPC Starcevich was injured in the April 16, 2007 EFP Attack. SPC Starcevich died on April 16, 2007, as a result of injuries sustained during the attack.

902. SPC Starcevich was a U.S. national at the time of the attack and his death.

903. Plaintiff Ava Tomson is the mother of SPC Starcevich and a U.S. national.

904. Plaintiff Richard Tomson is the stepfather of SPC Starcevich and a U.S. national. Mr. Tomson lived in the same household as SPC Starcevich for a substantial period of time and considered SPC Starcevich the functional equivalent of a biological son.

905. As a result of the April 16, 2007 EFP Attack and SPC Starcevich's injuries and death, each member of the Starcevich family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Starcevich's society, companionship, and counsel.

906. As a result of the April 16, 2007 EFP Attack, SPC Starcevich was injured in his person and/or property. The Plaintiff members of the Starcevich family are the survivors and/or heirs of SPC Starcevich and are entitled to recover for the damages SPC Starcevich sustained.

**The April 29, 2007 EFP Attack in Baghdad (Funcheon Family)**

907. On April 29, 2007, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Baghdad Governorate, Iraq (the "April 29, 2007 Attack"). The attack was planned and authorized by Hezbollah.

908. The April 29, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

909. **Sergeant Alexander Funcheon** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Funcheon was injured in the April 29, 2007 Attack. SGT Funcheon died on April 29, 2007, as a result of injuries sustained during the attack.

910. SGT Funcheon was a U.S. national at the time of the attack and his death.

911. Plaintiff Karen Funcheon is the mother of SGT Funcheon and a U.S. national.

912. Plaintiff Robert Funcheon is the father of SGT Funcheon and a U.S. national.

913. As a result of the April 29, 2007 Attack and SGT Funcheon's injuries and death, each member of the Funcheon family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Funcheon's society, companionship, and counsel.

914. As a result of the April 29, 2007 Attack, SGT Funcheon was injured in his person and/or property. The Plaintiff members of the Funcheon family are the survivors and/or heirs of SGT Funcheon and are entitled to recover for the damages SGT Funcheon sustained.

**The May 4, 2007 IED Attack in Baghdad (Guyton Family)**

915. On May 4, 2007, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "May 4, 2007 Attack"). The attack was planned and authorized by Hezbollah.

916. The May 4, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

917. **Private First Class Larry Guyton** served in Iraq as a member of the U.S. Army at the time of the attack. PFC Guyton was injured in the May 4, 2007 Attack. PFC Guyton died on May 5, 2007, as a result of injuries sustained during the attack.

918. PFC Guyton was a U.S. national at the time of the attack and his death.

919. Plaintiff Tonya Guyton is the widow of PFC Guyton and a U.S. national.

920. Plaintiff Jaidyn Guyton is the son of PFC Guyton and a U.S. national.

921. Plaintiff Kenyon Guyton is the son of PFC Guyton and a U.S. national.

922. Plaintiff Andrea McDonald is the mother of PFC Guyton and a U.S. national.

923. Plaintiff Larry Guyton Sr. is the father of PFC Guyton and a U.S. national.

924. As a result of the May 4, 2007 Attack and PFC Guyton's injuries and death, each member of the Guyton family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Guyton's society, companionship, and counsel.

925. As a result of the May 4, 2007 Attack, PFC Guyton was injured in his person and/or property. The Plaintiff members of the Guyton family are the survivors and/or heirs of PFC Guyton and are entitled to recover for the damages PFC Guyton sustained.

**The May 8, 2007 EFP Attack in Diyala (Little Family)**

926. On May 8, 2007, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Diyala Governorate, Iraq (the "May 8, 2007 Attack"). The attack was planned and authorized by Hezbollah.

927. The May 8, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

928. **Specialist Kyle Little** served in Iraq as a member of the U.S. Army at the time of the attack. SPC Little was injured in the May 8, 2007 Attack. SPC Little died on May 8, 2007, as a result of injuries sustained during the attack.

929. SPC Little was a U.S. national at the time of the attack and his death.

930. Plaintiff Tiffany Little is the widow of SPC Little and a U.S. national.

931. Plaintiff Kylee Little is the daughter of SPC Little and a U.S. national.

932. Plaintiff Dakota Smith-Lizotte is the brother of SPC Little and a U.S. national.

933. As a result of the May 8, 2007 Attack and SPC Little's injuries and death, each member of the Little family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Little's society, companionship, and counsel.

934. As a result of the May 8, 2007 Attack, SPC Little was injured in his person and/or property. The Plaintiff members of the Little family are the survivors and/or heirs of SPC Little and are entitled to recover for the damages SPC Little sustained.

**The May 14, 2007 Complex Attack in Baghdad (Dunckley Family)**

935. On May 14, 2007, Jaysh al-Mahdi committed a complex attack involving small arms fire and IEDs in Salman Pak, Baghdad Governorate, Iraq (the "May 14, 2007 Attack"). The attack was planned and authorized by Hezbollah.

936. The May 14, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

937. **Sergeant Allen Dunckley** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Dunckley was injured in the May 14, 2007 Attack. SGT Dunckley died on May 14, 2007, as a result of injuries sustained during the attack.

938. SGT Dunckley was a U.S. national at the time of the attack and his death.

939. Plaintiff Jennifer Gable is the widow of SGT Dunckley and a U.S. national.

940. As a result of the May 14, 2007 Attack and SGT Dunckley's injuries and death, each member of the Dunckley family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Dunckley's society, companionship, and counsel.

941. As a result of the May 14, 2007 Attack, SGT Dunckley was injured in his person and/or property. The Plaintiff members of the Dunckley family are the survivors and/or heirs of SGT Dunckley and are entitled to recover for the damages SGT Dunckley sustained.

**The May 17, 2007 IED Attack in Babil (Fontanilla Family)**

942. On May 17, 2007, Jaysh al-Mahdi committed an IED attack in Iskandariya, Babil Governorate, Iraq (the "May 17, 2007 Attack"). The attack was planned and authorized by Hezbollah.

943. The May 17, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

944. **Specialist Victor Fontanilla** served in Iraq as a member of the U.S. Army at the time of the attack. SPC Fontanilla was injured in the May 17, 2007 Attack. SPC Fontanilla died on May 17, 2007, as a result of injuries sustained during the attack.

945. SPC Fontanilla was a U.S. national at the time of the attack and his death.

946. Plaintiff Noel Fontanilla is the widow of SPC Fontanilla and a U.S. national.

947. Plaintiff Frances Quichocho is the mother of SPC Fontanilla and a U.S. national.

948. Plaintiff Lee Castro is the brother of SPC Fontanilla and a U.S. national.

949. Plaintiff Christine Concepcion is the sister of SPC Fontanilla and a U.S. national.

950. Plaintiff Karissa Roselyn Quichocho is the sister of SPC Fontanilla and a U.S. national.

951. Plaintiff Ramon Quichocho Jr. is the stepfather of SPC Fontanilla and a U.S. national. Mr. Quichocho lived in the same household as SPC Fontanilla for a substantial period of time and considered SPC Fontanilla the functional equivalent of a biological son.

952. As a result of the May 17, 2007 Attack and SPC Fontanilla's injuries and death, each member of the Fontanilla family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Fontanilla's society, companionship, and counsel.

953. As a result of the May 17, 2007 Attack, SPC Fontanilla was injured in his person and/or property. The Plaintiff members of the Fontanilla family are the survivors and/or heirs of SPC Fontanilla and are entitled to recover for the damages SPC Fontanilla sustained.

**The May 29, 2007 EFP Attack in Baghdad (Hancock Family)**

954. On May 29, 2007, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Sadr City in Baghdad Governorate, Iraq (the "May 29, 2007 EFP Attack"). The attack was planned and authorized by Hezbollah.

955. The May 29, 2007 EFP Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

956. **Specialist Jerral Hancock** served in Iraq as a member of the U.S. Army at the time of the attack. The May 29, 2007 EFP Attack severely wounded SPC Hancock, who suffered from his left arm bring torn off above the shoulder, resulting in an amputation of the left arm, burns to 30% of his body, paralysis below the chest, a severed spinal cord, and lasting effects from shrapnel lodged in the spine.

957. SPC Hancock was a U.S. national at the time of the attack and remains one today.

958. Plaintiff Samantha Hancock is the sister of SPC Hancock and a U.S. national.

959. As a result of the May 29, 2007 EFP Attack and his injuries, Plaintiff members of the Hancock family have experienced severe physical and emotional pain and suffering.

**The May 29, 2007 IED Attack in Baghdad (Weiglein Family)**

960. On May 29, 2007, Jaysh al-Mahdi committed an IED attack in Ilbu Falris, Baghdad Governorate, Iraq (the "May 29, 2007 IED Attack"). The attack was planned and authorized by Hezbollah.

961. The May 29, 2007 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the

attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

962. **Staff Sergeant Joseph Weiglein** served in Iraq as a member of the U.S. Army at the time of the attack. SSG Weiglein was injured in the May 29, 2007 IED Attack. SSG Weiglein died on May 29, 2007, as a result of injuries sustained during the attack.

963. SSG Weiglein was a U.S. national at the time of the attack and his death.

964. Plaintiff Jennifer Matzen is the widow of SSG Weiglein and a U.S. national.

965. Plaintiff Ellen Weiglein is the mother of SSG Weiglein and a U.S. national.

966. As a result of the May 29, 2007 IED Attack and SSG Weiglein's injuries and death, each member of the Weiglein family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Weiglein's society, companionship, and counsel.

967. As a result of the May 29, 2007 IED Attack, SSG Weiglein was injured in his person and/or property. The Plaintiff members of the Weiglein family are the survivors and/or heirs of SSG Weiglein and are entitled to recover for the damages SSG Weiglein sustained.

**The June 3, 2007 IED Attack in Baghdad (Christopher Family)**

968. On June 3, 2007, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "June 3, 2007 Attack"). The attack was planned and authorized by Hezbollah.

969. The June 3, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

970. **Sergeant Caleb Christopher** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Christopher was injured in the June 3, 2007 Attack. SGT Christopher died on June 3, 2007, as a result of injuries sustained during the attack.

971. SGT Christopher was a U.S. national at the time of the attack and his death.

972. Plaintiff Sarah Simmons is the sister of SGT Christopher and a U.S. national.

973. As a result of the June 3, 2007 Attack and SGT Christopher's injuries and death, each member of the Christopher family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Christopher's society, companionship, and counsel.

974. As a result of the June 3, 2007 Attack, SGT Christopher was injured in his person and/or property. The Plaintiff members of the Christopher family are the survivors and/or heirs of SGT Christopher and are entitled to recover for the damages SGT Christopher sustained.

**The June 4, 2007 Indirect Fire Attack in Baghdad (Fary Maldonado)**

975. On June 4, 2007, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an indirect fire attack in Baghdad Governorate, Iraq (the "June 4, 2007 Attack"). The attack was planned and authorized by Hezbollah.

976. The June 4, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

977. **Specialist Fary Maldonado** served in Iraq as a member of the U.S. Army at the time of the attack. The June 4, 2007 Attack severely wounded SPC Maldonado, who suffered from blast exposure, resulting in head and lower back injuries, TBI, and PTSD. The attack was classified as Stressor #1 for his PTSD in his VA file.

978. Plaintiff SPC Maldonado was a U.S. national at the time of the attack and remains one today.

979. As a result of the June 4, 2007 Attack and his injuries, SPC Maldonado has experienced severe physical and emotional pain and suffering.

**The June 5, 2007 EFP Attack in Kirkuk (Balmer and Kuglics Families)**

980. On June 5, 2007, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Kirkuk Governorate, Iraq (the "June 5, 2007 Attack"). The attack was planned and authorized by Hezbollah.

981. The June 5, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

982. **Technical Sergeant Ryan Balmer** served in Iraq as a member of the U.S. Air Force at the time of the attack. TSgt Balmer was injured in the June 5, 2007 Attack. TSgt Balmer died on June 5, 2007, as a result of injuries sustained during the attack.

983. TSgt Balmer was a U.S. national at the time of the attack and his death.

984. Plaintiff Danielle Sweet is the widow of TSgt Balmer and a U.S. national. She brings claims in her individual capacity and in her representative capacity on behalf of Ryan Balmer's estate.

985. Plaintiff Anthony Balmer is the son of TSgt Balmer and a U.S. national.

986. Plaintiff Gabrielle Balmer is the daughter of TSgt Balmer and a U.S. national.

987. Plaintiff Mark Balmer is the brother of TSgt Balmer and a U.S. national.

988. As a result of the June 5, 2007 Attack and TSgt Balmer's injuries and death, each member of the Balmer family has experienced severe mental anguish, emotional pain and suffering, and the loss of TSgt Balmer's society, companionship, and counsel.

989. As a result of the June 5, 2007 Attack, TSgt Balmer was injured in his person and/or property. The Plaintiff members of the Balmer family are the survivors and/or heirs of TSgt Balmer and are entitled to recover for the damages TSgt Balmer sustained.

990. **Staff Sergeant Matthew Kuglics** served in Iraq as a member of the U.S. Air Force at the time of the attack. SSgt Kuglics was injured in the June 5, 2007 Attack. SSgt Kuglics died on June 5, 2007, as a result of injuries sustained during the attack.

991. SSgt Kuglics was a U.S. national at the time of the attack and his death.

992. Plaintiff Emily Adams is the sister of SSgt Kuglics and a U.S. national.

993. As a result of the June 5, 2007 Attack and SSgt Kuglics' injuries and death, each member of the Kuglics family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt Kuglics' society, companionship, and counsel.

994. As a result of the June 5, 2007 Attack, SSgt Kuglics was injured in his person and/or property. The Plaintiff members of the Kuglics family are the survivors and/or heirs of SSgt Kuglics and are entitled to recover for the damages SSgt Kuglics sustained.

**<u>The June 14, 2007 EFP Attack in Al Qadisiyah (Parker Family)</u>**

995. On June 14, 2007, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack at Camp Scania, near the city of Nippur in Al Qadisiyah Governorate, Iraq (the "June 14, 2007 Attack"). The attack was planned and authorized by Hezbollah.

996. The June 14, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

997. **Sergeant Richard Parker** served in Iraq as a member of the U.S. Army National Guard at the time of the attack. SGT Parker was injured in the June 14, 2007 Attack. SGT Parker died on June 14, 2007, as a result of injuries sustained during the attack.

998. SGT Parker was a U.S. national at the time of the attack and his death.

999. Plaintiff Scott Hood is the father of SGT Parker and a U.S. national.

1000. Plaintiff Stephanie Hood Atherton is the sister of SGT Parker and a U.S. national.

1001. Plaintiff Flora Hood is the stepmother of SGT Parker and a U.S. national. Ms. Hood lived in the same household as SGT Parker for a substantial period of time and considered SGT Parker the functional equivalent of a biological stepson.

1002. As a result of the June 14, 2007 Attack and SGT Parker's injuries and death, each member of the Parker family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Parker's society, companionship, and counsel.

1003. As a result of the June 14, 2007 Attack, SGT Parker was injured in his person and/or property. The Plaintiff members of the Parker family are the survivors and/or heirs of SGT Parker and are entitled to recover for the damages SGT Parker sustained.

**The June 16, 2007 IED Attack in Baghdad (Grass Family)**

1004. On June 16, 2007, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "June 16, 2007 Attack"). The attack was planned and authorized by Hezbollah.

1005. The June 16, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1006. **Corporal Zachary Grass** served in Iraq as a member of the U.S. Army at the time of the attack. CPL Grass was injured in the June 16, 2007 Attack. CPL Grass died on June 16, 2007, as a result of injuries sustained during the attack.

1007. CPL Grass was a U.S. national at the time of the attack and his death.

1008. Plaintiff Patricia Grass is the mother of CPL Grass and a U.S. national.

1009. Plaintiff Franklin Grass is the father of CPL Grass and a U.S. national.

1010. As a result of the June 16, 2007 Attack and CPL Grass' injuries and death, each member of the Grass family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Grass' society, companionship, and counsel.

1011. As a result of the June 16, 2007 Attack, CPL Grass was injured in his person and/or property. The Plaintiff members of the Grass family are the survivors and/or heirs of CPL Grass and are entitled to recover for the damages CPL Grass sustained.

**<u>The June 21, 2007 Rocket Propelled Grenade Attack in Baghdad (Clifton Family)</u>**

1012. On June 21, 2007, Jaysh al-Mahdi committed a rocket propelled grenade attack in Baghdad Governorate, Iraq (the "June 21, 2007 Attack"). The attack was planned and authorized by Hezbollah.

1013. The June 21, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1014. **Corporal Karen Clifton** served in Iraq as a member of the U.S. Army at the time of the attack. CPL Clifton was injured in the June 21, 2007 Attack. CPL Clifton died on June 21, 2007, as a result of injuries sustained during the attack.

1015. CPL Clifton was a U.S. national at the time of the attack and her death.

1016. Plaintiff Ora Clifton is the mother of CPL Clifton and a U.S. national.

1017. As a result of the June 21, 2007 Attack and CPL Clifton's injuries and death, each member of the Clifton family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Clifton's society, companionship, and counsel.

1018. As a result of the June 21, 2007 Attack, CPL Clifton was injured in her person and/or property. The Plaintiff members of the Clifton family are the survivors and/or heirs of CPL Clifton and are entitled to recover for the damages CPL Clifton sustained.

**The July 6, 2007 IED Attack in Baghdad (Lamie Family)**

1019. On July 6, 2007, Jaysh al-Mahdi committed an IED attack in Baghdad Governate, Iraq (the "July 6, 2007 IED Attack"). The attack was planned and authorized by Hezbollah.

1020. The July 6, 2007 IED Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1021. **Sergeant Gene Lamie** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Lamie was injured in the July 6, 2007 IED Attack. SGT Lamie died on July 6, 2007, as a result of injuries sustained during the attack.

1022. SGT Lamie was a U.S. national at the time of the attack and his death.

1023. Plaintiff John Lamie is the brother of SGT Lamie and a U.S. national.

1024. As a result of the July 6, 2007 IED Attack and SGT Lamie's injuries and death, each member of the Lamie family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Lamie's society, companionship, and counsel.

1025. As a result of the July 6, 2007 IED Attack, SGT Lamie was injured in his person and/or property. The Plaintiff members of the Lamie family are the survivors and/or heirs of SGT Lamie and are entitled to recover for the damages SGT Lamie sustained.

**The July 6, 2007 EFP Attack in Baghdad (McRill Family)**

1026. On July 6, 2007, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Karadah District in Baghdad Governorate, Iraq (the "July 6, 2007 EFP Attack"). The attack was planned and authorized by Hezbollah.

1027. The July 6, 2007 EFP Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1028. **Chief Petty Officer Robert McRill** served in Iraq as a member of the U.S. Navy at the time of the attack. CPO McRill was injured in the July 6, 2007 EFP Attack. CPO McRill died on July 6, 2007, as a result of injuries sustained during the attack.

1029. CPO McRill was a U.S. national at the time of the attack and his death.

1030. Plaintiff Brett Coke is the stepson of CPO McRill and a U.S. national. Mr. Coke lived in the same household as CPO McRill for a substantial period of time and considered CPO McRill the functional equivalent of a biological father.

1031. As a result of the July 6, 2007 EFP Attack and CPO McRill's injuries and death, each member of the McRill family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPO McRill's society, companionship, and counsel.

1032. As a result of the July 6, 2007 EFP Attack, CPO McRill was injured in his person and/or property. The Plaintiff members of the McRill family are the survivors and/or heirs of CPO McRill and are entitled to recover for the damages CPO McRill sustained.

**The July 6, 2007 IED Attack in Maysan (Salazar Family)**

1033. On July 6, 2007, Jaysh al-Mahdi committed an IED attack in Muhammad Sath, Maysan Governorate, Iraq (the "July 6, 2007 Maysan Attack"). The attack was planned and authorized by Hezbollah.

1034. The July 6, 2007 Maysan Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1035. **Private First Class Bruce Salazar Jr.** served in Iraq as a member of the U.S. Army at the time of the attack. PFC Salazar was injured in the July 6, 2007 Maysan Attack. PFC Salazar died on July 6, 2007, as a result of injuries sustained during the attack.

1036. PFC Salazar was a U.S. national at the time of the attack and his death.

1037. Plaintiff Margaret Johnson is the mother of PFC Salazar and a U.S. national.

1038. As a result of the July 6, 2007 Maysan Attack and PFC Salazar's injuries and death, each member of the Salazar family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Salazar's society, companionship, and counsel.

1039. As a result of the July 6, 2007 Maysan Attack, PFC Salazar was injured in his person and/or property. The Plaintiff members of the Salazar family are the survivors and/or heirs of PFC Salazar and are entitled to recover for the damages PFC Salazar sustained.

**The July 17, 2007 EFP Attack in Baghdad (Joshua Family)**

1040. On July 17, 2007, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Baghdad Governorate, Iraq (the "July 17, 2007 Attack"). The attack was planned and authorized by Hezbollah.

1041. The July 17, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1042. **Private First Class Ron Joshua Jr.** served in Iraq as a member of the U.S. Army at the time of the attack. PFC Joshua was injured in the July 17, 2007 Attack. PFC Joshua died on July 17, 2007, as a result of injuries sustained during the attack.

1043. PFC Joshua was a U.S. national at the time of the attack and his death.

1044. Plaintiff Ursula Joshua is the mother of PFC Joshua and a U.S. national.

1045. As a result of the July 17, 2007 Attack and PFC Joshua's injuries and death, each member of the Joshua family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Joshua's society, companionship, and counsel.

1046. As a result of the July 17, 2007 Attack, PFC Joshua was injured in his person and/or property. The Plaintiff members of the Joshua family are the survivors and/or heirs of PFC Joshua and are entitled to recover for the damages PFC Joshua sustained.

**The July 18, 2007 Complex Attack in Baghdad (Clouser and Gilmore Families)**

1047. On July 18, 2007, Jaysh al-Mahdi committed a complex attack involving an IED and small arms fire in Baghdad Governorate, Iraq (the "July 18, 2007 Attack"). The attack was planned and authorized by Hezbollah.

1048. The July 18, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1049. **Specialist Zachary Clouser** served in Iraq as a member of the U.S. Army at the time of the attack. SPC Clouser was injured in the July 18, 2007 Attack. SPC Clouser died on July 18, 2007, as a result of injuries sustained during the attack.

1050. SPC Clouser was a U.S. national at the time of the attack and his death.

1051. Plaintiff Ronald Etheridge Jr. is the stepbrother of SPC Clouser and a U.S. national. Mr. Etheridge lived in the same household as SPC Clouser for a substantial period of time and considered SPC Clouser the functional equivalent of a biological brother.

1052. As a result of the July 18, 2007 Attack and SPC Clouser's injuries and death, each member of the Clouser family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Clouser's society, companionship, and counsel.

1053. As a result of the July 18, 2007 Attack, SPC Clouser was injured in his person and/or property. The Plaintiff members of the Clouser family are the survivors and/or heirs of SPC Clouser and are entitled to recover for the damages SPC Clouser sustained.

1054. **Specialist Richard Gilmore III** served in Iraq as a member of the U.S. Army at the time of the attack. SPC Gilmore was injured in the July 18, 2007 Attack. SPC Gilmore died on July 18, 2007, as a result of injuries sustained during the attack.

1055. SPC Gilmore was a U.S. national at the time of the attack and his death.

1056. Plaintiff Richard Gilmore Jr. is the father of SPC Gilmore and a U.S. national.

1057. As a result of the July 18, 2007 Attack and SPC Gilmore's injuries and death, each member of the Gilmore family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Gilmore's society, companionship, and counsel.

1058. As a result of the July 18, 2007 Attack, SPC Gilmore was injured in his person and/or property. The Plaintiff members of the Gilmore family are the survivors and/or heirs of SPC Gilmore and are entitled to recover for the damages SPC Gilmore sustained.

**The July 31, 2007 Small Arms Attack in Baghdad (Maddies Family)**

1059. On July 31, 2007, Jaysh al-Mahdi committed a small arms attack in Baghdad Governorate, Iraq (the "July 31, 2007 Attack"). The attack was planned and authorized by Hezbollah.

1060. The July 31, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1061. **Sergeant Stephen Maddies** served in Iraq as a member of the U.S. Army National Guard at the time of the attack. SGT Maddies was injured in the July 31, 2007 Attack. SGT Maddies died on July 31, 2007, as a result of injuries sustained during the attack.

1062. SGT Maddies was a U.S. national at the time of the attack and his death.

1063. Plaintiff Megan Clement is the daughter of SGT Maddies and a U.S. national.

1064. Plaintiff Jenae Maddies is the daughter of SGT Maddies and a U.S. national.

1065. Plaintiff Vanessa Gutierrez is the sister of SGT Maddies and a U.S. national.

1066. As a result of the July 31, 2007 Attack and SGT Maddies' injuries and death, each member of the Maddies family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Maddies' society, companionship, and counsel.

1067. As a result of the July 31, 2007 Attack, SGT Maddies was injured in his person and/or property. The Plaintiff members of the Maddies family are the survivors and/or heirs of SGT Maddies and are entitled to recover for the damages SGT Maddies sustained.

**The August 8, 2007 IED Attack in Baghdad (Young Family)**

1068. On August 8, 2007, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "August 8, 2007 Attack"). The attack was planned and authorized by Hezbollah.

1069. The August 8, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1070. **Specialist Donald Young** served in Iraq as a member of the U.S. Army at the time of the attack. SPC Young was injured in the August 8, 2007 Attack. SPC Young died on August 8, 2007, as a result of injuries sustained during the attack.

1071. SPC Young was a U.S. national at the time of the attack and his death.

1072. Plaintiff Angelina Boyd is the sister of SPC Young and a U.S. national.

1073. As a result of the August 8, 2007 Attack and SPC Young's injuries and death, each member of the Young family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Young's society, companionship, and counsel.

1074. As a result of the August 8, 2007 Attack, SPC Young was injured in his person and/or property. The Plaintiff members of the Young family are the survivors and/or heirs of SPC Young and are entitled to recover for the damages SPC Young sustained.

**The August 15, 2007 Indirect Fire Attack in Baghdad (Samuels and Worthy-Walker Families)**

1075. On August 15, 2007, Jaysh al-Mahdi committed an indirect fire attack in Baghdad Governorate, Iraq (the "August 15, 2007 Attack"). The attack was planned and authorized by Hezbollah.

1076. The August 15, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1077. **Sergeant Princess Samuels** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Samuels was injured in the August 15, 2007 Attack. SGT Samuels died on August 15, 2007, as a result of injuries sustained during the attack.

1078. SGT Samuels was a U.S. national at the time of the attack and her death.

1079. Plaintiff Anika Samuels is the mother of SGT Samuels and a U.S. national.

1080. Plaintiff Jubriel Lawal is the brother of SGT Samuels and a U.S. national.

1081. As a result of the August 15, 2007 Attack and SGT Samuels' injuries and death, each member of the Samuels family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Samuels' society, companionship, and counsel.

1082. As a result of the August 15, 2007 Attack, SGT Samuels was injured in her person and/or property. The Plaintiff members of the Samuels family are the survivors and/or heirs of SGT Samuels and are entitled to recover for the damages SGT Samuels sustained.

1083. **Specialist Zandra Worthy-Walker** served in Iraq as a member of the U.S. Army at the time of the attack. SPC Worthy-Walker was injured in the August 15, 2007 Attack. SPC Worthy-Walker died on August 15, 2007, as a result of injuries sustained during the attack.

1084. SPC Worthy-Walker was a U.S. national at the time of the attack and her death.

1085. Plaintiff Kenneth Walker is the widower of SPC Worthy-Walker and a U.S. national.

1086. As a result of the August 15, 2007 Attack and SPC Worthy-Walker's injuries and death, each member of the Worthy-Walker family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Worthy-Walker's society, companionship, and counsel.

1087. As a result of the August 15, 2007 Attack, SPC Worthy-Walker was injured in her person and/or property. The Plaintiff members of the Worthy-Walker family are the survivors and/or heirs of SPC Worthy-Walker and are entitled to recover for the damages SPC Worthy-Walker sustained.

**The August 23, 2007 EFP Attack in Wasit (Hochstetler Family)**

1088. On August 23, 2007, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Wasit Governorate, Iraq (the "August 23, 2007 Attack"). The attack was planned and authorized by Hezbollah.

1089. The August 23, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1090. **Captain James Hochstetler** served in Iraq as a member of the U.S. Army at the time of the attack. The August 23, 2007 Attack severely wounded CPT Hochstetler, who suffered from a shrapnel wound that cut off his nose, TBI, migraines, PTSD, and injuries to the left side of the face, the left eye, the right forearm, and the right hand (causing numbness in the index finger).

1091. CPT Hochstetler was a U.S. national at the time of the attack and remains one today.

1092. Plaintiff Cynthia Hochstetler is the mother of CPT Hochstetler and a U.S. national.

1093. Plaintiff Martin Hochstetler is the father of CPT Hochstetler and a U.S. national.

1094. Plaintiff Jonathan Hochstetler is the brother of CPT Hochstetler and a U.S. national.

1095. Plaintiff Mark Hochstetler is the brother of CPT Hochstetler and a U.S. national.

1096. Plaintiff Noah Hochstetler is the brother of CPT Hochstetler and a U.S. national.

1097. As a result of the August 23, 2007 Attack and CPT Hochstetler's injuries, Plaintiff members of the Hochstetler family have experienced severe physical and emotional pain and suffering.

**<u>The September 5, 2007 Rocket Propelled Grenade Attack in Baghdad (Paredes Family)</u>**

1098. On September 5, 2007, Jaysh al-Mahdi committed a rocket propelled grenade attack in Baghdad Governorate, Iraq (the "September 5, 2007 Attack"). The attack was planned and authorized by Hezbollah.

1099. The September 5, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1100. **Corporal Javier Paredes** served in Iraq as a member of the U.S. Army at the time of the attack. CPL Paredes was injured in the September 5, 2007 Attack. CPL Paredes died on September 5, 2007, as a result of injuries sustained during the attack.

1101. CPL Paredes was a U.S. national at the time of the attack and his death.

1102. Plaintiff Gonzalo Paredes is the brother of CPL Paredes and a U.S. national.

1103. As a result of the September 5, 2007 Attack and CPL Paredes' injuries and death, each member of the Paredes family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Paredes' society, companionship, and counsel.

1104. As a result of the September 5, 2007 Attack, CPL Paredes was injured in his person and/or property. The Plaintiff members of the Paredes family are the survivors and/or heirs of CPL Paredes and are entitled to recover for the damages CPL Paredes sustained.

**The September 22, 2007 EFP Attack in Baghdad (Reeves Family)**

1105. On September 22, 2007, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Baghdad Governorate, Iraq (the "September 22, 2007 Attack"). The attack was planned and authorized by Hezbollah.

1106. The September 22, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1107. **Corporal Joshua Reeves** served in Iraq as a member of the U.S. Army at the time of the attack. CPL Reeves was injured in the September 22, 2007 Attack. CPL Reeves died on September 22, 2007, as a result of injuries sustained during the attack.

1108. CPL Reeves was a U.S. national at the time of the attack and his death.

1109. Michael Reeves was the brother of CPL Reeves and a U.S. national at the time of the attack and until his death on August 27, 2017.

1110. Plaintiff James Reeves is the father of CPL Reeves and Michael Reeves and a U.S. national. He brings claims in solely in his representative capacity on behalf of Michael Reeves's estate.

1111. As a result of the September 22, 2007 Attack and CPL Reeves' injuries and death, each member of the Reeves family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Reeves' society, companionship, and counsel.

1112. As a result of the September 22, 2007 Attack, CPL Reeves was injured in his person and/or property. The Plaintiff members of the Reeves family are the survivors and/or heirs of CPL Reeves and are entitled to recover for the damages CPL Reeves sustained.

**The September 29, 2007 Small Arms Attack in Baghdad (Ayres Family)**

1113. On September 29, 2007, Jaysh al-Mahdi committed a small arms attack in Baghdad Governorate, Iraq (the "September 29, 2007 Attack"). The attack was planned and authorized by Hezbollah.

1114. The September 29, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1115. **Sergeant Robert Ayres III** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Ayres was injured in the September 29, 2007 Attack. SGT Ayres died on September 29, 2007, as a result of injuries sustained during the attack.

1116. SGT Ayres was a U.S. national at the time of the attack and his death.

1117. Plaintiff Michelle Ayres is the mother of SGT Ayres and a U.S. national.

1118. As a result of the September 29, 2007 Attack and SGT Ayres' injuries and death, each member of the Ayres family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Ayres' society, companionship, and counsel.

1119. As a result of the September 29, 2007 Attack, SGT Ayres was injured in his person and/or property. The Plaintiff members of the Ayres family are the survivors and/or heirs of SGT Ayres and are entitled to recover for the damages SGT Ayres sustained.

**The October 10, 2007 Rocket Attack in Baghdad (Clamens Family)**

1120. On October 10, 2007, Jaysh al-Mahdi committed a rocket attack in Baghdad Governorate, Iraq (the "October 10, 2007 Attack"). The attack was planned and authorized by Hezbollah.

1121. The October 10, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1122. **Staff Sergeant Lillian Clamens** served in Iraq as a member of the U.S. Army at the time of the attack. SSG Clamens was injured in the October 10, 2007 Attack. SSG Clamens died on October 10, 2007, as a result of injuries sustained during the attack.

1123. SSG Clamens was a U.S. national at the time of the attack and her death.

1124. Plaintiff Ayinde Williams is the son of SSG Clamens and a U.S. national.

1125. As a result of the October 10, 2007 Attack and SSG Clamens' injuries and death, each member of the Clamens family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Clamens' society, companionship, and counsel.

1126. As a result of the October 10, 2007 Attack, SSG Clamens was injured in her person and/or property. The Plaintiff members of the Clamens family are the survivors and/or heirs of SSG Clamens and are entitled to recover for the damages SSG Clamens sustained.

**The October 25, 2007 IED Attack in Baghdad (Banks Family)**

1127. On October 25, 2007, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "October 25, 2007 Attack"). The attack was planned and authorized by Hezbollah.

1128. The October 25, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1129. **Sergeant Derek Banks Sr.** served in Iraq as a member of the U.S. Army National Guard at the time of the attack. SGT Banks was injured in the October 25, 2007 Attack. SGT Banks died on November 14, 2007, as a result of injuries sustained during the attack.

1130. SGT Banks was a U.S. national at the time of the attack and his death.

1131. Plaintiff Sheena Banks-West is the widow of SGT Banks and a U.S. national.

1132. Plaintiff Derek Banks-West Jr. is the son of SGT Banks and a U.S. national.

1133. As a result of the October 25, 2007 Attack and SGT Banks' injuries and death, each member of the Banks family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Banks' society, companionship, and counsel.

1134. As a result of the October 25, 2007 Attack, SGT Banks was injured in his person and/or property. The Plaintiff members of the Banks family are the survivors and/or heirs of SGT Banks and are entitled to recover for the damages SGT Banks sustained.

**The November 12, 2007 Small Arms Attack in Baghdad (Vanek Family)**

1135. On November 12, 2007, Jaysh al-Mahdi committed a small arms attack in Baghdad Governorate, Iraq (the "November 12, 2007 Attack"). The attack was planned and authorized by Hezbollah.

1136. The November 12, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1137. **Sergeant Joseph Vanek** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Vanek was injured in the November 12, 2007 Attack. SGT Vanek died on November 12, 2007, as a result of injuries sustained during the attack.

1138. SGT Vanek was a U.S. national at the time of the attack and his death.

1139. Plaintiff Janice Vanek is the mother of SGT Vanek and a U.S. national.

1140. Plaintiff Anne St. Martin is the sister of SGT Vanek and a U.S. national.

1141. As a result of the November 12, 2007 Attack and SGT Vanek's injuries and death, each member of the Vanek family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Vanek's society, companionship, and counsel.

1142. As a result of the November 12, 2007 Attack, SGT Vanek was injured in his person and/or property. The Plaintiff members of the Vanek family are the survivors and/or heirs of SGT Vanek and are entitled to recover for the damages SGT Vanek sustained.

**The November 26, 2007 IED Attack in Wasit (Ali Safi)**

1143. On November 26, 2007, Jaysh al-Mahdi committed an IED attack in A'zizyiah, Wasit Governorate, Iraq (the "November 26, 2007 Attack"). The attack was planned and authorized by Hezbollah.

1144. The November 26, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1145. **Ali Safi** was in Iraq as an Iraqi citizen working for a government contractor as an interpreter at the time of the attack. The November 26, 2007 Attack severely wounded Ali Safi, who suffered from the amputation of both legs.

1146. Plaintiff Ali Safi is a U.S. citizen.

1147. As a result of the November 26, 2007 Attack and his injuries, Ali Safi has experienced severe physical and emotional pain and suffering.

**The December 9, 2007 EFP Attack in Wasit (Shaw Family)**

1148. On December 9, 2007, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Wasit Governorate, Iraq (the "December 9, 2007 Attack"). The attack was planned and authorized by Hezbollah.

1149. The December 9, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1150. **Micah Shaw** was in Iraq as a as a civilian contractor with Tetra Tech at the time of the attack. Micah Shaw was injured in the December 9, 2007 Attack. Micah Shaw died on December 9, 2007, as a result of injuries sustained during the attack.

1151. Micah Shaw was a U.S. national at the time of the attack and his death.

1152. Plaintiff Elena Shaw is the widow of Micah Shaw and a U.S. national. She brings claims in solely in her representative capacity on behalf of Micah Shaw's estate.

1153. As a result of the December 9, 2007 Attack and Micah Shaw's injuries and death, each member of the Shaw family has experienced severe mental anguish, emotional pain and suffering, and the loss of Micah Shaw's society, companionship, and counsel.

1154. As a result of the December 9, 2007 Attack, Micah Shaw was injured in his person and/or property. The Plaintiff members of the Shaw family are the survivors and/or heirs of Micah Shaw and are entitled to recover for the damages Micah Shaw sustained.

**The January 3, 2008 Small Arms Attack in Diyala (Olmsted Family)**

1155. On January 3, 2008, Jaysh al-Mahdi committed a small arms attack in Sadiyah, Diyala Governorate, Iraq (the "January 3, 2008 Small Arms Attack"). The attack was planned and authorized by Hezbollah.

1156. The January 3, 2008 Small Arms Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1157. **Major Andrew Olmsted** served in Iraq as a member of the U.S. Army at the time of the attack. MAJ Olmsted was injured in the January 3, 2008 Small Arms Attack. MAJ Olmsted died on January 3, 2008, as a result of injuries sustained during the attack.

1158. MAJ Olmsted was a U.S. national at the time of the attack and his death.

1159. Plaintiff Catherine Olmsted is the sister of MAJ Olmsted and a U.S. national.

1160. As a result of the January 3, 2008 Small Arms Attack and MAJ Olmsted's injuries and death, each member of the Olmsted family has experienced severe mental anguish,

emotional pain and suffering, and the loss of MAJ Olmsted's society, companionship, and counsel.

1161. As a result of the January 3, 2008 Small Arms Attack, MAJ Olmsted was injured in his person and/or property. The Plaintiff members of the Olmsted family are the survivors and/or heirs of MAJ Olmsted and are entitled to recover for the damages MAJ Olmsted sustained.

**The January 31, 2008 Rocket Propelled Grenade Attack in Baghdad (Straughter Family)**

1162. On January 31, 2008, Jaysh al-Mahdi committed a rocket propelled grenade attack in Baghdad Governorate, Iraq (the "January 31, 2008 Attack"). The attack was planned and authorized by Hezbollah.

1163. The January 31, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1164. **Sergeant Matthew Straughter** served in Iraq as a member of the U.S. Army National Guard at the time of the attack. SGT Straughter was injured in the January 31, 2008 Attack. SGT Straughter died on January 31, 2008, as a result of injuries sustained during the attack.

1165. SGT Straughter was a U.S. national at the time of the attack and his death.

1166. Plaintiff Andrew Straughter is the brother of SGT Straughter and a U.S. national.

1167. As a result of the January 31, 2008 Attack and SGT Straughter's injuries and death, each member of the Straughter family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Straughter's society, companionship, and counsel.

1168. As a result of the January 31, 2008 Attack, SGT Straughter was injured in his person and/or property. The Plaintiff members of the Straughter family are the survivors and/or heirs of SGT Straughter and are entitled to recover for the damages SGT Straughter sustained.

**The February 19, 2008 EFP Attack in Baghdad (Bitton Family)**

1169. On February 19, 2008, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Baghdad Governorate, Iraq (the "February 19, 2008 Attack"). The attack was planned and authorized by Hezbollah.

1170. The February 19, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1171. **Corporal Albert Bitton** served in Iraq as a member of the U.S. Army at the time of the attack. CPL Bitton was injured in the February 19, 2008 Attack. CPL Bitton died on February 20, 2008, as a result of injuries sustained during the attack.

1172. CPL Bitton was a U.S. national at the time of the attack and his death.

1173. Plaintiff Silvia Bitton is the mother of CPL Bitton and a U.S. national.

1174. Plaintiff Elizabeth Bitton is the sister of CPL Bitton and a U.S. national.

1175. Plaintiff Jacqueline Bitton is the sister of CPL Bitton and a U.S. national.

1176. As a result of the February 19, 2008 Attack and CPL Bitton's injuries and death, each member of the Bitton family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Bitton's society, companionship, and counsel.

1177. As a result of the February 19, 2008 Attack, CPL Bitton was injured in his person and/or property. The Plaintiff members of the Bitton family are the survivors and/or heirs of CPL Bitton and are entitled to recover for the damages CPL Bitton sustained.

**The March 17, 2008 EFP Attack in Baghdad (Levi Family)**

1178. On March 17, 2008, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Baghdad Governorate, Iraq (the "March 17, 2008 Attack"). The attack was planned and authorized by Hezbollah.

1179. The March 17, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1180. **Corporal Christopher Levi** served in Iraq as a member of the U.S. Army at the time of the attack. The March 17, 2008 Attack severely wounded CPL Levi, who suffered from the amputation of both legs, a fracture to the right ulna, loss of the second metacarpal in the right hand, persistent numbness in the left arm, and a TBI. Due to his injuries, CPL Levi received a 100% disability rating form the VA.

1181. CPL Levi was a U.S. national at the time of the attack and remains one today.

1182. Plaintiff Debra Levi is the mother of CPL Levi and a U.S. national.

1183. Plaintiff Emily Levi is the sister of CPL Levi and a U.S. national.

1184. Plaintiff Kimberley Vesey is the sister of CPL Levi and a U.S. national.

1185. As a result of the March 17, 2008 Attack and CPL Levi's injuries, Plaintiff members of the Levi family have experienced severe physical and emotional pain and suffering.

**The March 29, 2008 Complex Attack in Baghdad (Bennett and Miller Families)**

1186. On March 29, 2008, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed a complex attack involving an EFP and small arms in Baghdad Governorate, Iraq (the "March 29, 2008 Attack"). The attack was planned and authorized by Hezbollah.

1187. The March 29, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1188. **Specialist Durrell Bennett** served in Iraq as a member of the U.S. Army. SPC Bennett was injured in the March 29, 2008 Attack. SPC Bennett died on March 29, 2008, as a result of injuries sustained during the attack.

1189. SPC Bennett was a U.S. national at the time of the attack and his death.

1190. Plaintiff Dempsey Bennett is the father of SPC Bennett and a U.S. national. He brings claims in solely in his representative capacity on behalf of SPC Bennett's estate.

1191. As a result of the March 29, 2008 Attack and SPC Bennett's injuries and death, the Plaintiff members of the Bennett family have experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Bennett's society, companionship, and counsel.

1192. As a result of the March 29, 2008 Attack, SPC Bennett was injured in his person and/or property. The Plaintiff members of the Bennett family are the survivors and/or heirs of SPC Bennett and are entitled to recover for the damages SPC Bennett sustained.

1193. **Private First Class Patrick Miller** served in Iraq as a member of the U.S. Army. PFC Miller was injured in the March 29, 2008 Attack. PFC Miller died on March 29, 2008, as a result of injuries sustained during the attack.

1194. PFC Miller was a U.S. national at the time of the attack and his death.

1195. Plaintiff Kimberly Miller is the mother of PFC Miller and a U.S. national. She brings claims solely in her representative capacity on behalf of PFC Miller's estate.

1196. As a result of the March 29, 2008 Attack and PFC Miller's injuries and death, the Plaintiff members of the Miller family have experienced severe mental anguish as well as emotional pain and suffering, and the loss of PFC Miller's society, companionship, and counsel.

1197. As a result of the March 29, 2008 Attack, PFC Miller was injured in his person and/or property. The Plaintiff members of the Miller family are the survivors and/or heirs of PFC Miller and are entitled to recover for the damages PFC Miller sustained.

**The April 6, 2008 Indirect Fire Attack in Baghdad (Wolfer Family)**

1198. On April 6, 2008, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an indirect fire attack in Baghdad Governorate, Iraq (the "April 6, 2008 Attack"). The April 6, 2008 Attack was planned and authorized by Hezbollah.

1199. The April 6, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1200. **Major Stuart Wolfer** served in Iraq as a member of the U.S. Army at the time of the attack. MAJ Wolfer was injured in the April 6, 2008 Attack. MAJ Wolfer died on April 6, 2008, as a result of injuries sustained during the attack.

1201. MAJ Wolfer was a U.S. national at the time of the attack and his death.

1202. Plaintiff Esther Wolfer is the mother of MAJ Wolfer and a U.S. national.

1203. Plaintiff Leonard Wolfer is the father of MAJ Wolfer and a U.S. national.

1204. As a result of the April 6, 2008 Attack and MAJ Wolfer's injuries and death, each member of the Wolfer family has experienced severe mental anguish, emotional pain and suffering, and the loss of MAJ Wolfer's society, companionship, and counsel.

1205. As a result of the April 6, 2008 Attack, MAJ Wolfer was injured in his person and/or property. The Plaintiff members of the Wolfer family are the survivors and/or heirs of MAJ Wolfer and are entitled to recover for the damages MAJ Wolfer sustained.

**The April 7, 2008 EFP Attack in Baghdad (Smith Family)**

1206. On April 7, 2008, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Sadr City in Baghdad Governorate, Iraq (the "April 7, 2008 EFP Attack"). The attack was planned and authorized by Hezbollah.

1207. The April 7, 2008 EFP Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1208. **Sergeant Timothy Smith** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Smith was injured in the April 7, 2008 EFP Attack. SGT Smith died on April 7, 2008, as a result of injuries sustained during the attack.

1209. SGT Smith was a U.S. national at the time of the attack and his death.

1210. Plaintiff Jacqueline Smith is the sister of SGT Smith and a U.S. national.

1211. Plaintiff Thomas Smith is the brother of SGT Smith and a U.S. national.

1212. As a result of the April 7, 2008 EFP Attack and SGT Smith's injuries and death, each member of the Smith family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Smith's society, companionship, and counsel.

1213. As a result of the April 7, 2008 EFP Attack, SGT Smith was injured in his person and/or property. The Plaintiff members of the Smith family are the survivors and/or heirs of SGT Smith and are entitled to recover for the damages SGT Smith sustained.

**The April 7, 2008 Complex Attack in Baghdad (Vaughn Family)**

1214. On April 7, 2008, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed a complex attack involving RPGs and EFPs in Baghdad Governorate, Iraq (the "April 7, 2008 Complex Attack"). The attack was planned and authorized by Hezbollah.

1215. The April 7, 2008 Complex Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1216. **Sergeant Richard Vaughn** served in Iraq as a member of the U.S. Army. SGT Vaughn was injured in the April 7, 2008 Complex Attack. SGT Vaughn died on April 7, 2008, as a result of injuries sustained during the attack.

1217. SGT Vaughn was a U.S. national at the time of the attack and his death.

1218. Plaintiff Rachelle Idol is the widow of SGT Vaughn and a U.S. national. She brings claims solely in her representative capacity on behalf of SGT Vaughn's estate.

1219. As a result of the April 7, 2008 Complex Attack and SGT Vaughn's injuries and death, the Plaintiff members of the Vaughn family have experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Vaughn's society, companionship, and counsel.

1220. As a result of the April 7, 2008 Complex Attack, SGT Vaughn was injured in his person and/or property. The Plaintiff members of the Vaughn family are the survivors and/or heirs of SGT Vaughn and are entitled to recover for the damages SGT Vaughn sustained.

**The April 28, 2008 Indirect Fire Attack in Baghdad (Marion Family)**

1221. On April 28, 2008, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an indirect fire attack near Sadr city in Baghdad Governorate, Iraq (the "April 28, 2008 Indirect Fire Attack"). The attack was planned and authorized by Hezbollah.

1222. The April 28, 2008 Indirect Fire Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1223. **Private First Class Adam Marion** served in Iraq as a member of the U.S. Army National Guard at the time of the attack. PFC Marion was injured in the April 28, 2008 Indirect Fire Attack. PFC Marion died on April 28, 2008, as a result of injuries sustained during the attack.

1224. PFC Marion was a U.S. national at the time of the attack and his death.

1225. Plaintiff Adrian McCann is the sister of PFC Marion and a U.S. national.

1226. As a result of the April 28, 2008 Indirect Fire Attack and PFC Marion's injuries and death, each member of the Marion family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Marion's society, companionship, and counsel.

1227. As a result of the April 28, 2008 Indirect Fire Attack, PFC Marion was injured in his person and/or property. The Plaintiff members of the Marion family are the survivors and/or heirs of PFC Marion and are entitled to recover for the damages PFC Marion sustained.

**The April 28, 2008 Complex Attack in Baghdad (Montalbano Family)**

1228. On April 28, 2008, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed a complex attack in Sadr City, Baghdad Governorate, Iraq

(the "April 28, 2008 Complex Attack"). The April 28, 2008 Attack was planned and authorized by Hezbollah.

1229. The April 28, 2008 Complex Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1230. **Private First Class Samuel Montalbano** served in Iraq as a member of the U.S. Army at the time of the attack. The April 28, 2008 Complex Attack severely wounded PFC Montalbano, who suffered from a herniated disk, hearing loss, and PTSD.

1231. Plaintiff Deborah Wilson is the mother of PFC Montalbano and a U.S. national.

1232. As a result of the April 28, 2008 Complex Attack and PFC Montalbano's injuries, Plaintiff members of the Montalbano family have experienced severe physical and emotional pain and suffering.

**The May 1, 2008 IED Attack in Baghdad (Nichols Family)**

1233. On May 1, 2008, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "May 1, 2008 Attack"). The attack was planned and authorized by Hezbollah.

1234. The May 1, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1235. **Specialist Jeffrey Nichols** served in Iraq as a member of the U.S. Army at the time of the attack. SPC Nichols was injured in the May 1, 2008 Attack. SPC Nichols died on May 1, 2008, as a result of injuries sustained during the attack.

1236. SPC Nichols was a U.S. national at the time of the attack and his death.

1237. Plaintiff Jessica Nichols is the sister of SPC Nichols and a U.S. national.

1238. As a result of the May 1, 2008 Attack and SPC Nichols' injuries and death, each member of the Nichols family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Nichols' society, companionship, and counsel.

1239. As a result of the May 1, 2008 Attack, SPC Nichols was injured in his person and/or property. The Plaintiff members of the Nichols family are the survivors and/or heirs of SPC Nichols and are entitled to recover for the damages SPC Nichols sustained.

**The May 11, 2008 IED Attack in Baghdad (Ellis Family)**

1240. On May 11, 2008, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "May 11, 2008 Attack"). The attack was planned and authorized by Hezbollah.

1241. The May 11, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1242. **Corporal Jessica Ellis** served in Iraq as a member of the U.S. Army at the time of the attack. CPL Ellis was injured in the May 11, 2008 Attack. CPL Ellis died on May 11, 2008, as a result of injuries sustained during the attack.

1243. CPL Ellis was a U.S. national at the time of the attack and her death.

1244. Plaintiff Steven Ellis is the father of CPL Ellis and a U.S. national.

1245. Plaintiff Cameron Ellis is the brother of CPL Ellis and a U.S. national.

1246. As a result of the May 11, 2008 Attack and CPL Ellis' injuries and death, each member of the Ellis family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Ellis' society, companionship, and counsel.

1247. As a result of the May 11, 2008 Attack, CPL Ellis was injured in her person and/or property. The Plaintiff members of the Ellis family are the survivors and/or heirs of CPL Ellis and are entitled to recover for the damages CPL Ellis sustained.

**The June 12, 2008 EFP Attack in Baghdad (Aragon Family)**

1248. On June 12, 2008, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Baghdad Governorate, Iraq (the "June 12, 2008 Attack"). The attack was planned and authorized by Hezbollah.

1249. The June 12, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1250. **Sergeant John Aragon** served in Iraq as a member of the U.S. Army. SGT Aragon was injured in the June 12, 2008 Attack. SGT Aragon died on June 12, 2008, as a result of injuries sustained during the attack.

1251. SGT Aragon was a U.S. national at the time of the attack and his death.

1252. Plaintiff John Aragon Sr. is the father of SGT Aragon and a U.S. national. He brings claims solely in his representative capacity on behalf of SGT Aragon's estate.

1253. As a result of the June 12, 2008 Attack and SGT Aragon's injuries and death, Plaintiff John Aragon Sr. has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Aragon's society, companionship, and counsel.

1254. As a result of the June 12, 2008 Attack, SGT Aragon was injured in his person and/or property. Plaintiff John Aragon Sr. is a survivor and/or heir of SGT Aragon and is entitled to recover for the damages SGT Aragon sustained.

**The June 24, 2008 Bomb Attack in Baghdad (Kelley Family)**

1255. On June 24, 2008, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed a bomb attack in Sadr City, Baghdad Governorate, Iraq (the "June 24, 2008 Attack"). The attack was planned and authorized by Hezbollah.

1256. The June 24, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1257. **Major Dwayne Kelley** served in Iraq as a member of the U.S. Army at the time of the attack. MAJ Kelley was injured in the June 24, 2008 Attack. MAJ Kelley died on June 24, 2008, as a result of injuries sustained during the attack.

1258. MAJ Kelley was a U.S. national at the time of the attack and his death.

1259. Plaintiff Michael Kelley is the brother of MAJ Kelley and a U.S. national.

1260. As a result of the June 24, 2008 Attack and MAJ Kelley's injuries and death, each member of the Kelley family has experienced severe mental anguish, emotional pain and suffering, and the loss of MAJ Kelley's society, companionship, and counsel.

1261. As a result of the June 24, 2008 Attack, MAJ Kelley was injured in his person and/or property. The Plaintiff members of the Kelley family are the survivors and/or heirs of MAJ Kelley and are entitled to recover for the damages MAJ Kelley sustained.

**The August 25, 2008 Sniper Attack in Baghdad (Fitzmorris Family)**

1262. On August 25, 2008, Jaysh al-Mahdi committed a sniper attack in Baghdad Governorate, Iraq (the "August 25, 2008 Attack"). The attack was planned and authorized by Hezbollah.

1263. The August 25, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1264. **Specialist Steven Fitzmorris** served in Iraq as a member of the U.S. Army at the time of the attack. SPC Fitzmorris was injured in the August 25, 2008 Attack. SPC Fitzmorris died on August 25, 2008, as a result of injuries sustained during the attack.

1265. SPC Fitzmorris was a U.S. national at the time of the attack and his death.

1266. Plaintiff Rosemarie Fitzmorris-Currier is the mother of SPC Fitzmorris and a U.S. national.

1267. As a result of the August 25, 2008 Attack and SPC Fitzmorris' injuries and death, each member of the Fitzmorris family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Fitzmorris' society, companionship, and counsel.

1268. As a result of the August 25, 2008 Attack, SPC Fitzmorris was injured in his person and/or property. The Plaintiff members of the Fitzmorris family are the survivors and/or heirs of SPC Fitzmorris and are entitled to recover for the damages SPC Fitzmorris sustained.

**The September 30, 2008 Small Arms Attack in Baghdad (Bartkiewicz Family)**

1269. On September 30, 2008, Jaysh al-Mahdi committed a small arms attack in Baghdad Governorate, Iraq (the "September 30, 2008 Attack"). The attack was planned and authorized by Hezbollah.

1270. The September 30, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1271. **Specialist Christopher Bartkiewicz** served in Iraq as a member of the U.S. Army at the time of the attack. SPC Bartkiewicz was injured in the September 30, 2008 Attack. SPC Bartkiewicz died on September 30, 2008, as a result of injuries sustained during the attack.

1272. SPC Bartkiewicz was a U.S. national at the time of the attack and his death.

1273. Plaintiff Emily Stevenson is the widow of SPC Bartkiewicz and a U.S. national.

1274. As a result of the September 30, 2008 Attack and SPC Bartkiewicz's injuries and death, each member of the Bartkiewicz family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Bartkiewicz's society, companionship, and counsel.

1275. As a result of the September 30, 2008 Attack, SPC Bartkiewicz was injured in his person and/or property. The Plaintiff members of the Bartkiewicz family are the survivors and/or heirs of SPC Bartkiewicz and are entitled to recover for the damages SPC Bartkiewicz sustained.

**The December 31, 2008 Indirect Fire Attack in Baghdad (Tollefson Family)**

1276. On December 31, 2008, Jaysh al-Mahdi committed an indirect fire attack in Baghdad Governorate, Iraq (the "December 31, 2008 Attack"). The attack was planned and authorized by Hezbollah.

1277. The December 31, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1278. **Private First Class Benjamin Tollefson** served in Iraq as a member of the U.S. Army at the time of the attack. PFC Tollefson was injured in the December 31, 2008 Attack. PFC Tollefson died on December 31, 2008, as a result of injuries sustained during the attack.

1279. PFC Tollefson was a U.S. national at the time of the attack and his death.

1280. Plaintiff Mary Tollefson is the mother of PFC Tollefson and a U.S. national.

1281. Plaintiff Jamie Tollefson is the sister of PFC Tollefson and a U.S. national.

1282. Plaintiff Jeffrey Tollefson is the brother of PFC Tollefson and a U.S. national.

1283. As a result of the December 31, 2008 Attack and PFC Tollefson's injuries and death, each member of the Tollefson family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Tollefson's society, companionship, and counsel.

1284. As a result of the December 31, 2008 Attack, PFC Tollefson was injured in his person and/or property. The Plaintiff members of the Tollefson family are the survivors and/or heirs of PFC Tollefson and are entitled to recover for the damages PFC Tollefson sustained.

**The January 18, 2009 EFP Attack in Baghdad (Andrade Family)**

1285. On January 18, 2009, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Baghdad Governorate, Iraq (the "January 18, 2009 Attack"). The attack was planned and authorized by Hezbollah.

1286. The January 18, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1287. **Staff Sergeant Roberto Andrade Jr.** served in Iraq as a member of the U.S. Army at the time of the attack. SSG Andrade was injured in the January 18, 2009 Attack. SSG Andrade died on January 18, 2009, as a result of injuries sustained during the attack.

1288. SSG Andrade was a U.S. national at the time of the attack and his death.

1289. Plaintiff Angelica Andrade is the sister of SSG Andrade and a U.S. national.

1290. As a result of the January 18, 2009 Attack and SSG Andrade's injuries and death, each member of the Andrade family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Andrade's society, companionship, and counsel.

1291. As a result of the January 18, 2009 Attack, SSG Andrade was injured in his person and/or property. The Plaintiff members of the Andrade family are the survivors and/or heirs of SSG Andrade and are entitled to recover for the damages SSG Andrade sustained.

**The April 13, 2009 EFP Attack in Baghdad (Moncada Family)**

1292. On April 13, 2009, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Baghdad Governorate, Iraq (the "April 13, 2009 Attack"). The attack was planned and authorized by Hezbollah.

1293. The April 13, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1294. **Sergeant Raul Moncada** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Moncada was injured in the April 13, 2009 Attack. SGT Moncada died on April 13, 2009, as a result of injuries sustained during the attack.

1295. SGT Moncada was a U.S. national at the time of the attack and his death.

1296. Plaintiff Priscila Moncada is the daughter of SGT Moncada and a U.S. national.

1297. Plaintiff Obdulia Moncada is the mother of SGT Moncada and a U.S. national.

1298. Plaintiff Alexandra Aguilar is the sister of SGT Moncada and a U.S. national.

1299. Plaintiff Miriam Lopez is the sister of SGT Moncada and a U.S. national.

1300. Plaintiff Daniela Moncada is the sister of SGT Moncada and a U.S. national.

1301. Plaintiff Matthew Moncada is the brother of SGT Moncada and a U.S. national.

1302. As a result of the April 13, 2009 Attack and SGT Moncada's injuries and death, each member of the Moncada family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Moncada's society, companionship, and counsel.

1303. As a result of the April 13, 2009 Attack, SGT Moncada was injured in his person and/or property. The Plaintiff members of the Moncada family are the survivors and/or heirs of SGT Moncada and are entitled to recover for the damages SGT Moncada sustained.

**The May 17, 2009 EFP Attack in Baghdad (Canine Family)**

1304. On May 17, 2009, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Baghdad Governorate, Iraq (the "May 17, 2009 Attack"). The attack was planned and authorized by Hezbollah.

1305. The May 17, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1306. **Staff Sergeant Robert Canine** served in Iraq as a member of the U.S. Army at the time of the attack. The May 17, 2009 Attack severely wounded SSG Canine who suffered from severe injuries to both legs necessitating amputation of his right leg below the knee and subsequent amputation of the left leg below the knee due to infections. He also suffered from significant blood loss requiring transfusions, TBI, and PTSD.

1307. Plaintiff SSG Canine was a U.S. national at the time of the attack and remains one today.

1308. As a result of the May 17, 2009 Attack and his injuries, SSG Canine has experienced severe physical and emotional pain and suffering.

1309. Plaintiff Janet Jones is the mother of SSG Canine and a U.S. national.

1310. As a result of the May 17, 2009 Attack and SSG Canine's injuries, Plaintiff members of the Canine family have experienced severe physical and emotional pain and suffering.

**The May 27, 2009 IED Attack in Baghdad (Edmundson Family)**

1311. On May 27, 2009, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "May 27, 2009 Attack"). The attack was planned and authorized by Hezbollah.

1312. The May 27, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1313. **Specialist Chad Edmundson** served in Iraq as a member of the U.S. Army National Guard at the time of the attack. SPC Edmundson was injured in the May 27, 2009 Attack. SPC Edmundson died on May 27, 2009, as a result of injuries sustained during the attack.

1314. SPC Edmundson was a U.S. national at the time of the attack and his death.

1315. Plaintiff Karen James is the mother of SPC Edmundson and a U.S. national.

1316. As a result of the May 27, 2009 Attack and SPC Edmundson's injuries and death, each member of the Edmundson family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Edmundson's society, companionship, and counsel.

1317. As a result of the May 27, 2009 Attack, SPC Edmundson was injured in his person and/or property. The Plaintiff members of the Edmundson family are the survivors and/or heirs of SPC Edmundson and are entitled to recover for the damages SPC Edmundson sustained.

**The June 29, 2009 IED Attack in Baghdad (Adams Family)**

1318. On June 29, 2009, Jaysh al-Mahdi committed an IED attack in Baghdad Governorate, Iraq (the "June 29, 2009 Attack"). The attack was planned and authorized by Hezbollah.

1319. The June 29, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1320. **Sergeant Roger Adams Jr.** served in Iraq as a member of the U.S. Army National Guard at the time of the attack. SGT Adams was injured in the June 29, 2009 Attack. SGT Adams died on June 29, 2009, as a result of injuries sustained during the attack.

1321. SGT Adams was a U.S. national at the time of the attack and his death.

1322. Plaintiff Cheryl Larson is the sister of SGT Adams and a U.S. national.

1323. Plaintiff Brandy Loss is the sister of SGT Adams and a U.S. national.

1324. As a result of the June 29, 2009 Attack and SGT Adams' injuries and death, each member of the Adams family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Adams' society, companionship, and counsel.

1325. As a result of the June 29, 2009 Attack, SGT Adams was injured in his person and/or property. The Plaintiff members of the Adams family are the survivors and/or heirs of SGT Adams and are entitled to recover for the damages SGT Adams sustained.

**The July 23, 2009 Grenade Attack in Kirkuk (Polk Family)**

1326. On July 23, 2009, Jaysh al-Mahdi committed a grenade attack in Kirkuk Governorate, Iraq (the "July 23, 2009 Attack"). The attack was planned and authorized by Hezbollah.

1327. The July 23, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1328. **Sergeant First Class Johnny Polk** served in Iraq as a member of the U.S. Army at the time of the attack. SFC Polk was injured in the July 23, 2009 Attack. SFC Polk died on July 25, 2009, as a result of injuries sustained during the attack.

1329. SFC Polk was a U.S. national at the time of the attack and his death.

1330. Plaintiff Wanonia Polk is the widow of SFC Polk and a U.S. national.

1331. Plaintiff Mary Polk is the sister of SFC Polk and a U.S. national.

1332. Plaintiff Walter Polk is the brother of SFC Polk and a U.S. national.

1333. Plaintiff Alvin Jones III is the stepson of SFC Polk and a U.S. national. Mr. Jones lived in the same household as SFC Polk for a substantial period of time and considered SFC Polk the functional equivalent of a biological father.

1334. Plaintiff Deandra Jones is the stepson of SFC Polk and a U.S. national. Mr. Jones lived in the same household as SFC Polk for a substantial period of time and considered SFC Polk the functional equivalent of a biological father.

1335. Plaintiff Xavier Jones is the stepson of SFC Polk and a U.S. national. Mr. Jones lived in the same household as SFC Polk for a substantial period of time and considered SFC Polk the functional equivalent of a biological father.

1336. As a result of the July 23, 2009 Attack and SFC Polk's injuries and death, each member of the Polk family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Polk's society, companionship, and counsel.

1337. As a result of the July 23, 2009 Attack, SFC Polk was injured in his person and/or property. The Plaintiff members of the Polk family are the survivors and/or heirs of SFC Polk and are entitled to recover for the damages SFC Polk sustained.

**The October 12, 2009 EFP Attack in Maysan (Stephen Evans)**

1338. On October 12, 2009, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, committed an EFP attack in Al Amara, Maysan Governorate, Iraq (the "October 12, 2009 Attack"). The attack was planned and authorized by Hezbollah.

1339. The October 12, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1340. **Sergeant Stephen Evans** served in Iraq as a member of the U.S. Army at the time of the attack. The October 12, 2009 Attack severely wounded SGT Evans, who suffered from burns to the face and body, the left tibia being blown out, the loss of one testicle, loss of tissue in the thigh, and a TBI.

1341. Plaintiff SGT Evans was a U.S. national at the time of the attack and remains one today.

1342. As a result of the October 12, 2009 Attack and his injuries, SGT Evans has experienced severe physical and emotional pain and suffering.

**The November 22, 2009 Small Arms Attack in Wasit (Williams Family)**

1343. On November 22, 2009, Jaysh al-Mahdi committed a small arms attack in the Numaniyah, Wasit Governorate, Iraq (the "November 22, 2009 Attack"). The attack was planned and authorized by Hezbollah.

1344. The November 22, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1345. **Staff Sergeant Briand Williams** served in Iraq as a member of the U.S. Army at the time of the attack. SSG Williams was injured in the November 22, 2009 Attack. SSG Williams died on November 22, 2009, as a result of injuries sustained during the attack.

1346. SSG Williams was a U.S. national at the time of the attack and his death.

1347. Plaintiff Atyinia Williams is the widow of SSG Williams and a U.S. national.

1348. Plaintiff C.W., by and through his next friend Atyinia Williams, is the minor son of SSG Williams. He is a U.S. national.

1349. As a result of the November 22, 2009 Attack and SSG Williams' injuries and death, each member of the Williams family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Williams' society, companionship, and counsel.

1350. As a result of the November 22, 2009 Attack, SSG Williams was injured in his person and/or property. The Plaintiff members of the Williams family are the survivors and/or heirs of SSG Williams and are entitled to recover for the damages SSG Williams sustained.

**The August 15, 2010 Grenade Attack in Diyala (Rhett Family)**

1351. On August 15, 2010, Jaysh al-Mahdi committed a grenade attack in Baqubah, Diyala Governorate, Iraq (the "August 15, 2010 Attack"). The attack was planned and authorized by Hezbollah.

1352. The August 15, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1353. **Sergeant Jamal Rhett** served in Iraq as a member of the U.S. Army at the time of the attack. SGT Rhett was injured in the August 15, 2010 Attack. SGT Rhett died on August 15, 2010, as a result of injuries sustained during the attack.

1354. SGT Rhett was a U.S. national at the time of the attack and his death.

1355. Plaintiff Thornell Rhett is the father of SGT Rhett and a U.S. national.

1356. Plaintiff Jason Rhett is the brother of SGT Rhett and a U.S. national.

1357. As a result of the August 15, 2010 Attack and SGT Rhett's injuries and death, each member of the Rhett family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Rhett's society, companionship, and counsel.

1358. As a result of the August 15, 2010 Attack, SGT Rhett was injured in his person and/or property. The Plaintiff members of the Rhett family are the survivors and/or heirs of SGT Rhett and are entitled to recover for the damages SGT Rhett sustained.

**The June 23, 2011 EFP Attack in Baghdad (Everhart and Mughal Families)**

1359. On June 23, 2011, Hezbollah (an FTO at all times) and Jaysh al-Mahdi, acting together in a Joint Cell, attacked a three-vehicle American civilian convoy with an EFP in the

Karadah District, Baghdad Governorate, Iraq (the "June 23, 2011 Attack"). The attack was planned and authorized by Hezbollah.

1360. The June 23, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1361. **Dr. Stephen Everhart** was in Iraq as a as a civilian working with AECOM International Development at the time of the attack. Stephen Everhart was injured in the June 23, 2011 Attack. Stephen Everhart died on June 23, 2011, as a result of injuries sustained during the attack.

1362. Stephen Everhart was a U.S. national at the time of the attack and his death.

1363. Plaintiff Hannah Everhart is the daughter of Stephen Everhart and a U.S. national.

1364. Plaintiff Hayden Everhart is the son of Stephen Everhart and a U.S. national.

1365. Plaintiff Lindsay Everhart is the daughter of Stephen Everhart and a U.S. national.

1366. As a result of the June 23, 2011 Attack and Stephen Everhart's injuries and death, each member of the Everhart family has experienced severe mental anguish, emotional pain and suffering, and the loss of Stephen Everhart's society, companionship, and counsel.

1367. As a result of the June 23, 2011 Attack, Stephen Everhart was injured in his person and/or property. The Plaintiff members of the Everhart family are the survivors and/or heirs of Stephen Everhart and are entitled to recover for the damages Stephen Everhart sustained.

1368. **Abdul Mughal** was in Iraq as a civilian working with AECOM International Development at the time of the attack. The June 23, 2011 Attack severely wounded Abdul

Mughal, who suffered from a broken hand, partial loss of hearing, a variety of shrapnel injuries, PTSD, and other injuries.

1369. Plaintiff Abdul Mughal was a U.S. national at the time of the attack and remains one today.

1370. As a result of the June 23, 2011 Attack and his injuries, Abdul Mughal has experienced severe physical and emotional pain and suffering.

1371. Plaintiff Sitorai Khasanzod is the wife of Abdul Mughal and a U.S. national.

1372. Plaintiff Angela Mughal is the daughter of Abdul Mughal and a U.S. national.

1373. Plaintiff Hamid Mughal is the son of Abdul Mughal and a U.S. national.

1374. Plaintiff Khalid Mughal is the son of Abdul Mughal and a U.S. national.

1375. Plaintiff M.M., by and through his next friend Abdul Mughal, is the minor son of Abdul Mughal. He is a U.S. national.

1376. Plaintiff Nabila Mughal is the daughter of Abdul Mughal and a U.S. national.

1377. As a result of the June 23, 2011 Attack and Abdul Mughal's injuries, Plaintiff members of the Mughal family have experienced severe physical and emotional pain and suffering.

**The July 10, 2011 Rocket Attack in Maysan (William Chinn and Niquette Family)**

1378. On July 10, 2011, Jaysh al Mahdi committed an indirect fire attack, with advanced rockets (including IRAMs), against American servicemembers in Amarah in Maysan Governorate, Iraq (the "July 10, 2011 Attack"). The attack was planned and authorized by Hezbollah.

1379. The July 10, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1380. **Staff Sergeant William Chinn** served in Iraq as a member of the U.S. Army at the time of the attack. The July 10, 2011 Attack severely wounded SSG Chinn, who suffered from severe injuries requiring extensive treatment. Due to his injuries, SSG Chinn received a 100% disability rating from the VA.

1381. Plaintiff SSG Chinn was a U.S. national at the time of the attack and remains one today.

1382. As a result of the July 10, 2011 Attack and his injuries, SSG Chinn has experienced severe physical and emotional pain and suffering.

1383. **First Lieutenant Sean Niquette** served in Iraq as a member of the U.S. Army at the time of the attack. The July 10, 2011 Attack severely wounded 1LT Niquette, who suffered from a TBI.

1384. Plaintiff 1LT Niquette was a U.S. national at the time of the attack and remains one today.

1385. As a result of the July 10, 2011 Attack and his injuries, 1LT Niquette has experienced severe physical and emotional pain and suffering.

1386. Plaintiff Lauren Niquette is the wife of 1LT Niquette and a U.S. national.

1387. Plaintiff Mary Niquette is the mother of 1LT Niquette and a U.S. national.

1388. Plaintiff Thomas Niquette is the father of 1LT Niquette and a U.S. national.

1389. As a result of the July 10, 2011 Attack and 1LT Niquette's injuries, Plaintiff members of the Niquette family have experienced severe physical and emotional pain and suffering.

**The October 12, 2011 Rocket Attack in Maysan (Alldridge Family)**

1390. On October 12, 2011, Jaysh al-Mahdi committed an indirect fire attack, with advanced rockets (including IRAMs), in Maysan Governorate, Iraq (the "October 12, 2011 Attack"). The attack was planned and authorized by Hezbollah.

1391. The October 12, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1392. **Private First Class Brian Alldridge** served in Iraq as a member of the U.S. Army at the time of the attack. The October 12, 2011 Attack severely wounded PFC Alldridge, who suffered from injuries from being hit with shrapnel and a TBI. Due to his injuries, PFC Alldridge received a 100% disability rating from the VA.

1393. Plaintiff PFC Alldridge was a U.S. national at the time of the attack and remains one today.

1394. As a result of the October 12, 2011 Attack and his injuries, PFC Alldridge has experienced severe physical and emotional pain and suffering.

1395. Plaintiff Dianna Alldridge is the mother of PFC Alldridge and a U.S. national.

1396. Plaintiff Ronald Alldridge is the father of PFC Alldridge and a U.S. national.

1397. Plaintiff Todd Alldridge is the brother of PFC Alldridge and a U.S. national.

1398. Plaintiff Andrew Major is the stepson of PFC Alldridge and a U.S. national. Mr. Major lived in the same household as PFC Alldridge for a substantial period of time and considered PFC Alldridge the functional equivalent of a biological father.

1399. As a result of the October 12, 2011 Attack and PFC Alldridge's injuries, Plaintiff members of the Alldridge family have experienced severe physical and emotional pain and suffering.

**The November 2, 2011 Grenade Attack in Al Qadisiyah (Marcus Sullen)**

1400. On November 2, 2011, Jaysh al-Mahdi committed a grenade attack, with an anti-tank hand grenade, in Al Qadisiyah Governorate, Iraq (the "November 2, 2011 Attack"). The attack was planned and authorized by Hezbollah.

1401. The November 2, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1402. **Private First Class Marcus Sullen** served in Iraq as a member of the U.S. Army at the time of the attack. The November 2, 2011 Attack severely wounded PFC Sullen, who suffered from a TBI, memory loss, depression, sleep apnea, anxiety, and PTSD.

1403. Plaintiff PFC Sullen was a U.S. national at the time of the attack and remains one today.

1404. As a result of the November 2, 2011 Attack and his injuries, PFC Sullen has experienced severe physical and emotional pain and suffering.

## CLAIMS FOR RELIEF

**COUNT ONE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d) (All Plaintiffs: Aiding-and-Abetting Liability, Attack Predicate)**

1405. Plaintiffs incorporate their allegations above.

1406. The terrorist attacks that killed or injured Plaintiffs or members of their families were acts of international terrorism committed by Jaysh al-Mahdi.

1407. The terrorist attacks committed by Jaysh al-Mahdi, which killed or injured Plaintiffs and their family members, were violent acts and acts dangerous to human life that violated the criminal laws of the United States or of any State, or would have violated those laws if they had been committed within the jurisdiction of the United States or of any State. In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of employees of the United States performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively.

1408. Jaysh al-Mahdi's terrorist attacks appear to have been intended (a) to intimidate or coerce the civilian populations of Iraq and the United States, (b) to influence the policy of the United States and Iraqi governments by intimidation and coercion, and (c) to affect the conduct of the United States and Iraqi governments by mass destruction, assassination, and kidnapping.

1409. Jaysh al-Mahdi's terrorist attacks occurred primarily outside the territorial jurisdiction of the United States.

1410. Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks committed by Jaysh al-Mahdi. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are the estate, survivors, or heirs of U.S. nationals who suffered such injuries; or both.

1411. Defendants aided and abetted and knowingly provided substantial assistance to Jaysh al-Mahdi – and aided and abetted and knowingly provided substantial assistance to Jaysh al-Mahdi's attacks on Plaintiffs – by engaging in corrupt transactions with MOH that were structured to finance Jaysh al-Mahdi's terrorist activities, including by providing cash, drugs, medical devices, travel, lodging, recreation, and services to agents of Jaysh al-Mahdi.

1412. The Jaysh al-Mahdi attacks that killed or injured Plaintiffs and their family members were committed, planned, and/or authorized by Hezbollah, which the United States has designated as a Foreign Terrorist Organization under 8 U.S.C. § 1189 since 1997.

1413. As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

**COUNT TWO: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)**
**(All Plaintiffs: Aiding-and-Abetting Liability, RICO predicate)**

1414. Plaintiffs incorporate their allegations above.

1415. In approximately April 2003, terrorists from Hezbollah conspired with Muqtada al-Sadr and others to create and develop a terrorist enterprise capable of carrying out sophisticated attacks on American targets in Iraq – an enterprise that became known as Jaysh al-Mahdi. Since its inception, Jaysh al-Mahdi has been a group of associated individuals that functions as a continuing unit, and Jaysh al-Mahdi's express purpose has always included violence against, and the expulsion of, Americans from Iraq. Jaysh al-Mahdi has engaged in, and its activities have affected, foreign commerce.

1416. From April 2003 until the present, Muqtada al-Sadr and other terrorists employed by or associated with Jaysh al-Mahdi and Hezbollah (including without limitation Dr. Mutalib, Dr. Ali al-Shemari, Dr. Adel, Mr. Zamili, Dr. Ali Bustan, Dr. Jaleel, Dr. Hani, Dr. Chasib, Imad Abu Sajjad, Sa'ad Abadi, Ali Hindi, Abu Hajir, Husayn Saleem Zair, Abu Mahdi al-Muhandis, Ali Mussa Daqduq, and the other members of Jaysh al-Mahdi and Hezbollah described in this Complaint) have maintained interests in and conducted the affairs of Jaysh al-Mahdi as an enterprise by engaging in a campaign to expel Americans from Iraq through crime and anti-American violence (the "Jaysh al-Mahdi-Hezbollah Campaign").

1417. Specifically, Muqtada al-Sadr and other terrorists employed by or associated with Jaysh al-Mahdi and Hezbollah conducted and participated in the conduct of Jaysh al-Mahdi's affairs (and conspired to do so) through a pattern of racketeering activity involving crimes that include murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law, and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of employees of the United States performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing places of public use, financing terrorism, and receiving training from a Foreign Terrorist Organization, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively. Muqtada al-Sadr and other terrorists associated with Jaysh al-Mahdi and Hezbollah also maintained interests in and control of Jaysh al-Mahdi (and conspired to do so) through this pattern of racketeering activity. Examples of these predicate crimes committed as part of the pattern of racketeering activity are set forth in the following eight paragraphs.

1418. All of the Jaysh al-Mahdi attacks that killed or injured Plaintiffs, detailed in Part VII *supra*, constituted killing (or attempted killing) of U.S. nationals abroad and the commission of acts of terrorism transcending national boundaries, in violation of 18 U.S.C. §§ 2332 and 2332b, respectively. If committed within the jurisdiction of the United States or any State, these attacks would also constitute murder (or attempted murder) and conspiracy to murder; and conspiracy to murder in a foreign country, in violation of state law and 18 U.S.C. § 956(a)(1), respectively.

1419. If committed within the jurisdiction of the United States, the Jaysh al-Mahdi attacks that killed or injured Plaintiffs employed by the United States or any agency of it, while such Plaintiffs were engaged in or on account of the performance of official duties, as detailed in Part VII *supra*, would constitute the killing or attempted killing of employees of the United States engaged in the performance of official duties, in violation of 18 U.S.C. § 1114.

1420. The Jaysh al-Mahdi kidnappings of Michael Chand, SSG Al-Taie, Steven Vincent, and in the Crescent Security Attack and Karbala Attack, detailed in Part VII *supra*, constitute kidnapping and hostage taking, in violation of 18 U.S.C. § 1203. If committed within the jurisdiction of the United States or any State, these kidnappings would also constitute kidnapping in violation of state law.

1421. If committed within the jurisdiction of the United States or any State, the Jaysh al-Mahdi attacks that killed or injured Plaintiffs through the use of EFPs, IEDs, rockets, or mortars, while such Plaintiffs were indoors or within a vehicle, as detailed in Part VII *supra*, would constitute arson, the destruction of U.S. property by fire or explosive, and damaging U.S. government property, in violation of state law, 18 U.S.C. §§ 844(f)(2)-(3), and 18 U.S.C. § 1361, respectively.

1422. If committed within the jurisdiction of the United States, the Jaysh al-Mahdi attacks that killed or injured Plaintiffs through the use of EFPs, IEDs, rockets, or mortars, as detailed in Part VII *supra*, would constitute use of weapons of mass destruction, in violation of 18 U.S.C. § 2332a.

1423. If committed within the jurisdiction of the United States, the Jaysh al-Mahdi attacks that killed or injured Plaintiffs through the use of EFPs, IEDs, rockets, or mortars, while such Plaintiffs were in or on a building, land, street, or other location accessible or open to members of the public, as detailed in Part VII *supra*, would constitute bombing places of public use, in violation of 18 U.S.C. § 2332f.

1424. The collection of funds by Jaysh al-Mahdi and its members or agents described above constituted financing terrorism in violation of 18 U.S.C. § 2339C(a)(1).

1425. The receipt of terrorist training from Hezbollah by agents or members of Jaysh al-Mahdi described above constituted receiving training from a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339D.

1426. The Jaysh al-Mahdi-Hezbollah Campaign was an act of international terrorism. It was a violent act that was dangerous to human life and that violated the criminal laws of the United States prohibiting the conduct or participation in the conduct of an enterprise's affairs through a pattern of racketeering activity, 18 U.S.C. § 1962(c); the maintenance of an interest in or control of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(b); and conspiring to do either of these acts, 18 U.S.C. § 1962(d); or would have violated these prohibitions had the Jaysh al-Mahdi-Hezbollah Campaign been conducted within the jurisdiction of the United States. The Jaysh al-Mahdi-Hezbollah Campaign appears to have been intended (a) to intimidate or coerce the civilian populations of Iraq and the United States, (b) to influence

the policy of the United States and Iraqi governments by intimidation and coercion, and (c) to affect the conduct of the United States and Iraqi governments by mass destruction, assassination, and kidnapping.

1427. The Jaysh al-Mahdi-Hezbollah Campaign occurred primarily outside the territorial jurisdiction of the United States.

1428. Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the Jaysh al-Mahdi-Hezbollah Campaign. Specifically, the attacks that injured Plaintiffs were part of the pattern of racketeering activity through which Muqtada al-Sadr and other terrorists associated with Jaysh al-Mahdi conducted the affairs of, participated in conducting the affairs of, and maintained an interest in or control of Jaysh al-Mahdi. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the Jaysh al-Mahdi-Hezbollah Campaign; are the estate, survivors, and/or heirs of U.S. nationals who suffered such injuries; or both.

1429. Defendants aided and abetted and knowingly provided substantial assistance to Jaysh al-Mahdi, its members, and the Jaysh al-Mahdi-Hezbollah Campaign. Defendants did so by engaging in corrupt transactions with MOH that were structured to finance the terrorist activities of Jaysh al-Mahdi, its members, and the Jaysh al-Mahdi-Hezbollah Campaign, including by providing cash, drugs, medical devices, training, travel, lodging, recreation, and services to agents of Jaysh al-Mahdi.

1430. The Jaysh al-Mahdi-Hezbollah Campaign was committed, planned, and/or authorized by Hezbollah, which the United States has designated as a Foreign Terrorist Organization under 8 U.S.C. § 1189 since 1997.

1431. As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

**COUNT THREE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)**
**(All Plaintiffs: Conspiracy Liability)**

1432. Plaintiffs incorporate their allegations above.

1433. The terrorist attacks that killed or injured Plaintiffs or members of their families were acts of international terrorism committed by Jaysh al-Mahdi.

1434. The terrorist attacks committed by Jaysh al-Mahdi, which killed or injured Plaintiffs and their family members, were violent acts and acts dangerous to human life that violated the criminal laws of the United States or of any State, or would have violated those laws if they had been committed within the jurisdiction of the United States or of any State. In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of employees of the United States performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively.

1435. Jaysh al-Mahdi's terrorist attacks appear to have been intended (a) to intimidate or coerce the civilian populations of Iraq and the United States, (b) to influence the policy of the United States and Iraqi governments by intimidation and coercion, and (c) to affect the conduct of the United States and Iraqi governments by mass destruction, assassination, and kidnapping.

1436. Jaysh al-Mahdi's terrorist attacks occurred primarily outside the territorial jurisdiction of the United States.

1437. Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks committed by Jaysh al-Mahdi. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are the estate, survivors, or heirs of U.S. nationals who suffered such injuries; or both.

1438. Defendants entered into a conspiracy with Jaysh al-Mahdi, who committed the attacks on Plaintiffs. The overall object of Defendants' conspiracy with Jaysh al-Mahdi was to maintain Jaysh al-Mahdi's control of MOH and the Iraqi healthcare system, and thereby to promote Jaysh al-Mahdi's system of bribery and corruption in violation of laws prohibiting foreign bribery (15 U.S.C. § 78dd-1), material support to foreign terrorist organizations (*i.e.*, Hizballah) (18 U.S.C. § 2339B), and disguising the nature of such material support (18 U.S.C. § 2339A), among other laws.

1439. Jaysh al-Mahdi's acts of international terrorism targeting U.S. citizens, including the attacks that killed and injured Plaintiffs, furthered the overall object of Defendants' conspiracy and were a foreseeable consequence of that conspiracy.

1440. The Jaysh al-Mahdi attacks that killed or injured Plaintiffs and their family members were committed, planned, and/or authorized by Hezbollah, which the United States has designated as a Foreign Terrorist Organization under 8 U.S.C. § 1189 since 1997.

1441. As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

**COUNT FOUR: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(All Non-Estate Plaintiffs: State Law)**

1442. Plaintiffs, other than those representing the estates of decedents, incorporate their allegations above.

1443. Defendants' corrupt transactions with MOH were a direct, actual, and proximate cause of severe emotional distress suffered by Plaintiffs.

1444. Defendant's corrupt transactions with MOH further provided Jaysh al-Mahdi with substantial aid, assistance, and/or encouragement to conduct attacks that were a direct, actual, and proximate cause of severe emotional distress suffered by Plaintiffs. The substantial aid, assistance, and/or encouragement Defendants provided to Jaysh al-Mahdi was a substantial factor in causing the severe emotional distress suffered by Plaintiffs as a result of those attacks.

1445. Defendants knew or should have known that their conduct would result in severe emotional distress to Plaintiffs. Defendants acted willfully, wantonly, recklessly, or with deliberate disregard with respect to the severe emotional distress inflicted on Plaintiffs.

1446. Defendants' and Jaysh al-Mahdi's conduct constituted extreme and outrageous conduct that is so extreme in degree as to go beyond all possible bounds of decency and be considered atrocious and utterly intolerable in a civilized community.

1447. Until 2017, Plaintiffs did not and could not have known with the exercise of reasonable diligence of Defendants' wrongdoing or that Defendants caused their severe emotional distress.

1448. Defendants are liable to Plaintiffs for the intentional infliction of severe emotional distress under the laws of the District of Columbia and any other applicable state law, including for punitive damages.

**COUNT FIVE: ASSAULT AND BATTERY**
**(All Physically Wounded Plaintiffs: State Law)**

1449. Plaintiffs who suffered physical injuries caused by Jaysh al-Mahdi in Iraq incorporate their allegations above.

1450. Defendants' corrupt transactions with MOH provided Jaysh al-Mahdi with substantial aid, assistance, and encouragement to conduct terrorist attacks against the United States and Plaintiffs who were intentionally wounded in Iraq as a direct result of those attacks. Defendants' conduct was a substantial factor in causing those attacks.

1451. As a direct, actual, and proximate result of the Defendants' conduct, Plaintiffs who were wounded in Iraq were intentionally placed in a severe apprehension of harmful, offensive bodily contact, injury, and assault, from Jaysh al-Mahdi terrorist attacks. These Plaintiffs suffered severe, offensive, harmful bodily contact, personal injury and battery. They also suffered extreme fear, terror, anxiety, emotional and psychological distress and trauma. These Plaintiffs are entitled to recover compensation for these injuries.

1452. Defendants knew or should have known that their conduct would result in Jaysh al-Mahdi conducting attacks against Americans in Iraq. Defendants acted willfully, wantonly, recklessly, or with deliberate disregard to the assaults and batteries committed by Jaysh al-Mahdi against Plaintiffs who were wounded in Iraq.

1453. Until 2017, Plaintiffs who were wounded in Iraq did not and could not have known with the exercise of reasonable diligence of Defendants' wrongdoing or that Defendants caused their injuries.

1454. Defendants are liable for assaults and batteries committed on the Plaintiffs who were wounded in Iraq under the laws of the District of Columbia and any other applicable state law, including for punitive damages

**<u>COUNT SIX</u>: WRONGFUL DEATH**
**(All Estate Plaintiffs: State Law)**

1455. Plaintiffs who represent the estates of U.S. citizens who were killed by Jaysh al-Mahdi in Iraq ("Decedents") incorporate their allegations above.

1456. Defendants owed a duty to Decedents and the beneficiaries of their estates to not willfully, wantonly, recklessly, with knowledge, or with deliberate disregard, engage in corrupt transactions that funded terrorists and terrorist attacks committed by Jaysh al-Mahdi targeted at the United States. Defendants' transactions with Jaysh al-Mahdi were wrongful.

1457. Jaysh al-Mahdi owed a duty to not conduct terrorist attacks against the United States or the Decedents. The attacks committed by Jaysh al-Mahdi against the Decedents were wrongful.

1458. Defendants' corrupt transactions with MOH breached Defendants' duties and were the direct, actual, and proximate cause of the deaths of Decedents.

1459. Defendants' corrupt transactions with MOH further provided Jaysh al-Mahdi with substantial aid, assistance, and encouragement to conduct terrorist attacks that killed the Decedents. The substantial aid, assistance, and/or encouragement Defendants provided to Jaysh al-Mahdi was a substantial factor in causing the attacks that killed the Decedents.

1460. Defendants knew or should have known that their conduct would result in the Decedents' deaths. Defendants acted willfully, wantonly, recklessly, or with deliberate disregard with respect to the Decedents' deaths.

1461. Surviving family members and heirs of the Decedents and/or the estates themselves are entitled to recover damages from Defendants for these wrongful deaths. As a direct and proximate result of the wrongful deaths of the Decedents, their families and heirs have been deprived of future aid, income, assistance, services, comfort, companionship, affection, and

financial support. As a further direct and proximate result of the wrongful deaths of the Decedents, their heirs and families suffer and will continue to suffer permanent emotional distress, severe trauma, and psychological injuries.

1462. As a direct and proximate result of Defendants' conduct and the Jaysh al-Mahdi attacks that Defendants aided, assisted, and encouraged, the Decedents suffered severe pain and suffering prior to their deaths. As a further direct and proximate result of the wrongful deaths, the Decedents' estates have suffered lost earnings and a loss of accumulations and accretions.

1463. Had the Decedents survived, Defendants would have been liable to the Decedents.

1464. Until 2017, the personal representatives of Decedents' estates did not and could not have known with the exercise of reasonable diligence of Defendants' wrongdoing or that Defendants caused the deaths of the Decedents.

1465. Defendants are liable for the wrongful deaths of the Decedents under the laws of the District of Columbia and any other applicable state law, including for punitive damages.

## COUNT SEVEN: SURVIVAL ACTION
## (All Estate Plaintiffs: State Law)

1466. Plaintiffs who represent Decedents' estates incorporate their allegations above, on behalf of Decedents' estates.

1467. Defendants' corrupt transactions with MOH provided Jaysh al-Mahdi with substantial aid, assistance, and encouragement to conduct terrorist attacks against the United States and the Decedents who were killed in Iraq as a direct result of those attacks. Defendants' conduct was a substantial factor in causing those attacks.

1468. As a direct, actual, and proximate result of the Defendants' conduct, the Decedents were intentionally placed in a severe apprehension of harmful, offensive bodily contact, injury, and assault, from Jaysh al-Mahdi terrorist attacks. They suffered severe,

offensive, harmful, bodily contact, personal injury and battery that resulted in their deaths. They also suffered extreme fear, pain and suffering, terror, anxiety, emotional and psychological distress and trauma prior to their deaths.

1469. As a result of their deaths, the Decedents suffered damages including loss of life's pleasures, companionship, consortium, family, career, earning and earnings capacity, and accretion to their estates.

1470. Defendants knew or should have known that their conduct would result in Jaysh al-Mahdi conducting attacks against Americans in Iraq. Defendants acted willfully, wantonly, recklessly, or with deliberate disregard to the assaults and batteries committed by Jaysh al-Mahdi against the Decedents. Similarly, Defendants knew or should have known that their conduct would result in severe emotional distress to the Decedents. Defendants acted willfully, wantonly, recklessly, or with deliberate disregard with respect to the severe emotional distress inflicted on the Decedents.

1471. Defendants' and Jaysh al-Mahdi's conduct constituted extreme and outrageous conduct that is so extreme in degree as to go beyond all possible bounds of decency and be considered atrocious and utterly intolerable in a civilized community.

1472. Decedents would have been entitled to recover compensation for their injuries prior to their deaths. Their estates are entitled to that compensation under the survival statute of the District of Columbia and any other applicable state law.

1473. Until 2017, the personal representatives of the Decedents' estates could not have known with the exercise of reasonable diligence of Defendants' wrongdoing or that Defendants caused the Decedents' deaths.

1474. Defendants are liable for the assaults and batteries and the intentional infliction of emotional distress committed on the Decedents under the laws of the District of Columbia and any other applicable state law, including for punitive damages.

## JURY DEMAND

1475. In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

1476. Plaintiffs request that the Court:

(a) Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333, and applicable state law;

(b) Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

(c) Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

(d) Award Plaintiffs prejudgment interest; and

(e) Award Plaintiffs any such further relief the Court deems just and proper.

Dated: September 25, 2026

/s/ Jacob R. Loshin

Ryan R. Sparacino (DC Bar No. 493700)
Jacob R. Loshin (DC Bar No. 989320)
Kathryn L. Rakoczy (DC Bar No. 994559)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com
jacob.loshin@sparacinopllc.com
kate.rakoczy@sparacinopllc.com

*Counsel for Plaintiffs*